**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UBER TECHNOLOGIES, INC., and UBER USA, LLC,

                   Plaintiffs,

    v.

CITY OF NEW YORK,

                   Defendant.

No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

## COMPLAINT

Plaintiffs UBER TECHNOLOGIES, INC. and UBER USA, LLC (collectively, "***Uber***"), by and through their attorneys, Dunn Isaacson Rhee LLP, allege for their complaint against Defendant CITY OF NEW YORK (the "***City***"), as follows.

## NATURE OF THE ACTION

1.      Local Law 52 of New York City of 2026 (the "***Challenged Law***")[1]—titled "A Local Law to amend the administrative code of the city of New York, in relation to the wrongful deactivation of high-volume for-hire vehicle drivers"—unconstitutionally interferes with Uber's contractual agreements and violates Uber's rights guaranteed by the United States Constitution ("***Constitution***").

2.      Uber connects New York independent drivers, who want to earn money, with riders who need rides, by granting both of them access to Uber's technology platform. Both riders and drivers are subject to contractual terms.[2]

---

[1] Attached as Exhibit 1. Unless otherwise noted, all citations to Section or § refer to the Challenged Law.
[2] Uber also offers a platform for delivery services, to which the Challenged Law does not apply. This Complaint uses the term "platform" to refer only to the Uber platform that relates to mobility for-hire vehicle services. Where the Complaint refers to "Uber Marketplace" it references the full slate of platforms that Uber provides.

3.      As a precondition of providing rides on the Uber platform, each driver agrees to a Platform Access Agreement (the "*PAA*"),[3] which delineates each party's rights to terminate the agreement.  The PAA explicitly incorporates "applicable Uber standards and policies (including, without limitation, Uber's safety standards and accessibility policies)" and states that a violation of the PAA (including those incorporated standards and policies) can lead to deactivation:

> "You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a '*Material Breach or Violation*').  You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred."

PAA at § 5.3 ("*Deactivation Provision*").

4.      The Challenged Law would eliminate Uber's contracted-for ability to exercise its own business judgment about who is allowed to access its technology platform.

5.      The following provisions of the Challenged Law, independently and in combination, would force Uber to keep drivers on its platform even if Uber has determined that they have violated its standards, agreements, and policies, and to provide them with specific information that Uber is not contractually required to and otherwise does not and would not provide:

- Section 20-1282(a)-(c) of the Challenged Law (the "*Deactivation Prohibitions*") would substitute Uber's contractually agreed-upon right to deactivate a driver based on Uber's determination of a violation with the City's notion of only three limited and vaguely defined reasons, and would subject Uber to review by "fact-finders" that can consider and weigh any "factor" they want.

---

[3] Attached as Exhibit 2.

- Section 20-1282(d) ("*14-Day Notice Provision*") would require a 14-day notice period prior to deactivation in certain circumstances and thus would eviscerate Uber's existing contractual right to deactivate drivers without any notice and force Uber to continue to platform certain deactivated drivers for two weeks after notifying them of an impending deactivation.

- Section 20-1283(a)-(b) ("*Retroactive Provision*") would apply the Deactivation Prohibitions back to 2019, meaning that Uber would have to prove that its decision to deactivate a driver at any time in the past seven years would have met a standard that did not exist at the time, at the risk of ongoing forced association.

- Sections 20-1282(d) ("*14-Day Required Message*), 20-1282(e) ("*Five-Day Required Message*), and 20-1283(a)-(b) ("*Retroactive Required Message*") (collectively, "*Required Messages*"), plus § 20-1286 ("*Compelled Reports Provision*") would alter the content of Uber's speech by requiring it to deliver specific messages and information, including "all the precise and detailed reasons" for a driver's deactivation, "information and data," and "all customer comments, ratings, and complaints" about the driver.  Uber does not wish to convey that information, including because the disclosure could endanger riders,  conflicts with Uber's contracts with riders and drivers, and educates fraudsters.

- Section 20-1285 ("*Burden of Proof Provision*") would seek to construct kangaroo court proceedings before a fact-finder either in a private action court or in front of the Department of Consumer and Worker Protection ("*Department*"), a "dedicated voice" for "workers in NYC," by creating procedures that would presume all deactivations are unjust, shift the burden of proof to Uber in any proceeding involving a deactivated driver, and restrict Uber's ability to defend itself.

- Section 20-1287 ("*Informal Dispute Resolution Provision*") would require Uber to "engage in good faith" with deactivated drivers and conclude "informal resolution" processes over email and other electronic communications within 15 days, and impose civil penalties if Uber fails to do so.

6. The Challenged Law would require Uber to reinstate a driver if a fact-finder (including the biased Department) determines Uber has violated any of these provisions, no matter how technical.  Put simply, the fact-finder would have no choice but to order the driver reinstated if Uber's notice of deactivation is a day late or if the explanation is insufficiently "precise and detailed," even if the driver engaged in dangerous, criminal, or fraudulent misconduct or the

3

evidence demonstrates good cause for the deactivation.  And "fact-finders" could base their decision on any factors they want and weigh those factors however they choose.

7.     As a consequence, the Challenged Law would require Uber to connect riders with drivers even if Uber believes in good faith that those drivers pose a risk to rider or public safety, or have engaged in fraudulent activity.

8.     The New York City Council ("*Council*") passed the Challenged Law after the powerful taxi driver's lobby (the New York Taxi Workers Alliance ("*NYTWA*")) spent more than two years demanding the Council address purported "unfair deactivations," without regard for the rider or public safety or Uber's legitimate business interests, free speech rights, and existing contracts.

9.     At NYTWA's incessant urging, the Council passed the Challenged Law with the sole expressed purpose of protecting drivers from "wrongful deactivations."  The Council's official summary of the Challenged Law confirms that its primary purpose is to prohibit high-volume for-hire vehicle services (like Uber) from deactivating drivers "unless due to just cause, a bona fide economic reason, or if required by law."  The Council's summary also refers to the Challenged Law's procedural elements, including requiring advanced notice of deactivation and authorizing deactivated drivers to "request that the Department of Consumer and Worker Protection" investigate the deactivation to determine if it was "wrongful."

10.     During its deliberations, the Council accepted without scrutiny the claim that there is a proliferation of "unfair" deactivations.  The Council did not define "unfair" or  demand any data or proof that a problem actually existed, relying instead on hypothetical fears and anecdotes from the NYTWA and deactivated drivers, some of whom conceded to valid reasons for their deactivations.  The Council focused on how to prevent drivers from fearing "unfair" deactivations,

4

and barely discussed balancing such grievances with rider and public safety.  None of the public hearings reflected a meaningful discussion by the Council about safety at all, or why it was in the public's interest to prioritize the perceived problem of "unfair" deactivations above all other matters.

11.     The lead sponsor of the Challenged Law on the Council initially intended the law to create a presumption that any deactivation was unfair by establishing a "framework" whereby Uber must "bear the burden of proving that their actions were justified" beyond a reasonable doubt. That would have meant, for example, that Uber would be required to grant continued platform access to a driver accused of rape, and allow him to drive single female passengers at night, unless and until Uber could prove the crime "beyond a reasonable doubt."

12.     As far as its concerns about the deactivation process, the Council did not scrutinize whether the purported procedural concerns with how Uber notifies drivers of potential standard or policy violations and deactivations actually constitute a real, or widespread, problem.  Reality does not reflect any problems with the process, including notice in advance of what behavior could lead and/or has led to deactivation.  Unlike traditional employment—where an at-will employer may make termination decisions with no process, notice, explanation, or uniform standard—Uber and drivers enter into a contract that specifies the types of conduct that may lead to deactivation and establishes the parties' respective rights.  When Uber is determining whether to deactivate a driver, it looks to that contract and its incorporated policies to determine if there is a violation and, therefore, warrants deactivation.  In addition to understanding the type of conduct that can lead to deactivation, drivers typically receive warnings and notices beforehand, and avenues of appeal afterwards.

13.    Deactivating a driver is a last resort for Uber.  Permanent deactivations are rare, and largely relate to safety or fraud.  Uber's deactivation decisions and the underlying policies that inform them are rooted in a careful balance of competing priorities: promoting driver access to the platform and earning opportunities, maintaining rider and driver safety, and protecting Uber's brand and economic interests.  Uber memorializes in writing the guiding values that inform its decision-making process, including to make "magic in the marketplace" by exerting "judgment to make difficult trade-offs" and to "stand for safety" by embedding "safety into everything we do" in a "relentless pursuit to make Uber safer for everyone using our platform" by being an "industry leader for safety."

14.    Uber's attention to this balance serves drivers and riders alike.  Uber deeply values its relationship with the people who drive using the Uber platform, and they are its customers. Uber supports flexible earning opportunities when and where earners want them.  At the same time, Uber invests heavily in security measures, including by requiring comprehensive background checks and driving records before any driver gains access to the platform, and by engaging in ongoing monitoring for any indicia of potential safety or fraud concerns.

15.    Creating a symbiotic relationship among Uber, drivers, and riders requires a mutual and shared set of expectations.  The PAA memorializes those expectations and creates a contractual relationship between drivers and Uber.  Pursuant to the PAA, drivers have the flexibility to "decide when, where, and whether" they want to offer rides on Uber's platform and to terminate the agreement without cause.  In exchange, Uber reserves and must have the right to deactivate a driver who fails to comply with the terms of the PAA and the policies it incorporates, including the Community Guidelines.

16. The Community Guidelines is a written document that identifies "behaviors or circumstances that may cause" drivers (or riders) "to lose access" to the Uber platform. The Community Guidelines confirm: "Not following any one of our guidelines can constitute a material breach or violation of the terms of your agreement with Uber and may result in the loss of access" to the platform without notice.

17. Taken together, the PAA and incorporated policies and agreements identify specific conduct that could lead to deactivation including: failing to "behave decently toward other people" while using the platform; commenting on "someone's appearance" or asking if they are single; engaging in sexual assault or misconduct; disrespecting personal space; engaging in aggressive, confrontational, or harassing behavior; makings riders feel unsafe; or exhibiting a lack of honesty. They are common sense.

18. Having the contractual right to deactivate a driver if Uber has determined in its discretion that there has been a violation of Uber's standards and policies is critical to Uber's business. That discretion is particularly critical in ambiguous situations or situations with imperfect information, such as when a driver faces reports of sexual assault or substance use. Uber structures its contracts with drivers so that Uber retains the discretion it requires to protect that balance.

19. It is essential for Uber to have the ability to take prompt action and remove (whether temporarily or permanently) access to the platform without notice while it investigates whether, or once it has determined that, a driver may have engaged in violative conduct. Permitting a driver who materially violated his agreement with Uber to continue to interface directly with riders and the public poses an avoidable risk that Uber's contracts are designed to minimize.

20.     For similar reasons, Uber does not, outside of legal proceedings, disclose to a driver the specific, individualized comments, ratings, or complaints that a rider has lodged about him or her or details such as the date, time, or location of any specific incidents.  Providing that information could subject the rider to risk because a driver likely could identify or locate the rider even without personally identifiable content.  Plus, Uber's privacy notices to riders promise to maintain the privacy of their data (including content they submit to Uber) and inform riders of the specific information Uber shares with drivers, which excludes the comments, ratings, or complaints they submit.

21.     Multiple clauses of the Challenged Law independently—and taken together—would upend the contractual relationship between Uber and drivers, and otherwise violate Uber's constitutional rights.

22.     *First*, the Deactivation Prohibitions would override Uber's contractual right to deactivate drivers for conduct that it determines in its discretion materially violates drivers' agreement with Uber.  In place of that existing contractual agreement, the Council articulates only three valid reasons for deactivation: "just cause," "a bona fide economic reason," and a legal requirement.  The Council ignored concerns from Uber and "organizations representing various vulnerable passenger populations" that the three reasons were too narrow and would endanger riders, including by rejecting amendments that would have retained the discretion contained in Uber's contract with drivers.

23.     *Second*, the 14-Day Notice Provision would require Uber to continue to allow certain drivers to operate on the platform for 14 days after Uber has determined deactivation is necessary, and notify the driver of the impending deactivation.  This requirement is inherently unsafe and poses an avoidable risk; drivers who have received notice they soon will lose platform

access may behave recklessly or dangerously, without regard for the safety of others, and in retaliation. For example, while the 14-Day Notice Provision makes an exception for "egregious misconduct" that "poses an imminent danger to other persons," the Council rejected a proposed definition of "egregious misconduct" that would include all "conduct that endangers others" because that would have been "over-inclusive." The 14-Day Notice Provision thus purports to require Uber to keep a driver on the platform who it has notified will be deactivated for endangering riders if that danger is insufficiently "egregious." The same is true for drivers who have engaged in an act of fraud.

24.     *Third*, the Retroactive Provision would require Uber to prove, for any driver who "petitions," that any challenged deactivation from the past seven years meets the Deactivation Prohibitions, even though they did not exist at the time of the deactivations and Uber was (and is) not otherwise contractually obligated to meet them. Likewise, the "just cause" standard would impose consideration of seven "factors" that did not apply in the past, and even would allow a "fact finder" to consider any other factor they want, even though Uber had no notice—and even now lacks notice—of what those factors may be. Combined with the other provisions, the Retroactive Provision in essence would force the reactivation of any driver Uber has deactivated since 2019 if it has not maintained documentation substantiating the reason for the deactivation or sufficiently communicated the reason and underlying evidence to drivers, or a fact finder decides some new "factor" is determinative. This means Uber would be required to reactivate drivers even if Uber had just cause for their deactivation—such as, for example, due to serious complaints of endangering riders—due to a technicality.

25.     In addition to interfering with Uber's contracts, the Deactivation Prohibitions and 14-Day Notice, and Retroactive Provisions unconstitutionally compel association, violate Uber's

due process with its vagueness, and deprive Uber of equal protection under the law.

26.     *Fourth*, the Required Messages and Compelled Reports Provision are presumptively unconstitutional pursuant to the First Amendment.  They, respectively, would compel Uber to disclose "all the precise and detailed reasons" for a deactivation, the "information and data" related to the deactivation, and to collect and provide deactivated drivers with "all customer comments, ratings, and complaints" about them and with a report about all *other* driver deactivations from the preceding year.  Uber currently does not and is not required to provide such extensive information and data because it has determined in its business judgment that doing so would be detrimental to rider safety and to both rider and driver privacy, including as articulated in Uber's contractual agreements, and would also give fraudsters an upper hand in evading detection.  Leaving aside the significant operational burden on Uber, requiring the disclosure of such information will sweep in information that has no relevance to the underlying deactivation, thus jeopardizing safety and privacy for no valid reason.

27.     *Fifth,* the Burden of Proof Provision would prevent Uber from offering as evidence any materials it did not provide the driver at the time of deactivation, thereby entirely shifting the inquiry away from the expressed goal of the Challenged Law (i.e. whether Uber had "just cause" to deactivate a driver) to the procedural concerns (i.e. whether Uber provided sufficient notice to the driver of the reason for deactivation).  Further creating a one-sided "he said" process, the Burden of Proof Provision would permit drivers to submit any evidence they desire, even if never provided to Uber.  When Uber cannot meet its burden by a preponderance of the lopsided "evidence," it must reactivate the driver irrespective of the strength of the substantive reasons for the deactivation, and face economic liability.  For example, Uber may have to reactivate a driver it originally removed based on complaints of rape or kidnapping, or fraud against Uber or riders,

10

solely because it did not disclose the underlying reports to the driver in an effort to protect the rider's privacy, or to maintain the secrecy of its fraud detection capabilities. The Burden of Proof Provision would prioritize form over function to benefit a small percentage of drivers at the expense of everyone else.

28. The City has not attempted to, and cannot, show that the Challenged Law is a reasonable and necessary way to achieve any legitimate public purpose, let alone that it is narrowly tailored to that interest or that there are no less restrictive alternatives. The legislative history demonstrates that the Council relied on arbitrary assumptions and hypothetical fears to justify a desired policy outcome to satisfy one of the City's most powerful lobbies. The outcome is a law purporting to solve a problem that does not exist but will certainly create new ones, and a gross violation of Uber's constitutional rights. A law cannot survive constitutional scrutiny where, as here, novel regulation infringes upon constitutional rights and the government cannot meet its burden under the law to justify such infringement.

29. The Challenged Law will cause immediate and irreparable harm to Uber. Even a day of infringed constitutional rights is an immediate and irreparable injury. If the Challenged Law takes effect, it will permanently impair Uber's contracts, compel the communication and disclosure of sensitive and protected information that Uber would not otherwise provide, force at least temporary association with drivers whom Uber would otherwise deactivate, subject Uber to an unfair and lopsided adjudicative process, and potentially lead to reputational harm and a loss of business and goodwill.

30. Accordingly, Uber seeks declaratory relief, and preliminary and permanent injunctive relief on the grounds that the Challenged Law violates Uber's rights under the Constitution.

11

**THE PARTIES**

31.     Plaintiff Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Plaintiff Uber USA, LLC is a Delaware limited liability company and is a wholly-owned subsidiary of Uber Technologies, Inc.  Uber USA, LLC maintains a New York City Taxi & Limousine Commission high-volume for-hire service license (as that term is defined in the City's regulations) and enters into agreements with New York City drivers of for-hire vehicles (as that term is defined in the City's regulations).  Uber Technologies, Inc. and Uber USA, LLC are generally referred to in this Complaint as "Uber."  Uber licenses software that enables independent third-party transportation providers to receive and respond to requests for prearranged transportation from interested riders that also use software designed by Uber.

32.     Defendant City of New York is a municipal corporation organized and existing under and by virtue of the laws of the State of New York.

**JURISDICTION AND VENUE**

33.     This Court has jurisdiction over Uber's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983 because Uber alleges violations of its rights under the Constitution of the United States.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims.  This Court also has jurisdiction over the claims and relief sought pursuant to 28 U.S.C. §§ 2201, and 2202.

34.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(1) because Defendant is located within this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Uber's claims occurred in this District.

