# EXHIBIT 3

<u>Committee Staff:</u>
Mark Chen, Senior Legislative Counsel
Theodore Miller, Legislative Analyst
Kevin Kotowski, Senior Policy Analyst
John Basile, Senior Policy Analyst
Adrian Drepaul, Principal Financial Analyst



# **THE COUNCIL OF THE CITY OF NEW YORK**
Andrea Vazquez, Legislative Director

## **COMMITTEE REPORT OF THE INFRASTRUCTURE DIVISION**
Bradley J. Reid, Deputy Director

## **COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE**
Hon. Selvena N. Brooks-Powers, Chair

December 18, 2025

| | |
|---|---|
| **PROPOSED INT. NO. 276-A:** | By Council Members Krishnan, Hanif, Lee, Restler, Marte, Brewer, Hudson, Cabán, Abreu, Banks, Ung, Schulman, Sanchez, Ayala, Avilés, Zhuang, Riley, Joseph, Stevens, Hanks, Nurse, De La Rosa, Gutiérrez and Epstein |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York, in relation to the wrongful deactivation of high-volume for-hire vehicle drivers |
| **ADMINISTRATIVE CODE:** | Adds a new subchapter 8 of chapter 12 of title 20; and amends sections 20-1204, 20-1207, 20-1208, 20-1209, 20-1211, and 20-1212 |
| **PROPOSED INT. NO. 1000-A:** | By Council Members Brannan, Farías, Narcisse, Banks, Brewer, Nurse, Ossé, Louis, Zhuang, Lee and Schulman |

**TITLE:**                          A Local Law in relation to establishing a for-hire vehicles parking pilot program

**PROPOSED INT. NO. 1233-A:**       By Council Members Bottcher, Krishnan, Ossé, Brannan, Hanif, Brooks-Powers, Narcisse, Holden and Morano

**TITLE:**                          A Local Law to amend the administrative code of the city of New York, in relation to the planting of vegetation on new medians separating bicycle lanes from motorized vehicle traffic

**ADMINISTRATIVE CODE:**            Adds a new section 19-159.9

**PROPOSED INT. NO. 1346-A:**       By Council Members Brooks-Powers, Williams, Narcisse, Banks, Louis and Salaam

**TITLE:**                          A Local Law to amend the administrative code of the city of New York, in relation to requiring the department of transportation to study the commuter van industry

**ADMINISTRATIVE CODE:**            Adds a new section 19-175.9

2

## INTRODUCTION

On December 18, 2025, the Committee on Transportation and Infrastructure, chaired by Majority Whip Selvena N. Brooks-Powers, will conduct a hearing to vote on the following legislation: Proposed Int. No. 276-A, sponsored by Council Member Shekar Krishnan, in relation to the wrongful deactivation of high-volume for-hire vehicle drivers; Proposed Int. No. 1000-A, sponsored by Council Member Justin Brannan, in relation to establishing a for-hire vehicles parking pilot program; Proposed Int. No. 1233-A, sponsored by Council Member Erik Bottcher, in relation to the planting of vegetation on new medians separating bicycle lanes from motorized vehicle traffic; and Proposed Int. 1346-A, sponsored by Council Member Brooks-Powers, in relation to requiring the department of transportation to study the commuter van industry.

A previous version of Proposed Int. No. 276-A was heard at a September 27, 2024 hearing titled: "TLC: For-Hire Vehicles, Commuter Vans and other TLC Licensees." At this hearing, the Committee heard testimony from representatives of the New York City ("NYC" or "City") Taxi and Limousine Commission ("TLC"), taxi medallion owners and drivers, for-hire vehicle ("FHV") drivers, industry advocates, and other interested stakeholders.

A previous version of Proposed Int. No. 1000-A and a previous version of Proposed Int. No. 1346-A were heard at a September 15, 2025 hearing titled: "TLC: Commuter Vans, For-Hire Vehicles, and Licensing in NYC's Evolving Transportation Landscape." At this hearing, the Committee heard testimony from representatives of TLC, NYC Department of Transportation ("DOT"), FHV drivers, industry advocates, and other interested stakeholders.

A previous version of Proposed Int. 1233-A was heard at an October 1, 2025 hearing titled: "Maintaining, Greening, and Enhancing the City's Sidewalks, Medians, and Streetscapes." At this hearing, the Committee heard testimony from representatives of NYC DOT, NYC Department of Parks and Recreation ("DPR"), street safety advocates, stakeholders related to public space, environmental advocates, and other interested stakeholders.

## BACKGROUND

### *PROPOSED INT. NO. 276-A & PROPOSED INT. NO. 1000-A*

*TLC*

TLC, created in 1971, is responsible for the regulation and licensing of: taxicabs, including medallion taxicabs (also known as yellow taxis) and street hail liveries (also known as green or boro taxis); FHVs; commuter vans; and paratransit vehicles.[1] TLC has approximately 600 employees and its Board consists of nine members, eight of whom are unsalaried Commissioners, along with the salaried Commissioner and Chair ("TLC Chair").[2] TLC Chair is the head of the TLC and presides over its public meetings.[3] TLC regulates over 200,000 TLC licensees in NYC.[4]

*FHVs*

The category of FHVs was historically composed of liveries, corporate black cars, and luxury limousines,[5] however the FHV industry has experienced tremendous changes with the introduction of mobile application-based (app-based) FHVs in the City (including Uber and Lyft,

---

[1] N.Y.C. TLC, *About*, https://www1.nyc.gov/site/tlc/about/about-tlc.page.
[2] *Id.*
[3] *Id*.
[4] *Id.*
[5] TLC, *2018 Fact Book,* https://www1.nyc.gov/assets/tlc/downloads/pdf/2018_tlc_factbook.pdf

collectively "the FHV services"). As a result, the number of licensed FHVs increased from approximately 39,700 in 2011[6] to more than 130,000 in March 2018, with TLC issuing licenses to approximately 2,000 new FHVs per month at that time.[7] Ultimately, this led to the City Council's passage of Local Law 147 of 2018,[8] which paused the issuance of new FHV licenses, with an exception for wheelchair-accessible vehicles, and Local Law 149 of 2018, which created a new license category, High-Volume For-Hire Services ("HVFHS"), for TLC-licensed FHV bases that dispatch more than 10,000 trips per day.[9] In 2022, TLC allowed an exemption for an additional 1,000 electric vehicle FHVs.[10] In September 2025, TLC data indicated that there are approximately 105,000 licensed FHVs currently active in the City, as well as roughly 108,000 licensed FHV drivers.[11]

A survey conducted as part of a 2024 TLC report  reported that 91% of surveyed drivers were born outside of the United States, and 86% were non-white.[12] Eighty percent of the surveyed drivers relied on driving as their sole source of income, and another 11% reported that it was more

---

[6] TLC, *2011 Annual Report*, https://www1.nyc.gov/assets/tlc/downloads/pdf/annual_report_2011.pdf

[7] Testimony of Commissioner Joshi before the Committee on For-Hire Vehicles, March 8, 2018 NYC Council Hearing, https://legistar.council.nyc.gov/View.ashx?M=F&ID=5872328&GUID=DB0BCBEA-4B02-468F-B948-512FA842D7EE

[8] Local Law 147, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3331789&GUID=6647E630-2992-461F-B3E3-F5103DED0653&Options=ID|Text|

[9] TLC, Businesses, *High-Volume For-Hire Services*, https://www.nyc.gov/site/tlc/businesses/high-volume-for-hire-services.page

[10] TLC, *TLC's Fiscal 2024 Mayor's Management Report,* https://www.nyc.gov/assets/operations/downloads/pdf/mmr2024/tlc.pdf

[11] TLC, *Aggregated Reports: Yellow Taxi, Green Taxi, and For-Hire Vehicle (FHV) Monthly Data*, https://www.nyc.gov/site/tlc/about/aggregated-reports.page (follow "Monthly Data Reports" hyperlink).

[12] *Revised Expense Model for the NYC Taxi and Limousine Commission's High-Volume For-Hire Vehicle Minimum Pay Standard*, Report for the New York City Taxi and Limousine Commissioner at pg. 9, James A. Parrott, Dec. 2024, https://www.nyc.gov/assets/tlc/downloads/pdf/driver_expense_report.pdf.

than half but not all of their income.[13] Sixty-six percent of drivers surveyed were still paying off their vehicle, with 79% of drivers stating that they rented their vehicle primarily to drive for the FHV services.[14] The median car payment for driver-owners of internal combustion engine ("ICE") vehicles was $735 a month and $950 a month for driver-owners of electric vehicles ("EVs"), while median insurance costs was $379 a month ($4,548 annually) for ICE vehicle owners and $396 a month ($4,750 annually) for EVs.[15] Although the report examined other additional operating expenses, these two are relevant to deactivations because they continue to accrue while the driver is temporarily deactivated and no longer operating their vehicle.

An analysis conducted by the Asian American Legal Defense and Education Fund ("AALDEF") of data collected by the New York Taxi Workers Alliance in 2025 similarly found that 95% of drivers relied on their driving income as the main source of income for their family, 69% of drivers were still paying off their vehicle, 88% bought their vehicle for the purpose of working for the FHV services, and that median vehicle expenses were $1,200 a month.[16] FHV drivers are predominantly immigrant and minority populations,[17] with both low and unstable income.[18] Additionally, FHV drivers are also required to invest significant resources up front in order to begin operations, while continuing to accrue monthly expenses even if they are

---

[13] *Id.*
[14] *Id.* at pg. 15.
[15] *Id*. at pgs. 25, 27-28.
[16] AALDEF, *Deactivated Without Cause: The Data Behind Unjust Firings of Drivers* at pgs. 14-15, October 28, 2025, https://www.aaldef.org/press-release/aaldef-report-uber-and-lyft-deactivate-nyc-drivers-with-no-notice-no-due-process-and-no/.
[17] *Revised Expense Model for the NYC Taxi and Limousine Commission's High-Volume For-Hire Vehicle Minimum Pay Standard* at pg. 9; Gany, et. al., *Food insecurity among New York City taxi and for-hire vehicle drivers*, Work, May 17, 2023, https://pmc.ncbi.nlm.nih.gov/articles/PMC10191220/#R6
[18] Gany, et. al.