**FACTUAL ALLEGATIONS**

I.    **Uber's Business and Driver Earnings Depend On the Safety and the Quality of Services Available on the Platform.**

35.    Uber provides a set of smartphone applications that matches riders seeking rides with for-hire drivers.  Person-to-person connections are a core component of Uber's business. Uber's ridesharing platform business in New York depends on riders and drivers feeling safe. And in order for riders and drivers to feel safe, Uber makes driver and rider safety a top priority.

36.    Uber is a value-driven company and has developed a series of values that are its guiding principles.  One of its core values is to "Stand for Safety" as Uber describes on its website: "At Uber, safety isn't just a department; it's a core cultural value.  Teams across the company embrace the value of Stand for Safety in everything we build."[4]

37.    Uber is "committed to safety" and wants riders to "ride with confidence."  Uber makes its commitment to safety clear on its website: "The Uber platform was built with safety in mind.  Through incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."[5]

38.    Uber emphasizes its "commitment to safety," stating that "At Uber, we stand for safety. Safety is not just a feature—it's a foundation.  That's why we invest in innovative technologies, robust policies, and expert partnerships that prioritize women's safety at every step of their journey.  We are steadfast in our commitment to building a platform where women feel comfortable, safe, and in control."[6]

---

[4] *Standing for Safety with Greg Brown*, Uber, https://jobs.uber.com/en/people-stories/inside-the-work/standing-for-safety-with-greg-brown/  (last visited June 5, 2026).
[5] *Is Uber Safe For Riders?*, Uber, https://www.uber.com/us/en/ride/safety/ (last visited June 5, 2026).
[6] *Our commitment to safety*, Uber, https://www.uber.com/us/en/safety/our-commitment/?uclick_id=bd8a07c5-2192-4d2a-b0cd-ed79da09df17 (last visited June 5, 2026).

39.     Uber's background check process is more stringent than the one used by New York City's taxi regulators, which focuses on in-state (rather than national) data.  Uber's own checks have disqualified hundreds of prospective Uber drivers (for example, based on out-of-state criminal history) that the City's own screening process approved.

40.     Ongoing checks are built into the Uber platform.  Uber reruns criminal background checks every year.  It goes even further than annual checks with continuous monitoring, a system Uber pioneered in 2018.  This technology flags new criminal charges or convictions reported by trusted background check providers, even in between annual checks.

41.     Since 2016, Uber has used Real-Time ID Check, an industry-first technology that periodically requires drivers to upload "selfie" photos of themselves, to  verify the person driving matches the person registered.[7]

42.     Uber provides riders with several additional safety measures.  Riders receive key details about drivers prior to their arrival so that they can get into the correct car.  GPS tracks the trip in real time, and riders can share their location with loved ones.  A feature called RideCheck helps detect unexpected stops or route changes.  Riders also can record audio of their rides, and can call for emergency help by contacting Uber's 24/7 safety support or using the in-app emergency button.

---

[7] *Identity Verification Checks*, Uber, https://help.uber.com/en/driving-and-delivering/article/identity-verification-checks?nodeId=75fb55dc-da08-41bb-b1cb-3229f2839956 (last visited June 5, 2026).

43.    Uber expects everyone with access to its platform to follow its Community Guidelines.[8]  Uber posts its Community Guidelines publicly[9] and incorporates them into various agreements, including the PAA with drivers, and the Terms of Use that apply to riders.

44.    The Community Guidelines state that their purpose is to "provide the basis for behavior we expect from all in the Uber community."  They "were developed to help make every experience feel safe, respectful, and positive."

45.    To Uber, treating everyone with respect includes ensuring that everyone has a pleasant ride, behaves decently towards other people, and is able to ride in a safe and welcoming space.  The Community Guidelines prohibit aggressive, confrontational, or harassing behavior or using language that could be viewed as disrespectful, discriminatory, threatening, or inappropriate.  They also forbid drivers from contacting riders after a trip has completed or making any physical contact with a rider, except where help is requested.  Uber has a no-sex rule even if the driver and rider mutually consent.  Drivers must "keep their vehicles maintained and in good operating condition" and to "maintain an environment that makes riders feel safe."

46.    Uber aims to "provide a safe and enjoyable environment for everyone."[10]  One way to "maintain this standard" is by allowing riders and drivers to rate each other.  Uber "uses ratings to maintain high quality and fairness."

---

[8] Attached as Exhibit 4.  Uber's Community Guidelines state that they apply to "everyone who uses the Uber Marketplace Platform."  Uber defines the "Uber Marketplace" which Uber defines as the "rideshare marketplace" that "connects riders looking for transportation with drivers looking for work at the tap of a button" that includes both mobility and food delivery platforms.  *See Uber Marketplace*, Uber, https://www.uber.com/us/en/marketplace/ (last visited June 4, 2026).  References to "platform" throughout the complaint relates to the mobility offering, namely connecting riders to drivers for purposes of personal transportation.

[9]    *Uber Community Guidelines*, Uber, https://www.uber.com/legal/en/document/?country=united-states&lang=en&name=general-community-guidelines (last visited June 5, 2026).

[10]    *Understanding ratings*, Uber, https://help.uber.com/en/driving-and-delivering/article/understanding-ratings?nodeId=9e240708-a894-43d7-b19d-13061a4fbe5a (last visited June 5, 2026).

47.     Feedback between platform users is important. All riders have the option of providing their drivers with ratings on a one-to-five star scale.

48.     Uber makes it easy for riders and drivers to submit more fulsome feedback. Riders can use Uber's "Help" section, which provides the ability to report various types of "safety" incidents, including: "a serious incident with a driver," an "unsafe or broke down" vehicle," an accident, discrimination, dangerous driving, and a driver who or vehicle that did not match the profile in the application.

49.     Uber's "Help" section also provides riders with the ability to report various types of quality-related concerns, such as a driver who was "rude," "refused" to transport the rider to the requested destination, "made an unplanned stop," had "fewer seats than" requested, had an animal in the vehicle, or asked to "book outside the Uber app."

50.     Uber is vigilant about identifying driver fraud on its platform, not only for its own economic reasons but also as part of its commitment to safety and quality.  For example, deactivating drivers who present fake identity documents protects the platform and its users from drivers who have already been rejected for safety or other reasons.

**II.     Drivers And Uber Freely Enter Into A Contractual Relationship.**

51.     Drivers and Uber are independent contracting parties.  Each party voluntarily chooses to enter the relationship because of the value it brings to them, and each can choose to exit the relationship at any time.  At the same time, like any contractual relationship, the contracts impose obligations on each party as well as benefits: Drivers must not violate the policies, standards, and agreements that they have agreed to, and Uber can deactivate a driver only pursuant to the terms of the Platform Access Agreement.

52.     Uber creates and enforces policies to balance its commitment to driver access to the platform and earning opportunities, driver and rider safety, quality experiences, and protecting

16

Uber's brand and economic interests.  Drivers, riders, and Uber all benefit from striking the right balance: riders will take more rides if they have a safe and high-quality experience when using the platform, which in turn provides more earning opportunities for drivers and benefits Uber.  Drivers likewise provide more trips when they are safe, which benefits riders and Uber.

### A.    Drivers Benefit From Their Contracts With Uber.

53.    Drivers benefit from Uber's commitment to safety and quality, each of which attracts riders to the platform, which leads to increased earning opportunities for drivers.

54.    Uber offers drivers flexibility.  Drivers may choose to access the platform as much or little as they choose and at the hours they choose.  They also are free to locate and provide rides using platforms other than the ones Uber provides, and to terminate their relationship with Uber at any time, without explanation.

55.    Uber's platform provides New York City drivers with access to more than one-hundred thousand trips per day.

56.    On behalf of drivers in New York, Uber contributes to unemployment insurance, which provides temporary financial assistance in certain circumstances set by New York State rules.  New York City drivers also are eligible for Paid Sick Leave benefits.

57.    It is Uber's philosophy to facilitate independent work and earnings opportunities when and where people want.  Uber's contracts provide flexibility, permitting drivers to use other rideshare and courier platforms and take any other employment, and many drivers choose to use multiple platforms at the same time based on varying terms and benefits.

### B.    Uber Structures Its Contracts To Protect Its Ability To Balance Access, Fairness, Safety, and Its Brand.

58.    Uber's deactivation decisions and policies require carefully balancing drivers' access to the platform, fairness, rider and driver safety, the maintenance of Uber's brand, and its

financial wellbeing. The right balance benefits Uber, riders, and drivers.

59.    As Uber publicly states, it is "strongly motivated to keep access to the Uber platform open" to drivers. Uber is dedicated to facilitating independent work and earning opportunities when and where people want them. It is, generally speaking, in Uber's economic interest to have more drivers, because more drivers can equal more completed trips.

60.    Uber must balance its desire to keep drivers on its platform with its commitments and values related to safety for riders, drivers, and the entire Uber community. Uber is deeply committed to the safety and quality of services available on its platform. If both drivers and riders are not safe or do not feel safe on the platform, they will not use the platform to request and provide services, which can set off a negative cycle for all users: longer wait times, higher costs, fewer trips, and fewer earnings for the vast majority of drivers that are committed creating a safe environment. Just as Uber is vigilant and protective of initially granting access to its platform, it remains vigilant and protective about permitting ongoing access.

61.    Uber takes the decision to remove access to driver accounts seriously and considers deactivation to be a last resort.

62.    Uber's CEO has publicly stated that blocking a driver "from accessing their Uber account is one of the most serious decisions we make as a company." He continued:

> "Of course, there are many legitimate reasons why a driver could lose access to their account. We must balance access to the app with our commitment to safety and a high-quality experience for all users. It's our responsibility not only to follow the law but to enforce our Community Guidelines, which are designed to ensure every experience feels safe, respectful, and positive."

63.    Uber relies on written agreements and standards and policies, including the Community Guidelines, with drivers to confirm one another's rights, limitations, and expectations, including the rights to deactivation.

18

64.     Uber structures its contracts with drivers so that Uber retains the discretion it requires to balance its competing business needs.

65.     The contractual discretion to deactivate drivers based on Uber's determination of whether there has been a violation of Uber's policies and standards is critical to Uber's ability to balance priorities, particularly in ambiguous situations.  For example, when a driver faces reports of sexual assault or substance use, Uber may have to make decisions based on imperfect information.  Uber's standards and policies thus may require that being the subject of a serious report makes one ineligible for platform access, which protects riders and the public at large.

### C.     The PAA Establishes Uber's Discretion To Determine a Violation And Deactivate Without Notice.

66.     Since January 1, 2022, Uber and drivers have entered into the PAA, which establishes the contractual right to access to the platform.  In addition to its explicit terms, the PAA states that access is "also governed by the applicable terms on our website, including without limitation, the Community Guidelines" and other Uber standards and policies, all of which it incorporates by reference. The PAA expressly incorporates Uber's Privacy Policy, including the Notice for Drivers and Delivery People ("***Driver Privacy Notice***")[11] (PAA, together with incorporated documents, "***Agreement***").  Every driver in New York City that is active on the Uber platform has agreed to the Agreement.

67.     By accepting the Agreement, drivers confirm that they "read, understand and accept the provisions" of it and intend to be bound by it.

68.     The PAA's terms state that it is not an employment agreement and that Uber is not "hiring or engaging" the driver to "provide any service."  Rather, the driver is engaging Uber to

---

[11] *Uber Privacy Notice: Drivers and Delivery People*, Uber, https://www.uber.com/global/en/privacy-notice-drivers-delivery-people/ (last visited June 5, 2026).

19

receive access to the platform.  (§ 1.1).

69.    The terms of the PAA confirm that the drivers "decide when, where, and whether" they want to offer rides facilitated by the platform and there is no minimum number of rides they must take.  The PAA states that drivers have the choice whether to use "other platforms and applications in addition to, or instead of," the one Uber provides. (§ 1.2).

70.    The PAA makes clear that drivers must "understand" that a rider's experience with their rides, as conveyed by the rider, "may affect your ability to access" the platform. (§ 1.2).

71.    The PAA makes explicit that drivers "are responsible for identifying, understanding, and complying with" the law and with the Agreement.  (§ 2.2).

72.    The PAA requires drivers to "represent, warrant and covenant" that their access and use of the platform "will be in compliance with the Requirements."  (§ 2.3).

73.    The PAA specifically spells out each side's respective rights to terminate the agreement.  For drivers, the PAA permits a driver to terminate the Agreement "without cause at any time upon seven (7) days' prior written notice to Uber" or "immediately, without notice for Uber's violation or alleged violation of a material provision of this Agreement."  (§ 5.2 ("***PAA Termination Provision***")).

74.    For Uber, the PAA affords a more narrow right in the PAA Deactivation Provision, which by its own terms covers both temporary waitlisting and permanent deactivation:

> "**Deactivation.** You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a "*Material Breach or Violation*"). You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred."

(§ 5.3).

75.     The PAA Deactivation Provision expressly communicates that Uber is permitted to temporarily deactivate a driver's account without notice in order to conduct an investigation.

76.     The PAA Deactivation Agreement unequivocally states that Uber may permanently deactivate a driver's account without notice if Uber determines, in its discretion, that the driver "has engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference)" (a "*Material Breach or Violation*").

77.     The PAA Deactivation Agreement articulates a contractual standard regarding deactivation.  Uber does not grant itself free rein to deactivate drivers without a basis, which stands in contrast to the at-will nature of how employers (which Uber is not) often structure their relationships with employees (which drivers are not).

78.     The PAA Deactivation and Termination Provisions are central to the Agreement and part of the benefit of the bargain.

79.     Drivers deactivated from January 2, 2022 to present in New York City were, and are, subject to the PAA.  Drivers deactivated from January 6, 2020 to January 1, 2022 in New York City were subject to an earlier version of the Platform Access Agreement, which contained the same PAA Deactivation and Termination Provisions.

80.     Prior to 2020, Uber entered a Technology Services Agreement ("*TSA*")[12] with drivers in New York City.  Drivers deactivated from December 10, 2015 to January 5, 2020 were subject to the TSA.  Like the PAA, the TSA provided Uber the contractual right to deactivate a driver for "a violation or alleged violation of this Agreement, a violation or alleged violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its Affiliates,

---

[12] Attached as Exhibit 5.

Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliates' brand, reputation or business as determined by Uber in its sole discretion."[13]  The TSA further provided that Uber could deactivate a driver "immediately, without notice," if the driver "no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement."[14]

81.    As is the case with the PAA, the deactivation terms were central to the TSA and part of the benefit of the bargain.

82.    The contracted-for ability to deactivate drivers without notice based on Uber's determination of whether a violation has occurred (including by being identified as having committed a serious safety incident) is critical to Uber's ability to maintain the standards that benefit all users of the platform, including drivers, and to live by its values, including to Stand for Safety.  Uber's contractual terms are designed to protect against avoidable risks inherent when permitting drivers to remain on the platform and interface directly and privately with riders when there was a violation of Uber's standards and policies.

> D.    **The PAA And Incorporated Policies And Standards Identify Bases For Deactivation.**

83.    The PAA identifies some types of conduct that would violate the Agreement, including:

- "You agree not to share or allow anyone to use your login credentials or other personal information used in connection with your account, including but not limited to photos of yourself, to access our Platform" (§ 2.4);

- "You will also be required to pass various background, driving record and other checks both prior to the first time you access our Platform and from time to time thereafter during the Term of this Agreement" (§ 2.5(b));

---

[13] *Id.* § 2.4; *see also id.* 5 § 3.1 ("Uber reserves the right, at any time in Uber's sole discretion, to deactivate or otherwise restrict a Driver from accessing or using the Driver App or the Uber Services if Customer or such Driver fails to meet the requirements set forth in this Agreement or the Driver Addendum.").
[14] *Id.* § 12.2.

- "You agree that your vehicle will be in safe operating condition, consistent with safety and maintenance standards for a vehicle of its type" (§ 2.5(c))

- "Your device geo-location information is required for the proper functioning of our Platform, and you agree to not take any action to manipulate or falsify your device geo-location" (§ 2.10);

- "You will maintain automobile liability insurance on your vehicle that provides protection against bodily injury and property damage to third parties at coverage levels that satisfy the minimum requirements to operate a vehicle on public roads wherever you use your vehicle." (§ 3.1).

84.     Other policies that the PAA incorporates by reference—such as the Community Guidelines and the policy on "Riding with Service Animals"[15]—also identify examples of specific behavior that could serve as the basis for deactivation.

85.     The expressed purpose of the Community Guidelines is to articulate "behaviors or circumstances that may cause you to lose access" to the Uber platform.  Uber makes clear that failing to comply with any of the requirements of the Community Guidelines "can constitute a material breach or violation of the terms of your agreement with Uber" and thus good cause for deactivation.  Uber also makes clear that loss of access may be based on "reported violations," particularly "if the issues raised are serious or a repeat report."

86.     The Community Guidelines state that Uber can exercise its discretion to deactivate a driver if it determines that any "actions threaten the safety of the Uber community, our employees, and contractors, or cause harm to Uber's brand, reputation, or business" or any "behavior involving discrimination, violence, sexual misconduct, harassment, fraud, or deceptive, illegal, or unsafe activity."

---

[15] *Service animal user guide*, Uber, https://www.uber.com/us/en/about/accessibility/service-animal-user-guide/ (last visited June 5, 2026).

23

87.    The Community Guidelines lay out specific expectations of driver (and rider) behavior and consequences for failing to meet those expectations.  For example, the Community Guidelines state:

- "[Y]ou are expected to exercise good judgment and behave decently toward other people when using the Uber Marketplace Platform—just as you would in any public place."

- "Discrimination based on race or any other characteristic protected by law will not be tolerated on the Uber Marketplace Platform and can result in loss of access to the apps."

- "We all value our personal space and privacy. It's OK to chat with other people while remaining respectful. But please don't comment on someone's appearance or ask whether they are single. Sexual assault and sexual misconduct of any kind is prohibited. Sexual assault and misconduct refers to sexual contact or behavior without explicit consent of the other person. Personal space and privacy should be respected."