6

temporarily or permanently prohibited from working for the FHV services.[19]

*Deactivations*

Uber and Lyft currently have the ability to disable an FHV driver's ability to accept ride dispatches through their Uber or Lyft account, a process known as account deactivation. The FHV services state that reasons a driver may be deactivated include document issues (*i.e.*, an expired license on file), safety issues (including account sharing, unsafe driving, or altercations with passengers), fraudulent activities, and discrimination against passengers.[20]

When a driver is deactivated, they may appeal that deactivation with the FHV service,[21] and may request to be represented by the Independent Drivers Guild ("IDG").[22] Certain deactivations, such as those resulting "appeals related to criminal activity while on the app, like theft or reckless driving … [and] appeals related to physical or sexual altercations," are not subject to appeal with Uber,[23] while Lyft maintains a "zero-tolerance" policy for drug and alcohol related offenses.[24] These policies, in combination with the FHV services' refund policy for passengers,

---

[19] *See Revised Expense Model for the NYC Taxi and Limousine Commission's High-Volume For-Hire Vehicle Minimum Pay Standard* at pgs. 25, 27-28; AALDEF at pgs. 14-15.

[20] Uber, *Deactivations*, September 23, 2024, https://www.uber.com/us/en/drive/driver-app/deactivation-review/#our-commitment; Lyft, Deactivations, https://help.lyft.com/hc/en-us/all/articles/7366276697-Deactivations

[21] Uber, *Driver deactivation review panel*, June 29, 2020, https://www.uber.com/blog/new-york-appeals/; Lyft, *Appealing permanent deactivations*, https://help.lyft.com/hc/en-us/all/articles/5354487457-Appealing-permanent-deactivations

[22] IDG, *Deactivation support*, Apr. 11, 2022, https://driversguild.org/benefit/deactivation/; Uber, *Driver deactivation review panel*, June 29, 2020, https://www.uber.com/blog/new-york-appeals/

[23] Uber, *Driver Deactivation Review Panel*, June 29, 2020, https://www.uber.com/blog/new-york-appeals/

[24] Lyft, *Zero-tolerance drug and alcohol policy*, https://help.lyft.com/hc/en-us/all/articles/115012926187

has led to some passengers lodging false complaints to recoup the cost of their ride at the expense of the FHV driver's livelihood.[25]

With respect to the set of appealable deactivations, IDG reports that they have represented approximately 20,000 drivers in the City over the past five years, including 4,800 cases in 2024, and were able to obtain reinstatement for 90% of those drivers, many within days of taking up the appeal.[26] IDG's consistent success at obtaining reinstatement for a large number of drivers each year suggests that a significant number of deactivations either do not stand up to closer scrutiny or could be quickly resolved upon opening a line of communication between the FHV drivers and the FHV services.

In February 2023, the Asian Law Caucus conducted a survey of FHV drivers in California.[27] They reported that two out of three FHV drivers surveyed experienced discrimination, sexual harassment, or other forms of misconduct or customer bias while driving for the FHV services.[28] Half of the drivers who faced racial discrimination from a customer were also reported *by* the customer.[29] Drivers of color were more likely to be deactivated, with 69% of the surveyed drivers of color experiencing some form of deactivation compared to 57% that identified as white.[30] Almost all deactivated FHV drivers experienced some form of hardship as a

---

[25] *Uber cracking down on users who give bad ratings to get refunds*, Daniel Miller, Fox TV Digital Team, No. 15, 2023, https://www.fox4news.com/news/uber-crack-down-users-bad-ratings-refunds; *Uber drivers are losing their jobs over fake DUI complaints*, Dara Kerr, CNET, Mar. 16, 2020, https://www.cnet.com/tech/mobile/uber-drivers-are-losing-their-jobs-over-fake-dui-complaints/;

[26] IDG, *Deactivation Representation*, https://driversguild.org/deactivation/

[27] *Fired by An App: The Toll of Secret Algorithms and Unchecked Discrimination on California Rideshare Drivers*, Asian Law Caucus, Feb. 28, 2023, https://www.asianlawcaucus.org/news-resources/guides-reports/fired-by-an-app-report

[28] *Id.* at 6.

[29] *Id.*

[30] *Id.*

result of their deactivation, with 18% losing their vehicle and 12% losing their homes.[31] The Asian Law Caucus recommended requiring just cause for deactivations, providing due process to drivers, and conducting meaningful and transparent investigations into customer complaints in order to address these issues.[32]

In October 2025, AALDEF's report on driver deactivations found that most of the surveyed deactivated drivers were long-time, high-performing drivers with high ratings and no record of misconduct, and were deactivated without prior notice based on vague allegations of "customer complaints." [33] Seventy percent of the drivers for Uber and 76% of the drivers for Lyft reported not receiving any notice prior to deactivation.[34] Forty percent of the drivers for Uber and 33% of the drivers for Lyft reported that when deactivations were due to customer complaints, they were not told when the alleged incident occurred; and 64% of the drivers for Uber and 75% of the drivers for Lyft reported that when deactivations were due to multiple complaints, they were not informed of the earlier complaints prior to deactivation.[35] As a result of being deactivated, the most common consequences experienced by these FHV drivers was an inability to pay rent or afford groceries.[36] To address these issues, AALDEF recommended requiring a just cause framework for deactivation and implementing protections to require transparency and due process for drivers.[37]

---

[31] *Id.*
[32] *Id.* at 7.
[33] AALDEF, *Deactivated Without Cause: The Data Behind Unjust Firings of Drivers*, October 28, 2025, https://www.aaldef.org/press-release/aaldef-report-uber-and-lyft-deactivate-nyc-drivers-with-no-notice-no-due-process-and-no/
[34] *Id.* at 7 and 10.
[35] *Id.*
[36] *Id.* at 8 and 11.
[37] *Id.* at 16.

9

*Introduction of a bill to address wrongful deactivations*

Int. No. 276 was based upon its predecessor from a prior legislative session, Int. No. 1078 of 2023,[38] which was prepared based on the receipt of numerous complaints from FHV drivers about the arbitrary deactivation of FHV drivers. This is in line with news reporting around the time of Int. 1078 and the years leading up to it of customers lodging false complaints against drivers in order to secure a refund for their trip.[39] Given that FHV drivers could lose their livelihood based upon a false complaint, motivated by either a passenger's financial incentive[40] or racial animus[41] against the predominantly immigrant and racial minority FHV drivers,[42] Int. No. 1078, and its successor, Int. No. 276, were introduced in an attempt to address this problem by requiring just cause or a bona fide economic reason before an FHV driver could be deactivated, requiring notice to the driver prior to deactivation (except in cases where immediate deactivation was warranted), and requiring a meaningful process through which the FHV driver could challenge their deactivation. The bill also provides a 'look-back' provision to provide relief to FHV drivers who were previously subject to wrongful deactivations, and set guardrails when deactivations have to be made for bona fide economic reasons to ensure that the deactivations made during those periods are not arbitrary.

---

[38] Introduction 1078-2023, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6252775&GUID=F6720790-ED39-4F04-9346-0CCD75E2B555

[39] *Uber cracking down on users who give bad ratings to get refunds*, Daniel Miller, Fox TV Digital Team, No. 15, 2023, https://www.fox4news.com/news/uber-crack-down-users-bad-ratings-refunds; *Uber drivers are losing their jobs over fake DUI complaints*, Dara Kerr, CNET, Mar. 16, 2020, https://www.cnet.com/tech/mobile/uber-drivers-are-losing-their-jobs-over-fake-dui-complaints/;

[40] *Id.*

[41] *See Fired by An App: The Toll of Secret Algorithms and Unchecked Discrimination on California Rideshare Drivers* at pg. 6

[42] *Revised Expense Model for the NYC Taxi and Limousine Commission's High-Volume For-Hire Vehicle Minimum Pay Standard* at pg. 9; Gany, et. al., https://pmc.ncbi.nlm.nih.gov/articles/PMC10191220/#R6

*Concerns from Service Providers*

When Int. No. 276 was heard on September 27, 2024, both FHV services testified in opposition to the bill. Lyft stated that a 15-day notice requirement for *all* deactivations would "create serious safety hazards for users of the Lyft platform and the public as a whole," and "would make it impossible for Lyft to comply with conflicting regulations that call for drivers to be deactivated immediately."[43] Lyft additionally had concerns that the bill would require that victims be forced to relive traumatic events, and raise privacy concerns if the Department of Worker and Consumer Protection ("DCWP") were permitted to investigate complaints.[44] In addition, Lyft testified that the bill failed to take into account existing deactivation processes already set in place, including through Lyft's partnership with IDG.[45]

Uber requested that TLC, not DCWP, be responsible for overseeing the process set out in Int. No. 276, and that the bill apply equally to all FHV bases and medallion operators.[46] Uber requested that the bill should be revised to only apply to long-term deactivations (30 days or longer), and exclude deactivations caused by regulatory compliance issues.[47] Uber requested that the term "egregious misconduct" be defined to include "conduct that endangers the physical safety of others, intentionally causes economic harm, or is physically or verbally threatening, harassing,

---

[43] Hearing Testimony 9/27/24, Testimony submitted re: Intro 0276 – Deactivation of FHV drivers, Larry Gallegos for Lyft at pgs. 54-55, Sept. 27, 2024, https://legistar.council.nyc.gov/View.ashx?M=F&ID=13357427&GUID=F4E8C99F-EED7-469B-830E-B340D3E2F3AB.

[44] *Id.*

[45] *Id.*

[46] Hearing Testimony 9/27/24, Comments of Uber USA, LLC re: Int-0276-2024: Wrongful deactivation of high-volume for-hire vehicle drivers, Josh Gold for Uber at pg. 69, Sept. 27, 2024, https://legistar.council.nyc.gov/View.ashx?M=F&ID=13357427&GUID=F4E8C99F-EED7-469B-830E-B340D3E2F3AB.

[47] *Id.*

11

or abusive," allow for discretionary decision-making outside of the specifically defined categories of conduct, and cover conduct even when the driver is not providing driving services for the FHV service.[48] Uber additionally requested that the pre-deactivation notice period be reduced to 3 days because "[a]llowing drivers who have violated Uber's Platform Access Agreement or Community Guidelines to remain on the platform during a notice period may jeopardize the safety of other users."[49] Uber also testified about the success of their Driver Review Center and partnership with IDG.

Between September 27, 2024 through December 10, 2025, committee staff further engaged with the FHV services, as well as organizations representing various vulnerable passenger populations, to discuss their concerns about Int. No. 276. The primary concern of the organizations representing vulnerable passenger populations was that although the bill already permitted immediate deactivation of drivers who engaged in "egregious misconduct," that term was not defined. The FHV services also continued to request that "egregious misconduct" be defined using specific categories of wrongdoing in order to enable them to easily determine whether a driver's conduct qualified as egregious misconduct, and therefore could be immediately deactivated pursuant to the bill.