- "Uber has a no-sex rule regardless of whether you know the person or they give you their consent."

- "Aggressive, confrontational, or harassing behavior is not allowed. Don't use language, make gestures, or take actions that could be disrespectful, discriminatory, threatening, or inappropriate."

- "Unwanted contact (where there is not mutual consent) can be seen as harassment and includes, for example, texting, calling, social media contact, visiting, or trying to visit someone in person after a trip or delivery has been completed."

- "Drivers are expected to maintain an environment that makes riders feel safe; even if driving practices don't violate the law, reports of dangerous driving can lead to the loss of access to part or all of the Uber Marketplace Platform."

- "Deception can weaken trust and also be dangerous. Intentionally falsifying information or assuming someone else's identity isn't allowed. It is important to provide honest and accurate information when reporting incidents, creating and accessing your Uber accounts, disputing or claiming charges or fees, and requesting credits."

- "Drivers, riders, delivery people, or merchants who don't meet the minimum average ratings for their city may lose access to all or part of the Uber Marketplace Platform."

88.    Uber devotes multiple pages on its website to providing drivers with information about deactivations.

24

**E.    The Driver Privacy Policy That The PAA Incorporates Identifies How Uber Will And Will Not Use Driver Data.**

89.    The PAA also incorporates the Driver Privacy Notice, which addresses the wide range of personal data the drivers share with Uber when onboarding.

90.    The Driver Privacy Notice details Uber's collection and use of data, including account information, background check information, and identity verification information. The Driver Privacy Notice also states that users or others providing information in connection with customer support issues, claims or disputes may provide the driver's name and evidence relating to accidents, conflicts, claims or disputes (which may include photos or recordings of the driver).

91.    The Driver Privacy Notice does not provide that *other* drivers as a potential recipient of a driver's data. Uber does not currently share any data collected from individual drivers with some or all other drivers.

**III.    Deactivations Are Rare, And Predominantly Based On Safety Concerns.**

92.    Most account access issues are temporary (i.e. waitlistings) and relate to expired documents, lapsed insurance, or incomplete background checks.  For example, Uber may waitlist a driver if the driver does not resubmit up-to-date documentation, such as a driver's license or vehicle registration and insurance.[16]  Uber also may waitlist a driver for failing to upload photos of themselves for identity verification or uploading a photo that does not match the one displayed on the account profile.  Safety is the reason for these waitlistings: drivers are strictly prohibited from sharing their driver account with anyone else, and a driver who cannot submit a matching photo in real time is highly indicative of a driver sharing their account with someone who may not satisfy Uber's background check requirements.[17]

---

[16] *Uploading Your Documents*, Uber, https://www.uber.com/us/en/drive/requirements/documents/ (last visited June 5, 2026).
[17] *Identity Verification Checks*, *supra* note 7.

93.     A large majority of the instances where a driver is not able to access the Uber platform are short lived and not driven by Uber.  For example, a driver may also lose access temporarily if they do not resubmit an up-to-date driver's license, vehicle registration or insurance document, fails to submit an identity verification "selfie," refuses to download the latest version of the driver app or consent to an updated version of the PAA, or does not return a call from Uber during an investigation.  In many cases of temporary loss of access, it is actually the driver who controls if and when they resolve the issue and resume access.

94.     Waitlistings usually are resolved quickly, and often automatically because they are based on "steps drivers can take themselves, such as updating expired documents, renewing lapsed insurance, or completing required background checks."[18]

95.     Many issues with platform access in New York City are attributable to the New York City Taxi & Limousine Commission ("*TLC*") and to comply with its "24-hour" list of drivers who are legally allowed to accept dispatches each day ("*TLC List*").[19]  The TLC removes drivers from the TLC List on its own accord.  Uber reviews the TLC List daily and, as it is required to do, suspends account access for drivers who do not appear on the TLC's list.  If a driver reappears on the list, Uber will reinstate platform access.  Compliance with the TLC daily list is a frequent source of drivers' loss of access to the Uber platform.

96.     There are times when Uber may determine it is necessary to temporarily suspend access during a review of or investigation into reports of potential violations of the Agreement between Uber and drivers.  The length and scope of an investigation varies depending on the type

---

[18] *Putting Fairness in the Driver's Seat*, Uber (April 16, 2026), https://www.uber.com/us/en/blog/fairness-in-the-driver-seat/.

[19] Sep. 27, 2024 Committee Hearing Tr. (attached as Exhibit 6) at 156:2-157:19 (testimony of Uber's Josh Gold), available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563&; *see also TLC List of For Hire Vehicles (FHC) - Active Drivers*, NYC OpenData, available at https://data.cityofnewyork.us/Transportation/For-Hire-Vehicles-FHV-Active-Drivers/xjfq-wh2d/about_data (last visited June 5, 2026).

of incident and its severity, and may include time waiting for a driver to return a phone call from Uber's investigations team. Uber strives to complete investigations as quickly as possible, while also being thorough.

97.    Uber makes the decision to waitlist drivers without notice when the company determines that maintaining access could jeopardize Uber's standards for safety and quality, or to prevent fraud.

98.    Uber deactivates drivers to protect riders, drivers, and itself for reasons primarily that relate to safety, fraud prevention (including related to identity verification and documentation), legal compliance, and quality, which often overlap with each other.  Deactivations are rare.  Uber deactivates approximately 1% of driver accounts in New York each year and for a variety of reasons.

99.    In 2025, safety was the reason for more than half of deactivation of drivers in New York City.  Safety reasons for deactivation cover a wide range of specific types of conduct, including: person-to-person issues, such as personal altercations or sexual misconduct; dangerous driving, which may include reports of a crash or repeated reports of poor, unsafe, or distracted driving; serious traffic violations, including high speeding, captured by phone sensor data while using the Uber platform; or reports of having drugs and/or open containers of alcohol in the car or smells of alcohol or drugs.[20]

100.    Fraud, including identity verification and document fraud, comprised the second-most prevalent reason for deactivations in the City in 2025.  Together, safety and fraud made up more than 92% of deactivations in the City in 2025.

---

[20]    *Deactivations*,    Uber,    available    at    https://www.uber.com/us/en/drive/driver-app/deactivation-review/?city=washington-dc#overview (last accessed June 4, 2026).

101.    Identity verification and documentation reasons for deactivation include sharing a single account, submitting fake or altered documents such as driver's license, and using one account to evade a restriction on another account.  These reasons may implicate both fraud and safety concerns because they relate to Uber's efforts to verify the driver's identity to make sure that the person who underwent the background check is the person who is actually driving.

102.    Other fraud reasons for deactivation include schemes to steal money from Uber or from riders, or both.  For example, drivers may use software to manipulate the manner in which their phone or other device transmits GPS location data to the Uber Driver App.  This may be done, for example, to make it look like they completed a trip that they did not do, drove farther than they really did, paid a toll they did not pay, or that they are in an area where "surge" pricing is in effect.

103.    The remaining primary reasons for deactivations in the City in 2025—together comprising less than 8%—were divided into two categories:

- ***Compliance.***  Compliance reasons for deactivation include failed background checks, which are a central component of Uber's safety program.  Reasons for a failed background check may include serious criminal convictions; serious pending criminal charges; multiple moving violations, non-moving violations, or accidents within the last three years; and any serious driving violation, such as driving while intoxicated.

- ***Quality/Accessibility.***  Quality reasons for deactivation include consistently below-minimum aggregate ratings, which often correlate with unprofessional conduct.  Uber also deactivates accounts of drivers who discriminate, such as refusing or cancelling trips for riders because of their service animals, wheelchairs, or other assistive devices.

104.    Rider reports play a role in some, but not all, deactivations.  Uber may heavily depend on rider reports for deactivation decisions on certain grounds, such as those based on interpersonal conflict or sexual misconduct.  Other deactivation decisions, such as those based on documentation failures like altered insurance forms or on background check failures, do not

involve rider reports.  And some decisions, such as ones based on dangerous driving, depend on a hybrid of data, such as both on rider reports and on other information like telematics signals, such as acceleration and speed.  Uber has a relationship with a vendor that analyzes telematics data to generate a safe driving score, which Uber calls the CMT Score. Uber takes the CMT Score into account before deactivating any driver for unsafe driving, even if initiated by multiple rider reports of unsafe driving.

105.    When Uber does consider reports from riders, it may decide to permanently deactivate a driver's account based on a single report of particularly serious conduct, such as a single report of sexual assault, even if Uber is not able to corroborate the rider's report (for example, through video showing the assault).  In such situations, and pursuant to its commitment to safety, Uber carefully and appropriately exercises its discretion (as provided in the PAA) to determine if deactivation is warranted.

106.     For reports related to less serious conduct, Uber may consider time on the platform relative to the reports and the number of trips in decisions related to access.  For example, a couple of reports of less serious conduct may lead to a different result for a driver who has completed tens of thousands of rides over the course of a number of years as compared to a driver who has completed only a few dozen rides over the course of a year.

107.    Before any deactivation based on rider reports, Uber considers the reporting rider's history of reporting incidents.  For example, Uber identifies riders whose reports reflect a pattern of lodging similar complaints against a variety of drivers for the sake of receiving refunds and appeasements.  Similarly, Uber removes ratings from a driver's rating calculation where the rider has a proven pattern of consistently giving low ratings.  Uber also will ban a *rider* account where there is evidence that the rider submitted a fraudulent report.

**IV.     Uber Fairly Communicates With Drivers About Deactivation Decisions, How To Submit Evidence, And The Path To Appeals.**

108.    Uber devotes multiple pages of its website to informing drivers about the deactivation process, in addition to the Community Guidelines.  One page titled "Deactivations" focuses on "Understanding why drivers and delivery people can lose access to their accounts." "On this page, you'll find information about the most common reasons why drivers and delivery people may lose access to their accounts or specific earning opportunities, how to avoid it, and what to do if it happens to you."[21]

109.    Whenever possible, Uber informs drivers when they are the subject of reports that could result in deactivation or are at risk of losing access to their account.  For example, Uber notifies drivers when their ratings from riders, in the aggregate, are approaching the minimum aggregate rating requirement for the geographic location, and offers access to resources to help them improve their ratings. Uber also provides drivers with live in-app access to their CMT scores, so drivers can see their score and seek to improve it if it is close to an unsafe driving score.

110.    For most types of reports outside of the most severe issues, Uber sends the driver a notice within 24 hours after Uber receives a report.  The notice informs the driver that they have received a rider report, the date of the trip, and the general nature of the report, such as "Post-trip contact" or "concern with your braking and acceleration."  The notice also may include information about how the driver can respond to the report, and about the circumstances under which similar reports could lead to losing access to Uber's platform.

111.    Below is an example of the type of notice Uber sends to drivers when it receives a report about them:

---

[21] *Id.*

Title: A message from Uber

User Type: driver

Hi ████ ,We hope you are having a great day and on the safe side of the road.We're contacting you following some feedback we received about one of your trips on December 13th 2024. A rider gave feedback that an argument with you made them feel uncomfortable.We wanted to share this feedback with you and emphasize the importance of remaining respectful while using the Driver app, per our Community Guidelines. Multiple reports like this may result in losing access to the Uber apps.If you disagree with this feedback, you're welcome to share your own feedback by replying to this message. If you have a relevant recording, let us know and we can share a link that will let you upload your recording.You can record your trips with the Driver app. In some areas, we'll let your rider know that the trip is being recorded to help encourage respect and prevent false accusations. If you ever report a safety issue, you can choose to include a recording. Our Support team can only review recordings that you attach to a report. Go to this resource to learn more about your recording options and how to set it up.Thank you for your understanding.

112.    In 2024, Uber launched an in-app feature called Report Hub, which covers most types of reports in the City.  For covered report types, Report Hub provides an in-app notification (in addition to the emailed notification described above), which allows a driver to see that they have received a report from a rider and certain information about that report.  It also provides the driver an opportunity to provide additional information, photographs, and media recordings, which may be relevant to the issue.[22]

113.    Below is an example of the type of notice Uber makes available to drivers when it receives a report about them through the Report Hub, and how Uber proactively solicits evidence from the drivers, including by prompting drivers to submit any audio and video captured during the relevant trip using Record My Ride:

---

[22] *Fairness*, *supra* note 18 (providing screenshots of Report Hub interface).



114.    Uber is careful about how much information to provide.  In most situations, Uber believes the balance between safety and fairness favors providing the date and nature of the report to the driver, but not certain details.

115.    Uber does not provide to the driver the reporting party's name, the pick-up or drop-off addresses, the time of the trip, any personally identifiable information (PII) of a reporting party, or the verbatim text of the rider's report (unless such information is required during a legal process) because doing so would pose a risk to rider safety.  Even if the identity of the complaining rider is anonymized, providing the date and time or specific details increases the risk that a driver could identify the complaining rider.  For the more serious issues, such as sexual assault, Uber limits the type of information it provides due to the heightened risk of retaliation.

116.    Uber relies on its ability to deactivate driver accounts without providing additional details so it does not jeopardize the safety of the riders who use its platform, and on its discretion to differentiate between different situations (for example, between a report of speeding and a report of sexual assault) in determining how much information to provide.

117.    Uber also does not disclose details of its decision when it has deactivated a driver based on fraudulent activity because doing so would provide drivers with information they could exploit to evade Uber's fraud-detection mechanisms in the future.  Uber is an attractive target for fraudsters, due to the scale of its platform, the amount of money exchanging hands over the platform, the ability to receive fraudulent proceeds quickly, and the challenge of distinguishing legitimate from fraudulent activity in real time.  For these reasons, Uber has a robust and sophisticated team in place that is constantly trying to detect, identify, prevent, and reduce these kinds of economic frauds against Uber, riders, drivers, and the platform.  Uber and the entities and individuals that are constantly seeking to cheat Uber's systems and avoid detection are engaged in a "cat-and-mouse" game.  The fraudsters develop new schemes, while Uber develops new ways to catch them.  It is critical to Uber's efforts that the fraudsters do not get information and intelligence they can use to better commit fraud while avoiding detection.

118.    When Uber deactivates an account, drivers also receive an in-app message that includes: the reason for the deactivation; prior contact with Uber's support team when available; a Request Review button and an overview of the review process when available; and the ability to upload video, photos, or other documentation.

119.    Uber provides in-app access to the Driver Review Center, which is an internal team of agents that review drivers' appeal of most deactivations and evidence drivers submit to support their case.  Drivers have the ability to request a review of any decision that removes access for more than seven days.  The in-app notification provides information about appeals.

120.    The in-app notification that deactivated drivers receive looks like this:

33









121.    Uber also sends deactivated drivers an email notifying them of the deactivation and providing a link to request a review by the Review Center.  Below is an example of the notice a driver receives by email:

Title: A message from Uber

User Type: driver

Hi ▮,We've received multiple reports from riders expressing concern with your driving. We previously notified you that repeated reports of this nature could lead to loss of account access. As a result, your account has been deactivated.Please note: Driving Insights gives drivers more insight into their driving behaviors, and information on how they can drive more safely. Driving Insights, however, is not the only consideration taken into account for deactivation and your score does not guarantee continued access to the platform.While we understand this news may be upsetting, compliance with our Community Guidelines is required to drive with Uber.If you think this deactivation was an error or can provide additional information (video, photo, or other documentation not previously submitted) that's relevant to your deactivation, you can request a review here. A member of our team will review your account and any information you provide with your review request. The review process usually takes 7 business days, but we sometimes need additional time. We'll send you an email letting you know the outcome of your review.If you're not requesting a review of your account status, please discard or return any Uber-branded decals or signage that you may have used for your vehicle as outlined in our Community Guidelines.Keep in mind, local and/or state laws in your area may prohibit the display of decals to impersonate a rideshare driver, and criminal penalties may apply.

122.    If a driver is eligible and requests a review, a specialized team will review their deactivation and reconsider whether Uber correctly executed its policies, such as, for example, reviewing whether rider reports that were the basis of the deactivation actually report the conduct at issue and whether the rider had indications of submitting false reports.

123.    The review process includes the right of drivers to submit information to support their case, including audio and video recordings. Uber generally aims to collect and assess relevant information from riders and drivers, as well as other sources such as GPS location data, when considering if permanent deactivation is appropriate.  For instance, Uber will consider the driver's location data to determine whether it supports or refutes the allegations.[23]

124.    Every appeal is evaluated by a real person—never by automated systems alone.

125.    Drivers are aware of and utilize Uber's review process.  In 2025, for example, more than 80% of deactivated drivers chose to appeal.

---

[23] *Deactivations, supra* note 20 (explaining "Protection from false allegations" for couriers and opportunity for couriers to provide "information to support their case").

126.    Since 2016, drivers in the City also have had access to an independent, union-negotiated appeals process through the Independent Drivers Guild ("*IDG*"), an affiliate of the Machinists Union that "represents over 300,000 for-hire vehicle drivers."[24]

127.    The IDG provided a "worker-led and union-negotiated process for reinstating drivers after they have been deactivated" for a variety of reasons and that included the "right to be represented by trained advocates" from IDG ("*IDG Process*").  The fact-finder in the IDG Process was "a worker panel run by a third-party arbitrator from the American Arbitration Association."[25]

128.    A report from the City's Committee on Transportation and Infrastructure ("*Committee*") found that IDG had "represented approximately 20,000 drivers in the City over the past five years" in connection with appeals of deactivations.[26]

129.    In addition to the Review Center and IDG process, drivers in New York City have also filed various small claim proceedings, civil lawsuits, and arbitration demands against Uber challenging their deactivations.