As a result of these conversations and in consideration of the public testimony of the FHV services, the bill was amended to define "egregious misconduct" as any "conduct that poses an imminent danger to other persons, including but not limited to violence, threats to engage in

---

[48] *Id.*
[49] *Id.* at pg. 70.

12

violence, sexual harassment, or sexual assault" as well as "discrimination in violation of federal, state, or local law," and both account sharing and repeated fraudulent behavior were added to the list of conduct that excuses the FHV service from providing 14 days' notice prior to deactivation. As Uber requested, the term is broadly defined so as to include conduct that occurs outside of the FHV driver's performance of driving services for the FHV service. The umbrella definition of "conduct that poses an imminent danger to other persons" was chosen over Uber's suggestion of conduct that endangers others because Uber's preferred definition would be over-inclusive and could include behavior such as the failure to properly signal a turn that, although it arguably endangers others, does not rise to the level of wrongdoing contemplated by the term "egregious misconduct." In addition, deactivations required by law were excluded from the prohibition against wrongful deactivations to address both FHV services' concerns about regulatory compliance, meaning that an FHV service could immediately deactivate a driver without consequence if TLC rules, or any relevant law, required that result.

The FHV services' concerns about the bill's interaction with their existing appeals process and their relationship with IDG was addressed by removing the DCWP-run arbitration process and instead relying on an "informal resolution process" initiated with the FHV services through an "email address, website, or other form of electronic communication maintained by [the FHV service]," and allowing the driver to be represented throughout this process (and during the DCWP investigation, if there is one).

In addition to these amendments to address the primary concerns of the FHV services (permitting the immediate deactivation of drivers who engage in egregious misconduct, and

13

integrating the bill's process with the FHV services' existing processes), the discussions with the FHV services also yielded other amendments to ease the FHV services' compliance burden. The bill was amended to narrow the data required to be produced to the driver upon deactivation and personally identifiable information was required to be redacted; the definition of "deactivation" was amended to provide additional flexibility for temporary restrictions of access (up to 168 hours a year); and language concerning the consideration of exculpatory evidence was added at the request of the FHV services.

However several requests made by the FHV services during their public testimony could not be accommodated. Uber's request that TLC, not DCWP, be responsible for the oversight contemplated by this bill was rejected based on discussions with the agencies themselves, which both believed DCWP to be the agency better suited for this task. Uber's request that this bill be extended to all FHV bases was rejected because the balance struck by this bill would best fall only on entities defined by TLC rules as high-volume for-hire vehicle services as opposed to every single FHV or medallion operator regardless of size. Uber's request that the bill only concern long-term deactivations could not be addressed because of the potential for abuse if the FHV services were to string together a sequence of 'temporary' deactivations separated by brief moments of re-activation to fall outside of the definition of a 'long-term' or 'permanent' deactivation; however the bill was amended to afford the FHV services greater flexibility, allowing for up to 168 hours of temporary deactivation a year to conduct investigations or for any other reasons. Lyft's concerns about passenger privacy was partially addressed by requiring the redaction of passenger personally identifiable information, but could not be totally addressed because, in the interests of due process,

14

it may be required that the driver be provided information about the specific allegation giving rise to their deactivation (including when and where the driver allegedly engaged in the misconduct).

Outside of their public testimony, the FHV services and other stakeholders made additional requests for amendments that could not be accommodated. Some requests ran counter to the goals of the bill (*e.g.*, requesting that drivers who challenge their deactivations and fail should be subject to civil penalties), or disrupted the careful balance struck by the bill (requesting a standard more deferential to the FHV services when defending a deactivation than preponderance of the evidence). The FHV services frequently requested amendments that, if accommodated, would swallow the bill whole, *e.g.*, permitting any deactivation based on a ground set forth in the terms of service (which could permit deactivations for any reason); allowing any violation of the FHV services' anti-discrimination policy to qualify as egregious misconduct (with no guardrails on what that policy might say); allowing the FHV services' reasonable belief of misconduct to qualify as just cause (which would permit the FHV service to keep a driver deactivated even in the face of a DCWP determination to the contrary); or permitting any number of temporary deactivations so long as three days' notice is provided (allowing the FHV services to constructively permanently deactivate an FHV driver so long as notice is continuously provided), etc.

### Proposed Int. No. 1000-A: Public Bathrooms for TLC Drivers

A significant concern of the City's taxi and FHV drivers is their lack of access to restrooms while on duty. Because there are limited places for drivers to safely and legally pull over in high-demand areas of NYC like Manhattan, drivers are often forced to drive to other boroughs just to

15

find a place to take a break, resulting in increased congestion and lost wages.[50] The inability of drivers to reliably find a place to take timely breaks also has serious health and quality of life implications.[51] To address this issue, DOT has been working with TLC and driver advocacy stakeholders to install taxi and FHV relief stands,[52] which allow drivers to park and leave their vehicles for up to one hour to give them the opportunity to use the bathroom.[53] However, the City's relief stands are currently disproportionately available to taxi drivers. Of the 113 relief stands citywide, 43 are for taxis only, with the remaining 70 available to both taxis and FHVs.[54] Of the 70 relief stands in Manhattan, 36 are for taxis only, with the remaining 34 available to both taxis and FHVs.[55] For the roughly 108,000 active FHV drivers in the City,[56] that equates to one relief stand in Manhattan for every 3,176 drivers.

---

[50] Independent Drivers Guild, *Manhattan Bathroom Break*, (Feb. 16, 2022), https://driversguild.org/manhattan-bathroom-break/; Peter Saalfield, *Rideshare Drivers With No Place to Go Demand Bathroom Access*, Columbia Journalism School (Oct. 30, 2023), https://columbianewsservice.com/2023/10/30/rideshare-drivers-with-no-place-to-go-demand-bathroom-access/.

[51] Alon Mass et al., *Taxi Cab Syndrome: A Review of the Extensive Genitourinary Pathology Experienced by Taxi Cab Drivers and What We Can Do to Help*, 16 Rev. Urol. 99-104 (2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4191628/.

[52] David Do, Chair and Comm'r, N.Y.C. TLC, *Testimony Before the City Council Committee on Transportation and Infrastructure*, 3 (Sept. 15, 2025).

[53] N.Y.C. DOT, *Taxi and For-Hire Vehicle Relief Stands*, https://www.nyc.gov/html/dot/html/motorist/taxirelief.shtml.

[54] N.Y.C. DOT, *Taxi and For Hire Vehicle Relief Stands Dataset,* N.Y.C. OpenData (last updated Dec. 1, 2025), https://data.cityofnewyork.us/Transportation/Taxi-and-For-Hire-Vehicle-FHV-Relief-Stands/vqu8-xef9/about_data.

[55] *Id.*

[56] TLC, *Aggregated Reports: Yellow Taxi, Green Taxi, and For-Hire Vehicle (FHV) Monthly Data*, https://www.nyc.gov/site/tlc/about/aggregated-reports.page (follow "Monthly Data Reports" hyperlink).

16

**_PROPOSED INT. NO. 1233-A_**

**_Department of Transportation_**

DOT's mission is to provide for the safe, equitable, and sustainable movement of people and goods in NYC, while creating public spaces that strengthen the City's communities.[57] The agency's vision is a transportation system that provides equitable mobility for all residents and visitors, while also being environmentally sustainable and built to adapt to the threat of climate change.[58] DOT is responsible for a significant amount of the City's public infrastructure, which includes planning, design, construction, maintenance, and management of roads, sidewalks, bridges, traffic signals, and signs.[59] DOT has an annual operating budget of $1.5 billion and a 10-year $33.5 billion capital program, with nearly 6,000 employees.[60] Overall, DOT manages: 6,300 miles of streets and highways; over 12,000 miles of sidewalk; approximately 800 bridges and tunnels; over one million street signs; 13,500 signalized intersections; nearly 400,000 streetlights; over 350 million linear feet of markings; 15,000 parking meters and 37 parking facilities; and the Staten Island Ferry.[61] DOT also is responsible for smaller-scale public realm elements located on City sidewalks and streets such as lampposts, medians, bicycle lane barriers, and traffic calming measures that impacts public safety, climate resiliency, and quality of life.

---

[57] N.Y.C. DOT, *About DOT*, https://www1.nyc.gov/html/dot/html/about/about.shtml.
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*

17

*Medians*

According to the Federal Highway Administration ("FHWA"), a median "is the area between opposing lanes of traffic, excluding turn lanes."[62] In urban and suburban areas, medians "can be defined by pavement markings, raised medians, or islands to separate motorized and nonmotorized road users."[63] These medians may include trees or plantings to create natural barriers and make neighborhoods more environmentally sustainable and appealing.[64]

In the City, DOT utilizes medians, raised medians, and pedestrian safety islands (also known as "pedestrian refuge islands") to improve pedestrian safety at specific roadways.[65] Such medians are primarily utilized along roadways or extended through intersections to prevent left-turns and through-movements to and from intersection streets.[66] Pedestrian refuge islands provide pedestrians and cyclists with access to the median.[67]

According to DOT, the planting of trees and other vegetation within medians has been shown to provide significant benefits—enhancing pedestrian safety, improving environmental quality, and beautifying the streetscape.[68] While DOT currently coordinates with DPR to support such planting as part of its work,[69] DOT is not required to facilitate planting within newly constructed medians.

---

[62] Federal Highway Administration, *Proven Safety Measures, Medians and Pedestrian Refuge Islands in Urban and Suburban Areas*, https://highways.dot.gov/safety/proven-safety-countermeasures/medians-and-pedestrian-refuge-islands-urban-and-suburban-areas.

[63] *Id.*

[64] *Id.*

[65] N.Y.C. DOT, *Street Design Manual: Median Barrier*, https://www.nycstreetdesign.info/geometry/median-barrier.

[66] *Id.*

[67] *Id.*

[68] Margaret Forgione, First Deputy Comm'r, N.Y.C. DOT, *Testimony Before the City Council Committee on Transportation and Infrastructure*, 5 (Oct. 1, 2025).