## V.    Uber Enters Into Contracts With Riders And Commits to Safeguarding Their Personal Information and Privacy

130.    Uber emphasizes to riders that their "trust is important" and that: "When you use Uber, you trust us with your personal data. We're committed to keeping that trust."[27]

131.    Uber tells riders that their "comments are always anonymous" and that any details on "specific trip ratings are confidential and not provided."[28] Uber also assures riders that after

---

[24] *Deactivation Representation*, Independent Drivers' Guild, https://driversguild.org/deactivation/ (last visited June 5, 2026).
[25] September 27, 2024 Committee Testimony, IDG Letter (attached as Exhibit 7) at 1.
[26] IDG *Deactivation Representation*, *supra* note 24.
[27]    *Uber    Privacy    Notice:    Riders    and    Order    Recipients*,    Uber    (March    26,    2026), https://www.uber.com/global/en/privacy-notice-riders-order-recipients/.
[28] *Understanding ratings*, *supra* note 10.

trips, their "privacy is protected by anonymizing phone numbers and addresses so riders and drivers can rate their experience and report any concerning feedback to Uber."

132.    Uber publishes Privacy Principles, which are the foundation of Uber's privacy practices.[29] The Privacy Principles include using "reasonable and appropriate safeguards to prevent loss, and unauthorized use or disclosure, of personal data."[30]

133.    Uber requires riders to agree to its Terms of Service to govern their use of the Uber platform.[31] The Terms of Service incorporate additional documents, including the Community Guidelines, and Uber's Privacy Notice to Riders, and User Generated Content Terms.  User Generated Content ("*UGC*") relates to content that a rider submits to Uber, including in the form of "commentary, reviews, and feedback."[32]

134.    The Rider Privacy Notice discloses the specific types of data that Uber collects, how it uses that data, what specific data is disclosed and to whom, and all the ways Uber may use UGC.[33]

135.    The Rider Privacy Notice specifically addresses what rider data Uber will provide to drivers.  It states that a driver only will receive a rider's first name, rider rating, pickup and/or dropoff locations, settings (including accessibility settings) and preferences:

---

[29] *Uber's privacy principles*, Uber, https://www.uber.com/global/en/privacy/overview/ (last visited June 5, 2026).
[30] *Privacy*, Uber, https://www.uber.com/global/en/privacy/overview/ (last visited June 5, 2026).
[31] *U.S. Terms of Use*, Uber, https://www.uber.com/legal/en/document/?name=general-terms-of-use&country=united-states&lang=en.
[32] *Id.*
[33] *Privacy Notice: Riders*, *supra* note 27.

| Uber may share data: | |
| --- | --- |
| **1. With other users** | |
| This may include sharing data with: | |
| **Recipient** | **Data shared** |
| **Your driver** | • Account<br>  ◦ First name<br>  ◦ Rating<br>• Pickup and/or dropoff locations<br>• Settings (including accessibility settings) and preferences |

136.    Uber's disclosure about the rider data it provides to drivers does not include any reference to UGC, including the data it collects relating to rider complaints.

137.    Uber provides riders with the ability to "View as Driver, which shows riders the information seen by their drivers so they can be confident that Uber is sharing only what is necessary to enable their ride."[34]

138.    The rider information that Uber does share with a driver, including pickup and dropoff locations, is inherently sensitive, even when scrubbed of the personally identifying information such as name.  Riders use Uber to obtain transportation from their homes, workplaces, schools, and medical facilities.  Riders expect and Uber promises that rider name and pick up and drop off location  is shared separate and apart from their ratings and reports for obvious safety reasons.  Riders rely on that promise when sharing with Uber their experiences with drivers.

## VI.        The City Council Passed The Challenged Law To Stop "Unfair Deactivations" Based On Inaccurate Assumptions And Hypothetical Fear.

139.    From the time Uber began to offer its platform in the City in 2012, the City's taxi-cab industry and members of the Council took great efforts to inhibit its ability to operate.

140.    The NYTWA has been one of the primary organizing forces against Uber.  The NYTWA spent years lobbying the Council to regulate Uber, touting victory when the Council

---

[34]    *Living    Up    to    Our    Privacy    Principles:    Introducing    Uber's    Privacy    Center*,    Uber, https://www.uber.com/hu/en/newsroom/privacycenter/ (last visited June 5, 2026).

passed a series of regulations in 2018.  NYTWA's executive directly celebrated the passage as the "dawning of a new day for a workforce of a hundred thousand men and women."

141.    The anti-Uber rhetoric and sentiment has persisted over the years, and Uber has successfully challenged various prior efforts to stifle its business.[35]

142.    For years, City taxi advocates, led by the NYTWA, lobbied loudly across the country about what they attacked as "Uber and Lyft's cruel deactivation policy hurts drivers who take on expenses out of pocket to work, only to be told that they have been fired with no just cause or way to appeal."[36]  For "more than two years" NYTWA had "been working on legislation" to end "unfair deactivations without notice, cause, or appeal."  Their concerns were not warranted nor accurate.

143.    NYTWA summarized its "Demand to the City Council" on its website:

> "**The City Council must pass a "just cause" law.** This means that Uber - Lyft - Juno - Via would not be allowed to deactivate  (another way to say you are fired) without a just cause. The law would allow deactivated drivers to file a complaint with the city who would investigate the deactivation case to see if it was for an unfair reason. If the company deactivated unfairly, then the driver is entitled to get their job back, with back pay!"[37]

144.    This kind of process and protection extends far beyond anything available to employees all across New York City.  The NYTWA's efforts culminated on February 28, 2024 when Council Member Shekar Krishnan introduced the bill that would become the Challenged

---

[35] *E.g.*, "In win for Uber and Lyft, judge strikes down New York City's cruising cap," CNBC (Dec. 23, 2019), available at  https://www.cnbc.com/2019/12/23/in-win-for-uber-judge-strikes-down-new-york-citys-cruising-cap.html; "Uber Doesn't Have to Raise New York City Drivers' Pay, Judge Rules," N.Y. TIMES (Jan. 6, 2023), https://www.nytimes.com/2023/01/06/nyregion/uber-lyft-driver-pay.html; "N.Y. Judge Halts Law That Would've Raised Minimum Wage For App-Based Delivery Drivers In NYC," FORBES (July 7, 2023), https://www.forbes.com/sites/willskipworth/2023/07/07/ny-judge-halts-law-that-wouldve-raised-minimum-wage-for-app-based-delivery-drivers-in-nyc/; "Judge Rules in Favor of Food Delivery Apps in NYC Data-Sharing Lawsuit," JUSTIA LEGAL NEWS (Sep. 25, 2024), https://news.justia.com/judge-rules-in-favor-of-food-delivery-apps-in-nyc-data-sharing-lawsuit/; "Uber and DoorDash Try to Halt N.Y.C. Law That Encourages Tipping," N.Y. TIMES (Dec. 16, 2025), https://www.nytimes.com/2025/12/16/nyregion/uber-doordash-nyc-tipping.html.

[36] *Deactivation*, NYTWA, https://www.nytwa.org/deactivation (quoting since-removed X post by user @nicoemoe).

[37] *Id.*

Law (the "**Bill**"), titled "A Local Law to amend the administrative code of the city of New York, in relation to the wrongful deactivation of high-volume for-hire vehicle drivers."[38]

145. Public reports credit NYTWA with "draft[ing]" and "inspiring" the Bill.[39]

146. When Mr. Krishnan discussed the Bill during a hearing on September 27, 2024 ("**September Hearing**"), he parroted the language and concepts that the NYTWA used in its demand of the Council. The Bill, and ultimately the Challenged Law, relied on the same concepts and language, sometimes verbatim and what NYTWA demanded the Council include.

147. At the September Hearing, Mr. Krishnan explained that the Bill's animating principle is to address what he labeled "unfair deactivations." He explained: when drivers "are unfairly deactivated, drivers can be forced into a company driven appeals process where the companies have the upper hand and make the final decision with no real meaningful process, with no notice in advance and no real reasons listed [or] public available standard for what constitutes a fair reason for deactivation."[40]

148. During the same September Hearing, Mr. Krishnan conceded that the Bill targeted Uber and Lyft, stating that it would protect "the livelihoods of Uber [and] Lyft drivers" from being "thrown into chaos when they are deactivated from Uber and Lyft with little to no advance warning."[41]

149. NYTWA's Executive Director spoke at the September Hearing, making clear that the goal of the bill was to create a presumption that the deactivation was unlawful, and require

---

[38] File # Int. 0276-2024, Legislative Research Center, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563 (last visited June 4, 2026).

[39] *See* Amir Khafagy, "Taxicab Industry Uber-Backed Group Opposes Bill to Protect Drivers From Unfair Deactivations," DOCUMENTED (Sept. 30, 2025), https://documentedny.com/2025/09/30/uber-backed-group-opposes-bill-to-protect-drivers-from-unfair-deactivations/

[40] Ex. 6 at 22:8-14.

[41] Ex. 6 at 21:11-13.

Uber and Lyft to prove otherwise.  She said: "We have a right to be presumed to be innocent even by corporations that have a sword hanging over our necks you know in the form of taking our jobs away."[42] The NYTWA acknowledged the existence of contracts between Uber and drivers when it noted in support of the Challenged Law that "driver contracts don't require any proof for driver deactivations."[43]

150.    As it was considering the Bill, the Council did not focus on or even consider any data specifically about "unfair" deactivations (as opposed to deactivations generally) or define what "unfair" meant.  The basis for the claim of "unfair" deactivations was anecdotes from a handful of drivers, assertions by the NYTWA, and two surveys of drivers prepared by lobbyist organizations.  The bulk of the discussion focused on hypothetical fear and aspersions on the character of Uber and its executives, including the following statements:

- Shahana Hanif, Council Member for District 39: "No one should live in fear of being deactivated by a faceless algorithm.  I'm proud to co-sponsor Intro 276 to protect workers from wrongful deactivation and give them the right to challenge unfair treatment."[44]

- Selvena N. Brooks-Powers, Council Majority Whip and Chair of Committee on Transportation and Infrastructure: "For-hire vehicle drivers keep New York City moving, yet too many are one app notification away from losing their livelihoods with no explanation and no recourse."[45]

- Harvey Epstein, Council Member for District 2: "Hardworking ride-share drivers are at the mercy of billionaire tech companies who can deactivate their accounts on a whim."[46]

- Executive Director of the New York Taxi Workers Alliance, speaking in support of the bill: "I think if you asked every single Uber and Lyft driver in the City of New York, I would even say across this globe, they would tell

---

[42] Ex. 6 at 53:21-54:2.
[43] September 27, 2024 Committee Testimony, NYTWA Letter (attached as Exhibit 8) at 1.
[44] NYTWA Press Release, "Council Member Krishnan and NYTWA Celebrate Passage of Most Comprehensive Just Cause Protection Law in The Nation for App-Based Drivers" (Dec. 19, 2025), https://myemail.constantcontact.com/RELEASE--Krishnan---NYTWA-Celebrate-Passage-Just-Cause-Law-for-NYC-Uber---Lyft-Drivers.html?soid=1101912670699&aid=nRSQxpStqIo.
[45] Id.
[46] Id.

you even if they've never been deactivated, every single driver works with fear and anxiety over the threa[t] of an unfair deactivation."[47]

- Shekar Krishnan, Council Member and main sponsor of the Challenged Law: "[T]he current system allows Uber and Lyft to upend drivers' lives in exchange for their own profits. . . Today, we are setting an important national precedent for drivers, giving labor more power and holding megacorporations accountable."[48]

- Shekar Krishnan, Council Member and main sponsor of the Challenged Law: "No longer can Uber and Lyft hold the fear of unfair firings over the heads of almost 100,000 drivers in New York City."[49]

151.    The same hypothetical fear and anti-Uber sentiment was apparent in the remarks of 23 drivers who Uber or Lyft had deactivated and who spoke during the September Hearing. Most of the deactivated drivers knew why they had been deactivated, even describing the precise complaint that led to the deactivation, including for example: confrontation with a passenger; safety concerns; substance use; low ratings; issues with their required account information and documentation; and the refusal to permit a rider's service dog. The testimony of these drivers indicated that Uber or Lyft deactivated them for legitimate, and sometimes legally-required, reasons and a couple of them admitted to violating the Agreement. Other drivers described the very processes the Council claimed did not exist: advance notifications from Uber, and reactivation based on Uber's consideration of the driver's evidence. Deactivated drivers lodged grievances generally of having been "unfairly deactivated" did not provide the reason for their deactivation or any specificity about why it was "unfair," focusing solely on hardship or hypothetical scenarios.

---

[47] Ex. 6 at. 51: 24-52:5.

[48] December 18, 2025 Committee Hearing Tr. (attached as Exhibit 9) at 6:2-15, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563&.

[49] Press Release, New York City Council, NYC Council Votes to Override Vetoes from Former Mayor Adams of Legislation to Strengthen Worker Protections and Increase Housing Affordability (Jan. 29, 2026), https://council.nyc.gov/press/2026/01/29/3066/.

152.    Uber's Senior Director of Public Policy testified during the September Hearing about Uber's deactivation and appeals processes.  He explained that Uber deactivates "as a last resort" in order to provide "a safe and reliable experience" for "everyone who uses Uber," and that is careful not to consider "false allegations" in making a deactivation decision.[50]  Mr. Gold explained that drivers "can always dispute a deactivation and provide additional information" in Uber's Review Center, as well as being "able to appeal through a process set up with the IDG and overseen by AAA."[51]

153.    In contrast to other speakers, he focused on the underlying reasons for deactivation and provided detailed statistics, reflecting that only approximately "one percent" of drivers had faced "permanent deactivation" that year, "largely due to fraudulent activity and safety incidents." He explained that the majority of deactivations were temporary (waitlistings), largely "due to expired documents" or "TLC regulations," and resolved quickly.[52]

154.    After the September Hearing, the Council tabled the Bill until December 2025.

155.    Not one Council Member substantively engaged with how to balance protecting rider safety during the September Hearing (or at any point during the legislative process).

156.    Pro-Bill witnesses from the NYTWA and similar groups referenced safety only to lament drivers being "unfairly" deactivated for safety reasons.  In a September 30, 2024, letter, NYTWA downplayed "safety" as "a concept that the companies define so broadly as to cover many allegations related to driving or customer interactions."[53]

157.    The primary sponsor of the Bill on the Council echoed the deprioritization of safety, favoring instead a presumption that deactivations are unfair.  Mr. Krishnan repeatedly stated

---

[50] Ex. 6 at 145:9–150:3.
[51] *Id*. at 146:3-5, 146:24-147:1.
[52] *Id*. at 146:5-23.
[53] Ex. 8 at 2.

publicly that drivers should be "innocent until proven guilty" and that the "basic principle of proceed with due process is the prosecutor's office, the agency, government, whatever it is, has to make out the case to say you're innocent until we can show beyond a reasonable doubt or whatever it may be that you're guilty right? . . . why wouldn't that same framework be applied here for a process that of course impacts a driver's livelihood?"[54]  He emphasized that the Bill would mean "companies will bear the burden of proving that their actions were justified," and would be penalized by having to pay "back pay for the time that [the driver was] not allowed to work" if the company could not overcome the burden of proof.[55] These statements reflect a complete disregard for safety, and would mean, for example, that a driver accused of rape would be permitted to drive single female passengers at night unless and until Uber could prove the crimes "beyond a reasonable doubt," the highest legal standard of proof available, and reserved to convict a defendant in a criminal trial.[56]  And unlike prosecutors in a criminal trial, Uber is a private technology company that does not have access to any of the law enforcement tools on which the government relies to meet its high burden of proof.

158.    In the days and weeks after the September Hearing, Uber and various third party advocacy groups voiced concern with the Bill, including about its disregard for rider and public safety.  In a written submission dated September 30, 2024, Uber proposed a number of changes to achieve the Bill's goal to "provide drivers with additional protections" while addressing safety and pragmatic concerns:[57]

- Suggesting the Council explicitly define "egregious conduct" to include "conduct that endangers the physical safety of others, intentionally causes economic harm, or is physically or verbally threatening, harassing, or

---

[54] Ex. 6 at 173:21-174:3; 174:8-175:9.
[55] *Id*. at 23:17-24.
[56] *Id*. at 174:2-175:9.
[57] September 27, 2024 Committee Testimony, Uber Letter (attached as Exhibit 10) at 1–2.

abusive," and language that allows for "discretionary decision making outside of the defined categories;"

- Noting that allowing "drivers who have violated Uber's Platform Access Agreement or Community Guidelines to remain on the platform during a notice period may jeopardize the safety of other users;"

- Proposing limiting any pre-deactivation advance notice period to "no more than 3 days;"

- Requesting the removal of the retroactive provision because that drivers have had access to a pre-existing appeal process through the Driver Review Center, as well as to the IDG's additional appeal process since 2016;

- Explaining that TLC would be better suited to implement new protections rather than assigning oversight "to an agency without any experience dealing with the nuances of the industry."

159. Uber sent additional letters to Council Members explaining several of the practical and legal infirmities of the bill.[58]

160. Community groups also voiced concerns. In an editorial, the National Federation of the Blind of New York and the National Association of Guide Dog Users urged the Council to reconsider the Challenged Law: "Fair deactivation processes are achievable without sacrificing passenger protections."[59] By "significantly restrict[ing] rideshare companies' ability to deactivate bad and unsafe drivers accused of serious misconduct," the law would "inadvertently shield drivers who violate civil rights laws or endanger vulnerable passengers." In the writer's and other advocates' view, "such drivers must face immediate deactivation, so consequences fall on the violator, not the victim." As he put it, the Council was "wrong" to "prioritize driver job security over passenger protections." The Justice Without Exclusion Coalition (which includes RAINN

---

[58] Letter from J. Gold (Uber) (Dec. 15, 2025) (attached as Exhibit 11); Letter from K. Dunn on behalf of Uber (Dec. 17, 2025) (attached as Exhibit 12).

[59] Albert Elia, "NYC rideshare deactivation bill hurts the blind," NY DAILY NEWS (Oct. 2, 2025), https://www.nydailynews.com/2025/10/02/nyc-rideshare-deactivation-bill-hurts-the-blind/.

and 26 other members), SafeHorizon, and the NO MORE Foundation also voiced serious concerns about rider safety and urged the Council not to pass the Bill as written.