[69] *Id.*

**PROPOSED INT. NO. 1346-A**

*Commuter Vans*

Commuter vans are a subclassification of common carriers with a seating capacity of at least nine but no more than twenty passengers, and that transport those passengers between a residential neighborhood and a work related central location, mass transit facility, shopping center, recreational facility, or airport.[70] Commuter vans first became popular in 1980 during a New York transit strike and have continued to be popular in some outer borough neighborhoods,[71] offering an affordable mode of transportation for residents that are underserved by traditional FHVs and mass transit.[72] However, commuter vans have also been the source of various community complaints over the years, including passengers littering while waiting to be picked up, increased traffic congestion, and double parking.[73] As of Calendar Year 2024, there were 12 authorized commuter van bases, which together operate 38 licensed vehicles with 59 licensed commuter van drivers.[74] This figure represents a significant decline from 2014, when there were 48 bases, 534 vehicles, and 289 licensed drivers.[75]

In addition to licensed commuter vans, unlicensed commuter vans are also prevalent in some neighborhoods in the City. Unlicensed commuter vans provide similar services as licensed

---

[70] Ad. Code § 19-502.
[71] Kimiko de Freytas-Tamura, *Can 'Scooby Doo' and the Rest of the Dollar Vans Go High-Tech?,* New York Times, (Dec. 11, 2019), https://www.nytimes.com/2019/12/11/nyregion/dollar-van-app-nyc-dollaride.html.
[72] N.Y.C TLC, Commuter Van Decal Rule, (Jul. 16, 2015), https://www.nyc.gov/assets/tlc/downloads/pdf/newly_passed_rule_commuter_van_decal.pdf.
[73] *Id.*
[74] N.Y.C TLC, *New York City Taxi and Limousine Commission 2024 Annual Report,* (Jan. 2025), ://www.nyc.gov/assets/tlc/downloads/pdf/annual_report_2024.pdf.
[75] N.Y.C TLC, *New York City Taxi and Limousine Commission 2014 Annual Report,* (Jan. 2025), https://www.nyc.gov/assets/tlc/downloads/pdf/annual_report_2014.pdf.

commuter vans, but operate without the safety and consumer protection safeguards that TLC-licensed commuter vans are bound by, such as insurance and inspection requirements, as well as driver licensing requirements including background checks and drug testing.[76] According to the New York Times, as of 2019, nearly three-quarters of commuter van drivers in the City were operating illegally .[77] However, TLC has stated that the number of unlicensed commuter vans in operation is unknown.[78] Overall, data from TLC's Commuter Van Safety Study for Calendar Year 2023 indicated that over 93% of the 75 safety-related violations issued by TLC in Calendar Year 2023 were for violations related to unlicensed operation of a commuter van.[79]  In an effort to reduce the number of unlicensed commuter vans operating in the City, TLC utilizes TLC enforcement agents and partners with the NYC Police Department ("NYPD") and the NYC Sheriff.[80]  In total, in Calendar Year 2023, TLC seized four commuter vans, all of which were returned to their owners after a vehicle retention hearing at OATH.[81]

---

[76] 35 RCNY § 57-04

[77] Kimiko de Freytas-Tamura, *Can 'Scooby Doo' and the Rest of the Dollar Vans Go High-Tech?,* New York Times (Dec. 11, 2019), https://www.nytimes.com/2019/12/11/nyregion/dollar-van-app-nyc-dollaride.html.

[78] *Id.*

[79] N.Y.C. TLC, *Commuter Van Safety Study for Calendar Year 2023,* (Jun. 28, 2024), https://www.nyc.gov/assets/tlc/downloads/pdf/commuter_van_safety_study_2023.pdf.

[80] *Id.*

[81] *Id.*

20

## <u>LEGISLATIVE ANALYSIS</u>

Below are brief summaries of the legislation being heard today by this Committee. These summaries are intended for informational purposes only and do not substitute for legal counsel. For more detailed information, review the full text of the bills, which are included below.

**Proposed Int. No. 276-A, A Local Law to amend the administrative code of the city of New York, in relation to the wrongful deactivation of high-volume for-hire vehicle drivers**

Proposed Int. No. 276-A would prohibit HVFHSs from deactivating their drivers except if there is just cause or a bona fide economic reason for the deactivation, or if the deactivation is required by law. Just cause means that the driver engaged in egregious misconduct, or other misconduct that is demonstrably and materially harmful to the business interests of the FHV services. Egregious misconduct means conduct that poses an imminent danger to other persons, including but not limited to violence, threats of violence, sexual harassment or assault, as well as discrimination in violation of the law. A bona fide economic reason means that the FHV services experienced a reduction in sales or profit.

When the underlying cause for a deactivation is alleged egregious misconduct, account sharing, or fraud, the driver may be deactivated immediately. If the underlying cause is a bona fide economic reason, the driver must be provided 120 days' notice. For all other deactivations, the driver is required to be provided 14 days' notice of their deactivation. The notice must explain the reasons for the deactivation and provide the driver with an opportunity to submit evidence contesting the deactivation.

Upon being deactivated, the driver must be permitted to challenge the deactivation through an informal process by reaching out to the FHV service through a website, email, or other

electronic means. The driver may be represented as part of this process. The driver may also request that DCWP investigate their deactivation. If the deactivation is determined to be wrongful, the driver may be entitled to relief including but not limited to reinstatement and back pay.

This bill would also permit drivers who were previously deactivated by FHV services to seek reinstatement if their deactivations were wrongful, although the FHV services are not required to immediately reinstate the drivers if they are not currently accepting new drivers. Any such drivers that would be entitled to reinstatement would be put on a waitlist.

This bill would also require that the FHV services provide information about deactivations to DCWP in order to oversee the implementation of this program.

This local law would take effect 180 days after it becomes law.

**Proposed Int. No. 1000-A, A Local Law in relation to establishing a for-hire vehicles parking pilot program**

Proposed Int. No. 1000-A would require DOT to establish a pilot program to allow FHVs to park in commercial parking meter areas. The pilot program would have a 1-year duration, but could be extended by an additional 180 days if DOT determines that such an extension would promote the public interest. DOT would also be required to submit a report on the effects of the pilot program.

This local law would take effect immediately and expire and be deemed repealed 1 year after the submission of the report required by this local law.

22

**Proposed Int. No. 1233-A, A Local Law to amend the administrative code of the city of New York, in relation to the planting of vegetation on new medians separating bicycle lanes from motorized vehicle traffic**

Proposed Int. No. 1233-A would require DOT to build any new medians separating bicycle lanes from motorized vehicle traffic to accommodate the planting of trees and other vegetation, based on feasibility determinations made by DOT, in consultation with DPR. DPR would be required to plant, or permit to be planted, trees and other vegetation in the new medians accordingly. DOT would also be required to post information online regarding the long-term cleaning and maintenance responsibilities of such medians.

This local law would take effect 270 days after it becomes law.

**Proposed Int. No. 1346-A, A Local Law to amend the administrative code of the city of New York, in relation to requiring the department of transportation to study the commuter van industry**

Proposed Int. No. 1346-A would require DOT to study the licensed and unlicensed vans that make up NYC's commuter van industry. DOT would be required to study the service areas and ridership of commuter vans, survey commuter van passengers about their use of commuter vans and other forms of transportation, including public transit, and report on areas where commuter vans interfere with buses, pedestrians, and delivery zones. DOT would be required to complete this study by July 1, 2027 and every four years thereafter. The DOT commissioner may discontinue the study after October 1, 2039, if the commissioner determines that future studies are no longer necessary.

This local law would take effect immediately.

23

*Page intentionally left blank*

Proposed Int. No. 276-A

By Council Members Krishnan, Hanif, Lee, Restler, Marte, Brewer, Hudson, Cabán, Abreu, Banks, Ung, Schulman, Sanchez, Ayala, Avilés, Zhuang, Riley, Joseph, Stevens, Hanks, Nurse, De La Rosa, Gutiérrez and Epstein

A Local Law to amend the administrative code of the city of New York, in relation to the wrongful deactivation of high-volume for-hire vehicle drivers

Be it enacted by the Council as follows:

Section 1. Subdivision a of section 20-1204 of the administrative code of the city of New York, as added by local law number 107 for the year 2017, is amended to read as follows:

a. No person shall take any adverse action against an employee or high-volume for-hire vehicle driver that penalizes such employee or high-volume for-hire vehicle driver for, or is reasonably likely to deter such employee or high-volume for-hire vehicle driver from, exercising or attempting to exercise any right protected under this chapter. Taking an adverse action includes threatening, intimidating, disciplining, discharging, demoting, suspending or harassing an employee or high-volume for-hire vehicle driver, reducing the hours or pay of an employee or high-volume for-hire vehicle driver, informing another employer or high-volume for-hire vehicle service that an employee or high-volume for-hire vehicle driver has engaged in activities protected by this chapter, and discriminating against the employee or high-volume for-hire vehicle driver, including actions related to perceived immigration status or work authorization. An employee or high-volume for-hire vehicle driver need not explicitly refer to this chapter or the rights enumerated herein to be protected from retaliation.

25

§ 2. Paragraphs 1 and 2 of subdivision b of section 20-1207 of the administrative code of the city of New York, as amended by local law number 80 for the year 2020, are amended to read as follows:

1. Any person, including any organization, alleging a violation of this chapter may file a complaint with the department within two years of the date the person knew or should have known of the alleged violation, except that (i) a complaint alleging a violation of section 20-1282 or section 20-1283 may be filed only by the deactivated high-volume for-hire vehicle driver or by a representative of such high-volume for-hire vehicle driver, provided that the high-volume for-hire vehicle driver has agreed to such representation and (ii) a complaint alleging a violation of section 20-1283 may be filed within one year after the effective date of the local law that added subchapter 8 of this chapter.

2. Upon receiving such a complaint, the department shall investigate it, except that upon receiving a complaint alleging a violation of any provision of subchapter 8 of this chapter, the department shall, if resources permit, investigate the complaint.

§ 3. Paragraph 5 of subdivision b of section 20-1207 of the administrative code of the city of New York, as amended by local law number 80 for the year 2020, is amended to read as follows:

5. The department shall keep the identity of any complainant confidential unless disclosure is necessary to resolve the investigation or is otherwise required by law, except that for complaints alleging violations of section 20-1282 or 20-1283, the department shall provide notice of the complaint and the identity of the complainant to the high-volume for-hire vehicle service as soon

26

as practicable. The department shall, to the extent practicable, notify such complainant that the department will be disclosing the complainant's identity before such disclosure.

§ 4. The section heading of section 20-1208 of the administrative code of the city of New York, as added by local law 107 for the year 2017, is amended to read as follows:

§ 20-1208 Specific administrative remedies [for employees or former employees].