161.    The IDG, which oversaw the IDG Process, spoke out against the bill.  The IDG pointed out that drivers already had "a fair, proven way" to challenge deactivations through IDG's own "union-won grievance process."[60]  According to IDG, the Challenged Law risked replacing the proven pro-driver IDG Process with "a weak, city-run process" that would offer drivers "fewer protections" than the existing processes.[61]  The IDG also criticized delegating the appeals process to the Department, an agency that "can't handle the volume" as evidenced by the Department having "handled just 29 fast-food cases last year."[62]

162.    The Council proposed amendments to the Bill in December 2025.

163.    Although the Council purported to address the safety concerns of Uber and others, the amendments themselves highlighted the Council's lack of concern for rider safety considerations.

164.    A December 18, 2025 report ("*December 18 Report*")[63] published by the Committee acknowledged that "organizations representing various vulnerable passenger populations" had contacted Committee staff with concerns about the bill, and in particular about what would constitute "egregious misconduct" such that the driver "could be immediately deactivated pursuant to the bill."[64]  As reflected in the December 18 Report, the Committee

---

[60] "Why IDG Is Working To Fix NYC's Int 276 - A Deactivation Bill," IDG (Oct. 23, 2025), https://driversguild.org/why-idg-is-working-to-fix-nycs-int-276-a-deactivation-bill/.

[61] "NYC Ride-Share Drivers Push Back Against Proposed City Council Bill," IDG (Sep. 30, 2024), https://driversguild.org/nyc-ride-share-drivers-push-back-against-proposed-city-council-bill/.

[62] IDG *Deactivation Representation*, *supra* note 24.

[63] Dec. 18, 2025 *Committee Report of the Infrastructure Division*, Comm. on Transportation and Infrastructure (attached as Exhibit 3) at 12, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563&.

[64] *Id*. at 12.

explained that it had rejected a definition of "egregious misconduct" that would make clear it included all "conduct that endangers others" because that would be "over-inclusive:"[65]

> "The umbrella definition of 'conduct that poses an imminent danger to other persons' was chosen over Uber's suggestion of conduct that endangers others because Uber's preferred definition would be over-inclusive and could include behavior such as the failure to properly signal a turn that, although it arguably endangers others, does not rise to the level of wrongdoing contemplated by the term "egregious misconduct."[66]

165.   In other words, "endangering others," including violating the law, may be fine. The Committee also explained that it had rejected "allowing the [companies'] reasonable belief of misconduct to qualify as just cause" because that would allow the companies "to keep a driver deactivated even in the face of a [Department] determination to the contrary."[67]

166.   Similarly, the Committee minimized concerns about providing a driver with rider complaints, including the date and location of an alleged incident that could lead a driver directly to the rider.  The December 18 Report simply asserted that "it may be required that the driver be provided information about the specific allegation giving rise to their deactivation (including when and where the driver allegedly engaged in the misconduct)."[68]

167.   The December 18 Report confirmed that the focus when considering the Challenged Law remained on the possibility of unfair deactivations, including based on "false complaints": "FHV drivers could lose their livelihood based upon a false complaint, motivated by either a passenger's financial incentive or racial animus."[69]  The December 18 Report does not mention any other type of complaint.[70] Nowhere in the legislative history did the Council grapple

---

[65] *Id.* at 13.
[66] *Id.* at 12-13.
[67] *Id.* at 15.
[68] *Id.* at 14–15.
[69] *Id.* at 10.
[70] *Id.* at 15-16.

with the fact that rider complaints simply are irrelevant to a large proportion of deactivations, meaning that the Challenge Law risks jeopardizing rider safety even when doing so would serve no purpose.

168.    The December 18 Report confirmed the Council's one-sided approach to drafting the Bill was rooted on twin presumptions that deactivations are unfair and drivers are right.  In support of the Bill's assumption that unfair deactivations are a problem, the only purported objective evidence that the Council relied on were surveys located in two publications: "Fired by An App: The Toll of Secret Algorithms and Unchecked Discrimination on California Rideshare Drivers" and "Deactivated Without Cause: The Data Behind Unjust Firings of Drivers."[71]  Driver lobbying organizations were involved in designing both surveys: the former by the Rideshare Drivers United ("*RDU*"), a "driver-led organization of 20,000 app-based drivers in California"; and the latter by the NYTWA, which "was responsible for the design, administration, and collection of the survey data."  Both surveys are based on input from a few hundred current or former Uber and Lyft drivers.  Neither survey claims to be statistically significant or based on any accepted principles of survey design, and each focuses predominantly on the "toll" of deactivation on the driver.  They both contain material and significant inaccuracies and falsehoods.

169.    The RDU survey "surveyed 810 current and former Uber and Lyft drivers in California" in 2022 based on their experience any time in the four years prior (i.e. back to 2018), who were members of the RDU, and 66% of whom had been "deactivated at some point by Lyft, Uber, or both."  The survey qualifies up front that it only "describes the trends and themes in the data provided by this specific group of drivers," who "may be more likely to be inclined to participate in a survey" about deactivation than other drivers.  At best, the RDU report summarizes

---

[71] *Id*. at 8-10.

and draws conclusions from the anecdotes of fewer than 1,000 self-selected RDU members who drove for Uber or Lyft in California at some point between 2018 and 2022.  It is unclear what the surveyed drivers mean by "deactivated" and they could be referencing something like being waitlisted because they did not update an expired driver license.

170.    The NYTWA survey surveyed only "341 deactivated Uber and Lyft drivers" and focused on the "devastating" "human toll of deactivation."  Based on input from these 341 drivers, the NYTWA claims to have exposed "the deeply troubling reality of unjust deactivations-a harmful practice that strips hardworking people of their livelihoods without notice, evidence, or any real chance to defend themselves."  This is all false.  The NYTWA alone was responsible for all parts of the survey and the resulting report confirms its purpose as a way to lobby the Council to pass what would become the Challenge Law.  The NYTWA survey concludes: "To end these injustices, policymakers should enact and enforce just cause protections for New York City's 84,000 active rideshare drivers to ensure that no driver is deactivated without legitimate reason, transparency, or due process."  The NYTWA asserts, based on responses of 341 drivers, "that Uber and Lyft's deactivation practices are not isolated incidents but part of a broader, systemic pattern of injustice that strips hardworking people of their livelihoods by way of digital firings-terminations by a platform with no human involvement or explanation for a major life event for a worker. The absence of notice, explanation, or appeal rights related to deactivations violates basic principles of fairness and workers' dignity."  This also is all false.

171.    The Committee's citations to both reports focused on the "hardship as a result of" deactivation rather than the underlying reasons for deactivation, as well as rider misconduct reported by drivers and what drivers reported they were told about rider complaints.[72]  The

---

[72] *Id*. at 8–9.

December 18 Report reflected no questions or caveats from the Committee about the surveys' methodology, no concerns about the reports being pieces of advocacy, and no countervailing statistics presented by neutral or industry sources. It likewise did not appear to consider whether surveys of drivers with dramatically above-average deactivation rates might be unrepresentative of the views of drivers generally, let alone of the reality of deactivation outside of self-reported anecdotes.

172. In sum, the only purported empirical data that the Council considered to justify claiming there was a real problem with "unfair deactivations" in the City amounted to one years-old survey performed by a pro-driver lobby of 810 drivers who were not located in the City and another one of less than 350 drivers designed, administered, and collected by the largest taxi lobby in the City who has dedicated its existence to fighting against Uber. This is not sufficient to meet the burden the City bears under the Constitution.

173. In response to the proposed amendments, IDG again expressed concerns about replacing a proven process with a government one without proper knowledge or resources. Although one of the centerpieces of the Bill was the availability of a "fair process," IDG's president noted that the amendments added that the Department would take drivers' cases "only if [the Department] has resources," effectively "taking that right away" from drivers even as the law purported to give it to them.[73] At the same time, the amendment added an "informal resolution process." To the extent this was designed to provide room for IDG, it imposed such onerous deadlines as to render IDG's process impossible. IDG's concerns have already been born out: the

---

[73] Samantha Liebman, "Council overrides veto of bill meant to protect rideshare drivers," SPECTRUM NEWS NY 1 (Jan. 29, 2026), https://ny1.com/nyc/all-boroughs/traffic_and_transit/2026/01/30/council-advances-bill-meant-to-protect-rideshare-drivers; *see also* Ex. 1 at 2 ("upon receiving a complaint alleging a violation of any provision . . . the department shall, *if resources permit*, investigate the complaint") (emphasis added).

timelines imposed by the Challenged Law do not permit IDG's union-negotiated appeal process. The result is that drivers who are members of the IDG will no longer benefit from the IDG Process.

174. The Council dismissed criticisms about the Bill replacing the proven IDG Process by claiming the pro-driver success of the IDG proves the unfairness of most deactivations. The conclusion ignores that the IDG Process dealt with non-safety-related deactivations and relies on a false expectation that there would be the same high rate of reinstatements for deactivations based on serious safety-related  misconduct. The Committee's back-of-hand to the IDG Process overlooks the obvious conclusion that the IDG Process demonstrated a pro-driver appeals process already in place that provided a fair process whereby Uber neither is judge nor jury.

175. The legislative history shows no sign that the City seriously contended with Uber's existing processes for deactivation appeals, and none of the Council's reports so much as mention Uber's existing features to protect drivers from false reports or unfair ratings.

176. The New York City Mayor's Office of Management and Budget estimated that the bill would require the Department to establish a new compliance division of 170 staff, to review an assumed 2,000 cases per year.[74]

177. Up until and through the final vote, the Council ignored reality in favor of an imaginary problem constructed by a powerful taxi lobby. Before the final vote in mid-December 2025, Mr. Krishnan proclaimed that Uber and Lyft currently could deactivate drivers "at any time, for any reason, and with no notice, cause or appeal process."[75] This is false.

178. On December 18, 2025, the Council passed the amended version of the Bill.[76]

---

[74] Dec. 15, 2025 Fiscal Statement of the New York City Mayor's Office of Management and Budget (attached as Exhibit 13), available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563&.

[75] Stark-Miller, Ethan, "City Council approves 'unfair deactivations' safeguards for rideshare drivers, delivery workers," AMNY (Dec. 18, 2025), https://www.amny.com/news/city-council-unfair-deactivations-rideshare-delivery-workers/.

[76] Legislative Research Center, *supra* note 38.

179. Not a single Council Member mentioned safety in connection with the Bill as they voted for its passage.[77]

180. On December 31, 2025, Mayor Eric Adams vetoed the Bill, noting that it would "second-guess business decisions regarding independent contracts," "create regulatory confusion," and come "with a high cost."[78]

181. On January 29, 2026, the Council voted to override the veto and enact the Bill into law.[79]

182. The Challenged Law is slated to take effect on July 28, 2026.

## VII. The Challenged Law Interferes With Uber's Contracts, Free Speech, And Free Association.

183. The Challenged Law amends chapter 12 of title 20 of the administrative code of the City by adding a subchapter titled "WRONGFUL DEACTIVATION OF HIGH VOLUME FOR-HIRE VEHICLE DRIVERS" ("high volume for-hire vehicles" also referred to as "HVFHS"), as well as revising certain existing provisions of chapter 12 to include HVFHS drivers.[80]

184. Section 12-1281 includes various definitions, including as relevant here:

- **Deactivation**: "(i) an indefinite or permanent discharge, termination, or layoff of a high-volume for-hire vehicle driver; or (ii) a revocation or restriction of a high-volume for-hire vehicle driver's authorization to accept trips on a driver platform that is either continuously in effect for at least 72

---

[77] Ex. 9.

[78] *Veto Message*, Mayor Eric Adams (Dec. 31, 2025) (attached as Exhibit 14), available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563&.

[79] Legislative Research Center, *supra* note 38.

[80] The Challenged Law incorporates the definition of "high-volume for-hire service" from New York Administrative Code § 19-501: "an individual, partnership, limited liability company, business corporation, sole proprietorship or any combination of one or more individuals, partnerships, limited liability companies, business corporations or sole proprietorships operating under, or in affiliation with, one brand or trade name or a common brand, trade, business or operating name, that offers, facilitates or otherwise connects passengers to for-hire vehicles by prearrangement, including through one or more licensed black car bases, luxury limousine bases or livery base stations, as these terms are defined in section 51-03 of title 35 of the rules of the city of New York, utilizing software that allows a passenger or prospective passenger to arrange for transportation using a passenger-facing booking tool, including a smartphone or other electronic device, and that dispatches, or facilitates the dispatching of, 10,000 or more trips in the city in one day. Any and all bases using a common brand, trade, business or operating name will be considered together for purposes of determining whether they satisfy the definition of high-volume for-hire service."

hours or consists of multiple periods of revocation or restriction that total at least 168 hours within a 1-year period."

- **Egregious misconduct**: "(i) conduct that poses an imminent danger to other persons, including but not limited to violence, threats to engage in violence, sexual harassment, or sexual assault or (ii) discrimination in violation of federal, state, or local law."

- **Just cause**: "the high-volume for-hire vehicle driver engaged in egregious misconduct, failed to satisfactorily perform their job duties, or engaged in any other misconduct that is demonstrably and materially harmful to the high-volume for-hire vehicle service's legitimate business interests."

- **Prior deactivation**: "a deactivation that occurred during the 7 years prior to the effective date of the local law that added this subchapter."

- **Progressive discipline**: "a disciplinary system that provides for a graduated range of reasonable disciplinary measures, including but not limited to warnings and further training requirements, in response to a high-volume for-hire vehicle driver's 11 misconduct or failure to satisfactorily perform job duties for a high-volume for-hire vehicle service, with the type of disciplinary measure varying based on the frequency and degree of such misconduct or failure."

185. The Challenged Law creates two processes for drivers to challenge what it calls a "wrongful deactivation." It authorizes a driver to file a complaint with the Department, and also creates a private right of action to enforce the Challenged Law in any court of competent jurisdiction–a recipe for further delay given the backlogs in the New York state court system.[81] Accordingly, not only will Uber be facing proceedings in multiple jurisdictions, multiple fora, and in front of multiple fact finders, but drivers will also face a confusing maze of options with seemingly built-in delays.

186. The Challenged Law requires a "fact finder" to consider seven factors when determining if "just cause" supported a deactivation. The Challenged Law empowers any fact

---

[81] Chris Bragg, "Why New York Judges Are Fighting a Major Plan to Fix Court Backlogs," N.Y.S. FOCUS (May 30, 2025), https://nysfocus.com/2025/05/30/uncap-justice-act-new-york-court-backlog (New York courts "buckle under hundreds of thousands of unresolved cases[.]")

finder to consider any other factor they want, but gives no guidance on how to balance or weigh the factors.

187.    The Challenged Law establishes that if an HFVHS violates any part of §§ 20-1282 or 20-1283 (described below), including technicalities, the Department "shall order reinstatement or restoration of access" and in the case of 20-1282, "backpay" to the driver.[82]

**A.    Section 20-1282 Of The Challenged Law Limits The Permissible Bases For Deactivation, Imposes A 14-Day Notice Requirement, And Mandates Uber Convey Specific Messages.**

188.    Section 20-1282 is titled "Prohibition on wrongful deactivation" and includes five subsections that details various prohibitions and requirements.

i.    Deactivation Prohibitions (§ 20-1282(a)-(c))

189.    The Deactivation Prohibitions establish that an HVFHS "shall not deactivate" a driver outside of the 30-day probationary period "except for" three reasons:

1)    "just cause;"

2)    "a bona fide economic reason, as described in section 20-1284;"[83] or

3)    "where federal, state, or local law or rule requires" deactivation.

190.    Only three types of driver behavior would satisfy the "just cause" standard of the Deactivation Prohibitions based on the way the Challenged Law defines "just cause:"

1)    egregious conduct, *i.e.* behavior that "poses an imminent danger to other persons" or is discriminatory as a matter of law;

2)    a failure to "perform their job duties;"

3)    or "misconduct that is demonstrably and materially harmful" to the HVFHS.

---

[82] Sections 20-1208, 20-1289(c).

[83] Section 20-1284 of the Challenged Law defines a "bona fide economic reason" to mean: "(i) a proportionate reduction in volume of sales or profit within the fiscal quarter prior to the issuance of a notice of layoff required by subdivision d of section 20-1282; or (ii) a high-volume for-hire vehicle service discontinuing its driving services in the city."

191.    Section 20-1282 specifies that an HVFHS cannot demonstrate "just cause" for non-egregious conduct unless it has relied on a written form of progressive discipline.[84]

192.    Section 20-1282 identifies seven subjective factors that a "fact-finder shall consider" when determining whether there was "just cause" to deactivate a driver, including that: the "policy, rule or practice that forms the basis for such deactivation" was "reasonable and applied consistently" and "reasonably related to safe and efficient" operations of the HVFHS; and the deactivation was the result of a "fair and objective investigation" and is a "reasonable response" to the conduct and "accounts for any mitigating circumstances." The Challenged Law gives no guidance on how to balance or weigh the factors, nor what other factors should be considered.

193.    The Deactivation Prohibitions substitute the City's judgment for Uber's own business judgment about how to govern access to its platform. Uber and drivers made the decision to enter into a contractual relationship, which affords Uber the contractual ability  to remove drivers for what the PAA defines as a Material Breach Or Violation and as determined to have occurred at Uber's discretion. The Deactivation Prohibitions prohibit Uber from exercising this discretion and, instead, force Uber to grant certain drivers access to its platform even if Uber determined they have engaged in conduct that violates their bargained-for contractual agreements, including Uber's standards and policies, and even if the conduct could pose a serious safety risk to future passengers.

194.    Section 20-1282 also bars Uber from relying on an instance of "progressive discipline issued more than 1 year before such deactivation" in demonstrating to a fact-finder that a deactivation was for "just cause."[85] Uber's contracts with drivers include no such prohibition;

---

[84] Section 20-1282(b)(2).
[85] Section 20-1282(c)(1).