§ 5. Subdivision c of section 20-1208 of the administrative code of the city of New York, as added by local law number 107 for the year 2017 and redesignated by local law number 2 for the year 2021, is redesignated subdivision e and amended and new subdivisions c and d are added to such section to read as follows:

c.  1. For each violation by a high-volume for-hire vehicle service of section 20-1282 or 20-1283, the department shall order reinstatement or restoration of access to the driver platform of such high-volume for-hire vehicle service by such high-volume for-hire vehicle driver, unless waived by such high-volume for-hire vehicle driver.

2. For each violation by a high-volume for-hire vehicle service of section 20-1282 the department shall order the payment of back pay to the wrongfully deactivated high-volume for-hire vehicle driver, and such back pay shall be equal to the amount such high-volume for hire vehicle driver would have normally earned or received from such high-volume for-hire vehicle service during the period of a wrongful deactivation if such wrongful deactivation had not occurred, provided that:

(a) The department may subtract any additional amounts earned or received by such high-volume for-hire vehicle driver from other work during such period in excess of what such high-

27

volume for-hire vehicle would have normally earned or received from other work if such deactivation had not occurred;

(b)  For purposes of this paragraph, the amount a high-volume for-hire vehicle driver would have normally earned or received from a high-volume for-hire vehicle service or other work over a period of deactivation shall be determined based on the average daily amount such high-volume for-hire vehicle driver earned or received from such high-volume for-hire vehicle service or such other work over a reasonably comparable period;

(c) Notwithstanding any provision of this subdivision to the contrary, where a violation of section 20-1282 arises from an allegation of egregious misconduct that was not substantiated, back pay shall not accrue until 15 days after the date of deactivation of a high-volume for-hire vehicle driver; and

(d) The department may adjust the amount of back pay owed to a high-volume for-hire vehicle driver, as appropriate, based on a failure by such high-volume for-hire vehicle driver to make a reasonable effort to mitigate any loss of income, provided that a high-volume for-hire vehicle service shall have the burden of proving by a preponderance of the evidence that a driver failed to make a reasonable effort to mitigate;

d. For violations of this chapter, the department may grant the following relief to a high-volume for-hire vehicle driver or former high-volume for-hire vehicle driver:

1. All compensatory damages and other relief required to make such high-volume for-hire vehicle driver or former high-volume for-hire vehicle driver whole;

28

2. An order directing a high-volume for-hire vehicle service to comply with the requirements set forth in subchapter 8 of this chapter;

3. For each violation of section 20-1204,

(a) Any equitable relief appropriate under the circumstances, including rescission of any discipline issued, reinstatement of any deactivated high-volume for-hire vehicle driver, and payment of back pay for any loss of pay or benefits resulting from discipline or other action taken in violation of section 20-1204;

(b) $500 for each violation not involving deactivation, as such term is defined in section 20-1281; and

(c) $2,500 for each violation involving deactivation, as such term is defined in section 20-1281;

4. For each violation of 20-1282, $500, rescission of any discipline issued, and any other equitable relief as may be appropriate;

5. For each violation of subdivision c of section 20-1284, $500;

6. For each violation of section 20-1286, $500; and

7. For each violation of section 20-1289, $500.

e. The relief authorized by this section shall be imposed on a per employee or high-volume for-hire vehicle driver and per instance basis for each violation.

§ 6. Section 20-1209 of the administrative code of the city of New York, as added by local law 107 for the year 2017, is amended to read as follows:

29

§ 20-1209 Specific civil penalties payable to the city. a. For each violation of this chapter, <u>except for any violation of section 20-1283,</u> an employer <u>or high-volume for-hire vehicle service</u> is liable for a penalty of $500 for the first violation and, for subsequent violations that occur within two years of any previous violation of this chapter, up to $750 for the second violation and up to $1,000 for each succeeding violation.

b. The penalties imposed pursuant to this section shall be imposed on a per employee <u>or high-volume for-hire vehicle driver</u> and per instance basis for each violation.

§ 7. Section 20-1211 of the administrative code of the city of New York, as added by local law number 107 for the year 2017, subdivision a as amended, subdivision c as added, and subdivisions d and e as redesignated by local law number 2 for the year 2021, is amended to read as follows:

§ 20-1211 Private cause of action<u>.</u> a. Claims. Any person, including any organization, alleging a violation of the following provisions of this chapter may bring a civil action, in accordance with applicable law, in any court of competent jurisdiction:

1. Section 20-1204;

2. Section 20-1221;

3. Subdivisions a and b of section 20-1222;

4. Section 20-1231;

5. Subdivisions a, b, d, f and g of section 20-1241;

6. Section 20-1251;

7. Subdivisions a and b of section 20-1252; [and]

30

8. Section 20-1272;

9. Section 20-1282;

10. Section 20-1283;

11. Section 20-1284;

12. Section 20-1286; and

13. Section 20-1289.

b.    Remedies. Such court may order compensatory, injunctive and declaratory relief, including the following remedies for violations of this chapter:

1.    Payment of schedule change premiums withheld in violation of section 20-1222;

2.    An order directing compliance with the recordkeeping, information, posting and consent requirements set forth in sections 20-1205, 20-1206 and 20-1221;

3.    Rescission of any discipline issued in violation of section 20-1204;

4.    Reinstatement of any employee or high-volume for-hire vehicle driver terminated in violation of section 20-1204;

5.    Payment of back pay for any loss of pay or benefits resulting from discipline or other action taken in violation of section 20-1204;

6.    Other compensatory damages and any other relief required to make the employee or high-volume for-hire vehicle driver whole; and

7.    Reasonable attorney's fees and costs.

c. For each violation of section 20-1272, 20-1282, or 20-1283, the court shall order reinstatement or restoration of hours of the fast food employee or reinstatement or restoration of

31

the driver platform access of the high-volume for-hire vehicle driver, unless waived by the fast food employee or high-volume for-hire vehicle driver, and shall order the fast food employer or high-volume for-hire vehicle service to pay the reasonable attorneys' fees and costs of the fast food employee or high-volume for-hire vehicle driver. [The] For each violation of section 20-1272 or 20-1282, the court may, in addition, grant the following relief: $500 [for each violation], an order directing compliance with section 20-1272 or 20-1282, rescission of any discipline issued, payment of back pay for any loss of pay or benefits resulting from the wrongful discharge or deactivation, punitive damages, and any other equitable relief as may be appropriate. For each violation of 20-1282, the court shall order back pay to be determined as set out in paragraph 2 of subdivision c of section 20-1208.

d. Statute of limitations. A civil action under this section shall be commenced within two years of the date the person knew or should have known of the alleged violation, except that for a violation of section 20-1283, a civil action shall be commenced within one year after the effective date of the local law that added subchapter 8 of this chapter.

e.  Relationship to department action.

1.  Any person filing a civil action shall simultaneously serve notice of such action and a copy of the complaint upon the department. Failure to so serve a notice does not adversely affect any plaintiff's cause of action.

2.  An employee or high-volume for-hire vehicle driver need not file a complaint with the department pursuant to subdivision b of section 20-1207 before bringing a civil action; however,

32

no person shall file a civil action after filing a complaint with the department based on the same facts unless such complaint has been withdrawn or dismissed without prejudice to further action.

3.  No person shall file a complaint with the department after filing a civil action based on the same facts unless such action has been withdrawn or dismissed without prejudice to further action.

4.  The commencement or pendency of a civil action by an employee or a high-volume for-hire vehicle driver does not preclude the department from investigating the employer or the high-volume for-hire vehicle service, or commencing, prosecuting or settling a case against the employer or the high-volume for-hire vehicle service based on some or all of the same violations.

§ 8. Subdivisions a and c of section 20-1212 of the administrative code of the city of New York, subdivision a as amended by local law number 2 for the year 2021 and subdivision c as added by local law number 107 for the year 2017, are amended to read as follows:

a.  Cause of action.

1.  Where reasonable cause exists to believe that an employer or high-volume for-hire vehicle service is engaged in a pattern or practice of violations of this chapter, the corporation counsel may commence a civil action on behalf of the city in a court of competent jurisdiction.

2.  The corporation counsel shall commence such action by filing a complaint setting forth facts relating to such pattern or practice and requesting relief, which may include injunctive relief, relief [for employees] set forth in section 20-1208, civil penalties set forth in section 20-1209, and any other appropriate relief.

33

3.   Such action may be commenced only by the corporation counsel or such other persons designated by the corporation counsel.

c.   Civil penalty. In any civil action commenced pursuant to subdivision a of this section, the trier of fact may impose [a] <u>an additional</u> civil penalty of not more than $15,000 for a finding that an employer <u>or high-volume for-hire vehicle service</u> has engaged in a pattern or practice of violations of this chapter. Any civil penalty so recovered shall be paid into the general fund of the city.

§ 9. Chapter 12 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 8 to read as follows:

SUBCHAPTER 8

WRONGFUL DEACTIVATION OF HIGH VOLUME FOR-HIRE VEHICLE DRIVERS

<u>§ 20-1281 Definitions. As used in this subchapter, the following terms have the following meanings:</u>

<u>Account sharing. The term "account sharing" means permitting another person to use the high-volume for-hire vehicle driver's taxi and limousine commission driver's license, technology system login credentials, or driver platform login credentials, while performing driving services for a high-volume for-hire vehicle service.</u>

<u>Deactivation. The term "deactivation" means: (i) an indefinite or permanent discharge, termination, or layoff of a high-volume for-hire vehicle driver; or (ii) a revocation or restriction of a high-volume for-hire vehicle driver's authorization to accept trips on a driver platform that is</u>

34

either continuously in effect for at least 72 hours or consists of multiple periods of revocation or restriction that total at least 168 hours within a 1-year period.

Driver platform. The term "driver platform" means the driver-facing application or other application, service, website, or system used by a high-volume for-hire vehicle driver by which a high-volume for-hire vehicle service dispatches or facilitates the dispatching of passenger trips to such driver for compensation.

Driving performance data. The term "driving performance data" means any data regarding a high-volume for hire vehicle driver's operation of a for-hire vehicle, including, but not limited to, data recording a high-volume for-hire vehicle driver's rates of acceleration, deceleration, braking, speed, road movements, or any other electronic monitoring of driving performance.

Egregious misconduct. The term "egregious misconduct" means (i) conduct that poses an imminent danger to other persons, including but not limited to violence, threats to engage in violence, sexual harassment, or sexual assault or (ii) discrimination in violation of federal, state, or local law.