Uber may consider incidents from any time. The Challenged Law thus interferes with Uber's contractual rights by limiting the incidents which it may consider as well.

195. The vagueness of the Challenged Law deprives Uber of clarity about the extent of the Deactivation Prohibitions' interference with Uber's ability to enforce its own Agreement.

196. The Challenged Law's contemplation that a variety of different fact finders would be responsible for determining if Uber complied with the Deactivation Prohibitions injects uncertainty and further erodes Uber's ability and discretion to enforce its own agreements. With every challenge potentially going to a different judge or Department staffer, Uber will face a variety of interpretations of the Challenged Law's various standards, the consideration of various factors, and likely will face inconsistent judgments as applied to different drivers.

ii.    The 14-Day Notice Provision (§ 20-1282(d))

197. The 14-Day Notice Provision states that an HVFHS "shall provide" drivers "with notice of an impending deactivation 14 days in advance of the impending deactivation" except in two specific instances. *First*, the 14-Day Notice Provision does not apply when there is a bona fide economic reason for the deactivation provided that the HVFHS provides 120-day advance notice of layoff in a "form and manner designated" by the Department. *Second*, the 14-Day Notice Provision "is not required where a deactivation is for egregious misconduct, account sharing,[86] or if there is a pattern of repeated fraudulent behavior." (together, the "***Notice Exemptions***").

198. The 14-Day Notice Provision rewrites key provisions of Uber's existing contracts with drivers. It replaces the bargained-for provision that Uber may deactivate without notice, with the City's own provision requiring 14 days of notice.

---

[86] Section 20-1281 defines "account sharing" to mean "permitting another person to use" the driver's "driver's license, technology system login credentials, or driver platform login credentials" while performing services on the platform.

199. The 14-Day Notice Provision will require Uber to grant platform access to certain drivers for a two-week period even though the Agreement expressly permits their deactivation without Notice. For example, the Agreement provides Uber with the contractual right to remove access to drivers who have engaged in *any* fraudulent activity. The 14-Day Notice Provision removes the ability to deactivate a driver who has engaged in a single fraudulent act by requiring advanced notice unless there is "a *pattern* of *repeated* fraudulent behavior." In other words, the 14-Day Notice Provision requires Uber to continue to grant access to a driver who has defrauded Uber to the detriment of its business, and potentially the safety of riders, if such activity is not part of a "*pattern* of *repeated* fraudulent behavior," which means the driver can continue to defraud Uber for an additional two weeks, all with full knowledge of an impending deactivation and thus motivation to maximize the fraud. Such a standard ignores that a single instance of fraudulent behavior violates a driver's Agreement with Uber and can cause significant damage alone or in the aggregate, and is inexcusable, and can present safety concerns.[87]

200. The Notice Exemptions do not include the Challenged Law's other good-cause bases for deactivation: failure to perform job duties or "misconduct that is demonstrably and materially harmful" to Uber. The impact of that omission is that Uber must keep drivers on their platform even if there is "just cause" to deactivate them, including because a driver has violated their Agreement with Uber in a way that does not rise to the level of what the City may consider "egregious misconduct."

---

[87] *See* Press Release, Department of Justice, Two Individuals Charged in Multi-Million Dollar Scheme to Defraud Rideshare Customers, Drivers and Others (Aug. 28, 2024), https://www.justice.gov/usao-edny/pr/two-individuals-charged-multi-million-dollar-scheme-defraud-rideshare-customers; Matt Troutman, "'Screwber' scheme reaped whopping $40M in bogus surge fares for hundreds of shady Uber drivers: feds," N.Y. POST (Aug. 28, 2024), https://nypost.com/2024/08/28/us-news/screwber-scheme-reaped-40m-in-bogus-surge-fares-for-hundreds-of-shady-uber-drivers-feds-say/.

201.    Requiring Uber to retain a driver on its platform for 14 days after it has determined that the driver's misconduct warrants deactivation, and has provided notice of that decision to the driver as required by the Challenged Law, severely jeopardizes Uber's ability to maintain its quality and safety standards, and exposes passengers and the general public to risks from drivers whom Uber would remove from its platform if not for the Challenged Law.  Drivers who have been notified of their impending deactivation have fewer incentives to follow the rules and law, and pose an increased risk to riders and the public.

202.    Forcing Uber to open access to its private property even though just cause exists to revoke access is unprecedented.  No other state currently imposes any such requirement on an HVFHS.

### iii.    The 14-Day Notice Provision's Required Message (§ 20-1282(d))

203.    In addition to requiring 14-days notice, the 14-Day Notice Provision specifies the 14-Day Required Message that Uber must convey by requiring that such "advance notice shall state all the precise and detailed reasons for and the effective date of such deactivation."

204.    Uber does not currently and has not structured its contracts so that it is required to disclose "all the precise and detailed reasons" for a deactivation.  Uber does not disclose all of the reasons.  *First*, doing so could jeopardize the safety and privacy for riders, including as articulated in Uber's contractual agreements with rights.  *Second*, it may reveal Uber's proprietary and confidential methods for identifying and eliminating fraud.

205.    The language of the 14-Day Required Message does not explain what is sufficient to make a notice "precise" or "detailed."  The Committee itself pointed to the ambiguity of the standard, noting in the December 18 Report that the Challenged Law "***may***" require providing a

58

driver with "information about the specific allegation giving rise to their deactivation."[88]   The unfairness of this potentially shifting goalpost is underscored by the fact that Uber's compliance will be judged by any number of fact-finders, who may each have their own interpretation.

iv.      The    Five-Day    Required    Message    (§    20-1282(e))

206.    Section 20-1282(e) states that five days after deactivating a driver for "egregious conduct, account sharing, or if there is a repeated pattern of repeated fraudulent activity"— i.e. the second exemption to the 14-Day Notice Provision—an HVFHS "shall provide, in a form and manner designated by the department, a notice of deactivation" to the driver "which contains a written explanation of all the precise and detailed reasons for such deactivation and the effective date of such deactivations" (the Five-Day Required Message).

207.    Uber would not otherwise provide deactivated drivers with "a written explanation of all of the precise and detailed reasons" for the deactivation, and nor would it do so within five days in all instances.

208.    Like the 14-Day Required Message, the Five-Day Required Message does not provide Uber with clarity about what would satisfy the "precise and detailed" standard.

209.    Uber also would not, and has not, obligated itself to provide "all of the precise and detailed reasons" for a deactivation, let alone within five days of the deactivation.  The Five-Day Required Message would leave Uber with only five days to prepare a complying written explanation (likely to include multiple levels of review), and then deliver it to drivers in a yet-to-be disclosed but mandated "form and manner."  If Uber could not meet that imposed five-day deadline, it would face an untenable decision: expose itself to liability under the Challenged Law for failing to comply with the Five-Day Required Message or avoid liability by permitting a driver,

---

[88] Ex. 3 at 15.

who even the City Council admits deserves to be deactivated without notice and who may have been accused of a serious crime such as rape or kidnapping, to remain on the platform until Uber could ensure compliance. And if Uber is found to have violated the Five-Day Required Message, such as by sending the notice on the sixth day or lacking sufficient "detail," the Challenge Law would require Uber to reinstate the driver even if he or she engaged in or was alleged to have engaged in egregious conduct, account sharing, or a repeated pattern of repeated fraudulent activity.

210.    The Five-Day Required Message poses severe and unjustifiable consequences for Uber, riders, and the public.

**B.    Section 20-1283 Requires Uber To Reinstate Drivers For Prior Deactivations Going Back Seven Years.**

211.    Section 20-1283 applies to "prior deactivations."

i.    <u>The Retroactive Provision (§ 20-1283(a)-(b))</u>

212.    The Retroactive Provision provides drivers who an HVFHS has deactivated in the past seven years to "petition" for reinstatement any time within a one-year period following the Challenged Law's effective date.[89] For each "petition," Uber has 30 days to reinstate or restore access to the petitioning driver unless it determines that its deactivation decision would comply with the Deactivation Prohibitions.

213.    If Uber does not reinstate the driver, the driver may seek reinstatement through an "informal resolution process,"[90] private civil action[91] or an administrative claim filed with the Department.[92]

---

[89] Section 20-1283(a); Section 20-1281 (defining "prior deactivations").
[90] Section 20-1287.
[91] Section 20-1211(c).
[92] Section 20-1208(c)(1).

214.    Put concretely, once the Challenged Law takes effect on July 28, 2026, every one of the more than 12,000 New York City drivers deactivated since July 28, 2019, may petition Uber for reinstatement within the year.  Even if only a fraction of those drivers submit a petition, Uber will be forced to expend enormous resources individually re-investigating and responding to thousands of deactivations, each of which took place when Uber had no inkling that it had to retain the relevant documents and information, and then in seven years it might be required to justify the deactivation with evidence that it satisfied a "just cause" standard, including the seven factors that must be considered and any other factors the "fact-finder" elects to consider, all of which did not exist at the time of the deactivation.

215.    This Retroactive Provision exemplifies the Challenged Law's effect of forcing the reactivation of drivers regardless of the underlying offense due to mere technical violations.  In the event that Uber failed to retain a piece of evidence from a years-old deactivation, and therefore cannot provide documentation of egregious misconduct to the satisfaction of the Department or fact finder, including for serious crimes like sexual assault, the Challenged Law requires the Department to order Uber to reactivate a driver, no matter the legitimate reasons for the deactivation.

216.     By potentially requiring Uber to reactivate drivers based solely on paperwork issues when Uber had previously determined those drivers posed real safety or quality risks, the Challenged Law not only would force Uber to degrade its quality standards and violate its core value of standing for safety, it also may put riders and the general public in danger.

217.    The City provided no explanation for why any period of retroactivity was needed, much less a rationale for the choice of seven years.  Nor did it attempt to explain how the retroactive imposition of the new "just cause" standard would accommodate the practical changes

61

that have taken place during that long span. For example, the period stretches back before the onset of COVID-19, but the City has not considered whether refusal to mask constitutes "just cause" for deactivation under its modern standard.

218. The Challenged Law's retroactive provision effectively rewrites key provisions of Uber's prior contracts with drivers going back seven years. It replaces the bargained-for deactivation provisions in Uber's contracts with drivers with its own deactivation standard, long after deactivation decisions were made in reliance on the then-operative contracts.

219. Uber had no reason to foresee that a law might one day retroactively alter its contracted-for discretion of deactivations with a lookback period of seven years.

ii.      The Retroactive Required Message (§ 20-1283(c))

220. The Retroactive Required Message states that if a HVFHS does not reinstate or restore access to a driver who has filed a petition pursuant to the Retroactive Protection, it "shall provide a written explanation, in form and manner designated by the department," to the petitioning driver "of all the precise and detailed reasons for such prior deactivation."

221. Uber did not and was not contractually obligated to disclose "all of the precise and detailed reasons" why it deactivated any drivers during the past seven years either at the time of or in any of the years since the deactivation.

222. Like the 14-Day and Five-Day Required Messages, the Retroactive Required Message does not sufficiently explain the "precise and detailed standard."

223. If the Department of a fact finder does not find the Retroactive Required Message sufficient, the Challenged Law purports to require them to force Uber to reinstate that deactivated driver, even if there was just cause for the deactivation, including for heinous crimes.

62

### C.    Section 20-1286 Compels Uber To Prepare And Provide Reports To Deactivated Drivers.

224.    "Upon the issuance" of the Five-Day Required Notice or the Retroactive Required Message, the Compelled Reports Provision requires Uber to provide the deactivated driver "with information and data relevant" to the deactivation. The Compelled Reports Provision specifies without limitation what information Uber must provide:

1)  "Driving performance data specific to such high-volume for-hire vehicle driver" ("***Performance Reports***");

2)  "All customer comments, ratings, and complaints received regarding the high-volume for hire vehicle driver" ("***Rider Information***"); and

3)  "Anonymized and aggregated reports, covering the 12 months prior to such high-volume for hire vehicle driver's deactivation, regarding discipline, including deactivation, imposed by such high-volume for-hire vehicle service on any other high-volume for-hire vehicle drivers who engaged in the same or similar misconduct or failure to satisfactorily perform job duties forming a basis for the deactivation of the high-volume for-hire vehicle driver subject to such notice." ("***Comparative Reports***").[93]

(collectively, "***Compelled Reports***").

225.    The Compelled Reports Provision requires Uber to remove personally identifiable information about riders.[94]

226.    The Compelled Reports Provision requires Uber to allow drivers deactivated in the past 6 years to have access to "all information and data" about themselves that they would have had access to while on the platform.[95]

227.    Uber does not currently provide any of the Compelled Reports to drivers and would not choose to do so.  Each of the three sets of data contains confidential and/or sensitive

---

[93] Section 20-1286.
[94] Section 20-1286(b).
[95] Section 20-1286(c).

information that Uber would not otherwise disclose to or permit active or deactivated drivers to receive.

228.    Uber does not disclose all Rider Information, and does not disclose to riders that it will do so.  The Compelled Reports Provision concedes that such data contains sensitive data about riders but fails to consider that a deactivated driver who has access to this information may be able to identify the complaining riders and/or their location of pickup or dropoff, which could include their home or place of work.

229.    On top of the information providing a deactivated driver with a roadmap to the complaining rider, the Challenged Law's Required Message would arm deactivated drivers with "precise and detailed" notice of the reasons for the deactivation, which the City has indicated "may" require providing "information about the specific allegation giving rise to their deactivation (including when and where the driver allegedly engaged in the misconduct)."[96]  Such information would lead the alleged perpetrator straight back to his accuser.

230.    Forcing Uber to turn over all Rider Information will chill riders' reporting of their experiences, especially if the rider feels unsafe with the driver.  Uber's business model, including its emphasis on safety, quality, and honesty, depends on providing riders and drivers with a safe way to communicate their feedback.  Mutual feedback has been a core pillar of Uber's platform for many years.

231.    The Comparative Reports requirement forces Uber to disclose information about other drivers to deactivated drivers.

232.    Fulfilling the Comparative Reports requirement to prepare and disclose a comparative discipline report requires Uber to take a position on what other misconduct is "the

---

[96] Ex. 3 at 15.

same or similar" to that of the driver in question.  This is not feasible where drivers may be deactivated based on a combination of multiple different types of activity.

233.    The Compelled Reports Provision compels Uber to speak in ways that could reveal its own proprietary information, including confidential processes.  For example, if Uber deactivated the driver for fraudulent activity, disclosing Uber may be forced to turn over data that could reveal Uber's closely-guarded techniques for detecting fraud, and in effect, would give drivers who engage in fraud a roadmap to circumventing the system.

234.    The Compelled Reports Provision is burdensome on Uber's operations. Uber must devote significant resources to compiling the Compelled Reports and creating the Comparative Reports immediately upon deciding to deactivate a driver for egregious misconduct.  The rigid timelines provide Uber with just five days to do so.  Uber must provide the same data "to the extent that such information is available" within the 30-day window provided for the Retroactive Required Message, notwithstanding that Uber must also conduct its investigation into a years-old deactivation in that same window as well as digging up this now-old data.  Complying with these deadlines will require multiple full-time employees to constantly collect, review, sort, assemble, and review data.  And the process will never end–it will continue in perpetuity since deactivations are a necessary aspect of maintaining the safety and standards of Uber's platform.

235.    The Compelled Reports Provision's full application is unclear because it does not apply to the 14-Day Required Notice by its plain text.  The Challenged Law makes this omission despite numerous comments in the legislative history detailing the data to be provided in conjunction with that notice.  If Uber interprets the provision to apply to the 14-Day Notice, it will be penalized for every day it takes to compile the Compelled Reports: the Compelled Reports is to be provided "[u]pon the issuance of" the relevant notice, so the 14-day clock cannot start running

until Uber has delivered that data. If Uber believes the plain text, however, it may be penalized if the City takes the stance that the Compelled Reports Provision does apply to the 14-Day Notice.

236.    If Uber is unable to fully comply with the Compelled Reports Provision's timeline, the result would be detrimental to Uber, riders, and the public. It appears that making compliance impossible may be the goal. In fact, for many types of deactivation (for example, for one based on the submission of an altered and fraudulent insurance document), the information that Uber must convey has no relevance whatsoever to the deactivation and would not be relevant in any challenge.

### D.    Section 20-1285 Creates An Unbalanced Adjudicatory Process That Censors Uber's Ability To Defend Itself.

237.    The Burden of Proof Provision places the burden of proof on an HVFHS to prove just cause and bona fide economic reasons, as if Uber is a prosecutor in a criminal matter. In a typical breach of contract matter, the party alleging breach, which would in this case be the driver, would bear the burden of proof and persuasion.

238.    The Burden of Proof Provision bars a fact-finder who is considering whether the HVFHS had "just cause" from considering "any reasons" for deactivation that was "not included in the notice of deactivation" provided in the Five-Day or Retroactive Required Messages.[97]

239.    On the other hand, the Burden of Proof Provision permits a deactivated driver to submit any evidence even if it was "not provided to the HVFHS" at the time it was considering whether there was just cause for deactivation.[98] This means Uber could be subjected to monetary

---

[97] Confusingly, portions of the Burden of Proof Provision do not apply to all the Challenged Law's required notices. By its plain language, Uber is not barred from presenting evidence that it did not provide to a driver if the relevant notice was pursuant to the 14-Day Notice Provision. This inexplicable omission forces Uber to guess whether it will in fact be subjected to different evidentiary standards based on the relevant notice provision, and if not disclosing certain sensitive details in reliance on the plain language of the provision may nonetheless expose it to liability.
[98] Section 20-1285.

liability based on information and evidence that it was not provided when it made the decision for which it is being held liable.

240. The Burden of Proof Provision rewrites the PAA, which reflects a bargained-for agreement in which the driver has the right to terminate without cause and provides Uber with the discretion to determine if a driver committed a Material Breach. The Burden of Proof Provision destroys virtually all discretion by constructing a one-sided procedure that holds Uber to a nearly impossible burden.