High-volume for-hire vehicle driver. The term "high-volume for-hire vehicle driver" means a driver who performs driving services for a high-volume for-hire vehicle service, or who performs driving services for a third-party as a result of receiving a dispatch or referral from a high-volume for-hire vehicle service.

High-volume for-hire vehicle service. The term "high-volume for-hire vehicle service" has the same meaning as set forth in subdivision gg of section 19-502.

35

Just cause. The term "just cause" means that the high-volume for-hire vehicle driver engaged in egregious misconduct, failed to satisfactorily perform their job duties, or engaged in any other misconduct that is demonstrably and materially harmful to the high-volume for-hire vehicle service's legitimate business interests.

Prior deactivation. The term "prior deactivation" means a deactivation that occurred during the 7 years prior to the effective date of the local law that added this subchapter.

Probation period. The term "probation period" means a period of 30 calendar days beginning on the first date that a high-volume for-hire vehicle driver performs driving services for a high-volume for-hire vehicle service.

Progressive discipline. The term "progressive discipline" means a disciplinary system that provides for a graduated range of reasonable disciplinary measures, including but not limited to warnings and further training requirements, in response to a high-volume for-hire vehicle driver's misconduct or failure to satisfactorily perform job duties for a high-volume for-hire vehicle service, with the type of disciplinary measure varying based on the frequency and degree of such misconduct or failure.

§ 20-1282 Prohibition on wrongful deactivation. a. A high-volume for-hire vehicle service shall not deactivate a high-volume for-hire vehicle driver after such high-volume for-hire vehicle driver's probation period with such service except for just cause, for a bona fide economic reason, as described in section 20-1284, or where federal, state, or local law or rule requires such high-volume for-hire vehicle service to deactivate such high-volume for-hire vehicle driver.

36

b. In determining whether a high-volume for-hire vehicle service has deactivated a high-volume for-hire vehicle driver for just cause, a fact-finder shall consider, in addition to any other relevant factors, whether:

1. Such high-volume for-hire vehicle driver knew or should have known of such high-volume for-hire vehicle service's policy, rule, or practice that forms a basis for progressive discipline or such deactivation and knew or should have known of the potential consequences for violation of such policy, rule, or practice;

2. Such high-volume for-hire vehicle service's policy, rule, or practice that forms a basis for progressive discipline or such deactivation is reasonably related to safe and efficient high-volume for-hire vehicle service operations;

3. Such high-volume for-hire vehicle service provided relevant and adequate training to such high-volume for-hire vehicle driver;

4. Such high-volume for-hire vehicle service's policy, rule or practice that forms a basis for such deactivation, including the utilization of progressive discipline, was reasonable and applied consistently;

5. Such high-volume for-hire vehicle service undertook a fair and objective investigation into the high-volume for-hire vehicle driver's job performance as well as their misconduct or failure to satisfactorily perform job duties;

6. Such deactivation is a reasonable response to such high-volume for-hire vehicle driver's job performance as well as their misconduct or failure to satisfactorily perform job duties and

37

accounts for any mitigating circumstances, including but not limited to such high-volume for-hire vehicle driver's past work history; and

7. Such high-volume for-hire vehicle driver violated the policy, rule or practice or engaged in any misconduct or failure to satisfactorily perform job duties that forms a basis for progressive discipline or such deactivation.

c. Except where deactivation is for alleged egregious misconduct, a deactivation of a high-volume for-hire vehicle driver shall not be considered based on just cause unless a high-volume for-hire vehicle service demonstrates that:

1. Such high-volume for-hire vehicle service has utilized progressive discipline; provided, however, that such high-volume for-hire vehicle service may not rely on progressive discipline issued more than 1 year before such deactivation; and

2. Such high-volume for-hire vehicle service had a written policy on progressive discipline that was in effect and was provided to such high-volume for-hire vehicle driver.

d. A high-volume for-hire vehicle service shall provide the high-volume for-hire vehicle driver with notice of an impendent deactivation 14 days in advance of the impending deactivation, except that (i) where a deactivation of a high-volume for-hire vehicle driver is for a bona fide economic reason, as described in section 20-1284, a high-volume for-hire vehicle service must provide, in a form and manner designated by the department, an advance notice of layoff to such high-volume for-hire vehicle driver at least 120 days prior to such deactivation, and (ii) advance notice is not required where a deactivation is for egregious misconduct, account sharing, or if there is a pattern of repeated fraudulent behavior. Such advance notice shall state all the precise and

38

detailed reasons for and the effective date of such deactivation. Such advance notice shall include information about: (i) such high-volume for-hire vehicle driver's right to challenge such deactivation as unlawful pursuant to this subchapter; (ii) how such high-volume for-hire vehicle driver may initiate an informal resolution process with such high-volume for-hire vehicle service pursuant to section 20-1287; (iii) the opportunity for such high-volume for-hire vehicle driver to submit evidence to substantiate a challenge to such deactivation; (iv) such high-volume for-hire vehicle driver's right to file a complaint with the department, or initiate a private action; and (v) eligible high-volume for-hire vehicle drivers' rights to access unemployment insurance.

e. Within 5 days after deactivating a high-volume for-hire vehicle driver for egregious misconduct, account sharing, or if there is a pattern of repeated fraudulent behavior, a high-volume for-hire vehicle service shall provide, in a form and manner designated by the department, a notice of deactivation to such high-volume for-hire vehicle driver which contains a written explanation of all the precise and detailed reasons for such deactivation and the effective date of such deactivation. Such notice shall include information about: (i) such high-volume for-hire vehicle driver's right to challenge such deactivation as unlawful pursuant to this subchapter; (ii) how such high-volume for-hire vehicle driver may initiate an informal resolution process with such high-volume for-hire vehicle service pursuant to section 20-1287; (iii) the opportunity for such high-volume for-hire vehicle driver to submit evidence to substantiate a challenge to such deactivation; (iv) such high-volume for-hire vehicle driver's right to file a complaint with the department, or initiate a private action; and (v) eligible high-volume for-hire vehicle drivers' rights to access unemployment insurance.

39

f. This section shall not apply to any deactivation that occurred prior to the effective date of the local law that added this section.

§ 20-1283 Prior deactivations. a. Within 1 year after the effective date of the local law that added this section, a high-volume for-hire vehicle driver who was subject to a prior deactivation by a high-volume for-hire vehicle service may petition such high-volume for-hire vehicle service for reinstatement or restoration of access to such high-volume for-hire vehicle service's driver platform. Within 30 days after receipt of such petition, such high-volume for-hire vehicle service shall reinstate or restore such high-volume for-hire vehicle driver's access to such driver platform, unless such prior deactivation occurred during the probation period or was for just cause, for a bona fide economic reason, as described in section 20-1284, or required by federal, state, or local law or rule.

b. In determining whether a prior deactivation of a high-volume for-hire vehicle driver by a high-volume for-hire vehicle service was for just cause, a fact-finder shall consider, in addition to any other relevant factors, whether:

1. Such high-volume for-hire vehicle driver knew or should have known of such high-volume for-hire vehicle service's policy, rule, or practice that formed a basis for such prior deactivation and knew or should have known of the potential consequences for violation of such policy, rule or practice;

2. Such high-volume for-hire vehicle service's policy, rule, or practice that formed a basis for such prior deactivation was reasonably related to safe and efficient high-volume for-hire vehicle service operations;

40

3. Such high-volume for-hire vehicle service's policy, rule or practice that formed a basis for such prior deactivation was reasonable and applied consistently;

4. Such prior deactivation was a reasonable response to such high-volume for-hire vehicle driver's job performance as well as their misconduct or failure to satisfactorily perform job duties and accounted for any mitigating circumstances, including, but not limited to, such high-volume for-hire vehicle driver's past work history;

5. Such high-volume for-hire vehicle driver violated the policy, rule, or practice or committed the misconduct or failure to satisfactorily perform job duties that formed a basis for such prior deactivation; and

6. Such high-volume for-hire vehicle service considered any exculpatory evidence or other facts indicating that such high-volume for-hire vehicle driver did not violate such high-volume for-hire vehicle service's policy, rule or practice.

c. If a high-volume for-hire vehicle service does not reinstate or restore access of a high-volume for-hire vehicle driver who was subject to a prior deactivation to such high-volume for-hire vehicle service's driver platform within 30 days after receipt of a petition pursuant to subdivision a of this section, such high-volume for-hire vehicle service shall provide a written explanation, in a form and manner designated by the department, to such high-volume for-hire vehicle driver of all the precise and detailed reasons for such prior deactivation. Such written explanation shall include information about: (i) such high-volume for-hire vehicle driver's right to challenge such prior deactivation as unlawful pursuant to this subchapter; (ii) how such high-volume for-hire vehicle driver may initiate an informal resolution process with the high-volume

41

for-hire vehicle service pursuant to section 20-1287; (iii) the opportunity of such high-volume for-hire vehicle driver to submit evidence to substantiate a challenge to such prior deactivation; (iv) such high-volume for-hire vehicle driver's right to file a complaint with the department, or initiate a private action; and (v) how a high-volume for-hire vehicle driver may apply for unemployment benefits.

d. Notwithstanding any other provision of this section, a high-volume for-hire vehicle service may decline to immediately reinstate or restore access to such high-volume for-hire vehicle service's driver platform to a high-volume for-hire vehicle driver whose access is required to be reinstated or restored pursuant to subdivision a of this section if such high-volume for-hire vehicle service is not providing access to such driver platform to any new high-volume for-hire vehicle driver, and has not provided such access during the 3 months prior to the effective date of the local law that added this section. Where such high-volume for-hire vehicle service declines to immediately reinstate or restore access to such driver platform pursuant to this subdivision, such high-volume for-hire vehicle service shall maintain a waitlist of high-volume for-hire vehicle drivers whose access to such driver platform is required to be reinstated or restored pursuant to subdivision a of this section and reinstate or restore such high-volume for-hire vehicle drivers' access to such driver platform, in the order in which such high-volume for-hire vehicle drivers were placed on such waitlist, provided that any such driver meets the minimum requirements that apply to all current high-volume for-hire vehicle drivers for such high-volume for-hire vehicle service, prior to providing any other new high-volume for-hire vehicle driver access to such driver platform.

42

§ 20-1284 Bona fide economic reasons. a. A deactivation, including a prior deactivation, shall not be considered based on a bona fide economic reason unless supported by a high-volume for-hire vehicle service's business records demonstrating that such deactivation is in response to: (i) a proportionate reduction in volume of sales or profit within the fiscal quarter prior to the issuance of a notice of layoff required by subdivision d of section 20-1282; or (ii) a high-volume for-hire vehicle service discontinuing its driving services in the city.

b. 1. Deactivations of high volume for-hire vehicle drivers based on bona fide economic reason shall be done in reverse order of seniority, so that high volume for-hire vehicle drivers with the greatest seniority shall be retained the longest and reinstated or restored access to the driver platform first.