241. The Burden of Proof Provision puts more than a heavy thumb on the scale for the driver, it places heavy weights that prevent Uber from balancing driver access with rider safety and its own brand standards.  For example, faced with a serious situation such as a sexual assault, the Burden of Proof Provision seeks to force Uber to prioritize driver access by privileging the driver's side of the imperfect evidence rather than allowing Uber to exercise its discretion in the face of a report of serious, alarming incidents.

242. The Burden of Proof Provision seeks to set up a sham proceeding by failing to construct procedures that will permit a fact finder from considering all evidence relevant to the actual question: whether Uber had "just cause" to deactivate a driver.  Uber will not be able to defend itself by presenting all the evidence it actually considered when making the decision (including confidential and sensitive information, and including information that law enforcement directed Uber not to convey), and must instead limit itself to only what it disclosed to the deactivated driver.  But for the reasons discussed above, Uber does not disclose all of the evidentiary bases for a deactivation decision as a matter of course in order to protect the security and privacy of the business and riders, and to avoid revealing to fraudsters Uber's fraud detection capabilities.  The Burden of Proof Provision deprives Uber of the ability to defend the decision it

actually made based on the just cause standard and replaces it with an inquiry into whether the notice to a driver sufficiently disclosed all of the supporting evidence.

243.   While barring Uber from submitting all relevant evidence to defend itself, the Burden of Proof Provision permits the deactivated driver to defend itself with evidence it never submitted, and therefore that Uber could not have relied on and benefited from in deciding not to deactivate the driver in the first place, and that could not have formed a basis for whether Uber had just cause to deactivate a driver.  Permitting drivers to submit any evidence they choose coupled with Uber's inability to counter those submissions with contrary evidence, unless Uber provided them in tandem with the disciplinary proceeding, impedes rather than promotes a fact-finding adjudication.  Uber can then be subjected to financial liability based on the skewed adjudication.

244.   The consequence of such a one-sided process is to create a *fait accomplis* such that every adjudication begins with a presumption that Uber unfairly deactivated the driver and then hamstringing its ability to rebut the presumption.

245.   The presumption in favor of the driver, even in cases of egregious misconduct or fraud, will force Uber to platform drivers whom Uber actually did have just cause to deactivate, solely because it did not contemporaneously disclose all the evidence supporting the decision.

246.   For instance, if a rider provides a detailed and sensitive report of sexual assault or physical harassment, the Burden of Proof Provision's paradigm requires Uber to disclose the report to the driver even if contrary to the rider's safety or privacy interests.  If Uber refuses to do so because it instead lives up to its values, Uber is foreclosed from presenting the fact finder with the report, while the deactivated driver is free to submit any evidence he chooses.  Such a one sided "he-said" version of events does not provide any probative value into the operative question of

68

whether Uber had just cause to deactivate the driver.  And if a fact-finder determines there to be a lack of just cause solely because Uber did not disclose all of the evidence at the time of deactivation, Uber would be required to match the driver with riders even if there was evidence that he sexually assaulted a rider in the past.  Similar problems exist in the case of fraud, where Uber would have to choose between revealing fraud detection methods or giving platform access to those who defraud it and riders.

247.    The Burden of Proof Provision is essentially an alternative way to coerce Uber to providing the Rider Data at the time of deactivation and poses all of the same problems as the Compelled Disclosure Provision creates.  If Uber does not provide the Rider Data in tandem with deactivation, it will be unable to rely on any of its contents even if it more than substantiates just cause.

**CAUSE OF ACTION I.A: CONTRACTS CLAUSE**
**(RETROACTIVE PROVISIONS)**

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Contracts Clause of the United States Constitution (42 U.S.C. § 1983) as to Retroactive Provisions)**

248.    Uber realleges and incorporates herein by reference all paragraphs above.

249.    The Retroactive Provision (§ 20-1283(a)-(b)), Retroactive Required Message (§ 20-1283(c)), and Compelled Reports Provision (§ 20-1286) violate the Contracts Clause of the U.S. Constitution by effectively rewriting the central deactivation provision of Uber's contracts with drivers over the past seven years.  U.S. Const., art. I, § 10, cl. 1.

250.    The Contracts Clause prohibits state and local governments from "pass[ing] any . . . Law impairing the Obligation of Contracts."  U.S. Const., art. I, § 10, cl. 1.  The Contracts Clause limits the power of a state or local government "to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power."  *Allied Structural Steel Co. v. Spannaus*,

438 U.S. 234, 242 (1978). That is because "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id*. at 245.

251. Uber's contracts with drivers since 2019, and well before, included a PAA Deactivation Provision affording Uber discretion to deactivate drivers' accounts immediately if the driver engaged in "activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement," as "determine[d]" by Uber "in [its] discretion." The PAA Deactivation Provision is and was central to Uber's contracts with drivers and constitutes a key means of protecting Uber and passengers from potential driver misconduct, degrade Uber's standards, and subject Uber to legal liability. Both parties reasonably relied on the PAA Deactivation Provision as part of the parties' contractual bargain.

252. The Retroactive Provision substantially impairs Uber's contracts over the last seven years by replacing the PAA Deactivation Provision's standard for deactivation with the City's own constricted "just cause" standard, which— to avoid mandatory reactivation— must be proven by Uber to a fact-finder by a preponderance of the evidence. Even more, it requires Uber to revisit deactivations already carried out pursuant to contracts over the prior seven years to apply these new standards and documentary and procedural requirements, wiping out Uber's benefit of the bargain over those years. A Committee of the City Council stated at one point that Uber's "reasonable belief" that a driver has engaged in misconduct or violated a condition of their agreement with Uber alone is insufficient to justify deactivation under its standard; both were valid reasons to deactivate a driver under Uber's contracts for the last seven years.

253. The Retroactive Required Message substantially impairs Uber's contracts over the last seven years by rewriting the PAA Deactivation Provision, which does not require Uber to

provide any explanation of its reasons for deactivation, instead requiring that Uber revisit deactivations that already happened under that provision and provide the driver an "explanation" of "all the precise and detailed reasons" for that long-ago deactivation.

254.    The Compelled Reports Provision substantially impairs Uber's contracts over the last seven years by rewriting the same PAA Deactivation Provision to require disclosure of even more information that Uber was not required to disclose (or retain) at the time the deactivation happened.

255.    This interference upsets the reasonable expectations Uber had when it entered into these contracts, and when it exercised its rights under the contracts over the past seven years to deactivate drivers to protect its platform's safety and standards according to the contractual provisions operative between Uber and each driver at the time of deactivation.  Uber reasonably expected that these settled plans or arrangements would remain settled.  When Uber entered into its contracts with drivers, there was no indication that the City would compel Uber to apply a different standard and procedure for deactivation of drivers, and Uber would have structured its contracts with drivers differently had it known.  Given the harsh remedial provisions, Uber has no way to safeguard its rights; any violation of the Retroactive Provision or Retroactive Required Message leads to mandatory reinstatement of the driver.

256.    These provisions do not advance any significant or legitimate public purpose.  The Challenged Law does not respond to any economic emergency, further public health or safety, or otherwise remedy an important general social or economic problem.  Nor is there any pressing need for the Challenge Law because Uber already operates pursuant to an articulated and agreed-upon contractual standard for deactivating drivers.  The Challenged Law is intended to favor one narrow subset of the population—high-volume for-hire drivers who were deactivated—rather than

benefiting the public at large. In fact, the public at large would likely be harmed if Uber is forced to reactivate drivers who were previously deactivated, for example for matters like dangerous driving on public roads.

257. These provisions' interference with Uber's contracts with drivers over the previous seven years is not an appropriate, reasonable, or necessary way to advance any legitimate public purpose. It is not reasonable to interfere with deactivations that took place as much as seven years in the past and according to the standards, processes and factors to which the parties freely agreed in their contracts, particularly when that interference is for the hypothetical benefit of a narrow class of drivers and would come at the expense not only of Uber but of riders and the public welfare. That unreasonableness is underscored by the lack of any rationale behind the selection of seven years as the period of retroactivity.

**CAUSE OF ACTION I.B: CONTRACTS CLAUSE
(DEACTIVATION PROHIBITION AND 14-DAY NOTICE REQUIREMENT)**

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Contracts Clause
of the United States Constitution (42 U.S.C. § 1983))**

258. Uber realleges and incorporates herein by reference all paragraphs above.

259. The Deactivation Prohibitions (§ 20-1282(a)-(c)) and 14-Day Notice Provision (§ 20-1282(d)) violate the Contracts Clause of the U.S. Constitution by effectively rewriting the central deactivation provision of Uber's existing contracts with drivers to impose new substantive and procedural requirements. U.S. Const., art. I, § 10, cl. 1.

260. Uber's existing contracts with drivers include a PAA Deactivation Provision affording Uber the contractual right to deactivate drivers' accounts immediately without notice if the driver engaged in "activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein

72

by reference),” as Uber “determine[s] in [its] discretion.”  The PAA Deactivation Provision is central to Uber’s contracts with drivers and constitutes a key means of protecting Uber and passengers from potential driver misconduct that could endanger passengers or degrade Uber’s standards.  Both parties reasonably relied on the PAA Deactivation Provision as part of the parties’ contractual bargain.

261.    The Deactivation Prohibitions substantially impair Uber’s existing contracts by replacing the PAA Deactivation Provision’s standard for deactivation with the City’s own constricted “just cause” standard, which–to avoid mandatory reactivation–must be proven by Uber to a fact-finder by a preponderance of the evidence.  The December 18 Report states the view that Uber’s “reasonable belief” that a driver has engaged in misconduct or violated a condition of their agreement with Uber alone may be insufficient to justify deactivation under its standard[99]—but both are valid reasons to deactivate a driver under the plain language of the existing contractual relationships between Uber and drivers.

262.    The 14-Day Notice Provision substantially impairs Uber’s existing contracts by reversing the PAA Deactivation Provision’s clear instruction that Uber may deactivate a driver “without notice,” requiring instead that Uber provide the driver with 14 days of advance notice before deactivation, unless Uber can prove its deactivation meets the stricter egregious misconduct standard.

263.    This interference upsets the reasonable expectations Uber had when it entered into these contracts.  When Uber entered into its contracts with drivers, there was no indication that the City would compel Uber to apply a different standard and procedure for deactivation of drivers, and Uber would have structured its contracts with drivers differently had it known.  Given the

---

[99] Ex. 3 at 15.

harsh remedial provisions, Uber has no way to safeguard its rights; any violation of the Deactivation Prohibitions or 14-Day Notice Provision leads to mandatory reinstatement of the driver.

264. These provisions do not advance any significant or legitimate public purpose. The Challenged Law does not respond to any economic emergency, further public health or safety, or otherwise remedy an important general social or economic problem. Instead, the Challenged Law is intended to favor one narrow subset of the population—high-volume for-hire drivers who face deactivation—rather than benefiting the public at large or even the majority of drivers. In fact, the riders on Uber's platform and the public at large would likely be harmed if Uber is forced to reactivate drivers who were previously deactivated for real misconduct, or to keep providing platform access to drivers for 14 days where Uber would otherwise deactivate them immediately.

265. These provisions' interference with Uber's existing contracts with drivers is not an appropriate, reasonable, or necessary way to advance any legitimate public purpose. It is not reasonable to permanently restrain Uber's contractually-agreed discretion to deactivate drivers as needed, let alone to compel Uber to retain drivers on its platform for two weeks after determining that they should be deactivated, even where the City agrees deactivation is justified, and for conduct that endangers people. The unreasonableness of the interference is particularly stark when that interference is for the hypothetical benefit of a narrow class of drivers and would come at the expense not only of Uber but of the public welfare, and when the prescribed remedial processes would likely do more to cause delay and confusion than to assist the drivers the Challenged Law purports to help.

**CAUSE OF ACTION I.C: CONTRACTS CLAUSE**
**(DISCLOSURES)**

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Contracts Clause**
**of the United States Constitution (42 U.S.C. § 1983) as to Disclosures)**

266.    Uber realleges and incorporates herein by reference all paragraphs above.

267.    The Required Messages (§§ 20-1282(d), 20-1282(e), and 20-1283(c)), Burden of Proof Provision (§ 20-1285), and Compelled Reports Provision (§20-1286) violate the Contracts Clause of the U.S. Constitution by effectively rewriting the central deactivation provision of Uber's existing contracts with drivers to require Uber to make disclosures found nowhere in the existing contracts.  U.S. Const., art. I, § 10, cl. 1.

268.    Uber's existing contracts with drivers include a PAA Deactivation Provision affording Uber discretion to deactivate drivers' accounts without notice based on Uber's "determin[ation] in [its] discretion" of whether the driver engaged in "activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference)."  Nowhere does the PAA Deactivation Provision or any other provision of that contract require Uber to provide any explanation for deactivation decisions.  The PAA Deactivation Provision is central to Uber's contracts with drivers and constitutes a key means of protecting Uber and passengers from potential driver misconduct that could endanger passengers or degrade Uber's standards.  Both parties reasonably relied on the PAA Deactivation Provision as part of the parties' contractual bargain.

269.    The Required Messages substantially impair Uber's existing contracts by imposing disclosure requirements that are nowhere to be found in those contracts or the incorporated privacy notices.  Uber's reasonable expectation upon entering these contracts that it would not be forced

75

to disclose sensitive information such as rider complaints when deactivating a driver is turned on its head by the Required Messages' requirements to provide a "precise and detailed" explanation of "all the reasons" for the deactivation.

270.    The Burden of Proof Provision substantially impairs Uber's existing contracts by imposing one-sided evidentiary rules that coerce Uber to make disclosures that are not required by its contracts, lest it be barred from using that evidence in a subsequent fact-finding proceeding.

271.    The Compelled Reports Provision substantially impairs Uber's existing contracts by requiring Uber to provide Performance Reports, Rider Information, and Comparative Reports in contradiction of Uber's reasonable expectation upon entering these contracts that it would not be forced to disclose sensitive information about both riders and other drivers when deactivating a driver.  Further, the Compelled Reports Provision mandates disclosure of forms of information to recipients not even contemplated by the privacy notices incorporated in the PAA.

272.    This interference upsets the reasonable expectations Uber had when it entered into these contracts.  When Uber entered into its contracts with drivers, there was no indication that the City would compel Uber to provide disclosures in connection with deactivation of drivers that were nowhere provided for in those contracts, and Uber would have structured its contracts with drivers differently had it known.  Given the harsh remedial provisions, Uber has no way to safeguard its rights.  Any perceived violation of the Required Messages leads to mandatory reinstatement of the driver, and the Burden of Proof Provision's lop-sided requirements effectively force compliance with the Compelled Reports Provision.

273.    These provisions do not advance any significant or legitimate public purpose.  The Challenged Law does not respond to any economic emergency, further public health or safety, or otherwise remedy an important general social or economic problem.  Instead,  the Challenged Law

is intended to favor one narrow subset of the population—high-volume for-hire drivers—rather than benefiting the public at large. In fact, the public at large would likely be harmed if Uber is forced to reactivate drivers who were previously deactivated for real misconduct.

274. These provisions' interference with Uber's existing contracts with drivers is not an appropriate, reasonable, or necessary way to advance any legitimate public purpose. It is not reasonable to permanently force Uber to make disclosures in connection with every deactivation in contravention of its contractually-agreed right not to do so. The unreasonableness of the interference is particularly stark when that interference is for the hypothetical benefit of a narrow class of drivers and would come at the expense not only of Uber but of the riders and other drivers whose information would be disclosed.

## CAUSE OF ACTION II: DUE PROCESS – RETROACTIVITY

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 6 of the New York Constitution)**

275. Uber realleges and incorporates herein by reference all paragraphs above.

276. The Retroactive Provision (§ 20-1283(a)-(b)) violates the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution because it imposes an irrational and arbitrary retroactive period stretching back seven years from the Challenged Law's effective date without any rationale, let alone a persuasive one, for either the retroactive effect generally or the 7-year period in particular.

277. The Retroactive Required Message (§ 20-1283(c)) and Compelled Reports Provision (§ 20-1286) likewise violate the Due Process Clause because they impose disclosure requirements over the same 7-year retroactive period without any rationale whatsoever for the need

to provide such information in connection with prior deactivations at all or for the 7-year-period in particular.

278.   Retroactivity concerns are further heightened here because the Challenged Law affects contractual rights, in which predictability and stability are of prime importance.  The Challenged Law here interferes with Uber's contracts with drivers going back to 2019, upsetting seven years of predictability and stability.

279.   Neither the Challenged Law itself nor its legislative history purport a clear purpose for its retroactive application. The 7-year retroactivity period blindsides Uber and disrupts, without forewarning, Uber's settled interests in how it contracts and has contracted with drivers for over half a decade.

280.   The Challenged Law furthers no discernible or legitimate public interest in requiring retroactive application to July 28, 2019.  This time period was plucked from thin air. Punishing Uber for how it contracted with drivers up to 7 years ago is an illegitimate justification for retroactivity.

281.   For substantially similar reasons, the Challenged Law violates Article I, Section 6 of the New York Constitution.

## CAUSE OF ACTION III: COMPELLED SPEECH

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the First Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 8 of the New York Constitution)**

282.   Uber realleges and incorporates herein by reference all paragraphs above.

283.   The Challenged Law violates the First Amendment of the United States Constitution, which protects both the freedom to speak and the freedom not to speak. For this reason, the government cannot "compel a person to speak its own preferred messages," *303*

78

*Creative LLC v. Elenis*, 600 U.S. 570 (2023), as this "alter[s] the content of their speech."  Uber would "rather avoid" disclosing more than what it already does or what its private contracts require, and for good reasons rooted in safety and protecting its economic interests against fraudsters.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

284.    The Required Messages (§§ 20-1282(d), 20-1282(e), and 20-1283(c)), Compelled Reports Provision (§ 20-1286), and Burden of Speech Provision (§20-1285) compels Uber to disclose internal processes and rider data in a manner and method that it otherwise would not.  As such, strict scrutiny applies, and the Challenged Law is presumptively unconstitutional.