2. A high-volume for-hire vehicle service shall make reasonable efforts to offer reinstatement or restoration of access to such high-volume for-hire vehicle service's driver platform to any high-volume for-hire vehicle driver deactivated by such high-volume for-hire vehicle service based on a bona fide economic reason within the previous 3 years, if any, before such high-volume for-hire vehicle service may provide any other new high-volume for-hire vehicle driver access to such driver platform.

3. This subdivision shall apply only to deactivations that occur on or after the effective date of the local law that added this section.

§ 20-1285 Burden of proof; evidence. a. In any proceeding alleging a violation by a high-volume for-hire vehicle service of section 20-1282 or section 20-1283, such high-volume for-hire vehicle service shall bear the burden of proving just cause and bona fide economic reason pursuant

43

to section 20-1282 or 20-1283 by a preponderance of the evidence, subject to the rules of evidence as set forth in the civil practice law and rules or, where applicable, the common law.

b. In determining whether a high-volume for-hire vehicle service had just cause for a deactivation, a fact-finder may not consider any reasons proffered by the high-volume for-hire vehicle service not included in the notice of deactivation provided to the high-volume for-hire vehicle driver pursuant to subdivision e of section 20-1282 or the written explanation provided to the high-volume for-hire vehicle driver pursuant to subdivision c of section 20-1283.

c. When determining damages, the fact-finder may take into account any evidence the high-volume for-hire vehicle driver submitted pursuant to subdivision d or e of section 20-1282, subdivision c of section 20-1283, or section 20-1287, that was not timely or duly considered by the high-volume for-hire vehicle service.

c. A high-volume for-hire vehicle driver may submit evidence in any proceeding alleging a violation of this subchapter that was not provided to the high-volume for-hire vehicle service pursuant to subdivision d or e of section 20-1282, subdivision c of section 20-1283, or section 20-1287 and no negative inference or consequence shall apply to a high-volume for-hire vehicle driver's decision not to submit evidence pursuant to these provisions.

§ 20-1286 Provision of data. a. Upon the issuance of a notice of deactivation required pursuant to subdivision e of section 20-1282, a high-volume for-hire vehicle service shall provide a deactivated high-volume for-hire vehicle driver with information and data relevant to such high-volume for-hire driver's deactivation. Such information shall include, but need not be limited to:

1. Driving performance data specific to such high-volume for-hire vehicle driver;

44

2. All customer comments, ratings, and complaints received regarding the high-volume for-hire vehicle driver; and

3. Anonymized and aggregated reports, covering the 12 months prior to such high-volume for-hire vehicle driver's deactivation, regarding discipline, including deactivation, imposed by such high-volume for-hire vehicle service on any other high-volume for-hire vehicle drivers who engaged in the same or similar misconduct or failure to satisfactorily perform job duties forming a basis for the deactivation of the high-volume for-hire vehicle driver subject to such notice.

b. The information or data required by subdivision a of this section shall be redacted to remove the personally identifiable information of passengers. This requirement does not apply to any independent obligation to produce information, including but not limited to any production of information required as part of an adjudicatory hearing.

c. Upon the issuance of the notice required pursuant to subdivision c of section 20-1283, a high-volume for-hire vehicle service shall provide a deactivated high-volume for-hire vehicle driver with information and data relevant to such high-volume for-hire driver's deactivation, including all information required under subdivision a of this section, to the extent that such information is available to such high-volume for-hire vehicle service.

d. For at least 6 years after deactivating a high-volume for-hire vehicle driver, a high-volume for-hire vehicle service must continue to provide such high-volume for-hire vehicle driver with access to all information and data concerning such high-volume for-hire vehicle driver that such high-volume for-hire vehicle driver had access to prior to deactivation, including but not limited to such high-volume for-hire vehicle driver's tax and payment records.

45

§ 20-1287 Informal resolution process. a. A high-volume for-hire vehicle service shall maintain an email address, website, or other form of electronic communication through which a high-volume for-hire vehicle driver or their representative may challenge such high-volume for-hire vehicle driver's deactivation, prior deactivation, or impending deactivation for which such high-volume for-hire vehicle driver received a notice of layoff pursuant to subdivision d of section 20-1282, as unlawful pursuant to this subchapter. Such high-volume for-hire vehicle service must provide such high-volume for-hire vehicle driver an opportunity to submit evidence to substantiate any such challenge and accept written communications pursuant to this section in the language in which they are written.

b. A high-volume for-hire vehicle driver may seek informal resolution of a deactivation of such high-volume for-hire vehicle driver, or an impending deactivation for which such high-volume for-hire vehicle driver receives a notice of layoff pursuant to subdivision d of section 20-1282, by a high-volume for-hire vehicle service by initiating, an informal resolution process through the email address, website, or other form of electronic communication maintained by such high-volume for-hire vehicle service pursuant to subdivision a of this section, or through any other means that such high-volume for-hire vehicle driver and such high-volume for-hire vehicle service agree to. The parties shall have 15 days after commencing such informal resolution process to reach a resolution, unless such high-volume for-hire vehicle driver and such high-volume for-hire vehicle service mutually agree to a longer timeframe. If the parties resolve a challenge pursuant to this subdivision, they shall memorialize such resolution in a written agreement, on a form provided by the department.

c. The high-volume for-hire vehicle service's failure to engage in good faith with the informal resolution process shall be a violation subject to a civil penalty under section 20-1209, but such violation shall not be subject to enforcement pursuant to sections 20-1207, 20-1208, 20-1210, 20-1211 and 20-1212.

d. After receiving a complaint pursuant to section 20-1207 alleging a violation of section 20-1282 or 20-1283, the department shall notify the high-volume for-hire vehicle driver or such high-volume for-hire vehicle driver's representative and the high-volume for-hire vehicle service that they may resolve the complaint through an informal resolution process pursuant to this section.

e. Notwithstanding any other provision of this chapter to the contrary, the department shall not proceed with its investigation of a complaint filed pursuant to section 20-1207 alleging a violation of section 20-1282 or 20-1283 unless (i) the high-volume for-hire vehicle driver or such high-volume for-hire vehicle driver's representative and the high-volume for-hire vehicle service fail to reach a resolution within 15 days after commencement of an informal resolution process pursuant to this section, or (ii) the high-volume for-hire vehicle driver has opted out of the informal resolution process pursuant to this section, in a form and manner specified by the department.

§ 20-1288 Reporting; records; information. a. Data collection and reporting. No less than annually, the department shall make available on the city's website a report on deactivations and alleged violations of sections 20-1282 and 20-1283 during the preceding calendar year. The department shall promulgate rules requiring that high-volume for-hire vehicle services produce anonymized, aggregated data necessary to prepare such report. Such report shall include, with respect to the year preceding the release of such report: (i) the number of high-volume for-hire

47

vehicle drivers each high-volume for-hire vehicle service deactivated for just cause, egregious misconduct, and bona fide economic reasons; (ii) the number of high-volume for-hire vehicle drivers who filed complaints with the department alleging violations of sections 20-1282 and 20-1283 and the outcomes of such complaints; (iii) the number of high-volume for-hire vehicle drivers who initiated an informal resolution process; (iv) the number of high-volume for-hire vehicle drivers who reached an informal resolution with a high-volume for-hire vehicle service; (v) the number of high-volume for-hire vehicle drivers who commenced arbitrations or private actions that include claims alleging violations of sections 20-1282 or 20-1283 and the outcomes of such proceedings; and (vi) any other information the department deems relevant. Until all high-volume for-hire vehicle drivers placed on a waitlist pursuant to section 20-1283 have had their driver platform access restored, such report shall also include the number of high-volume for-hire vehicle drivers with prior deactivations who petitioned a high-volume for-hire vehicle service for reinstatement or restoration of their access to such high-volume for-hire vehicle service's driver platform and the number of high-volume for-hire vehicle drivers who were placed on a waitlist pursuant to section 20-1283.

b. Recordkeeping. 1. A high-volume for-hire vehicle service shall retain records documenting its compliance with the applicable requirements of this subchapter for a period of 3 years and shall allow the department to access such records and other information, consistent with applicable law and in accordance with rules of the department and with appropriate notice, in furtherance of an investigation conducted pursuant to this chapter. A high-volume for-hire vehicle service must maintain records in their original format and provide such records to the department

48

in their original format or a machine-readable electronic format as set forth in rules of the department. The department may promulgate rules concerning the maintenance, retention, and provision by a high-volume for-hire vehicle service of data necessary to the implementation and enforcement of this subchapter, which may include a requirement that a high-volume for-hire vehicle service adhere to a uniform system of records and submit such records and other reports as the department may determine, in accordance with applicable law and rules and with appropriate notice.

2. The failure of a high-volume for-hire vehicle service to maintain, retain, or produce a record or other information required to be maintained by this chapter and requested by the department in furtherance of an investigation conducted pursuant to this chapter that is relevant to a material fact alleged by the department in a notice of violation issued pursuant to this chapter creates a rebuttable presumption that such fact is true.

3. To implement or enforce the provisions of this chapter, the department may issue an order or subpoena for the production of data, documents, testimony, or other information from a high-volume for-hire vehicle service. Such data, documents, testimony, or other information may include, but are not limited to, information about the data that a high-volume for-hire vehicle service monitors, collects, or stores about or from a high-volume for-hire vehicle driver or passenger; information about discipline imposed on a high-volume for-hire vehicle driver; and any other information deemed relevant by the department. In accordance with applicable law and rules and upon reasonable notice of no less than 14 days, a person who receives a request or subpoena for data, documents, or other information pursuant to this section shall produce such

49

data, documents or information to the department in its original format or a machine-readable electronic format as set forth in rules of the department.

c. Information and assistance program. The department shall establish a program that provides information and assistance to high-volume for-hire vehicle drivers relating to the provisions of this subchapter. Such program shall include assistance by a natural person by phone and email and outreach and education to the public relating to the provisions of this subchapter. Such program shall not provide legal advice but may provide general information and referrals to legal service providers. The city may provide access to legal services to assist a high-volume for-hire vehicle driver in challenging a deactivation, or impending deactivation for which a high-volume for-hire vehicle driver received a notice of layoff pursuant to subdivision d of section 20-1282, as unlawful pursuant to this subchapter. The mayor may designate an appropriate agency or other entity of the city to contract for such legal services with one or more qualified non-profit legal services organizations.