285.    The Required Messages do not merely regulate conduct; they regulate how Uber must communicate about deactivations and impose specific content-based rules that Uber must follow.  The forced disclosure of all of the "precise and detailed reasons for deactivation" constitutes speech and forces Uber to modify its speech in a way that it otherwise would not and does not convey.

286.    The Compelled Reports Provision likewise is content-based and violates the First Amendment by imposing specific content-based rules and regulating how Uber must communicate about riders and deactivations.  The disclosure of Driver Reports, Rider Information and Comparative Reports constitutes speech, and forces Uber to express views on privacy, safety, and discipline that may be contrary to its own.

287.    The Burden of Proof Provision coerces Uber to disclose every piece of potential evidence regarding a driver by creating a one-sided process that would otherwise bar Uber from later relying on that evidence to rebut a fact-finder's presumption that even a justified deactivation was unfair.  The Burden of Proof Provision thus violates the First Amendment by compelling speech and regulating how Uber must communicate to drivers about deactivations.  This disclosure

forces Uber to convey details about deactivation that Uber would not otherwise disclose. The Burden of Proof Provision is thus presumptively unconstitutional and subject to strict scrutiny as well.

288.    The City cannot establish that the Challenged Law furthers a compelling government interest. The Challenged Law does not (and does not purport to) cure any alleged consumer deception. The City Council has made clear that the Challenged Law's purpose is to address an imaginary problem, specifically that there is a deficiency in Uber's deactivation process, including how it notifies drivers about deactivation. The provisions benefit an even narrower  class of drivers—those who have been subject to "unfair" notification—at the expense of the general public. This is not a legitimate state interest, let alone a compelling one.

289.    Nor are any of these provisions narrowly tailored to serve even that interest, given the overbreadth of the disclosure requirements and–with respect to the Five-Day Required Message, Burden of Proof Provision, and Compelled Reports Provision–the seven years of retroactivity imposed. The City cannot establish that the Challenged Law is narrowly tailored to achieve any compelling government interest. Even if there were such an interest in drivers receiving information on internal Uber processes and rider reports and ratings (there is not), a law that requires disclosure in the manner, method, scope, and time period required under the Challenge Law, to the consequences forced by the Burden of Proof Provision, is a far cry from narrowly tailored. There are less restrictive alternatives to serve the City's supposed interests.

290.    These provisions regulate speech that does more than merely propose a commercial transaction or advertise a product or service for a business purpose. Even if these provisions did compel Uber to engage in purely commercial speech, they would remain subject to intermediate scrutiny. The City has no substantial interest in protecting drivers at the expense of Uber and the

general public.  Forcing Uber to promulgate the City's preferred messages also would not directly advance even that interest because it would not alleviate any problems with driver deactivation to a material degree, and the City could serve its purpose as well with more limited regulations.

291.    None of these provisions merely require the disclosure of purely factual and uncontroversial information about Uber's services to consumers.  Moreover, these disclosure provisions are unjustified, unduly burdensome, and not reasonably related to any interest the City has in preventing deception of consumers.  No customer would be deceived about anything in the absence of a law requiring Uber to make the City's preferred disclosures in connection with deactivation.

292.    For substantially similar reasons, the Challenged Law violates Article I, Section 8 of the New York Constitution.

## CAUSE OF ACTION IV.A: COMPELLED ASSOCIATION (RETROACTIVITY)

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the First Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 8 of the New York Constitution)**

293.    Uber realleges and incorporates herein by reference all paragraphs above.

294.    The Retroactive Provision (§ 20-1283(a)-(b) and Retroactive Required Message (§ 20-1283(c)) violate the First Amendment of the United States Constitution by forcing Uber, who is proudly expressive on the safety issues upon which deactivations are often based, to reinstate on its platform drivers from whom it had chosen to disassociate for safety or other reasons, consistent with its public commitments such as "Stand for Safety."

295.    The Challenged Law infringes on Uber's freedom of expressive association by forcing Uber to include unwanted persons in the cohort of individuals who it permits to offer services on its platform and to whom it offers its services.  State action compels association in

81

violation of the First Amendment when "the group making the claim engaged in expressive association," "the state action at issue significantly affected the group's ability to advocate its viewpoint," and the "state's interest" does not justify "the burden imposed on the associational expression." *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023).

296.    Uber engages in protected expressive association through its public statements, and company values and policies, including its "Stand for Safety." First Amendment protections apply to this association, even where Uber does not associate for the sole purpose of disseminating a certain message. Here, the Retroactive Provision and Retroactive Required Message force Uber to reassociate with individuals it already found undercut and force Uber to not live up to its public statements and values.

297.    The Retroactive Provision alters Uber's ability to advocate its viewpoint by forcing Uber to reinstate drivers with whom Uber has already chosen to disassociate based on its determination that they have engaged in conduct contrary to its message or that present risks incompatible with its values. Compelling Uber to reinstate drivers who act or have acted against the very mission of its organization is a severe alteration.

298.    The City's interest implicated in the Retroactive Provision does not outweigh or justify the burden imposed on Uber's associational expression. The Challenged Law aims to address an imaginary problem for the benefit of a narrow class of former drivers at the expense of Uber, riders and the general public. This is not a legitimate state interest, let alone a compelling one. Nor is the Challenged Law narrowly tailored to serve even that interest, given the utter lack of rationale behind the seven year period of retroactivity imposed, which makes the City's less restrictive alternatives all the more obvious.

299.   The Retroactive Provision chills and imminently threatens Uber's First Amendment right to freedom of association.

300.   The Retroactive Provision is unconstitutional on its face and as applied.

301.   Absent declaratory and injunctive relief against application and enforcement of the Retroactive Provision, Uber will suffer irreparable harm.

302.   For substantially similar reasons, the Challenged Law violates Article I, Section 8 of the New York Constitution.

### CAUSE OF ACTION IV.B: COMPELLED ASSOCIATION (DEACTIVATION PROHIBITIONS AND 14-DAY NOTICE REQUIREMENT)

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the First Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 8 of the New York Constitution)**

303.   Uber realleges and incorporates herein by reference all paragraphs above.

304.   The Deactivation Prohibitions (§ 20-1282(a)-(c)) significantly affect Uber's ability to advocate its viewpoints by forcing Uber to retain drivers if deactivation does not meet the City's standard for deactivation, even if Uber determines that the driver undercuts Uber's message and values, and instead engages in conduct that Uber disapproves of.

305.   The 14-Day Notice Requirement (§ 20-1282(d)) significantly affects Uber's ability to advocate its viewpoints by forcing Uber to retain drivers on its platform for two weeks after Uber has determined that their conduct may endanger riders, thus forcing Uber to take actions that violate its own Stand for Safety core tenet.

306.   The Challenged Law infringes on Uber's freedom of expressive association by forcing Uber to include unwanted persons in the cohort of individuals who it permits to offer services on its platform and to whom it offers its services.  State action compels association in violation of the First Amendment when "the group making the claim engaged in expressive

83

association," "the state action at issue significantly affected the group's ability to advocate its viewpoint," and the "state's interest" does not justify "the burden imposed on the associational expression." *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023).

307. Uber engages in protected expressive association through its company policies and values, including its "Stand for Safety." First Amendment protections apply to this association, even where Uber does not associate for the sole purpose of disseminating a certain message. Here, the Deactivation Prohibitions and 14-Day Notice Requirement force Uber to remain associated with individuals it already found did not align with its viewpoints.

308. The Deactivation Prohibition and 14-Day Notice Requirement unlawfully burden and impair Uber's expressive association by forcing Uber to retain drivers on its platform *two weeks* after Uber has determined that associating with the driver does not sincerely and effectively allow Uber to convey its message. Compelling Uber to retain personnel who act or have acted against the very mission of its organization is a severe alteration.

309. The City's purported interest implicated in the Deactivation Prohibition and 14-Day Notice Requirement—the prevention of wrongful deactivations—does not outweigh or justify the burden imposed on Uber's associational expression. The Challenged Law aims to address an imaginary problem for the benefit of a narrow class of drivers who have been deactivated at the expense of the general public. This is not a legitimate state interest, let alone a compelling one.

310. Nor is the Challenged Law narrowly tailored to serve even that interest, given the utter lack of rationale behind the two-week notice period imposed, which makes the City's less restrictive alternatives all the more obvious.

311. The Challenged Law chills and imminently threatens Uber's First Amendment right to freedom of association.

84

312.    The Challenged Law is unconstitutional on its face and as applied.

313.    Absent declaratory and injunctive relief against application and enforcement of the Challenged Law, Uber will suffer irreparable harm.

314.    For substantially similar reasons, the Challenged Law violates Article I, Section 8 of the New York Constitution.

## CAUSE OF ACTION V: DUE PROCESS – VOID FOR VAGUENESS

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 6 of the New York Constitution)**

315.    Uber realleges and incorporates herein by reference all paragraphs above.

316.    The Challenged Law violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.  The Due Process Clause requires that governments provide fair notice of what conduct is prohibited.  "As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007).  The vagueness doctrine serves to ensure that regulated parties "know what is required of them so they may act accordingly" and "that those enforcing the law do not act in an arbitrary or discriminatory way."  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

317.    Each of these provisions' plain text fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits.

318.    The Deactivation Prohibitions (§ 20-1282(a)-(c)) and Retroactive Provision (§ 20-1283(a)-(b)) provide or reference no clarifying definition of "just cause" that enables Uber to

understand what is required under those provisions.  The definition itself incorporates other ambiguous language that does not aid interpretation, including that it is "just cause" if a driver "failed to satisfactorily perform their job duties" (without explaining what might be satisfactory) or if the driver's conduct was harmful to Uber's "legitimate business interests" (without explaining what might be legitimate).[100]  The Challenged Law provides for Uber's compliance with the just cause standard to be evaluated by factors incorporating further ambiguous terms, including whether the driver violated a policy that was "reasonably related to safe and efficient" operations and whether deactivation was a "reasonable response."[101]  By defining an inherently vague phrase only with further ambiguity, the Challenged Law "produces more unpredictability and arbitrariness than the Due Process Clause tolerates."  *Johnson v. United States*, 576 U.S. 591, 598, 603 (2015).

319.    The Required Messages (§§ 20-1282(d), 20-1282(e), and 20-1283(c)) do not define "precise and detailed" such that Uber can understand what it must include in each of the Required Messages.  Uber faces serious risk of different fact-finders interpreting "precise and detailed" in different ways, leading to arbitrary and unpredictable results and preventing Uber from understanding what it must include in the required notice.

320.    With regard to the Retroactive Required Message (§ 20-1283(c)), the plain text does not even explain *when* Uber must provide the notice, but the Challenged Law nonetheless requires a fact-finder order reinstatement if it finds that Uber violated the provision.

321.    The Burden of Proof Provision (§ 20-1285) is unclear as to when its one-sided evidentiary restrictions apply.  By its plain text, a fact-finder "may not consider any reasons" proffered by Uber that are "not included" in a Retroactive Required Message or 5-Day Required

---

[100] Section 20-1281.
[101] Section 20-1282(b)(2) and (6).

Message, but no such restrictions apply with regard to a 14-Day Required Message.[102]  Uber must guess whether the content of its notices will be judged by different standards based on the type of message required, and risk either divulging sensitive details unnecessarily or be hamstrung by unexpected evidence rules if it guesses wrong.

322.    The Compelled Reports Provision (§ 20-1286) is likewise unclear as to when its application is required.  By its plain language, Compelled Reports are required only in connection with the Five-Day Required Message and the Retroactive Required Message; the provision makes no reference to the 14-Day Notice Provision, requiring Uber to guess as to whether the drafters intended to omit the Challenged Law's core provision, and to choose whether to risk enforcement in reliance on that plain text.  It is possible that the City may take the view that Uber must make reasonable settlement offers in order to comply  with the Informal Dispute Resolution Provision.

323.    For substantially similar reasons, the Challenged Law violates Article I, Section  of the New York Constitution.

<h3 style="text-align:center"><u>CAUSE OF ACTION VI: EQUAL PROTECTION</u></h3>

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution (42 U.S.C. § 1983)and Article I, Section 11 of the New York Constitution)**

324.    Uber realleges and incorporates herein by reference all paragraphs above.

325.    The Challenged Law violates the Equal Protection Clause of the Fourteenth Amendment, which requires that the reason for treating two groups differently be rationally related to a legitimate government interest.

326.    The Challenged Law imposes an irrational and arbitrary restraint on Uber's ability to maintain safety, anti-fraud, and quality standards on its platform, and instead provides

---

[102] Section 20-1285(b).

preferential treatment to a narrow group, HVFHS drivers who are (or would otherwise be) deactivated.  That preferential treatment comes at the direct expense of Uber and Lyft (the only two companies named as targets of the Challenged Law), and to the detriment of both riders and public safety, which is not a reasonable and nondiscriminatory legislative purpose.

327.    As it relates to providing service to those who provide for-hire vehicle services in New York City, Uber and Lyft are similarly situated to other businesses operating in the City, such as lower-volume FHSs and medallion taxicabs, who also provide services to individuals who provide for-hire vehicle service in New York City.  The Ordinance nonetheless restrains the ability of one class (Uber and Lyft) to deactivate drivers to maintain standards and safety, including restraining the ability to freely contract with drivers, while it does not do so for any other similarly situated business, including the thousands of businesses in New York City that have at will employment and can terminate anyone for any or no reason, and with no explanation or appeal process.

328.    The City has not provided any (let alone a rational) basis for this distinction other than animus against Uber and Lyft.

329.    For substantially similar reasons, the Challenged Law violates Article I, Section 11 of the New York Constitution.

### CAUSE OF ACTION VII: PROCEDURAL DUE PROCESS

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 6 of the New York Constitution)**

330.    Uber realleges and incorporates herein by reference all paragraphs above.

331.    The Burden of Proof Provision (§ 20-1285) creates a procedure based on a presumption that Uber is wrong and imposing evidentiary rules that tilt the proceedings in favor of drivers, violating the Due Process Clause of the Fourteenth Amendment of the United States

Constitution, which guarantees a "fair trial in a fair tribunal." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

332.    Uber has a protected property interest in its ability to deactivate drivers to protect its quality and safety standards and to prevent fraud being committed against it.  Uber also has a protected property interest in the money implicated by the Challenged Law's monetary penalties and the money it will lose when its ability to stop fraud is hampered.

333.    The procedures created by the Burden of Proof Provision create a risk of erroneous deprivation of Uber's interests.  By limiting Uber to evidence that was included in the notice provided to the driver, while explicitly permitting the driver to present any evidence regardless of whether Uber had been provided that evidence during the deactivation process, the provision stacks the deck in favor of the reactivating the driver regardless of the underlying reason, purely for evidentiary reasons.  By simply not limiting Uber's available evidence while expanding drivers' available evidence, the proceeding would be more likely to reach the truth of whether a deactivation met the prescribed standard, rather than finding that it did not purely based on evidentiary limitations.

334.    The City's interest in the procedure imposed by the Burden of Proof Provision is minimal.  By tilting the evidentiary playing field regardless of the underlying reason for deactivations, the procedure undermines the stated purpose of the Challenged Law: to prevent "wrongful deactivations."  An alternative procedure would both protect Uber's constitutional rights and better serve the City's actual interests.

335.    For substantially similar reasons, the Challenged Law violates Article I, Section 6 of the New York Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Uber respectfully requests that this Court enter judgment in Uber's favor and grant the following relief:

a.      A declaration that the Challenged Law violates provisions of the United States Constitution and the New York Constitution, is invalid, and is unenforceable against Plaintiffs;

b.      A declaration that each of the following provisions of the Challenged Law violate the United States Constitution and the New York Constitution, are invalid, and are unenforceable against Plaintiffs:

     i.      Deactivation Prohibitions (§ 20-1282(a)-(c));

     ii.      Retroactive Provision (§ 20-1283(a)-(b));

     iii.      14-Day Notice Provision (§ 20-1282(d));

     iv.      Required Messages (§§ 20-1282(d), 20-1282(e), and 20-1283(c));

     v.      Burden of Proof Provision (§ 20-1285);

     vi.      Compelled Reports Provision (§ 20-1286);

     vii.      Informal Dispute Resolution Provision (§ 20-1287); and

c.      A preliminary and permanent injunction (1) enjoining the Defendant City of New York and the Commissioner of the New York City Department of Consumer and Worker Protection, and each of Defendant's officers, agents, servants, employees, and attorneys, and any other person or entity subject to its control, acting on its behalf, or acting directly or indirectly in concert or participation with it from taking any steps to (a) implement any provision of the Challenged Law against Plaintiffs or their affiliated entities, or (b) enforce or apply, retroactively or prospectively, to or as against Plaintiffs,

90

any provision of the Challenged Law, pending this Court's final determination on the merits of Plaintiffs' claims; and (2) staying, enjoining, and restraining the effective date of the Challenged Law as to Plaintiffs;

      d.     An award of fees, costs, expenses, and disbursements, including attorneys' fees to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

      e.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Uber demands a trial by jury in this action of all issues so triable.

Dated: Washington, DC

June 9, 2026

Respectfully submitted,

DUNN ISAACSON RHEE LLP

By: */s/Martha Goodman*
Martha Goodman

Karen L. Dunn (N.Y. Bar No. 4498028, *SDNY admission pending*)
Martha Goodman (N.Y. Bar No. 5034210)
Kyle N. Smith (N.Y. Bar No. 5075940, *SDNY admission pending*)
Meryl C. Governski (*pro hac vice forthcoming*)
Leah R. Hibbler (*pro hac vice forthcoming*)
Linda E. Halfacre (*pro hac vice forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Suite 800
Washington, DC 20004
Tel: (202) 240-2900
kdunn@dirllp.com
mgoodman@dirllp.com
ksmith@dirllp.com

91

mgovernski@dirllp.com
lhibbler@dirllp.com
ehalfacre@dirllp.com

*Attorneys for Plaintiffs*