§ 20-1289 Progressive discipline policy. a. A high-volume for-hire vehicle service shall maintain a written progressive discipline policy in a single writing and adhere to such policy.

b. The written policy required pursuant to subdivision a of this section shall satisfy all requirements of this subchapter and, at a minimum, address the following:

1. Types of misconduct by a high-volume for-hire vehicle driver that may warrant discipline;

2. Any performance standards used to assess failure to satisfactorily perform job duties by a high-volume for-hire driver;

50

3. Disciplinary measures that may be applied to a high-volume for-hire vehicle driver, including but not limited to deactivation;

4. Procedures for notifying a high-volume for-hire vehicle driver of disciplinary measures that a high-volume for-hire vehicle service intends to take against such high-volume for-hire vehicle driver and providing an opportunity to respond; and

5. Procedures for applying discipline against a high-volume for-hire vehicle driver.

c. The written policy required pursuant to subdivision a of this section must be clear and specific such that a reasonable person can understand the acts and omissions that may result in deactivation or other disciplinary measures.

d. The written policy required pursuant to subdivision a of this section must include a notice of rights of high-volume for-hire vehicle drivers that the commissioner shall publish and make available on the city's website.

e. A high-volume for-hire vehicle service shall provide the written policy required pursuant to subdivision a of this section to each high-volume for-hire vehicle driver hired, retained, or engaged by such high-volume for-hire vehicle service in English and in any other language as the department may determine by rule. A high-volume for-hire vehicle service shall provide such policy to each high-volume for-hire vehicle driver no later than the effective date of this subdivision, or prior to such high-volume for-hire vehicle driver's first trip, whichever is later, in a form and manner that the department may determine by rule.

51

f. A high-volume for-hire vehicle service shall notify each high-volume for-hire vehicle driver of any change to the written policy required pursuant to subdivision a of this section at least 14 days before such change takes effect.

§ 20-1290 Exceptions. This subchapter shall not:

1. Apply to the deactivation of any high-volume for-hire vehicle driver by a high-volume for-hire vehicle service during such driver's probation period with such service;

2. Limit or otherwise affect the applicability of any right or benefit conferred upon or afforded to a high-volume for-hire vehicle driver by the provisions of any other law, regulation, rule, requirement, policy, or standard including but not limited to any federal, state, or local law providing for protections against retaliation or discrimination;

3. Limit or otherwise affect the authority of the taxi and limousine commission to issue, revoke, or suspend the licenses of high-volume for-hire vehicle drivers; or

4. Limit or otherwise prevent a high-volume for-hire vehicle service from deactivating a high-volume for-hire vehicle driver whose license has been revoked or from deactivating a high-volume for-hire vehicle driver whose license has been suspended for the duration of the suspension.

§ 10. This local law takes effect 180 days after it becomes law, provided that the commissioner of consumer and worker protection shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date, and further provided that such rules requiring that a high-volume for-hire vehicle service, as defined in section 20-1281 of the administrative code of the city of New York, as added by section nine

52

of the local law that added this section, provide data, documents, testimony, or other information

to the department of consumer and worker protection may take effect before such date.


Session 13
MC
LS #10312
12/10/2025 3:57PM

Session 12
RL
LS #10312
5/30/2023

53

*Page intentionally left blank*

Proposed Int. No. 1000-A

By Council Members Brannan, Farías, Narcisse, Banks, Brewer, Nurse, Ossé, Louis, Zhuang, Lee and Schulman

A Local Law in relation to establishing a for-hire vehicles parking pilot program

Be it enacted by the Council as follows:

Section 1. a. Definitions. For purposes of this local law, the following terms have the following meanings:

Commercial parking meter area. The term "commercial parking meter area" means an area where signs are posted regulating the use of the curb by commercial vehicles, as described in subparagraph (ii) of paragraph (3) of subdivision (l) of section 4-08 of title 34 of the rules of the city of New York.

Department. The term "department" means the department of transportation.

For-hire vehicle. The term "for-hire vehicle" has the same meaning as set forth in subdivision g of section 19-502 of the administrative code of the city of New York.

b. Pilot program. 1. Notwithstanding any other provision of local law or rule, the department shall establish a pilot program to allow for-hire vehicles to park in commercial parking meter areas, provided that no person shall park a for-hire vehicle, whether attended or not, in a commercial parking meter area pursuant to such pilot program:

(a) Without first purchasing the amount of parking time desired from a parking meter, mobile payment system, parking reservation system, or other means as determined by the department; or

55

(b) In excess of 3 hours, unless otherwise indicated by a posted sign.

2. Such pilot program shall commence no later than 180 days after the effective date of this local law. The duration of the pilot program shall be 1 year; provided, however, that the department may by rule extend the initial 1-year duration of the pilot program by an additional 180 days where the department determines that such an extension would promote the public interest.

c. Report. No later than 1 year after the commencement of the pilot program conducted pursuant to subdivision b of this local law, the department shall submit a report to the mayor and the speaker of the council evaluating the effects of such pilot program on, and proposing any recommendations for future changes to law, rule, or policy related to: (i) the efficient and orderly delivery of goods in commercial parking meter areas; (ii) enforcement of rules relating to parking, stopping, and standing in commercial parking meter areas; (iii) the utilization of commercial parking meter areas by for-hire vehicles and commercial vehicles; and (iv) the health, safety, and well-being of for-hire vehicle drivers. Such report shall consider the feasibility of implementing limits on the duration that for-hire vehicles may park in commercial parking meter areas and of prohibiting for-hire vehicles from parking in certain commercial parking meter areas or portions thereof.

§ 2. This local law takes effect immediately and expires and is deemed repealed 1 year after the submission of the report required by subdivision c of section one of this local law.

DL/CoJM/TM
LS # 15800
12/10/25 9:00PM

56

Proposed Int. No. 1233-A

By Council Members Bottcher, Krishnan, Ossé, Brannan, Hanif, Brooks-Powers, Narcisse, Holden and Morano

A Local Law to amend the administrative code of the city of New York, in relation to the planting of vegetation on new medians separating bicycle lanes from motorized vehicle traffic

Be it enacted by the Council as follows:

Section 1. Subchapter 1 of chapter 1 of title 19 of the administrative code of the city of New York is amended by adding a new section 19-159.9 to read as follows:

§ 19-159.9 Vegetation on new medians separating bicycle lanes from motorized vehicle traffic. a. When designing a new median that separates a bicycle lane from motorized vehicle traffic, the department shall consult with the department of parks and recreation or other appropriate agency to determine the feasibility of planting trees and other vegetation on such median. In making such determination, the department shall prioritize the planting of trees and shall consider public safety, the suitability of the median for the growth of trees and other vegetation, the potential impact on underground infrastructure, the existence of a plan for long-term cleaning and maintenance, and other factors the department deems appropriate.

b. The department shall build such median to accommodate the planting of trees and other vegetation in accordance with the determination made pursuant to subdivision a of this section, unless such determination indicates that the planting of trees or other vegetation on such median is infeasible.

c. The department shall post on its website a list or map that identifies each such median built pursuant to subdivision b of this section, and identifies the agency or office responsible for the long-term cleaning and maintenance of the median.

d. The department of parks and recreation shall plant or permit to be planted trees on such median in accordance with the determination made pursuant to subdivision a of this section and with section 18-106. The department of parks and recreation or another agency authorized to plant vegetation or permit such vegetation to be planted shall also plant or permit to be planted other vegetation on such median in accordance with such determination.

§ 2. This local law takes effect 270 days after it becomes law.

RL/TM
LS #14305
12/10/25 8:20PM

58

Proposed Int. No. 1346-A

By Council Members Brooks-Powers, Williams, Narcisse, Banks, Louis and Salaam

A Local Law to amend the administrative code of the city of New York, in relation to requiring the department of transportation to study the commuter van industry

Be it enacted by the Council as follows:

Section 1. Subchapter 2 of chapter 1 of title 19 of the administrative code of the city of New York is amended by adding a new section 19-175.9 to read as follows:

§ 19-175.9 Commuter van industry study. a. Definitions. For purposes of this section, the following terms have the following meanings:

Commuter van. The term "commuter van" has the same meaning as set forth in section 19-502.

Commuter van industry. The term "commuter van industry" means all commuter van services licensed pursuant to chapter 5 of this title, and all vehicles being operated as commuter van services without commuter van licenses as required by chapter 5 of this title.

Commuter van service. The term "commuter van service" has the same meaning as set forth in section 19-502.

b. No later than July 1, 2027, and no later than July 1 every 4 years thereafter, the department shall complete a study regarding the commuter van industry in the city. As part of such study, the department shall:

1. Estimate the number of vehicles operating in the commuter van industry, disaggregated by licensed commuter vans and unlicensed vehicles operating as commuter van services;

2. Estimate the total daily number of passengers of the commuter van industry;

3. Evaluate the operations of the commuter van industry in areas of the city served by the commuter van industry, including routes, ridership, service and stop frequency, the number of daily trips conducted by the commuter van industry in any such area, and the number of vehicles operated in the commuter van industry in any such area;

4. Provide a map of commuter van stops designated by the department;

5. Identify any area of the city where the commuter van industry impacts:

(a) The use of street infrastructure, such as travel lanes, bus lanes, bus stops, delivery zones, and crosswalks, by vehicles; and

(b) The use of streets by pedestrians;

6. Identify locations where additional commuter van stops would likely improve efficiency or safety for other street uses;

7. Conduct surveys of commuter van passengers and operators regarding ridership patterns and modes of transit other than commuter vans that passengers of the commuter van industry utilize;

8. Assess strategies for enforcement of laws and rules applicable to commuter vans to promote compliance with such laws and rules; and

9. Assess any other aspect of the commuter van industry that the department deems relevant.

c. No later than 60 days after the completion of each study required pursuant to subdivision b of this section, the department shall post on the department's website and submit to the mayor and the speaker of the council a report on the findings of such study.

60

d. Notwithstanding any other provision of this section to the contrary, the commissioner may discontinue the study required by this section on or after October 1, 2039, provided that the commissioner determines that such a study is not necessary to improve the condition of the commuter van industry. The commissioner shall inform the speaker of the council in writing of such determination and the reasons for such determination.

§ 2. This local law takes effect immediately.

MLL/MC
LS #18775
11/17/2025 10:19PM

61