# EXHIBIT 6

1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

        Of the

COMMITTEE ON TRANSPORTATION
AND INFRASTRUCTURE
------------------------ X

                    September 27, 2024
                    Start:  10:20 a.m.
                    Recess:  3:45 p.m.


HELD AT:          COUNCIL CHAMBERS – CITY HALL

B E F O R E:      Selvena Brooks-Powers,
                  Chairperson


COUNCIL MEMBERS:
                  Public Advocate Williams
                  Joann Ariola
                  Chris Banks
                  Carmen N. De La Rosa
                  Amanda Farias
                  Shekar Krishnan
                  Farah N. Louis
                  Mercedes Narcisse
                  Carlina Rivera
                  Julie Won

2

A P P E A R A N C E S (CONTINUED)

Alexander Kemp
TWU Local 100

Leroy Morrison
NYC Commuter Van Assoc.

Bhairavi Desai
NYTWA

Luis Alzate
ATU Local 1056

James DiGiovanni
Deputy Commissioner for Policy and Community
Affairs

Carlos Ortiz

David Do
TLC

I.Daneek Miller
Self

Giovanny Ramos
Self

Ibrahim Zoure
NYTWA

Jeremy Moskowitz
Voyager Global Mobility

Mohamed Mohamed
Self

Bamba Diakite
Self

3

A P P E A R A N C E S (CONTINUED)

Walter Hurdle
Self

Dennis A. Addison
Self

Yoden Thoden
Self

Desmond West
Royal Rose Transportation Commuter Van

Carmen Cruz
New York Taxi Workers Alliance

Frank Haley
Self

Naveed Paracha
Self

Suresh Chand(SP?)
Self

Shamsur Rahman
Self

Wain Chin
Self

Akinwunmi Anthony Komolafe
Self

Allison Langley
New York Taxi Workers Alliance

Tenzin Dorjee "Tendor"
Self

Pradhumna Rayamajhi
Self

4

A P P E A R A N C E S (CONTINUED)

Josh Gold
Uber

Pasang N. Sherpa
Self

Hylande Pierre-Louis(SP?)
Self

Ganesh Harry
Self

Tenzin Phentok Lama
Self

Richard Chow
Self

Diallo Tizo
Self

Urgen Sherpa
Self

Kunchok Dolma
Self

Kunga Rota
Self

Malang Gassama(SP?)
Self

Alpha Barry
Self

Saif Aizah
Self

Saiful Hogue
Self

A P P E A R A N C E S (CONTINUED)

Barry Mohamed
Self

Mohamed Barry
Self

Norbu Choezung
Self

Tashi Choephel
Self

Tenzin Tsering
Self

Tsering Diki
Self

Raul Rivera
Self

Dolma Yangzom
Self

Sonam Sangpo
Self

Tenzin Bhuti
Self

Tsering Lhamu Serpha
Self

Zubin Soleimany
Self

Marleny Cruz
Self

Christopher Leon Johnson
Self

6

            A P P E A R A N C E S  (CONTINUED)

Choudary Adnan
Self

Ibrahim K. Diallo
Self

Sameena Syed(SP?)
Self

Nima Sange Sherpa
Self

Chhewang Lama
Self

Tashi Dolma
Self

Dorel Tamam
Self

Yohanes Lie
Self

Akouete Afandalo
Self

MD Karim
Self

Ugyen Pema
Self

Nicole Salk
Brooklyn Legal Services

Lhakpa Dhoundup

Charles Dorvil

7

A P P E A R A N C E S (CONTINUED)

Shahal Udolin(SP?)
Self

Anthony Aybozo
Self

Modibo Doukaru(SP?)
Self

Paul Sonn
Self

Lateef Ajala
Self

Mohammad Ali Awan
Self

Arvan Babar
Self

Dawa Yangi Sherpa
Self

Muhammad Arshad
Self

Tsering Jupa
Self

Yanming Gong
Self

Ali Akbar
Self

Kara Klita
Self

Yi Feng Chen(SP?)
Self

8

A P P E A R A N C E S (CONTINUED)

Max Cheung
Self

Raja Sohail(SP?)
Self

Bashiru Kamara
Self

Pasang Sherpa
Self

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

SERGEANT AT ARMS:  This is a microphone check for the Committee on Transportation and Infrastructure. Today's date is September 27, 2024 located in the chambers.  Recording is done by Rocco Macedi(SP?).

SERGEANT AT ARMS:  Good morning and welcome to the New York City Council hearing of the Committee on Transportation and Infrastructure.  At this time, I need everybody to please silence your cell phones. There is no eating or drinking in the Council Chambers.  If you wish to testify, please go up to the Sergeant at Arms desk to fill out a testimony slip.  Written testimony can be emailed to testimony@council.nyc.gov.  Once again, that is testimony@council.nyc.gov.  If you have any questions or concerns, please see one of our Sergeant at Arms and at this time and going forward, nobody is to approach the dais.  I repeat, nobody is to approach the dais.

Chair, we are ready to begin.

CHAIRPERSON BROOKS-POWERS:  [GAVEL]  Good morning and welcome to this morning's Oversight Hearing on the TLC with a focus on For-Hire Vehicles and Commuter Vans.  My name is Selvena Brooks-Powers and I am the Chair of this Committee.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    10

In addition to this oversight, we will be hearing several pieces of legislation, Intro. Number 100, sponsored by Council Member Won in relation to the suspension of alternate side parking regulations on Losar.  Intro. Number 276 sponsored by Council Member Krishnan in relation to the wrongful deactivation of high-volume for-hire vehicle drivers.  Introduction Number 277 sponsored by Council Member Krishnan in relation to taxicab driver pay for electronically dispatched taxicab trips.  Intro. Number 323, sponsored by Council Member Moya.

[DISRUPTION FROM AUDIENCE [00:01:59]- [00:02:06]

[GAVEL] Serg remove him please.  Let it be clear, we have a lot of people that have signed up to testify today.  This is an official hearing.  Anyone that is disruptive will be asked to leave the Chamber.

Intro. Number 323 sponsored by Council Member Moya in relation to establishing maximum rates for leasing, rental, least to own and conditional purchase of for-hire vehicles.  Intro. Number 939, sponsored by myself in relation to allowing commuter vans to accept hails from prospective passengers in the street.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    11

Intro. Number 950 sponsored by Public Advocate Williams in relation to increasing the number of violations required to revoke authorizations to operate a commuter van service.  And Intro. Number 1021, sponsored by Majority Leader Farias in relation to the suspension of alternate side parking relations on Patriots Day.

Since 2012 the for-hire vehicle industry has experience monumental growth with the arrival of at base for-hire vehicle companies like Uber and Lyft to the city.  The Council has always worked to ensure that this industry has grown and a sustainable and responsible way.  In 2018, to maintain competitiveness for drivers, the Council passed Local Law 147, which caused the issuance of new for-hire vehicle licenses with limited exceptions and tasked TLC with studying the utilization rate of these for-hire vehicles.

The Council also passed Local Law 149, which created a new license category for high volume for-hire services, which covers for-hire vehicle bases that dispatch more than 10,000 trips per day, such as Uber and Lyft.  Today, the Council is ready to address these issues once more.  My goal is to

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    12

provide a form with the public, advocates and relevant city agencies can speak on record about what is happening, what needs to be done and how we can help.

One of the problems I want to highlight is the recent scores of driver lock outs on the at base for-hire vehicle companies.  Many drivers today find themselves temporarily locked out of the system unable to work and unsure when they'll be able to drive again.  This July, Commissioner David Do of the Taxi and Limousine Commission and the Administration announced that the city secured agreements from Uber and Lyft to reduce driver lockouts with plans to phase out the practice by Labor Day.  That date has come and gone.

Have all parties satisfied the terms of agreement?  Has the TLC been working on its promise rule package to provide a long term solution?  What does the sustainable market look like in terms of balancing new drivers, reducing empty cars on our streets and maintaining driver pay?  In addition to lock outs, drivers and advocates have come to us with complaints about account deactivations.  We want to better understand how deactivations are affecting

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    13 drivers and learn more about the process in place to reinstate drivers.  How many drivers are deactivated in a year?  How many are reinstated?  How long does the process take?  What happens to drivers who can't get reinstated?  For corporate entities, drivers may just be numbers deactivate one and replace them with another but for the driver, it's their livelihood on hold.  But lockouts and wrongful deactivations threaten driver income, creating instability during a time where costs are rising and bills are piling up.

I hope this hearing with arm us with the facts and clear understanding of what can be done to help drivers.  In addition to the pressing issues faced by for-hire vehicle drivers, we are also confronted with the near collapse of the commuter van industry.  For people in transit deserts like my district, commuter vans are a lifeline, providing crucial transportation to work or other essential activities.

These vans serve areas and routes not covered by mass transit and serve populations that can't afford to take a taxi or drive to work every day.  Before the pandemic, there were over 200 licensed commuter vans and now there are fewer than 40.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    14

Many parts of Southeast Queens and Brooklyn have community vans woven into their fabric even as residents still do rely on public transportation.

I want to explore what can be done. [DISRUPTION FROM AUDIENCE [00:07:14]- [00:07:20]. [GAVEL] please remove them. [00:07:21]- [00:07:51] [GAVEL] Can we get order in the chamber? [DISRUPTION FROM AUDIENCE [00:07:55]- [00:08:05]. Again, we will have decorum in this Chamber or you will be removed from the room. Thank you.

I look forward to hearing – excuse me. I look forward to hearing from the TLC about the measures it has taken to safeguard the health of the aforementioned industries and the people who work with them. I am also eager to hear from drivers and advocates regarding their experiences again with the at base lockouts and deactivations, their suggestions for improving these process and how the Council can smooth the way. I also want to bring focus to the commuter van industry as I mentioned before, which is a smaller market but is no less important to the people who rely on them to bridge the gaps in our transit systems.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    15

Before we begin, I would like to thank my staff and Committee staff for their hard work, Kevin Kotowski, Senior Policy Analyst, John Basile, Senior Policy Analyst, Mark Chen, Senior Counsel to the Committee, Connor Mealey, Counsel to the Committee, Adrian Drepaul, Senior Policy Analyst, Julian Martin, my Policy and Budget Director and Renee Taylor, my Chief of Staff.

As a reminder, hearings are designed for all voices to be heard on a given issue.  Today is your opportunity to present your very best argument that can enlighten and inform the public.  As of now, I do not have an official opinion on most of the bills being heard at this hearing.  I look forward to a vibrant and respectful discussion today on all bills at hand.  Next, I would like to – first I would like to acknowledge my colleagues that are here.  I'm joined by Majority Leader Amanda Farias, Council Member Shekar Krishnan, Council Member Joann Ariola, the Public Advocate Jumaane Williams, and I know we will be hearing later on from former Council Member I. Daneek Miller.

Next, I would like to invite a panel to offer their firsthand experience and insight into the state

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    16

of these various industries.  We had a pre-panel that we discussed in advance with the TLC and so, with that, we would like to – and before we bring them up, we are going to hear from the Public Advocate followed by Council Member, excuse me Majority Leader Farias followed by Council Member Krishnan briefly.

PUBLIC ADVOCATE JUMAANE WILLIAMS:  Thank you Madam Chair.  I'll just mention my name is Jumaane Williams, Public Advocate of the City of New York.  I'd like to thank Chair Brooks-Powers and members of the Transportation Committee for holding this hearing.

I introduced one of the bills being heard today, Intro. 950 of 2024.  My intent is to address an inequity created by Local Law 41 in 2019 and throughout the industry standard that applies for all for-hire vehicles apply to the commuter van industry.

For these reasons I am also a co-sponsor of Intro. 913 that would allow commuter van's to accept street hails and I thank the Chair for introducing it.

Intro. 950 as written increases the number of violations required to take away the authorization necessary to operate a commuter van service.  Here

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   17

the word service means the base operator and the entire fleet, not just the driver who was issued driving infractions.

Local Law 41 makes commuter van operators responsible for the violation of individual drivers. It's not a burden that taxi cabs or other for-hire vehicles have.  If an Uber driver has excess violations, it is the driver's individual license that gets taken away.  In this scenario, Uber is still able to operate and have other Uber vehicles on the road.

Intro. 950 raises the amount of violations threshold from three violations in a six month period to six violations in a twelve month period.  Looking into the future, the ultimate goal is to stop the unfair targeting of the commuter van industry. Commuter vans are an important part of public transportation infrastructure in New York City and both the New York City Council and the Administration must support commuter van networks by treating them equally under the law.  Commuter vans are frequently the only form of transportation in public transit deserts, particularly in parts of Queens and Brooklyn.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    18

Commuter vans provide a key public resource with over 100, actually 120,000 daily riders utilizing the service but still are regulated in a way that puts tremendous burden on commuter van operators. Commuter vans fill a gap left by the city's inability to provide – to consider outer borough communities and are now a necessarily part of New York City's public transportation network and we must work with licensed commuter van operators to make sure that they are safe driver's while not holding operators to unequal standards.

And just a reminder that the commuter vans have been existing with other modes of transportation for many decades.  Additionally securing the future of commuter vans is a social justice issues. Communities of more color and immigrant communities in transit deserts rely on commuter vans.  Public buses are often unreliable and have long wait times which force residents to look for alternative solutions and some of these communities don't have any of those options.  Many cannot afford the cost that come with owning and operating car or using private transportation on a daily basis and community vans are lifeline of transportation.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    19

Commuter van service should be supported as part of long term solutions in our 21st century infrastructure.  Plans that must address traffic congestion, high carbon emissions and decaying transportation infrastructure.  I also want to point out that Uber and Lyft were giving ease of entrance into our transportation system even at the cost of people like the yellow cab industry and van drivers are primarily immigrant and Black and Brown owners of small businesses.  We want to make sure that we have pathways for folks to do this service legally and licensed.  And so, that's what we've been working on for such a long time.  I do believe they can exist. I also think they can be unionized.  That's another conversation but we want to make sure that everybody has access to be able to feed their family and provide the services that all communities need. Thank you so much.

COUNCIL MEMBER FARIAS:  Thank you Majority Whip and Chair Brooks Powers for allowing me time to speak and for hearing my bill in this hearing.  This bill is a reflection of New York City's commitment to honoring the diverse cultural and religious

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   20

traditions that make our city so vibrant and to honor sacrifices made.

By suspending alternate side parking on holidays such as Christmas, Yom Kippur, Diwali, Eid and so many others, we are recognizing the importance of these days for our communities.  Today includes consideration for Patriot Day, September 11th to honor and remember the sacrifices made on this day by essential workers, public servants, emergency services personnel and New Yorkers alike from across the city to honor them in their sacrifice.

This measure brings fairness and inclusivity to our parking regulations respecting the traditions, an important recognition of all New Yorkers while making it easier for residents to observe these recognition days without unnecessary burden.  I look forward to hearing feedback from the Administration on this bill and I encourage my colleagues to support their co-sponsorship.  Thank you.

COUNCIL MEMBER KRISHNAN:  Good morning everyone. Thank you so much Majority Whip Brooks Powers for holding today's hearing and good morning to everyone who is here today too.  Our hard working Uber Lyft and taxi drivers are essential workers of our city.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    21

They carry this city forward before the pandemic, during the pandemic and long after.  They keep our city moving safely and efficiently.  Many of them are immigrant workers reflecting the truest embodiment of the American dream and as an Indian American Council Member, the first Indian American ever elected to New York City government where I represent the district with the highest number of drivers in New York City, I am proud to represent them in city government.

However, the livelihoods of Uber Lyft drivers can be thrown into chaos when they are deactivated from Uber and Lyft with little to no advanced warning. Our drivers, victims of predatory lending for decades, an issue we worked hard to resolve but took many years to do so.  After resolving it, the deactivation, the unfair deactivation of taxi drivers is the single biggest issue that driver's face in the city.  It affects –

CHAIRPERSON BROOKS-POWERS:  Sorry Council Member. We ask that everyone please do not disrupt this hearing because you will be asked to leave.  If you would like to acknowledge something you agree with, just wave your hand.  You may continue.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    22

COUNCIL MEMBER KRISHNAN:  It is the single biggest issue that driver's face.  It affects their livelihood and when they lose their livelihood, they lose their ability to pay their rent, to pay their mortgage, to pay their childcare, to support their families and simply live in this city.  So, when they are unfairly deactivated, drivers can be forced into a company driven appeals process where the companies have the upper hand and make the final decision with no real meaningful process, with no notice in advance and no real reasons listed are publicly available standard for what constitutes a fair reason for the deactivation.

This is particularly consequential for a workforce that has to pay for the car insurance and licensing fees just to go to work every day.  These expenses continue even when you lose your job and that is why I am proud that Intro. 276 will be heard today.  My bill works in two ways.  First, it increases driver protections before deactivations happens, creating a due process standard, which everyone should be subject to and is a fundamental principal of American law and workers' rights.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    23

If Uber and Lyft believe a driver is not meeting their community guidelines, this bill requires them to enter into a progress discipline structure where consequences will match the severity of the infraction.  Additionally, drivers will be required to have at least two weeks' notice of an impending, permanent deactivation.  Notice in advance is an essential part of due process and driver's don't have that today before they are deactivated unfairly.

Second, my bill creates an independent appeals process for driver's to pursue after they have been deactivated.  Driver's will be able to appeal the deactivation through a number of means, including arbitration or a complaint with DCWP.  This means the driver's will have an independent neutral arbiter and appeals process through DCWP.  App companies will be required to give drivers the information necessary for them to build their case and the companies will bear the burden of proving that their actions were justified.  Driver's would be allowed a representative to help them through this process.  If reactivated, driver's would also get back pay for the time that they were not allowed to work.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   24

Finally, drivers who have been unfairly deactivated in the last six years would have an opportunity to appeal with the city within a year of my bills passage.  The third point as I mentioned, is that this process shifts the burden from the driver having to prove why they were deactivated after the fact to now requiring for-hire vehicle companies to justify why the deactivation was necessary.

In other words, when a decision is made by an app company, it shouldn't place the burden on driver's after the fact to reverse that decision.  The decision maker must provide the justifications for doing so and that is where the decision should be placed.  Again, a basic principle of due process in American Law and for workers' rights protections. This bill would provide robust protections for Uber and Lyft driver's and open up an additional, not a replacement, an additional pathway for driver's to fight back against wrongful deactivations.  And to be clear, nothing in this bill stops a driver from using other appeals processes if they so desire.  When an app company unjustly deactivates a driver, it is up to city government to step in and provide basic worker protections and establish necessary processes.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    25

This bill by providing process, notice in advance, making the burden with the companies and a neutral arbiter is a fundamental part of worker protections and workers' rights.  And I could not think of a more proworker bill than this.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Now we will have a prepanel ahead of the Administration and we'd like to have join us at the dais, Michele Dottin from IDG, Bhairavi Desai from NYTWA, Luis Alzate from ATU who is joining virtually, Alex Kemp from TWU, and Leroy Morrison with the Commuter Van organization.

As you all are coming up to the dais, I'd like to acknowledge that we've been joined by Council Member Farah Louis and Council Member Chris Banks online.

LUIS ALZATE:  Good morning.

SERGEANT AT ARMS:  Luis, you'll be able to speak after Bhairavi Desai.

LUIS ALZATE:  Thank you, appreciate that.

SERGEANT AT ARMS:  No problem.

CHAIRPERSON BROOKS-POWERS:  I'll call the names one last time, Michele Dottin from IDG, Bhairavi Desai with NYTWA, Luis Alzate, ATU online, Alex Kemp, TWU, and Leroy Morrison.  I ask that you please have a seat as quickly as possible.  Is Michele Dottin in

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    26

the room at all IDG?  Okay, we will proceed. Bhairavi.

BHAIRAVI DESAI:  Good morning.  Thank you so much.  My name is Bhairavi Desai.  I am the Executive Director of the 28,000 member New York Taxi Workers Alliance and I am speaking specifically on Intro. 276.  This is an incredible bill.  This is a bill that will give first time rights to over 80,000 Uber and Lyft drivers in New York City who have worked for far too long without job security.  A workforce that goes to work every single day beginning at a negative.  If you've been deactivated, you still have to pay for the car loan and the insurance.  You're living life without any income coming in but your expenses remain fixed.  A workforce that is dealing with the public.  A job where you can be the victim of racially motivated, you know other biased motivated complaints.  And in the drop of a dime, you lose your job.  The loss of a job for every single American worker can be catastrophic but for workers who not only go without income from that loss of job but also have to pay for expenses out of pocket, it's absolutely devastating.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    27

You wake up ready to go to work.  You go on your app and you've been told that you don't have a job.  It could be for a reason for a complaint that was filed against you six months ago.  Even a year ago and to insult upon incredible injury, there is no independent process.  A process that is not controlled by the companies themselves.  The current process, Uber will tell you on its website, Uber gets to dictate which drivers can even access it.

At this point, if you've been a driver for ten years, you've had an incredible record.  None of that gets used –

CHAIRPERSON BROOKS-POWERS:  Thank you.  I just ask that you submit the rest of your testimony in writing and I just want to remind everyone here that recording is prohibited in this space.  So, we ask that you not record.  Thank you and thank you, you could submit the rest in writing.

BHAIRAVI DESAI:  Thank you.

CHAIRPERSON BROOKS-POWERS:  [GAVEL] Please do not disrupt this hearing.  There is no recording that is to be done within this room.  It is a recorded hearing; you can get it online.  Any disruption, we'll have you removed.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    28

LUIS ALZATE:  Good morning.

CHAIRPERSON BROOKS-POWERS:  To clarify, you could record yourself.  You cannot record the dais or the witnesses testifying for clarity.  I'll ask that you be removed on the next disruption, please stop. Luis, are you there online?

LUIS ALZATE:  Yes, I am.  Good morning. Amalgamated Transit Union, thanks Majority Whip Selvena Brooks-Power and the Council Committee on Transportation and Infrastructure for this opportunity to share ATU's concerns on the impact of Intro. Number 939 and 950 on MTA bus service, particularly for the residents of Southeast Queens. My name is Luis Alzate, ATU Local 1056 President and Business Agent and ATU New York State Legislative Conference Board Financial Secretary.

I also deliver this testimony on behalf of the ATU Locals 726, 1179 and 1181.  All of our members serve the riding public and the rider community.  ATU 1056 members, bus operators and mechanics work for the MTA New York City Transit's Queens Bus division with depots in Flushing, Casey Stengel, Jamaica and Queens Village.  ATU Local 726 represents bus

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   29

operators and mechanics who work for MTA New York City Transit's Staten Island bus division.

ATU 1179 represents bus operators, mechanics and supervisors who work from Far Rockaway to JFK Depots of the MTA Bus division, formerly Green Bus lines. ATU Local 1181 represents bus operators and mechanics who work for the MTA Bus division, formerly Command Bus Service in Brooklyn's Spring Creek, and paratransit operators and Yellow School Bus drivers and escorts.

Statewide, the ATU represents more than 25,000 hard-working transit workers throughout ATU cities including Albany, Binghamton, Buffalo, New York City, Rochester, and Syracuse.  If enacted these harmful bills would effectively allow commuter vans to replace bus public transit, especially in Southeast Queens.  Already, vans licensed and unlicensed illegally and unsafely operate along bus routes and deprive the MTA of revenue that it can be reinvested in bus service.

This de facto privatization of public bus service in Southeast Queens especially impacts students, our seniors, working people and bus riders who benefit from the Fair-Fares program.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    30

SERGEANT AT ARMS:  Your time is expired.

CHAIRPERSON BROOKS-POWERS:  Thank you.  We will ask that your provide the remaining testimony in writing but please don't sign off because I think we'll have some questions for your shortly.

LUIS ALZATE:  Thank you.

ALEXANDER KEMP:  Good morning.  Hi.  My name is Alexander Kemp.  I am a representative from the TWU Local 1000.  I am here in regards to Intro. 939 and 950 and as it pertains to bus service, I am a representative who represents TA Service which is the Brooklyn Department of Buses.  Our grave concern about these Intro.'s or these bills on how they will affect the safety of bus operators pulling into and out of stops, the fact that the standard that we are held to as bus operators in New York City Transit is the highest in the country.  Our medical standards, our training, our responsibility and the consequences of how we operate can never be matched without any regulation that's being proposed for dollar van drivers.

One of our bigger concerns also from TWU Local 100 is that these Intro.'s are not ultimately intended to benefit the dollar van driver's or public

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    31

transportation but more so to supplement big business with an opportunity to create a rideshare program that will allow people to do what they've done in San Diego with Uber Express, allowing people to use an app to pick up 20 people at a time and transport them in large quantities and do it for cheaper rates and undermine labor.  This consequence will ultimately affect the people that you guys are tasked to represent, protect and ultimately to benefit the welfare of New York City.

Transit workers are also essential. Unfortunately, everybody overlooks the consequences that we face and look for means to undermine us, surpass us and redistribute wealth away from the Labor Department, the Labor Unions and transport it into different aspects of big business.

So, I ask anybody to oppose these and to consider finding new solutions to get better bus service and uhm, make us a better city ultimately.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you. You timed that well.  Next, Mr. Morrison.

LEROY MORRISON:  Anyway Chair, I want to say good morning.  Thanks for having this hearing on the commuter vans.  As you know commuter vans are a

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    32

lifeline transportation in New York City.  Over 38 years now we've been filling a lot of gap that MTA did not fill.  When the bus strike, the city call on the commuter vans.  When the train strike, they call on the commuter vans.  When the yellow cab, they call on the commuter van.  Everything MTA does, they call on the commuter vans and the City of New York also and we – the 911 we was here, Storm Sandy we was here.  At a certain time of night, you got to understand the ridership is out, there are people out there trying to get home when MTA cut the services, especially in Southeast Queens, they take an hour and 45 minutes.  Someone working at JFK airport, they want to get to work, MTA will take them an hour and 45 minutes to get to work.

If they got to get to Jamaica Avenue and then they got to get back to JFK Airport.  That's not fair.  What about the ladies who stand on the street corners at night?  They could get robbed and they could raped on the corner, MTA cut their services and people are desperate out there for transportation and on a certain neighborhood.  And as you know that every other transportation come to New York City, commuter van is always here.  The lifeline, the

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   33

backbone for New York City and we got to understand also to commuter vans, look out for the MTA drivers. Most of their driver's getting to work, they still ride on the commuter van. On the record, they still ride commuter vans. The driver's that rush to go to work to catch their MTA, the bus they drive, they still do, and you got to understand a lot of people in our neighborhood, they've been underserved. They're treated like they're from underground with a commuter van. When they need us, they pull us out on the ground. When they don't need us, they put us back on the ground. We want to be treated like first class citizen in America. We are minority. We are low income neighborhood where commuter van is always operated and what this bill does ma'am is save us from getting harassment and pulled over by NYPD. We are paying high insurance. Thank you for having us here. Thank you.

CHAIRPERSON BROOKS-POWERS: Thank you. I have a couple of questions that I'd like to ask and then I'll allow my colleagues to ask questions if they have questions as well. I will start with Mr. Kemp and Mr. Morrison just in terms of the two pieces of legislation that's before us today. So, we

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   34

understand that the public bus service, the public transit system is critical in New York.  One of the best by far I always say in the world.  We also have a commuter van industry, particularly in parts of Southeast Queens and Brooklyn.  That is a part of that fabric and understanding that both entities keep New Yorkers moving.  You all service routes and vines that are not easily satisfied one way or another where it is why we need great transit equity broadly speaking.

And so, I wanted to understand that this isn't – but I understand that this is an interconnected network and it has unintended consequences and so that what myself and my colleagues want to get a better understanding for and I'd like to understand if there are additional comments on how street hails for commuter vans could coexist in a world with public transit.  Like I know that there have been conversations about the interference with the bus routes for example, but we'd like to understand how do we address transit deserts and also recognizing that the commuter vans that we are privy to in these communities that I mentioned are often people from our communities as well.  Not the big business Uber's

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    35

but I definitely appreciated getting that insight in that regard.  So, I'm curious to hear from you in that regard but also hear from Mr. Morrison recognizing how critical the public transit network is to New Yorkers and not wanting to diminish or reduce services.  What does that – like how does that work?  Or how can it work rather, excuse me.

ALEXANDER KEMP:  Thank you.  So, I just want to be very clear that from those same communities as the gentleman next to me had spoken about, we all do – are all part of a network and that network is the community.  We're all New Yorkers and ultimately, I never want our position as labor to ever be condemning any citizen of New York, any minority, any culture that we would want to suppress an opportunity in America, a capitalist society that any business should thrive or have the opportunity to thrive.  But we do represent labor and we do understand the nuances of reducing service and the consequences of what that means to the lives of the people that we represent.  So, from the time after the stock market crashed, transit has cut service and never put that service back.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    36

So, that issue, which never being addressed, by adding another mechanism to reduce more service or take away the means of fixing a broken system, how do we ever address the system that's broken by just adding band aids to it and not to suggest that the dollar bands are a band aid but it's almost a supplement to not actually addressing what the ultimate issue is with transit.

So where we have one component of it where we went from five minute headways or ten minute headways to now 15 and 30 minutes, in the bus redesign.  Are they addressing where dollar vans would fit at the end of the line where there was transit deserts?  A lot of these components are meant to actually reduce service and actually cut running time which affects the driver's but nobody's considering how it affects the lives of the people who are trying to buy houses, who can't afford to live in New York, who can't afford to pay rent and we're civil servants.  So, that is one of the issues, not directly pertaining to them but a biproduct of something that is inconsequential to where we're trying to get right, a better transit system.  So we are interconnected but sometimes these bills or these sponsored bills can

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    37

separate us.  So, I just want to make sure that's not where we're heading to.

CHAIRPERSON BROOKS-POWERS:  No and I appreciate that and after Mr. Morrison, Luis if you can also respond to the question as well.  I'm sorry I have to keep looking at the screen to decide.  Mr. Morrison.

LUIS ALZATE:  ATU's position on this is this is no different than a concept that as my colleague from TWU stated, it's a concept that's nationwide regarding micro-transit and the first mile, last mile where it directly attacks public transportation.  And the answer is not to give these commuter vans or these micro-transit you know the opportunity to replace our ride in public, our public transportation.  These are services that don't have the training standard or the equipment standard, especially for our handicap riding public.  They are reckless.  We've seen this many times when there weren't a time when they were active in which they cut off our buses, cause accidents.  You know this was something that at many hearings, we made an issue of, especially in the southeast part of Queens.

There is you know, there is a sense of recklessness when it comes to obeying traffic

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    38

regulations and this is something that our bus operators with our training, you know our members are held to a higher standard when they do these kind of driving hazards in the community.

CHAIRPERSON BROOKS-POWERS:  Mr. Morrison.

LEROY MORRISON:  Yes sir.  I want to answer the question that you're saying sir.  I didn't see one commuter van –

CHAIRPERSON BROOKS-POWERS:  No, Mr. Morrison, you address it to us, not to each other.

LEROY MORRISON:  I'm sorry about that Chair, Madam Chair.  In my life, running commuter van over close to 40 years, I never seen a licensed commuter van cut people off, cut the buses off and I want the gentleman to know that we have licensed standard too, we have CDL, we're Article 19A, we have medical, we pay high insurance.  Our insurance right now costs about anywhere from $45,000 to $50,000 a year.

So, we can't afford.  We cannot speak for the roads that they're talking about.  You cannot mix the roads with the licensed commuter vans out there.  I want you do know that Chair, Madam Chair and I never seen all these years a commuter van that's licensed by the TLC cut a bus off because we have consequence.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    39

If there's a problem like that, the TLC stepped in so we never did anything like what the gentlemen are saying and at the same time also, we also secure, make sure TW union and make sure the labor, they stay in business because after commuter van, if we never put the cap on the commuter vans, then you would have [INAUDIBLE 00:40:48] would take over MTA system.  And I did that to save MTA.

Also with Labor Union, they'd either build or other big bus company couldn't come here in 2018 and we saved the MTA.  Myself, with the bill that I was doing, so at the time we're looking to be partnership with the union and the bus system to work with us because everywhere we have licensed commuter vans, in Jersey and everywhere.  It's only in New York City and we save the MTA a lot of time from their waiting time and the MTA need over 40 something years, now the ladies are stranded after certain hours of the night, the MTA cut their service and MTA cannot say because there commuter van cut their service.

Commuter van have the ridership and the MTA have their own ridership.  So, by the gentleman is saying commuter van is doing this and commuter van is doing that.  I can speak in commuter van all these years,

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    40

we're not out here we are a small business and America strive with small businesses and we are immigrant and what we do in the Black and Brown community that's underserved.  It's always underserved and MTA always turn their back against the ridership in the low income neighborhood like our neighborhood.  I remember back in the days, the way how we were treated.  So, at the end of the day, we're not here to compete with MTA because guess what?  MTA, when they pick you up, you get a free ride at the subway but it is not everybody.  When they're going to work and they have to stand at the bus stop for 45 minutes, an hour and the bus right now is still overcrowded and people – what you have to tell your driver – it's about feeding your family.  It's about putting food on the table.  It's about small business drive.  So MTA have to understand that we need to work with them and they need to work with us and we're not out here to harm MTA and we cannot speak for the road sir.

CHAIRPERSON BROOKS-POWERS:  Can you enlighten the panel in terms of what are the consequences that the commuter vans are faced with when they you know disobey the traffic laws?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    41

LEROY MORRISON:  When licensed commuter van disobeyed the traffic law, if we run the speed and it still goes to the TLC, they still bring the driver's and still charge the driver's also.  And if they run the lights, you still got to go through the TLC Division zero also to and if they do, what the gentleman is saying, they can lose their commercial driver's license and it affected Article 19A and the medical also too.  So, what the gentleman is saying, the commuter vans are licensed in New York City and across New York City and that's what we are doing now.

CHAIRPERSON BROOKS-POWERS:  Where are the remaining commuter van businesses operating and are there regions that have lost their last commuter van route?

LEROY MORRISON:  Yeah, there's routes here that MTA doesn't service from Gateway all the way back into the Junction, East Flatbush.  Commuter van will go all the way there and also even Fulton, over there in Fulton Street and a lot of routes now currently MTA is cutting their service.  We are not subsidized them.  We are running this course out of our own pocket.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    42

CHAIRPERSON BROOKS-POWERS:  Mr. Alzate and Mr. Kemp, what are some of the challenges faced in terms of the service right now that you see?  I know in Queens we have the bus redesign underway so there is a unique opportunity to try to address some of these routes but what are some of the challenges that for example, the routes that Mr. Morrison just mentioned, that ATU or TWU has tried to work through and how can the Council be able to address that in light of that?

ALEXANDER KEMP:  Well, that's kind of the reason we're here right?  That the Intro.'s kind of argue against what our ultimate argument is.  Is that if there's going to be an effort to get better service, a better transportation network, the interest should lay in public transportation.  That there should be an influx of resources and support in trying to get these deserts fixed because in the areas that he specified in Brooklyn, let's just say Gateway, Flatbush, the Junction, Fulton Street, all of those areas have bus routes that run through them.  Whether the service has been either cut, modified, or reduced.  That in essence leads to these 45 minute waits.  That if you have one bus, two buses or three buses with a 15 minute headway, in the event one of

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    43

those buses are late, you're now waiting 30 minutes. When they talk about a better bus network. A better bus network requires operators who are highly trained, who are professionals, who meet a standard that is the highest in the country and have who – as the gentleman next to me has stated, where the dollar vans have been available through crisis. There has not been a day, a moment or a minute that New York City transit bus operators have not been available to provide services in emergencies for New York City and actually have lost our lives. And New York City transit workers have lost more lives than any other agency on the plant during COVID.

So, our sacrifices to the communities should never be overlooked or understated when it comes to protecting our work as far as it pertains to TW Local 100 and the other locals for sure.

CHAIRPERSON BROOKS-POWERS: Mr. Alzate, do you have anything to add to that?

LUIS ALZATE: ATU has had experience with what is now called micro-transit and these van services. When we lost our Q74 route in Queens and this route service was going to be replaced with commuter vans. That is being the danger of such legislation that it

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    44

replaces commuter van service with you know replaces public transportation.  There are – I'm not here to say that we don't have our challenges when it comes to routes and when it comes to the schedules.  There are challenges that as you pointed out, we are trying to address in Queens and everybody understands that Queens is a unique system based on the fact that everybody depends on the bus service.  We have a system that only goes up to Flushing, trains and to 179 Street Corridor in the hillside.  After that it depends solely on bus service.  And the remedy to fixing the issues that we have is not to allow hail service by anybody specifically in the bus stops.

CHAIRPERSON BROOKS-POWERS:  So, is the concern more so being along the bus routes in themselves?  And when you mention the Q74 route was lost, can you explain what caused the loss of that route?

LUIS ALZATE:  Well, ultimately it wasn't through a ridership issue, ultimately this was a route that addressed the needs of the community, not only through Queens College and several high schools.  Ultimately it became evident and this was when then Councilman I. Daneek Miller was the President of our local.  It became after that that the goal from ATU's

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    45

point of view was that they wanted to replace our bus routes with a commuter van service.

CHAIRPERSON BROOKS-POWERS:  But what was the official reason for them getting rid of Q74?

LUIS ALZATE:  Ultimately the transit parties decision was that they didn't need the service.  That it was based on budgetary cuts, even though we – there were hearings that were held to justify that this was an intricate part of the community.  But once again, what became evident to us after the fact was that they wanted to replace that route with a micro-transit system, with a van service.

CHAIRPERSON BROOKS-POWERS:  Mr. Morrison, what are the toughest challenges facing the commuter van industry?  Was the decline in the commuter van market due to the pandemic?  And the market has simply failed to bounce back?  Or are there other factors that have led to the industry shrinking?

LEROY MORRISON:  Well, our main problem ma'am is it's not shrinking.  It's the insurance costs ran up to about $50,000.  So I have a bill that I just passed in Albany also to lower the cost of, it's not only just commuter vans, it's for all for-hire vehicle, for black cars, ambulant, commuter vans so

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   46

we could have a better lower cost insurance system in New York City.

As you know Madam Chair, the black cars is one incident. They're paying if they have a local car service, they're paying $10,500 a year with American transit and if they're local Uber, they're paying $4,500 a year with the same American transit. So, what we're trying to do is bring in more volunteer insurance market to New York City, so we can have affordable insurance. We could bring back commuter vans.

So, right now we are looking to put these commuter vans back out but the insurance cost was the problem that we was having in New York City and that's our only problem now holding back but we should be out soon because we have the money that I raised to pay into the insurance so these commuter vans could get back on the street again.

So, it was very tough with commuter van. As you know, the price went up from $10,000 to $55,000. In Queens, it's $45,000 a year. In Brooklyn, it's about $50,000 a year for a license commuter van on the street. So, we've been going through insurance

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    47

crisis but we're trying to as small business, we try to drive now.

CHAIRPERSON BROOKS-POWERS:  And what alternative if any is there for commuter van service?  When a commuter van stops operating, have customers switched to mass transit, personal vehicles or something else?

LEROY MORRISON:  Well, a lot of the customers, they switched to – for now they're struggling, trying to reach work.  They are having a hard time now, especially in Southeast Queens.  They're having a hard time from Rockaway to Jamaica center to come back to JFK airport, an hour and 45 minutes.  It took them an hour and 45 minutes from Rockaway to Jamaica Avenue about an hour on the bus and then they got to take the bus 45 minutes back where they're coming from.  So, they are meeting a lot of challenge, so they have to pay for other transportation but they're willing to bring back the commuter vans to drop them less time and people stop doing –

CHAIRPERSON BROOKS-POWERS:  But I'm asking about the passengers.  What has been the trend?  Has it been that they've gone to mass transit?  Have they gone to their personal vehicles?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    48

LEROY MORRISON:  Some of them is on personal vehicle and some of them is taking the illegal vans out there too.  So, some of them is taking other means of transportation to get back out there on the street.  Some of them, they don't want to ride in mass transit.  They want to drive, they want to do this, they want to take the bus, whoever want to take the buses up to them but we'll be back soon ma'am.

CHAIRPERSON BROOKS-POWERS:  And Ms. Desai, I know that the commuter vans are largely relied in parts of Queens and Brooklyn.  Not necessarily a lot of I think your members may be located but is there an impact on your industry as well and if so, what is that?

BHAIRAVI DESAI:  Yes, absolutely.  I mean in terms of the outer boroughs because many of our members particularly that drive for Uber and Lyft, a lot of their work is in the outer boroughs.  And so, you know one in terms of the impact of potential ridership being poached is one issue.  But the second is even in terms of just traffic and people having a harder time moving around.  I mean with the Yellow Cab sector, you know 96th Street and below, I mean you don't have this concept of commuter vans but I

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    49

can tell you overall, whether you're driving Uber, Lyft or even livery or Yellow Cab or Green Cab, this has been like one of the slowest summers in the last 30 years that drivers have had.  There are already too many you know taxi and FHV cars in the streets. Drivers are really struggling to put trips together. Most drivers are spending their time empty and there just isn't enough work for you know new cars to continually to be added in the same market.  And so, we have tremendous concern over the impact of this.

CHAIRPERSON BROOKS-POWERS:  I'm going to yield and allow my colleagues to ask any questions.  We will start with Council Member Krishnan.

COUNCIL MEMBER KRISHNAN:  Thank you so much Majority Brooks-Powers.  I just have two questions Bhairavi, thank you so much and thank you for the work of the New York Taxi Workers Alliance for drivers every day.  I just want to – two questions for you about Intro. 276.  One is, can you tell me how many drivers have reached out to you about their deactivations and how many of them have actually been able to get reactivated with the current process?

BHAIRAVI DESI:  Sure, thank you.  I mean we've done thousands of intakes throughout the years.  It's

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    50

you know, usually we average a couple of thousand every year.  There are two problems here.  One is even – there in some cases where drivers may get reactivated but the reactivation will be for just a couple of days and then, you know immediately, they're deactivated again for a much longer time period.

So, even in the so-called reactivation, there's still tremendous insecurity because you just never know you know when the company is essentially going to change its mind and put the deactivation back into order.  So, most of the drivers that we see, I mean one, there's certain issues like, for example, a lot of complaints regarding like service animals where it'll be marked as like a safety issue.  Where the passenger may not have any documentation or anything and the driver legitimately feels threatened, especially in Uber and Lyft vehicles, you don't have a partition.  You know and if a pet, if like a dog is in the car and there's no leash or anything, it's understandable that a person operating the vehicle sitting in the front subject to bumps and you know bumps on the road can legitimately feel scared, right from that animal.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    51

But all it takes is one complaint from that passenger and you get deactivated and in some of these instances, you don't even have a right to an appeal.  I mean Lyft, there's not even a physical office that you could go to.  So, you know you're desperately trying to get through to customer service or you might go through the Uber IDG appeals process for example.  If Uber allows you to, because Uber still controls who has access to those appeals and that's something that Uber states very clearly on its website.  What we find is that uhm, you know majority of the cases, drivers just don't get their jobs back. If it's anything that's marked as like basically more than you know like paperwork, although we do have instances of even drivers, even just for sheer paperwork issues, we'll remain deactivated you know. And so much of it is because the process is set up where the driver is presumed to be guilty and so the burden is on the driver and then that process is controlled by the same company that has been your prosecutor, now gets to act as your judge and jury. And so, it's stacked against you and you know lastly I would just say, I think if you asked every single Uber and Lyft driver in the City of New York, I would

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    52
even say across this globe, they would tell you even if they've never been deactivated, every single driver works with fear and anxiety over the thread of an unfair deactivation.  And that's why we so strongly support Intro. 276 because it is the first time that drivers will have rights codified in law where the companies must have good cause to even take this very drastic measure against you and then they must give you notice so it doesn't go into effect immediately and there must be an appeals process that they cannot control.

COUNCIL MEMBER KRISHNAN:  Thank you and my final question is just, can you describe what is unique about driver deactivations compared to other workers?  Do you tell your members to use the IDG process?

BHAIRAVI DESAI:  Yes, to answer your second question.  First, yes we do tell drivers to use the you know Uber IDG process because I mean, it's publicized by Uber.  It exists for drivers.  We want to see every single driver be able to get their job back and it goes to the first part of your question, the consequences are enormous.  If you're deactivated, you still have to pay off your car note. Still have to pay for insurance and because you're

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    53
paying for those things and there's no income coming in because there's no paychecks in this industry. So, you're paying for money that you're supposed to be able to use for groceries and rent, is now going towards your car because there's no other income coming in right?

And then uhm, you know on top of that, you don't know if you could get your job back and like you've been given no notice, so immediately you spend your days just trying to get your job back.  I know of driver's; we've seen members who come through who sometimes for months are just desperately hopelessly waiting to get their job back and they're stuck. Their life is stuck because they've got this car that they only bought because of this job so people don't know what to do.  Do they go and look for other job? You know what other jobs are really available?  This is also workforce that is over 90 percent immigrants, people of color.  And so, I think there's – to me this is also an issue, not just civil rights but also racial justice that here's a workforce that's predominantly people of color and what you're essentially allowing at the moment is corporations that control their economic life are going to take

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    54

their job away and presume them to be guilty.  You know there's in certain cases, there's no hearings, no opportunity for you to defend yourself.  You know and so within your community all you heard is this driver, there's a sexual harassment charge against him.  The people in the community don't know.  You were never given a right to defend yourself.  You never seen any evidence against you.  Your good name is just smeared.  You know there's consequences to this that are tremendous financially but they're also tremendous you know socially and psychologically and just to the mental health wellbeing of the drivers. But the other, you know besides the cost I think there are two other reasons why this is so unique to this workforce.  This is a workforce that has licensed by the City of New York.  The City of New York has said, this is an individual that has been trained past their course and believes to be capable of doing this job.

And so, the city has a responsibility here to create a layer of security for a workforce that has invested thousands of dollars into this job in large part because the City of New York has entrusted them and encouraged them to do so.  Lastly, you know

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    55

drivers have not been found to be employees under the National Labor Relations Board and so, do not have access to collective bargaining.  That's one of the reasons that a company union is allowed to exist in this industry.  Otherwise of course, you know IDG and any other company union would actually be considered illegal under the law.

And in the absence of collective bargaining and in the presence of city regulation and expenses for a by the drivers, there must be a basic sense of due process that upholds very basic American values that protect all of us as Americans.  That protect us as workers.  We have a right to be presumed to be innocent even by corporations that have a sword hanging over our necks you know in the form of taking our jobs away.  In the labor movement, there's an old saying that a loss of job is like capital punishment.  Because that's truly what it feels like especially for a workforce with no guaranteed income and this summer, with lockouts, can you imagine drivers lost thousands of dollars throughout this summer and then to go through a deactivation now, you've had no saving, nothing to take care of your life.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    56

I mean, this is an incredible crisis.  I wish to God every single driver that has been here in this room from 10 in the morning when we started was still here and I beg every driver, read this bill.  Read the 14 pages of this bill.  This is like a holy book that will give rights and protections to a workforce that desperately needs it and truly deserves it.

[APPLAUSE]

CHAIRPERSON BROOKS-POWERS:  [GAVEL]  Again, you will be asked to leave if you disrupt this hearing.  I believe Majority Leader Farias has a follow up question.

COUNCIL MEMBER FARIAS:  I do.  I just wanted a better understanding of last year's data if you have it.  How many people did you folks serve in terms of deactivations?  And then I guess the follow up I have on that is what's the ratio breakdown of deactivations, lockouts and folks on waitlists?

BHAIRAVI DESAI:  Sure, so in terms of the first question Council Member, the exact number I don't have with me but it would have been I mean well over 2,000 drivers that we would have both served and drivers that we've done intakes for.  I know that the vast majority of them, even if they were reactivated,

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    57

you know it was for a short period of time before they were deactivated again but we're happy to follow up and put that in our written comments.

COUNCIL MEMBER FARIAS:  Yeah, I'd like to definitely get the follow up data on the amount of people you're serving year by year and what is the ratio divided between people coming to you with deactivations versus lockouts, versus the waitlist. And then if you haven't already I have an expectation to also know the average ratio of people letting you know that they've been deactivated today but three days later, a week later, however, long are reactivated and then x-amount of days later deactivated.  That's helpful for us to get a better understanding of how frequent it's happening.

And in that amount of time, it helps us have conversations between all of you and with the agency and then lastly, have you folks tried to make any attempts on demystifying with drivers versus riders on for the example that you gave with a service animal, right?  Legally, not even us in this building can ask people for documentation.  They have a service animal for whatever the means are.

BHAIRAVI DESAI:  Right.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    58

COUNCIL MEMBER FARIAS:  That service animal is legally mandated to be their partner for that day and that commute, that office visit.  How are you folks demystifying for drivers that that is legal and it is illegal to ask for documentation?

BHAIRAVI DESAI:  Yes and let me just be clear if I misspoke or was misunderstood.  We understand that you cannot ask for a documentation.  Even when drivers go through the course to get their license, that's actually part of the curriculum.

COUNCIL MEMBER FARIAS:  Right.

BHAIRAVI DESAI:  And so, we understand that but I think the issue that I was trying to raise is, uhm just by the sheer allegation right, a driver faces a very serious consequence of losing their job and they may not even be able to appeal it you know in many cases.  And so, you're not able to defend yourself. Even the history of your driving record is not taken into consideration even if you're allowed to appeal.

And so, the totality of your performance right, should be part of your review like it is in most jobs.  In these cases, drivers don't have that protection and that is one of the things that Intro. 276 would give to drivers, the right where as part of

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    59

making the decision on whether or not the deactivation was for good cause, they would have – the decision maker would have to look at the totality of your record, including like you know good accommodations that you have gotten.  There also has to be progressive discipline and so, if someone did not understand and you know makes that mistake, which is wrong but you know we also have the concept of that you can't just you know you can't just discard people from mistakes that they make, that there has to be a process to allow people to learn and to show their growth.  And so, this bill is also important to us because it would allow that.

COUNCIL MEMBER FARIAS:  Yeah, I'd like to keep talking about that after this hearing, just you know as you stated, it is a part of the curriculum and so, just as much as driver's do have to be protected and all of the folks in this room know that I've been a driver advocate for many years.  People with disabilities also have their rights and we have to make sure that if there's anything that's unclear and we know every driver has in camera facing video out you know forward facing out into the streets to protect their car and the way they're driving amongst

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    60

the defensive driving that we have to do throughout New York City.  We should continue talking about that because that's both – it is a larger conversation that has to be had on both sides to protect people.

BHAIRAVI DESAI:  Yes, and that's definitely one other reason that we really support the bill is because as you said –

COUNCIL MEMBER FARIAS:  I can totally get it.  I totally get it.  I'd like to continue the conversation offline as we have many people that need to testify today.  Thank you.

BHAIRAVI DESAI:  Thank you.

COUNCIL MEMBER FARIAS:  Thank you.  Thank you to this panel.  You are now dismissed.  I'll now ask Committee Counsel to introduce our next witnesses and administer the oath.  Sorry, sorry that was not communicated to me.  Council Member Narcisse has a question please.

COUNCIL MEMBER NARCISSE:  Good afternoon and I apologize because I was scheduled for two Committee hearings at once, so I had to be over there and I had to come here.  So, thank you for being here.  Thank you Madam Chair.  I always wonder with this bill right, if street hails are allowed, will this cause a

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    61

rise in insurance for commuter vans?  That's one.  I would assume so because I have been hearing a lot of complaining.  I see somebody here talking about insurances.  It's hard to get when it comes to commuter vans.  If they can – I mean, I'm assuming they can stop anywhere and now the insurance will be a problem.   That's one.

Uhm, insurance has been an issue for them for the past I don't know how long because I've been seeing these young men in my office.  I don't want this to be an unintended consequence of passage of this important bill, so I would like for you to answer that before I ask my next question.  A few questions. Anyone?  Anyone?

LEROY MORRISON:  The most important thing is in the Black and Brown community.  The insurance is so high for us.  We are small businesses and what I did, I took the fight to Albany.  Just like the people upstate New York, they did a risk protection group last year, they haven't passed.  We introduced a risk protection group.  Also, to lower the cost of the insurance in local New York City here.  So, we all in the for-hire business can have affordable insurance.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    62

I had that passed in the Senate but we didn't push it in the assembly but hopefully next year we can do it and with this bill that we have updated now in Albany, it will bring down the cost of the Black car insurance per transit, ambulette commuter vans. So, we are calling on upstate the governor to sign this one.  It will lower the cost for every for-hire vehicle especially commuter vans because we were paying at least with the DFS, we are having a hard time and we have to say thanks also to the TLC Commissioner for part of this movement and it's been a movement and we're not going to stop and fight it until we get affordable insurance across New York City for commuter van for all for-hire vehicle across New York City who is going through this problem here. And that is the reason we are here also to; it doesn't raise the cost of the insurance because the street hail.  It's just that we – the street hail, we've been operating for over 38 years and when we pick up a passenger, we've been getting harassment and treated like criminal.  Some of us lose our life driving vans because when the police pull us over, they paralyze guys I know who died already and some of us get shot, we get stabbed, we get robbed.  And

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   63

then also, when the passengers come onboard they've been harassed also by NYPD because they get in the vans and we want to feel like we're first class citizens in America and we came to this industry with the American dreams but we're going to get the cost of the insurance down and I'm fighting for all for-hire vehicles, not only commuter vans to get affordable insurance across New York City and New York State and we're telling MTA we want to be partnership with MTA, not the guys on – because we fill a lot of gaps that MTA is doing and we would also take in the ridership that they left behind late at night especially if you're familiar with Brooklyn and the library, imagine a woman standing there coming from the library and turn her back to the park.  She can get robbed and she can get raped.  MTA cut their service at a certain time of night if you're familiar with Brooklyn, so we're trying to get the service up and running.  Thank you so much Ma'am.

COUNCIL MEMBER NARCISSE:  Thank you.  Another question I have, right now do Uber and Lyft have representation right now if they're deactivated by any chance?  I don't know if that question was asked before.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    64

BHAIRAVI DESAI:  There is no proc- I guess –

COUNCIL MEMBER NARCISSE:  No process, okay.

BHAIRAVI DESAI:  Well, the real issue is the process that exits is uhm if it's in partnership – we don't really know.  It's a private partnership between Uber and their company funded union called the Independent Drivers Guild.  What we do know if you go on the website is Uber says, Uber retains control over which drivers are even able to access that process.  So, what we really need here is a process that is not controlled by the companies because your prosecutor cannot be your judge and jury.

COUNCIL MEMBER NARCISSE:  I got you.  I fully understood.  Another problem that you just mentioned, which I'm with you with that because I take Uber; I'm an Uber user and uhm, it's just like not having an office, not having direct communication and if the driver decided to do something; I understand there's bad apples out there but sometimes the driver take things for granted.

So, I'm in agreement.  I would like to have better access because if you're using, if you're a person that's using the company, you should be able

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    65

to talk to someone and have communication.  Because when you do it online, it's not the same thing as a person you can actually follow up.  So, thank you for your service.  Thank you for answering my question and thank you everyone and disclaimer, my father was a driver in New York City for many, many years and uhm Black car, Yellow cab and all.  So, thank you for your service and all that, keeping New York City moving, appreciate you.

BHAIRAVI DESAI:  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Okay, now thank you this time for real to the panel.  Appreciate all of you coming out to – sorry we have to keep order in the Chamber.  We will – I'll now kick it over to Counsel.

COMMITTEE COUNSEL:  Thank you.  I'm Mark Chen, Counsel to the Transportation and Infrastructure Committee of the New York City Council.  Our next panel will be from the Taxi and Limousine Commission.  Commissioner David Do and Deputy Commissioner for Policy and Community Affairs James DiGiovanni.  And from the Department of Consumer and Worker Protection, Assistant Commissioner for External Affairs, Carlos Ortiz.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    66

I will now administer the oath.  Please raise your right hands.  Do you affirm to tell the truth, the whole truth and nothing but the truth before this Committee and to respond honestly to Council Member questions?

PANEL:  I do.

COMMITTEE COUNSEL:  Thank you.  You may begin when ready.

DAVID DO:  Good morning Chair Brooks-Powers and other members of the Committee on Transportation and Infrastructure.  I'm David Do, Chair and Commissioner of the New York City Taxi and Limousine Commission. With me today is TLC's Deputy Commissioner for Policy and Community Affairs, James DiGiovanni, and the Department of Consumer and Worker Protection's Assistant Commissioner, Carlos Ortiz.  We thank you for the invitation to provide an update on TLC's regulated industries and welcome the opportunity to start a dialogue on the TLC related bills on the agenda.

As is typical when I've appeared before this Committee, I'll start with a general update on the TLC-regulated industries.  As a whole, TLC-licensed vehicles now complete between 22 and 25 million trips

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    67

per month, the highest level of activity since before COVID.  In August of 2024, the high-volume sector that's Lyft and Uber completed over 18 million trips, about 90 percent of 2019 levels, and yellow taxis completed nearly 3 million trips, about 50 percent of the August 2019 trip count.  Additionally, non-high-volume For-Hire vehicles completed 1.3 million trips in July of 2024, 71 percent of their 2019 levels.

Similar recoveries can be seen through other metrics including vehicle and driver counts.  All the data I just referenced, and much more, can be found on TLC's new data dashboard called the TLC Factbook, reflecting TLC's commitment to transparency.  I'd like to provide updates on several recent TLC initiatives and developments that I know are of interest to the Council, drivers, and members of the public.  As we wrap up Climate Week, TLC continues to support the City's climate goals.

Earlier this week we released a new report titled Electrification in Motion, which analyzes data generated by the fleet of more than 10,000 EVs now performing trips and documents the rapid expansion of charging investments since the Green Rides Initiative launched in October 2023.  Green Rides requires high-

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    68

volume companies to dispatch exclusively to zero-emission or wheelchair accessible vehicles by 2030. I am pleased to report that we are already exceeding our 2025 benchmarks.

In August, almost 20 percent of high-volume trips were dispatched to EVs or Wheel Chair Accessible Vehicles.  This is largely thanks to the EV-only FHV licenses issued in late 2023 and early 2024, over 90 percent of which went to individual drivers.  As discussed in the report, Green Rides is already having its desired effect on spurring additional charging infrastructure, including more than 200 new fast-charger stalls from Tesla and Revel, DOT fast chargers being installed in the Bronx, and an upcoming dramatic expansion of DOT's curbside Level 2 network in neighborhoods where TLC drivers live.

Another important regulatory change is the implementation of Local Laws 33 and 56 of 2024, sponsored by Council Member Farias, which allow for in-vehicle advertising in FHVs.  TLC held a public hearing in August and, in response to public testimony and input from the Council, will soon publish revised rules for an additional public hearing.  While the process for these complex rules

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    69

has taken longer than anticipated, we welcome the feedback and look forward to opportunities to adopt the final rules.

As you know, one major concern in the for-hire industry is Uber and Lyft's restrictions on driver access to their platforms, commonly known as lockouts.  As background, in 2018, TLC commissioned a report by labor economists Dr. James Parrott and Dr. Michael Reich on the need for a minimum driver pay standard for app-based drivers.  The report revealed that 85 percent of drivers were earning less than minimum wage; 80 percent of drivers bought their vehicles to drive for those platforms, taking on significant personal expense and risk; and driver earnings were declining.  The report recommended a per-trip driver pay standard on time, distance, and a utilization.

The Council then passed Local Law 150 of 2018, directing TLC to establish such a pay standard.  The utilization rate, or UR, part of the formula is vital but also, frankly, has proven the most challenging. The UR is the percentage of time drivers spend transporting passengers.  If a driver works for eight

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    70

hours but only transports passengers for four of those hours, their UR is 50 percent.

Drivers are only paid for trips, so the UR is used as a multiplier to compensate them for all their working time.  For example, if a driver would have been paid $10 for a 30-minute trip, but the UR is 50 percent, that $10 is multiplied by two and that driver must be paid $20 for that trip.  The lower the UR, the more the companies must pay their drivers.  This incentivizes the companies to adequately manage their driver pool and keep drivers busy.  What we have seen is that instead of long-term driver supply management, not onboarding new drivers, the companies added new drivers to their platform, and then periodically locked them out of the platform to increase their UR.  In other words, the companies used periodic lockouts to avoid paying drivers more.  This is unfair to drivers and defies the intention of TLC's rules and the underlying Local Law.

In July, we were able to get the companies to end Uber's lockouts by Labor Day, increase Lyft's UR to 50 percent annually, and end both companies' onboarding of new drivers.  We viewed this agreement as a short-term solution to get drivers immediate

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    71

relief while TLC crafted a long-term answer in the form of rules.  And the agreement has worked: Uber's lockouts have ended and the companies are not onboarding new drivers, we plan to publish new rules to ensure that drivers are paid and treated fairly. I am looking forward to a robust public rulemaking process as we gather feedback from drivers and other stakeholders.  I will turn now to the commuter van sector and its important role in the transportation network of many of our outer borough communities. There are currently 35 commuter vans, down from 215 in 2019.  The primary issue faced by the commuter van industry is the high cost of insurance that meets state-standard coverage levels.  As one way to address the high costs of state legislature allocated $11 million to the Commuter Van Stabilization Program, which is managed by the Empire State Development and offers $40,000 to commuter van operators to offset insurance costs as funding to reimburse safety equipment upgrades such as dashboard cameras and driver assistance technology.

We worked with ESD on this program and on industry outreach.  I encourage our licensees to apply to the program and former licensees to renew

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    72

their TLC licenses to be eligible for these funds. TLC will continue to provide guidance to state agencies and elected officials as ideas and approaches are presented to address insurance issues in the commuter van sector. Another significant issue facing TLC-licensed industries is the financial condition of American Transit Insurance Company, which insures about two-thirds of TLC licensed taxis and For Hire Vehicles.

Earlier this month, the New York State Department of Financial Services, which regulates insurance providers, released a regulatory report on American Transit's financial condition, detailing their insolvency. The report also explains that this is not a new issue; the company's insolvency has been well known by regulators, policymakers, and others for over 40 years. While insurance is a significant expense for TLC drivers, American Transit essentially offered rates lower than their competitors by operating at a loss, which stifled competition.

DFS is working diligently to address this issue with stakeholders, but a comprehensive approach, including legislative action, is likely needed to ensure the long-term stability of the for-hire

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    73

insurance market.  Most importantly, American Transit is continuing to provide insurance to TLC licensees during this critical period.  I thank DFS for the collaborative approach they have taken on this matter and look forward to continuing to work with them and state policymakers to secure the long-term health of the taxi and for-hire insurance market.

Finally, you may have heard about recent developments in the lawsuit related to taxi accessibility.  As ordered by the federal district court, TLC has proposed rules requiring all new taxis to be wheelchair accessible.  Because this will have a major impact on the finances of the taxi industry, we will continue to work with stakeholders to determine how we can increase accessibility while ensuring continued economic viability of the industry.  This brings us to the bills on the agenda, and I will start with the two bills relating to commuter vans.  Intro. 939 would authorize commuter vans to accept street hails.  Currently, TLC licensed commuter vans are only authorized to provide pre-arranged service.  TLC supports this legislation as a way to align local law with common industry practices and increase options in communities underserved by

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    74

public transportation.  However, it may be helpful to specify within the bill the geographic areas where street hails would be permitted, for example only in the outer boroughs.  Intro. 950 would increase the number of violations required to revoke commuter van licenses from three to six violations and increase the timeframe from six months to 12 months.  Additionally, it would increase the number of violations required to suspend authorization from two to three in a six-month period.

So far in 2024, TLC has issued 47 safety-related violations to commuter vans, but zero to the licensed commuter vans.  Because of the negligible number of violations issued to licensed commuter vans, the bill as drafted may not have its intended effect.  We welcome additional conversations with the sponsor to better understand the bill's intent and history to determine what actions may be appropriate to address those concerns.  Intro 277 would require taxi e-hail trips, such as those arranged by taxi apps Curb and Arro to pay drivers at least as much as they would have received from a traditional street hail trip on the meter.  This bill would effectively reverse studies and rulemaking efforts dating back to 2018,

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    75

when TLC first launched the Flex Fare Pilot.  Under this Pilot, e-hail app companies were permitted to offer up-front pricing to taxi passengers, allowing taxis to compete with Lyft and Uber for customers, as up-front pricing is a key factor that contributed to the growth of app-based FHVs.  Granting the taxi industry that same flexibility is vital to ensuring their long-term competitiveness.  Importantly, taxi drivers can decline e-hail trips if they're not satisfied with the up-front price; the choice to opt-in is theirs.

E-hails now represent between 5 and 10 percent of taxi trips, a small but important supplemental trip source for the industry at a time when taxi trips are still at about half of 2019 levels.  TLC also analyzed fare and driver pay data, finding that per-mile take-home pay was slightly higher for Flex Fare than the metered trips and that average Flex Fare trips are longer than metered trips.  Following our public hearing in response to stakeholder feedback, TLC also analyzed the driver pay data in alternative ways, finding that on trips with similar origins and destinations, Flex Fare trips paid slightly more than metered trips.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    76

Based on all this analysis, and because Flex Fare is a small and optional part of the taxi sector, we determined that it would not be appropriate to impose additional fare or pay requirements on taxi e-hail trips.  Instead, we will continue to monitor Flex Fare's impact on the industry and may adopt additional requirements in the future as needed. Requiring e-hail trips to pay at the metered rate would harm taxi competitiveness and likely cause customers who prefer app-based dispatch to avoid the taxi industry altogether, reducing taxi trips by up to 10 percent and moving millions of dollars in revenue from taxis to Uber and Lyft.  For these reasons, TLC opposes this bill.

Intro. 276 would prohibit high-volume companies from deactivating drivers without just cause or a bona fide economic reason.  The Department of Consumer and Worker Protection, who would oversee this process, supports Intro. 276. Arbitrary or unfair deactivations are financially devastating for app-based workers, as DCWP is well familiar with in the food delivery worker context, where they likewise support deactivation protections.  Ultimately, DCWP's goal is to create fair labor standards for all that

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    77

build upon past models of success and that have been stood up by workers and their advocacy organizations. The Administration looks forward to working with the Council and stakeholders to create standard deactivation protections for these workers.

Lastly, Intro. 323 would require TLC to establish maximum rates for leasing, rentals, lease to own, and conditional purchases of for-hire vehicles.  TLC recognizes the burden of high leasing costs, which is one reason why we targeted the issuance of new EV licenses to individual drivers, and why we have adopted FHV lease transparency rules.  We are also currently conducting a study to ensure that our driver pay rules align with current operating costs, including lease costs.

While TLC does regulate lease rates for taxis, differences between the sectors make setting FHV lease rates much more challenging.  Makes and models in the for-hire sector are far more diverse than in the taxi sector.  Unlike taxis, the FHV industry relies on a wide range of vehicle types to offer a variety of different services to passengers, from standard trips in compact sedans to premium services in luxury vehicles.  Depending on their target

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    78

market, a recent survey of drivers revealed that some may spend $40,000 on a new car while others may spend well over $100,000.  Determining the appropriate lease rates for such a wide range of vehicle types, makes, models, and years would be incredibly challenging, especially because lease prices typically include insurance, maintenance, and other costs that are difficult to capture.

There is also much more variation in leasing arrangements in the FHVs sector, from lease-to-own and conditional purchase arrangements to informal short-term lease rentals between drivers, each of which would have to be addressed with distinct regulatory approaches.  While we are open to exploring additional ways to reduce the burden of leasing costs on drivers, we do not believe that establishing maximum rates is the best approach. Thank you again for inviting me to provide an update on TLC-regulated industries, address recent developments, and offer the Administration's position on the proposed bills.

We look forward to continuing to work with you to ensure that New Yorkers can rely on the City's for-

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   79

hire industry.  I am now happy to answer any questions you may have.

CHAIRPERSON BROOKS-POWERS:  Thank you.  I'm going to give an opportunity for Council Member Louis to ask her questions first.  Okay, so let's talk about the July agreement on the lockouts.  On July 31, 2024, the Mayor and yourself announced that the city had secured agreements with Uber and Lyft to drastically reduce lockouts.  What specific commitments were made by Uber and Lyft in regards to reducing lockouts and how will these commitments be tracked?

DAVID DO:  So, it was a three-prong approach. What we wanted to do Council Member was to ensure that we had an effort that provided relief for drivers immediately.  A standard rule making process could take months, often times more than several months.  And so, we wanted to make sure that we could provide relief for those drivers who were impacted by the lockouts immediately.

One, it would end lockouts, which it has and continues to do.  Require Lyft to have a minimum utilization on an annualized basis of 50 percent and the other part was that they would not onboard any

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    80

new drivers and ensure that current drivers are busy before onboarding new drivers.

CHAIRPERSON BROOKS-POWERS:  Thank you and I would also like to recognize Gotham Professional Arts Academy from Council Member Crystal Hudson's District who has joined us today.  Welcome, we hope you enjoy yourself at City Hall.

Were any of the agreements that were made or commitments memorialized in any formal documents?

DAVID DO:  Yes, there was a formal document from Lyft dated in July to provide their assurance that they would reach 50 percent on an annualized basis.

CHAIRPERSON BROOKS-POWERS:  Can you share those documents with the Committee?

DAVID DO:  We can.

CHAIRPERSON BROOKS-POWERS:  Are there any penalties or consequences if Uber or Lyft do not meet their commitments?

DAVID DO:  Yeah, so one of the ways that we're looking at this is that we're working with our stakeholders, including our advocates to ensure that we have the correct rule making process in place and we're going to take on a rule making process despite this deal right.  What I wanted to do was ensure that

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    81

we work with Uber or Lyft and many of the drivers because what I heard from hundreds of drivers is that they wanted immediate relief from this and what we able to achieve was immediate relief for our drivers but that doesn't preclude us from issuing new rules and we are working on them as we speak.

CHAIRPERSON BROOKS-POWERS:  Thank you for that. Now how long has Uber and Lyft agreed to pause onboarding new drivers and when would it be appropriate for Uber and Lyft to begin onboarding new drivers again?  Is there a utilization rate threshold?  You have an eye on it all?

DAVID DO:  As part of the agreement, they cannot onboard but it is indefinite and we want to look at memorializing some of the things within the agreement permanently like, not onboarding new drivers until there's a certain utilization rate.  Again, this is all delivered Council Member and we haven't finalized where we are yet but one of the main aspects of this is to resolve the lockout issue in perpetuity.

CHAIRPERSON BROOKS-POWERS:  Now, Uber's commitment to reducing lockouts is contingent on Lyft reaching a 50 percent utilization rate.  If Lyft does

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    82

not reach that rate is there anything preventing Uber from reinstating their policy on lockouts?

DAVID DO:  Yeah, like I said, that we're working on rules to make permanent some parts of those agreements but also additional rules to ensure that we protect driver pay and then also ensure that hopefully in the future, that loopholes like the ones that they have taken advantage of are close.

CHAIRPERSON BROOKS-POWERS:  I know you said the rules are still being worked out but will there be any changes to next year's utilization rate calculation to offset the impact of Uber and Lyft's lockout policy from the first half of this year?

DAVID DO:  We're looking at ways where the new rules may address that.

CHAIRPERSON BROOKS-POWERS:  While the agreement with Uber and Lyft is a step in the right direction, it's ultimately a short-term solution to the larger problem of driver lockouts.  What specific long term solutions is TLC and the Administration working towards to eliminate driver lockouts?  What specific long-term solution is TLC and the administration working towards to eliminate driver lockouts and when the agreement was announced you stated that there was

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    83

a robust rule package designed to disincentivize access restrictions.  Can you describe what those rules would do and when the rule making process will actually begin?

DAVID DO:  Yeah, I know that there have been a lot of pain for drivers during the couple of months that there were lockouts.  And so, that is why we are not only working with our advocates to looking at what they have put in front of us but our own rules to ensure that lockouts hopefully are a thing of the past.  What we're looking at is one continuing onboarding restrictions, providing flexibility to drivers and ending overall lockouts.  This is something that I know is incredibly important to many of our drivers but there is a very delicate balance in terms of the utilization rates that we need to be aware of because that utilization rate increases driver pay.  And so, we're looking at that aspect as part of the solution as well.

But our advocates have come up with a real meaningful solutions that I am examining diving deep and ensuring that we look at it deeply so that we can have the best rule package available.  We hope that

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    84

we can get the rule package out by the end of this year.

CHAIRPERSON BROOKS-POWERS:  Thank you.  I want to pivot to Green rides, EV for-hire vehicle applications.  How many new licenses were given out last year when the EV for-hire vehicle applications were open?

DAVID DO:  There were about 9,700 applications. We gave out about 8,700 and 93 percent of those went to individual drivers.

CHAIRPERSON BROOKS-POWERS:  What's the percentage?

DAVID DO:  93 percent went to individual drivers.

CHAIRPERSON BROOKS-POWERS:  Have all applications been processed?

DAVID DO:  We were very proud and I thank our TLC licensing team for processing many of those licenses within a three month period, four month period, excuse me.

CHAIRPERSON BROOKS-POWERS:  What type of outreach was done to mitigate any negative impacts of the opening and quick closing of the application process?

DAVID DO:  Yeah, so as part of the litigation, we were required to close it in a 96 hour period, right.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    85

About four weeks before that we opened the licenses, only about 2,500 applications were applied for and then overnight, there was about 7,500 applications. And so, we had a period where the judge recognized that it was Veterans Day to ensure that not only the public would know about the closure, we communicated that to the communities and then the industry itself communicated to itself about that closure and we saw a rush of 7,500 applications in the 96 hour period before we had to close it on that Monday at 9 a.m..

CHAIRPERSON BROOKS-POWERS:  And did the influx of additional EV for for-hire vehicles result in pressure on the utilization rate that might have led to the lockouts?

DAVID DO:  Yeah, that's a very good question and in short, no.  Many of the drivers were already driving.  They were in leasing arrangements right? And so, they moved from having to lease upwards of $425, upwards to $900 a week to now owning their own vehicle and being able to own their own business and drive in New York City.

CHAIRPERSON BROOKS-POWERS:  In going forward, how do we manage the driver ecosystem to balance the interest of new drivers or add EV's and wheelchair

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    86

accessible vehicles while also reducing empty cars on our streets and supporting driver pay?

DAVID DO:  Yeah, so one of the main issues that I think we need to reflect on was that Uber and Lyft were onboarding thousands of drivers as of late last year and even early this year, right?  Despite not having enough trips out there.  And so, what we're doing is we're looking at ways to limit onboarding of new drivers and ensuring that our existing drivers have enough jobs before we allow for Uber and Lyft to onboard new drivers.  Again, like I said, it's a deliberative process.  We're looking at many ways that would assist us with this but it is crucial that we take a lot of time to think about how it would impact the overall infrastructure of driver pay and the industry.

CHAIRPERSON BROOKS-POWERS:  And in terms of the For-Hire Vehicle License Storage program, during the COVID-19 pandemic, the TLC created a for-hire vehicle license storage program to provide relief to license holders who could not afford to maintain their vehicles during the pandemic.  That program ended in August of last year.  The TLC has now established a short-term storage program that allows a licensee to

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    87

put their license in storage once every two year renewal period for up to 90 days.  Have you done a retrospective on this long term storage program and do you believe that it was successful?  Are there any lessons that we can learn from the implementation of the program that we can apply going forward?  Particularly in respect to the new short-term storage program?

DAVID DO:  We wanted to ensure that driver's with the 90 day period to have flexibility, when they travel abroad, when they have medical appointments, when they have long term you know other commitments that they have the flexibility to put their license in storage.  What we did not want folks to take advantage of this program, where the big leasing companies putting their vehicles into storage and not putting them on the road to ensure that drivers not only have options for those vehicles.  And so, that was the intent of the overall rules to ensure that drivers had access to these vehicles and not that the big leasing companies would be able to take advantage of that.  However, we also had the flexibility built in for our drivers so that they could put their licenses in storage and I have not heard of many

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    88

cases where there have been concerns about the new storage program.

CHAIRPERSON BROOKS-POWERS:  Thank you for that and why was the decision made to limit the short-term storage program to only one use per two years.  Like, what happens if there's an emergency?  Which we all know happens more frequently at times more than once every two years.

DAVID DO:  Yeah, we believe that in a 90 day period, over two years works for most if not all of the for-hire industry.  Again, while passage of this rule, I heard some concerns but I haven't heard additional concerns since the passage of this rule.  We think it strikes the right balance but we're always welcoming I think feedback from the community to make any program a little bit better.

CHAIRPERSON BROOKS-POWERS:  And how many driver's make use of the short-term storage program each month?  What's the average number of licenses in storage?

DAVID DO:  I don't have that information right in front of me Council Member but we'll definitely get it and hopefully we can it at this hearing so we can provide it to you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   89

CHAIRPERSON BROOKS-POWERS:  Thank you.  And so far, do you believe the short-term storage program is a success?  Do you have any intention to expand the program or loosen its requirements?

DAVID DO:  Like I said, we're always looking at our industries feedback to make our programs, our rules a lot better.  I haven't heard a lot of push back besides from when we passed the rule but I'm focused on ensuring that drivers have options especially when they're traveling abroad or you know having medical appointments that take them out of service or any other way to assist our drivers in their time of need and provide more flexibility.

CHAIRPERSON BROOKS-POWERS:  Thank you for that.  Next, I'm going to pivot to commuter vans.  So, commuter vans, as I have said many times are vital in outer borough communities providing an affordable and reliable transportation option in transit deserts.  However, the number of commuter van basis drivers and vehicles have dramatically decreased in recent years.  As you mentioned during your testimony, the number of licensed drivers and licenses bases have suffered a similar drop.  You mentioned state mandated insurance coverage as the primary issue facing the industry.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    90

Just for clarification, do you mean that this is a current issue or did you mean that this was a primary cause for the collapse of the industry?

DAVID DO:  Like I said in my testimony, we're broadly supportive of ensuring that there's a continuum of different transportation options within all five boroughs of New York City.  Commuter vans played an important role in many of our communities. I know and I've heard of stories where many students might be in Southeast Queens but had to take a bus so that they can get to their subway station and get to Manhattan for their school.  These are important stories that I hear about and so, the health of the commuter van industry is something I'm keenly aware of wanting to ensure that there are options for our outer borough residents.

Look, it is extremely devastating right that insurance has been so high for our commuter van industry but what we know is that with state programs like the $11 million dedicated to commuter van insurance implemented by ESD is helping commuter vans get back on the road.  We know that $40,000 subsidy with in vehicle telemetrics and in vehicle help to provide some of that security so that they can get

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    91

cheaper insurance rates is going to help the industry as a whole.  And so we're here to be supportive of the commuter van industry.

CHAIRPERSON BROOKS-POWERS:  What other issues in the TLCs opinion stand in the way of rebounding commuter van industry and what can we do to smooth the way for them?

DAVID DO:  Yeah so like I said that we are going to try to implement the $40,000 in grants for the commuter van industry and in fact, we have been working ESD on a regular basis.  They just released the applications for commuter vans and I hope that every single commuter van who was previously active can reach out to the TLC so that we can get them active again, so that they can participate in this program.  Because as you've heard from Leroy, you know insurance can be anywhere from $40,000 to $50,000.  A $40,000 grant is going to allow for a meaningful impact so that commuter vans can get back on the road.

CHAIRPERSON BROOKS-POWERS:  And commuter vans are not easily replaced by taxi's or for-hire vehicles which are much more expensive or by buses that you know may not service particular routes but what are

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   92

you doing to preserve this form of transportation for people who need it.  How do you plan to address the challenges facing the commuter van industry?

DAVID DO:  Look, I met with our commuter van associations including Leroy and Hector to ensure and learn about the challenges that are facing them.  And what we have been able to do was work with them, work with the operators, learn about their challenges and make flexible changes and exemptions when we could to that.  And so, typically if authorized commuter van base might not have any vehicles, we require them to put at least one vehicle right.  The previous restrictions were much higher than that.  If they have one vehicle associated with the authorization, we would work with them to renew that vehicle license and that base.  And so, we are working internally at the TLC but also externally with the state to ensure that there is flexibility for our commuter van industry.

CHAIRPERSON BROOKS-POWERS:  And has the TLC examined where these commuter vans are most concentrated?  What kind of passengers do these commuter vans primarily serve and where the routes actually go?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    93

DAVID DO:  Yeah, commuter vans play an important role in transit deserts like you said.  In Southeast Queens, in parts of Brooklyn.  And so, we want to ensure right that there is a continuum of options.  Beit Yellow Taxi, for-hire vehicles, transit, and even commuter vans to address any of the concerns that our riders face in all five boroughs.  And so, I want to always provide more opportunities, more options for our residents instead of less options, right?  And so, more options means residents can get to where they need to go faster and that is something that I think we should all be supportive of.

CHAIRPERSON BROOKS-POWERS:  Thank you for that.  Equally important in communities, especially Southeast Queens, is our public transit system, particularly the buses because we don't have access to subways.  We're a two fare zone and some of the issues raised earlier by the prepanel was around the commuter van industry being a potential threat to the bus drivers and diminishing of service within these communities.  Does TLC have any ideas in which they can help the commuter van industry rebound while still protecting the public bus network?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    94

DAVID DO:  Yeah, so I understand where our transit workers are coming from and make no mistake, I think that the industry has been impacted so hard. The commuter van industry has been impacted so hard, that there's only 35 licensed commuter vans in all five boroughs licensed through the TLC.

CHAIRPERSON BROOKS-POWERS:  But if this bill were to pass, it would probably would you say increase that number?

DAVID DO:  Of the Street Hail Bill?

CHAIRPERSON BROOKS-POWERS:  Yeah.

DAVID DO:  Uh, I can't say either way right?  But that is something that the commuter van associations are going to have to be hyper focused on to ensure that not only the state help but the additional flexibility provides to them makes their industry grow.  But there are protections right because any route has to be reviewed by DOT.  But more so is that this common industry practice.  That they pick up passengers at various block to block, corner to corner and so, this is just memorializing some of what they're already doing into the law.

CHAIRPERSON BROOKS-POWERS:  Uhm, okay another question that came or another issue that came up in

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    95

the prepanel that I was hearing also.  I think it was from ATU's in terms of like the behavior of the commuter van drivers, which Mr. Morrison had indicated, that was not the case of the license commuter vans.  How does TLC manage what's on the road in terms of licensed versus unlicensed?  Because as we look to explore what legalizing the street hails look like, we're not trying to reward the ones that are the bad actors that impact the safety and access to the bus services.  So, what has or can TLC do to address that?

DAVID DO:  Yeah Council Member, enforcement is a key aspect of unlicensed commuter vans.

CHAIRPERSON BROOKS-POWERS:  And enforcement is by TLC right or PD?

DAVID DO:  Both by TLC and by PD.  And so, we regularly work with NYPD to ensure that commuter vans are operating legally so that there are the protections of not only insurance but having a licensed operator, having a CDL operator.  Following DMV state guidelines.  These are all incredibly important and as I look through my data, in 2023 about 95; there was 95 summonses in total.  Only five went to licensed commuter vans and so, what Leroy was

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    96

saying is correct, that 90 of the 95 went to non-licensed commuter vans.  As of this year so far, all 47 summonses to commuter vans went to unlicensed commuter vans, right?  And so, I think for the most part, the licensed commuter vans are following the rules, the regulations, and the state traffic laws.

So, is there a shortage of resources why the enforcement is not able to kind of address the bad actors?

DAVID DO:  Well-

CHAIRPERSON BROOKS-POWERS:  Because I know I have some that are in Rosedale that are not licensed that do all types of things to people's property and I know they're not the licensed ones.

DAVID DO:  Yeah, well thanks to Mayor Adams and the Administration, we were able to get 100 new TLC police officers.  We're training our first class in two years currently and are going to recruit more officers and so, that is going to help us provide more attention to areas where we can be helpful to you.  So, if you let us know about where they're operating, we will come out there and support you and your community.  Yes, we're hyper focused on ensuring

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    97

that non licensed commuter vans get licensed or not operate in New York City.

CHAIRPERSON BROOKS-POWERS:  That is helpful and is there coordination with TLC and PD in terms of how to engage the commuter vans?  What is actually legal versus not legal?  What they should have and shouldn't have?

DAVID DO:  Well, every unlicensed commuter van is – should not be operating, should not picking up trips and so, they need to go through the regulatory process that assures that not only do they have the proper insurance, the proper licensing but also the proper education so that they can operate as a commuter van.  And so, as we see commuter vans with non- New York State plates or Pennsylvania plates etc., those are not operating legally on New York City roads.  And so, we are going to be focused on ensuring that they do not operate.

CHAIRPERSON BROOKS-POWERS:  Thank you for that and is the current rule prohibiting street hail something you enforce strictly?  And if so, how many violations typically occur in a month?

DAVID DO:  Uhm, yeah so we do enforce when we see it, right but again, with 100 TLC police officers

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    98

growing to 200 hopefully soon, we will be able to pay more attention to this issue in partnership with NYPD but we work with every precinct to ensure that when we see that there is a higher number of certain issues and cases regarding commuter vans, we will address that based on constituent concerns, residents' concerns to ensure that you know they don't see that type of activity in their communities.

CHAIRPERSON BROOKS-POWERS:  Thank you for that. I'm going to yield to Council Member Krishnan for questions.

COUNCIL MEMBER KRISHNAN:  Thank you so much Majority Leader Brooks-Powers.  Thank you Commissioner and I just have a few questions for you on Intro. 276.  My first question is, uhm will this bill negatively impact any existing processes to deal with deactivation?

DAVID DO:  So, I'll have I think Carlos answer that question.  He's with DCWP who will be implementing this new law.

COUNCIL MEMBER KRISHNAN:  Sure, thank you.

CARLOS ORTIZ:  Thank you Commissioner.  I think Council Member with respect to your question, our goal with this legislation is to I think build upon

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    99

the successes of workers and worker advocates. Support existing processes that are out there certainly but ultimately create a fair standard for all workers in New York City in this for-hire vehicle space.  I certainly was very appreciative of the remarks in your opening statements.  To this point about other processes that are out there, I think that is the same intent that we have as an administration and we want to work with you on that as we go into the legislative process.

COUNCIL MEMBER KRISHNAN:  So, just to be clear, would this impact any of the existing processes right now?

CARLOS ORTIZ:  I think my plan is to ensure when we're drafting that we're not making any impacts unnecessarily.  I think again, we want to build upon success, not walk back anything that workers and the advocates that have won for us.

COUNCIL MEMBER KRISHNAN:  Got it.  Do you have – or how many – sorry, one more question.  Do you have any recommendations for the legislation?

CARLOS ORTIZ:  Yes, I think Council Member, you know we've had a lot of experience now in the space of just cost protections for fast food workers.  A

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   100

lot of experience in the context of food delivery workers.  I think there are certainly tweaks we might want to work into legislation around arbitration and making it a more efficient and effective process for workers who want to engage in that process.  I think there's components of separation pay we think might be interesting that could help folks if they've been deactivated, unfairly deactivated.  I think these would really help make sure that we are reducing the financial, devastating financial impact that an unfair deactivation could have.  Or also we're just disincentivizing companies having to deactivate workers too.

COUNCIL MEMBER KRISHNAN:  And finally, how many complaints or cases do you anticipate?

CARLOS ORTIZ:  I think Council Member, you know I heard my colleagues from NYTWA mentioned something around 2,000 cases that they've worked through.  I've heard numbers from other advocates of upwards of 13,000 cases a year on deactivation.  So, I think we're looking at that kind of ballpark and for us, it's certainly helpful for that to be kind of flushed out in the record because you know we work very closely with OMB to identify resources that are

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   101

needed and this kind of a caseload is definitely significant.

COUNCIL MEMBER KRISHNAN:  So, would it require perhaps funding or support resources, digital resources for DCWP?

CARLOS ORTIZ:  Think that's part of the conversation we have to have particularly with this amount of cases that are being spoken to on the record.

COUNCIL MEMBER KRISHNAN:  Okay, thank you.  No further questions.  Thank you.

COUNCIL MEMBER FARIAS:  Thank you Council Member. Seeing no one else signed up, I have one question and then we'll move to public testimony.  The Chair had asked about Green rides and the 8,500 EV licenses that we've already rolled out here in the city.  I wanted to know if we had any data on how many of those vehicles have stayed on the road currently and if we have any percentage of folks that have gave up those EV licenses in the time being?  I know we've had some difficulty with charging infrastructure etc., so just wanted to ask about that.

DAVID DO:  Yeah, if I could step back and give an overall picture of where we are.  We're two years

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    102 ahead of schedule on our Green Rides initiative.  You know the Administration goal was to get to 100 percent either wheelchair accessible or EV's by 2030 and we're hitting that mark.  19 percent so far are now EV or wheelchair accessible in terms of the number of trips.

Overall, we see that this has helped build additional infrastructure.  Just yesterday Council Member, I opened up ten additional or I helped open up excuse me, it wasn't my charging but opened up ten additional fast charging stations in Manhattan.  We – this initiative has spurred more infrastructure across all five boroughs and has potential to add additional infrastructure in the Bronx and so, we're very excited by this.

In terms of the EV, FHV numbers that you asked for, uhm, there were 10,243 EV's as of February 2024 and today, right despite not issuing any additional licenses, there are about 11,490.  And so, what we have seen based on the regulation, is that many individuals are transitioning from an ICG vehicle or an Internal Combustion Gas vehicle to EV because possibly there is a lot more infrastructure out there.  We have set up a taskforce to work with NYPA,

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   103

to work with the New York and New Jersey Port Authority to build more infrastructure at JFK and at LaGuardia Airports and we're seeing that come to fruition so that the pain that driver's had to wait for last winter won't happen this year.

COUNCIL MEMBER FARIAS:  Great and so do we have any data of folks that were initially given their EV licenses and then –

DAVID DO:  Specifically on that, I'll get back to you Council Member and see where we are at that.  I apologize, I don't have that number in front of me.

COUNCIL MEMBER FARIAS:  Thank you so much.  Thank you Chair.

DAVID DO:  And Chair Brooks-Powers, there are currently 601 vehicles in storage, in the FHV storage program.

CHAIRPERSON BROOKS-POWERS:  601 currently.

DAVID DO:  Yup.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Okay, thank you to TLC and your testimony today and participation.  I now open the hearing for public testimony.  I remind members of the public that this is a government proceeding and that decorum shall be

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   104 observed at all times.  As such, members of the public shall remain silent at all times.

The witness table is reserved for people who wish to testify.  No video recording or photography is allowed from the witness table.  Further, members of the public may not present audio or video recordings as testimony but may submit transcripts of such recordings to the Sergeant at Arms for inclusion in the record.  If you wish to speak at today's hearing, please fill out an appearance card with the Sergeant at Arms and wait to be recognized.  When recognized, you will have two minutes to speak on today's hearing topics.  Oversight TLC for-hire vehicles, commuter vans and other TLC licensees, Intro. Number 100, a local law to amend the Administrative Code of the City of New York in relation to the suspension of alternate side parking regulations on Losar.  Intro. Number 276, a Local Law to amend the Administrative Code of the City of New York in relation to the wrongful deactivation of high-volume for-hire vehicle drivers.  Intro. Number 277, a Local Law to amend the Administrative Code of the City of New York in relation to taxi cab driver pay for electronically dispatched taxi cab trips.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   105

Intro. Number 323, a Local Law to amend the Administrative Code of the City of New York in relation to establishing maximum rates for the leasing, rental, lease to own and conditional purchase of for-hire vehicles.  Intro. Number 939, a Local Law to amend the Administrative Code of the City of New York in relation to allowing commuter vans to accept hails from prospective passengers in the street.

Intro. Number 950, a Local Law to amend the Administrative Code of the City of New York in relation to increasing the number of violations required to revoke authorization to operate a commuter van service.  Intro. Number 1021, a Local Law to amend the Administrative Code of the City of New York in relation to the suspension of alternate side parking regulations on Patriot Day.

If you have a written statement or additional testimony you wish to submit for the record, please provide a copy of that testimony to the Sergeant at Arms.  You may also email written testimony to testimony@council.nyc.gov within 72 hours of this hearing.  Audio and video recordings will not be

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   106

accepted.  We will call the first panel which will be former Council Member I.Daneek Miller.

I.DANEEK MILLER:  Good morning Madam.  Good afternoon Madam Chair and members of the Committee. It is great to be in the peoples house again and uhm, so I just after hearing TLCs testimony, I kind of just wanted to divert from what we were talking about because obviously they're either misguided or misinformed about what the commuter van industry really is at this moment and time and the services that they are providing and I would love to work collaboratively with them and the other agencies to ensure that that's happening but for him not to mention the actual mandated report that came out of the legislation, that we passed back in 2018, that required an annual review and reports of the industry around safety.  That wasn't mentioned at all and quite frankly that was important as to whether or not you made a determination that this should be expanded.  And also, I just want to mention, the first name basis of the industry folks is clearly where he's getting his information from.

And I do take offense to that something that we took nearly eight years to make sure that we were

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    107

protecting the safety and integrity of communities throughout the city to pass that legislation, to see it under minded and be diminished in a way that not just the street hails may happen in an arbitrary way but also that the fines and penalties that were put in place be diminished as well.  But you know what I really wanted to talk about and very briefly is that public transportation and that transportation was not being spoken about here today.  It is a great equalizer.  We do talk about transportation deserts are often communities of color and the impact that that has on there but transportation – what we're missing uhm is that there is an obligation by the city and the state to ensure that they're providing this public benefit equitably throughout the city. In the city that we see communities that have public transportation options or have new options such as ferries that are being subsidized at $12 and change per trip.

In other communities, their options are commuter vans, which are greatly underfunded that are not regulated and often times not providing the safe service.  Clearly, it was also demonstrated that they don't provide, they're not ADA accessible.  They're

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    108

not accessible to those who would normally access fair fare programs and so forth.  So, that is an equity that our community really is losing out on and I think in order for us to have equitable growth throughout the city, we have to talk about equitable transportation options.

As we move further, I think one of the testimonies whether 100 or ATU, talked about transportation funding.  Transportation funding by the MTA, when the operation side is strictly by fare box, and anything that interferes with the fare box numbers that are coming in, the people that are captured by the fare box, diminishes the service that is provided.

As we talk about transportation equity and transportation as a great equalizer, uhm, there's been conversation about congestive pricing and as this Committee knows that if and when that is implemented, it is only for capital projects. Meaning that the operations of bus service is not going to be impacted by it.  It is not going to get you a contract.  It is not going to provide benefits. It is not going to impact the day to day operations. And certainly, I don't think that in our lifetime

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    109

that we're going to see light rail or subways riding down Merrick Boulevard, Flatbush Avenue, Northern Boulevard, anywhere of these transportation deserts that currently exist.

So we have to look at you know common sense measures that really matter.  One of the things is –

CHAIRPERSON BROOKS-POWERS:  Sorry –

I.DANEEK MILLER:  Okay, so we talked about very briefly and we've been working on the bus network redesign.  I think those are areas that we can focus on and we could – but right now, we could have a conversation about what the industry, the commuter van industry does but to arbitrarily integrate them into bus stops and street hails, I think is a wrong move.

CHAIRPERSON BROOKS-POWERS:  And I thank you for that testimony.  I will say that I've heard consistently similar to what you shared in terms of the concerns in the bus route or below 96th Street and so, considering that you have a significant transportation background, I would love to hear from you like what could you see as a world where these two industries co-exist without diminishing?  And I ask you this because as someone who has and continues

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    110

to represent parts of Southeast Queens, you know first-hand what that ridership looks like.  And then I do want to have a follow up question that I asked earlier and I didn't really get a clear answer, but when the commuter vans are not available, do you see that the majority of those riders go to taking a bus or do they go into their personal vehicles?

I.DANEEK MILLER:  Well, no, I think that those who travel into the city or into other boroughs for work are probably using New York City or public transportation just in general.  Yeah, just short of it yeah.  I think they're taking public transportation as an alternative, not necessarily an alternative means but what I would envision, what I think has not been captured is that uhm, there are communities that are truly transportation deserts for a plethora of reasons, logistics and otherwise. Someone like the Rockaways and so forth, like that. I think whether or not we're leveraging this conversation around greater transportation, public transportation options but in the meantime, could we see something like that you know in there but in terms of where routes already exist which I think is a task of DOT, is to look at the existing routes in

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   111
the city, whether or not they are functioning efficiently.  Can it be better?  Could it be assisted by the vans?

And so, that's their job in licensing the vans is assessing whether or not they are not performing or providing the service in that area.  So, if in terms of collaboration, I think DOT and their data collaboratively with the Transit Authority will really sort of dictate whether or not or where you know they could possibly operate.

CHAIRPERSON BROOKS-POWERS:  And then I know like for example in Queens, we have the Queens bus redesign going on, which I'm hopeful that we'll still see some more changes.  I'm concerned about one, diminishing of our bus services through it.  Uhm, but also too, there are still pockets of the communities that still would not have a direct access readily where they could walk maybe a block and a half to a bus stop.  And so, do you feel that in instances where the – when you look at the map and the bus redesign is still not capturing certain neighborhoods, that there is a way in which the commuter vans could be that connection to the buses?  Because again, I know that –

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   112

I.DANEEK MILLER:  At that point, so we're talking about creating what we got rid of 30 years ago, which is a two fair zone or putting a van to a bus to a train.

CHAIRPERSON BROOKS-POWERS:  Well, some of the bus redesign creates a two, three fare zone now.

I.DANEEK MILLER:  I would suggest that you get the MTA in here and have a hearing on the redesign and what that looks like.  Often the routes that run throughout the City of New York, in particularly in the outer borough, they were old trolly routes and they haven't been changed in 75 years.  They were industrial communities that are now residential and vice versa and so, you know this is really an opportunity to be better and they have an impact on communities, on industries in a way, I think it's really important to do that.  But I wouldn't you know just throw out the baby with the bath water.  That one thing should this or the other.  I think that it's really important to finally have their ear and the resources and revenue behind it.  But again, losing revenue at a time where MTA is hiring people to circumvent fare dodging and the rest of that stuff, but to give it away is really advocating their

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   113

fiduciary responsibility of all, not just agencies but bodies of government, including the Council to make sure that we have the operating expenses and revenue that are going to allow them to serve folks efficiently.

And we don't want to do anything that take away from that.  Is there a space for them to make money?  I think that we have absolutely done our due diligence to incorporate commuter vans.  Wherever we can, but in the daily operations of you know we want people to be safe and efficient.  Mind you from an ATU perspective, that industry started in Staten Island brought them back and forth and they you know, crossing into Manhattan.  It would do potentially great damage they talked about, industries nationally where corporations come and use policies and legislations such as this and run fleets on public transportation and we don't want to diminish that and see that in that way.

I just also want to say how much I do support Intro. 276.  It makes all the sense in the world that you know collective bargaining, due process and discipline is a basic fundamental intended of labor rights and it just absolutely has to happen, so.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   114

CHAIRPERSON BROOKS-POWERS:  And I think you for that.

I.DANEEK MILLER:  Yup.

CHAIRPERSON BROOKS-POWERS:  Thank you.  And also, I'd just like to clarify for everyone something that was stated earlier, so although no video recording or photography is allowed from the witness table, members of the public may record these proceedings from their seats but may not use tripods or obstruct walk ways.  We'll have our next panel.  Thank you.

I.DANEEK MILLER:  Thank you so much and you know as always, I am available.

CHAIRPERSON BROOKS-POWERS:  And we understand that there are some members that are signed up that will have to step away to pray.  We will come back if we call and you're not in the room.  So, just understand that too.

So, we'll next have Paul Sonn, Jeremy Moskowitz, Giovanny Ramos(SP?), Shahal Hawk(SP?), Ibrahim Zoure.  Just come to the front.  And please just introduce yourself before you speak, so we can have it on record as well.  And I just want to make one more attempt to see if Michele Dulton of IDG is in the

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    115

room, if so, you can come now as well.  Okay, you can get started just please unmute your mic.

GIOVANNY RAMOS:  Hi, my name is Giovanny Ramos. I come to plead to you to help me for my family because my car is deactivated.  Over come to the market in New York City, I'm here to help all.  Uh, when I first driver started driving Uber at the market.  When I started Uber, I make a lot of money – a little money for my family then still when I see a lot of people come to the Uber driver, I know I make a lot of mistakes.  Uber closed my account.  We still have a balance – I bought my car and I have to pay the bills for my family.  I have to pay mortgage and a lot of things in my bills for my family.  Now, please do me a favor, please try to go back to driving Uber.  Thank you very much.

CHAIRPERSON BROOKS-POWERS:  Thank you.

IBRAHIM ZOURE:  Thank you everyone.  I just wanted to say thank you for the great mind that set this meeting today.  For us be here to present our case.  My name is Ibrahim Zoure.  I'm a member of NYTWA and I drive for Uber and Lyft.  So, I was deactivated by Uber in 2019 and put a great impact on me and my family because I could no longer provide

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    116

you know the necessary basic that my family need. So, I find myself in a situation where I went to pick up a stranger and at that pickup location, I was blocked by another driver so I could proceed my journey to drop the passenger. So, I reached out to the driver of that car to find out if he was sleeping in his car. That's why he couldn't respond to my horn to move away. So, we engaged into a conversation. My passenger out of the vehicle came behind me and record the situation between me and the other driver and sent it to Uber. So, I was deactivated because of that. Six months after this situation happened, they waited six months to deactivate me. So, I reached out to Uber office to see if the problem could be solved. So, at Uber office, they referred me to IDG to solve the problem. So, when I went to IDG, so I was told by IDG member that my situation is critical and it had to be reviewed by the Uber headquarter. So, ever since I have never been able to have my account reestablished.

CHAIRPERSON BROOKS-POWERS: Thank you. I just ask if you could submit the rest of your testimony in writing.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    117

IBRAHIM ZOURE:  Okay, thank you.

JEREMY MOSKOWITZ:  Hi, my name is Jeremy, I'm with Voyager Global Mobility.  We run two of the largest rental, TLC rental fleets in the city, Buggy and Fast Track.  We are weekly, no strings attached rentals.  We do not trap drivers in long term leasing agreements.  We're an important part of the industry.  We're here so that people can go on vacation for two or three months abroad.  They can save their expenses if they get deactivated or find themselves in other trouble.  We do whatever we can to help drivers who are deactivated, involving giving any documents that we have, payment history, contracts, whatever we can do.  Sometimes we'll get calls from the IDG or from Uber or Lyft.  We're here today in terms of your overall oversight of the TLC to request that you sincerely focus on the insurance storm that is about to hit.  We manage our insurance responsibly.  It's built into our very fair rental pricing.  We have a large array of nice vehicles that are fully covered.  We manage our insurance responsibly.  We've never been late on a payment.  We pay out claims.  With American transit, if one of our driver's gets in an accident with them, I will fax a claim over.  I will

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   118

wait two months.  I will never get paid.  It's a shame that everyone has known about this forever. That they have let drivers get on with low premiums so people aren't managing their finances responsibly.

The other major players Harford and Mia are not that much better and so, this is a storm that's brewing.  We commend what the larger Council or Committee or City Council discussed on changing the insurance rates.  But before any conversation about rental prices or the government regulating rental prices, the city needs to get a real strong handle on the insurance industry and its major effects on drivers, as well as interest rates borrowing for people who are buying their cars, etc..  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you to this panel.  The next panel we'll have is Mohamed Mohamed, Dennis Addison, Saif Aizah, Bamba Diakite, Walter Hurdle.  We ask that you just introduce yourself at the start of your comments and uhm, we ask that you hold it to the two minutes because we have a lot of people signed up today to testify.

MOHAMMAD ALI AWAN:  Hi, my name is Mohammad Ali Awan and I drove Yellow cab for 26 years and then switched to this promise land they call Uber and Lyft

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    119

because we thought the life was going to get a little bit better but it's not.  This company have enormous kind of like control on the driver.  They can deactivate any time they want and we are deactivated for a very long time.  It's impacted our life and our families life and this is just like staying on top, like government of the people, by the people.  So, we are the people.  So, we need the help from the City Council and the members and the Chair to please just like make the regulation to stop this deactivation for like unknown time and forever.  This should be like that because like we are the one who are sitting on this hot seat driving for hours and hours and burning of our fuel.  We're paying for all the expense of the car.

This company Uber and Lyft and other app companies, they have nothing.  They are just, in reality they are just the connecting companies.  They are connecting us with the passengers.  That's all they do but they make all the rules and they control everything.  It shouldn't be like that so City Council and the Taxi Limousine Commission should become some kind of like the regulations to stop this nonsense deactivation.  Thank you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    120

CHAIRPERSON BROOKS-POWERS:  Next.

BAMBA DIAKITE:  Hi, my name is Bamba Diakite.  I do taxi drive long time.  Okay, before I talk about – I got my own program that I think in my program, I got a lot of drivers now in the hospital and their home.  If I wake up morning, because I got a lot of children.  I got a lot of family.

Uber locked up.  This is not fair.  If I wake up, I'll go see them.  Before you talking your problem, okay.  I started Uber 2019.  Uber closed me.  Uber closed me.  Nobody complain me, Uber closed me because they say my points is low.  I go once in the Bronx Uber office.  They tell me go take a class.  The teacher see me and say man, you don't have problem, your points is good.  I say Uber closed me because of my point is low.

Okay, IGD, I see IGD.  IGD take $10 my bank account.  They say you now have big problem.  Uber have to open you.  I say okay.  Every month IGD take $10 of my money.  How many times they don't do nothing.  Uber don't open me.  You see, I got a family at home.  Taking my money IGD, it don't do nothing.  After that, [INAUDIBLE 02:31:51].  They have taxi alliance office there.  I go to taxi

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   121

alliance office there, I talk to them.  I say I got a problem.  My friend have problem too.  Uber closed me.  Uber closed me because of my rating is low.  I said, nobody complain me but Uber not open me.  I got a big family, a lot of family.  Uber don't open me.

Okay, pulled up, Uber customer, they picked me.  Uber don't do nothing.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.

WALTER HURDLE:  Good morning.  My name is Walter Hurdle and uh I am in the industry for six years with the New York Taxi Workers Alliance for two and half years.  I was unfairly deactivated by Uber and as a result, I lost $1,200 a week.  They are so called three strikes where in the first situation, uhm during COVID, I had a mask on my mouth but not on my nose.  A customer complained even though I had a petition in my vehicle, I got an email from Uber who said, any further allegations of this nature you will be removed from the Uber platform.

The second time was with a mounted phone, you get rides when a next ride before the first ride is finished.  You have to interact with your phone.  I got an email from Uber.  A customer said you was using your phone.  They said again, any allegations

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    122

of this nature can result in removal from the Uber platform.  The third time was a young lady.  It was 3:00 in the morning and I said, ma'am I'm just going to wait for you to get inside before I drive off.  I don't know why she took it the way she may have because I felt like my responsibility doesn't end when I close the app.

That humanity takes over and if something were to happen to this passenger, I need to interact.  The $60,000 I invested in my vehicle for my "partners" Uber and Lyft, is now a burden now because even though I have to make my car payment, my insurance payment, my rent whatever, my bills don't stop.  This deactivation process with Uber, Intro-

CHAIRPERSON BROOKS-POWERS:  Thank you.  If you have anything additional, you can submit it in writing sir.

You have to turn on the mic sir.  Could you just let us know your name as well?

DENNIS ADDISON:  Good morning, my name is Dennis Addison.  Thank you so much for making this possible at the hearing.  I have been in this business now for six and half years and a member of the New York Taxi Alliance as well for two and a half years.  I've been

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    123

unfairly deactivated by both Uber and Lyft and weekly, I make over $1,600.  And since Uber have deactivated me, it was very much unfair for me and my family.  I have a vehicle that I invested in in over $65,000 that I had to pay for that.  My insurance, fees and other the different things that I have to pay for maintaining my family.

It's been so difficult since then, losing my job from Uber and Lyft because of the deactivation.  Lost my vehicle.  Don't have any income coming in.  It has been so difficult for me and my family.  The deactivation is solely – is really unfair to drivers like myself and the panel here is testifying the same thing.

We would like to see if this independent department can really step in and help us because we know that it will lift the burden off of us to some degree but at the same time, we can make ends meet. It's not easy dealing with passengers who lie and say different things about driver's like myself and others who are working so hard.  And all of a sudden, you become deactivated.  All because what?  Uber listens to these passengers to get free rides because of what they say.  They don't even take into

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   124

consideration us the driver's.  We are completely mute.  We have no say.  We have no comment in anything whatsoever.  So, please, if you can listen and hear what we are saying?  It is greatly appreciated by all of the drivers and Uber and Lyft.

CHAIRPERSON BROOKS-POWERS:  Thank you.  I believe Council Member Krishnan has a question for the panel.

COUNCIL MEMBER KRISHNAN:  Just one question, especially for the last two driver's that testified.  Did you, when you were deactivated, did you try the IDG process?  What happened in that process?  Did you reach out to the company?

DENNIS ADDISON:  I'm sorry, when I go to Uber office and I called them and I called them and I plead with them, I called them every single day, go down to the office every single day to no avail, we cannot help you.  Try this, try that.  They didn't give me no kind of warning.  They didn't give any kind of leeway like what they are saying.

CHAIRPERSON BROOKS-POWERS:  Just for clarification, he is asking about going to IDG through their process, not Uber.

DENNIS ADDISON:  They're no help.  They just take my money and just say that they will try to help me

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    125

and nothing.  They charge my credit card every given month because of fees and all that stuff and I had to put a stop to it.  IDG ain't helping me.  They're not for me.

COUNCIL MEMBER KRISHNAN:  And so, did you hear back after you tried to go through the process?

DENNIS ADDISON:  Nothing.  It's like this. Knock, knock, knock, deaf ears.

COUNCIL MEMBER KRISHNAN:  So, have you heard anything from the IDG process or from the app company?

DENNIS ADDISON:  The app company, nothing.  At this point, I'm at the mercy right now thanking you for listening to what I'm going through.  Nothing.  I wish someone could say something to me to let me know what's the way out.  I have not gotten no response.

COUNCIL MEMBER KRISHNAN:  Thank you.

CHAIRPERSON BROOKS-POWERS:  And just for my own clarification, when you say your card is getting charged each month, are you talking about your union dues or are you talking, what are you referring to when you say that your card is being charged?

DENNIS ADDISON:  Yeah, it's a due that day.  Say that in order for them to help you, you have to give

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   126

them your credit card information for them to charge – for you to pay them every given month.  I assume that's what it is but they didn't make it clear. After six months and I said and I can't continue because every time I go to them, they're not telling me anything.  I go to the office when I call them or they put me on hold or whatever the case may be. They're not clear to me what's what and then when I get irate and go down to the office and not being rude to them.  Irate because I'm upset that you're taking my money but not helping me.  You say you're going to help me to reactivate my account, nothing.

COUNCIL MEMBER KRISHNAN:  And so, you're still not reactivated?

DENNIS ADDISON:  No, no.

COUNCIL MEMBER KRISHNAN:  Sorry, you had to say what you're experience was.

WALTER HURDLE:  Yes, I never went the IDG process because it was widely known that the IDG was funded by Uber.  So, a lot of people you know don't trust them because it's like you're knocking on deaf ears and as far as the deactivations is concerned, even right now, when I go on my Lyft app, I can't work because I'm locked out.  This is what happens every

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   127

single day to all of these drivers.  We're locked out all day long and they turn us on whenever they want to even though they call us partners.  Thank you.

COUNCIL MEMBER KRISHNAN:  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you to this panel.  We'll call the next panel up.  Yoden Thoden, Desmond West, Lateef Ajala, Josh Gold, Alpha Barry. Anthony Aybozo, Frank Haley, Shahal Udolin(SP?) and Carmen Cruz.  And again for those who are praying, we'll just come back to those names afterwards.

YODEN THODEN:  Thank you Chair and members of the Committee.  My name is Yoden Thoden and I'm here to talk about Intro. 100, so thank you for allowing me to jump the line a little bit.  I come from the Tibetan community in New York and we also have a lot of for-hire drivers in our ranks but I'm here to talk about Intro. 100.  And thank you to Council Member Julie Won for sponsoring this.

So, I am a lifelong New Yorker, Tibetan, born and raised in Manhattan District 3.  I raised my three kids here.  I also have this strange distinction of being the first Tibetan born in New York and I also serve on Manhattan Community Board 5.  So, I grew up in the city in the 70's and 80's at a time when the

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    128

entire Tibetan community in the tristate area could literally fit in my parents living room.  And it's been amazing to see in the last decades how our community has grown to now of tens and thousands.

So, I'm asking you to support this bill that would allow us to fully celebrate the most important holiday of the year for us Losar Tibetan New Year.  This holiday is shared by all those who follow the Tibetan Lunar Buddhist calendar and we're now number 60,000 in New York City.  We fill all professions and walks of life and we are also your for-hire drivers.  The next time you get into a cab or an Uber or a Lyft, it might be one of us.  Losar is our most high holy day and we request the recognition that we deserve in this great molting pot and mosaic in New York City.

CHAIRPERSON BROOKS-POWERS:  Thank you.  We just ask that you submit the rest of testimony.

YODEN THODEN:  Thank you very much for your time.

CHAIRPERSON BROOKS-POWERS:  Thank you.

DESMOND WEST:  Good afternoon.  My name is Desmond West, President of Royal Rose Transportation Commuter Van.  I've been in the business for over 30 years and we go through strict regulations as a bus

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   129

driver, medical everything.  Mr. Miller was here before me and I think that some of his argument was very bias and uhm, I think what we are doing now, we're almost doing street ends now.  So, it's only – we're only asking for it to be legalized so that we won't get any tickets for it because sometimes a person comes out.  The bus just went by, the bus just went by and they need to catch the bus.  We compliment the trains.  Most of the vans, the commuter vans compliment the trains because it's a two fare zone.  The people drive on the bus are free. The bus driver don't care if they are not – they pick up and they leave, so if the bus is gone, the only other alternative for riders to get to their job on time is to get on a commuter van and we are there for them.  So, the street will be approved by the Board. Thank you.

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE[02:46:10]- [02:46:17]

INTERPRETER:  Good afternoon.  My name is Carmen and I'm a member of the New York Taxi Workers Alliance.

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE [02:46:21]- [02:46:35].

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    130

INTERPRETER:  I've been working as an Uber driver for over 11 years and it's very important to me to have security in my work and not constantly live in fear that I could be fired at any time.

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE [02:46:47]- [02:46:55].

INTERPRETER:  The law 276 would give us this job security, give us protection.  It would also mandate that the companies give us 14 days' notice if they are to fire us.

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE [02:47:06] - [02:47:12].

INTERPRETER:  We need this equitable process where drivers can be heard.

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE [02:47:18] - [02:47:25].

INTERPRETER:  Additionally, 276 can help driver's against the economic losses that we're facing due to the lock outs.

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE [02:47:33] - [02:47:46].

INTERPRETER:  This law would mandate progressive discipline and would you know force them to have a

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    131

real investigation into what actually happens and it also would apply to lockouts.

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE [02:47:57] - [02:48:07].

INTERPRETER:  I also think it's important to say in the deal between Uber and Lyft and the Mayor, this deal allows Uber to cheat the pay rules.

CHAIRPERSON BROOKS-POWERS:  Thank you and I just ask that you submit the rest of the testimony in writing.

INTERPRETER:  Since she was translating, can she finish her testimony?  Have a little extra time.

CHAIRPERSON BROOKS-POWERS:  Sure if we could just put another like 40 seconds back up.  Just you're wrapping up now right?

INTERPRETER:  Yes.

CHAIRPERSON BROOKS-POWERS:  Okay.

CARMEN CRUZ: SPEAKING IN OTHER LANGUAGE [02:48:33] - [02:48:45].

INTERPRETER:  We need a solution that not only ends locks outs but that raises driver pay to make up for loss of trips.  Cheating the payrolls is why Uber started the lockouts in the first place.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   132

CARMEN CRUZ:  SPEAKING IN OTHER LANGUAGE [02:48:56].

INTERPRETER:  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Sir.

FRANK HALEY:  Hello City Council.  My name is Frank Haley, I've been a TLC licensed driver since 2016.  I work for Uber, Lyft, and I've worked for apps that dispatch MTA, Access A Ride trips.  I'm here to support Intro. 276 hopefully that gets passed.  Drivers need something to protect them.  Like in unfair deactivations.  We have absolutely nothing.  I mean, any app or any client can make a story up, lie, recently I had a Lyft passenger just lie because you know she was in a rush.  She wanted to get there quick, she wanted me to drive quicker.  I told her no.  To be vindictive she filed a complaint against me.

Lyft didn't even give me the date of the incident, so even if I have dash cam in my car, I can't even defend myself if they don't even provide that information.  They don't disclose the time and date of the incident they're referring to and they can just come against you with anything and it's very hard for a driver to defend themselves.  I was also

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    133

deactivated from the MTA because they claimed I didn't take a drug test and I was never notified from the app companies and it was completely unfair.  It was never disclosed that they would do random drug tests.  Drivers are also not compensated for those drug tests and when they deactivate you have no recourse.

I did try to file claims with IDG.  They, you know they have a website where you can submit claims.  They didn't even get back to me.  I opened a case, they gave me a case number, they assigned a steward but they never got back to me.  You know they claim an 80 percent success rate.  I doubt that's accurate.  I mean this is very important.  Drivers, they'll lose all their income right.  We deactivate them.  They have car bills to pay.  As soon as you deactivate them, your right to poverty.  I mean it's uhm, I'm asking the City Council to seriously consider pass this bill, drivers need these protections and it's long overdue, so I hope you pass it.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you to the panel.  Next we will call up Naveed Paracha, Shamsur Rahman, Modibo Doukaru(SP?), Arvan Barbar, Mohammad Ali Awan, and Richard Ehone(SP?).  And when

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   134

you come up, we just ask that you state your name before speaking so we have it for the record and adhere to the two minute rule.

Bashiru Kamara, Yi Feng Chen(SP?), Charles Dorvil, Max Cheung, Suresh Chand(SP?), Wain Chin, Kara Klita, Akinwunmi Anthony Komolafe.  You may begin taking the mic off mute and please state your name and adhere to the two minute rule.

NAVEED PARACHA:  Hi, my name is Naveed Paracha, driving for Uber since 1990.  Then I stopped and then I started again.  Since permanently I'm working with them since 2018.  Recently I was labeled with illegal driving and I did read to Uber while chatting and I end up artificial intelligence so then I talked to the verbally.  They said they were going to dig into the issue within 24 hours.  It never happened and I just want to know the reason because what was my mistake, what was the timing, what was the date but they obviously ignore it.

Finally, I rented an Uber office, green hub, make an appointment and they were surprised by themselves that the rider allegation was I did the short term. So, I think this should not be because of the deactivation.  And secondly, they labeled me with a

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    135

ride cancelation which is provoking a rider with intent to accept the ride but not to accept it.  But this thing is created by Uber by itself.  The reason is when we get to the ride, the place to pick up the ride in, the five minute time is started.  After the five minutes, Uber offer us either stay would make - and in the meanwhile when the rider showed up, we clicked to start the ride.  Then Uber send this message, the cancellation that you're doing purposely.  It's not the driver.

So, I mean, I never had this kind of situation listening from the people of the deactivation.  I couldn't sleep for two days and I never wanted to open the Uber app.  It was very frustrating for me and it shouldn't be the criteria.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  I just ask that you submit the rest in writing.

NAVEED PARACHA:  Yes, that I will do.

SURESH CHAND:  Hi, good afternoon.  My name is Suresh Chand and I'm 30 years driving Yellow Cab since 1994.  We have both in Bloomberg Administration that while medallion for $18,000 to $65,000.  Now we have a lot of burden.  We have not given fully given the loan from the bank and lender because Signature

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    136

Bank is out of business, bankrupt and the land, the new land that they don't give us, so I request the Councilman Shekar Krishnan knows this, all the story. Jack Schumer did this. MRP with the TLC but they must be forced to do this loan and we'll be, otherwise, we'll be out of business. We have this vehicle which cost $90,000. So, we don't want to sell. We don't sell any money from the city whatever but it costs too much increase now. We want the Flex Fare but what appears to us, if they want to charge some money, they charge the customer. We want our meter fare, what we used to have regularly. Thank you.

CHAIRPERSON BROOKS-POWERS: Thank you.

SHAMSUR RAHMAN: Hi, good afternoon. My name is Shamsur Rahman. I've been an Uber driver for more than ten years now and I never had an issue with Uber but recently this month on the 24th, I received a notice from Uber that my account is deactivated. They claimed that I did unsafe driving. So, in the last ten years, I never had any issue and right now they consider me as an unsafe driver and provided me with two dates, last month on the 2nd and this month on the 15th, they said I did unsafe driving but

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    137

they're not disclosing the exact date and time because I do have dashcam in my car.  So, if they don't give me the exact date and time, how can I defend myself?

So, I went to Uber office twice but they couldn't really help me out.  They sent me to IDG.  I went to them and they said to submit an application for appeal.  But uhm, they told me that I got to wait at least three months to up to a year to get a decision on my appeal.  And most of my riders are happy with me.  I get tips but sometimes I do get some riders that always complain, tell me to make U-turns because I'm legal, then they do make false report.  Some riders they ask me to cancel the trips so they could pay me cash which is illegal.  I don't do that.  They make a false report.

Sometimes I get so many riders.  I'm allowed to take on four riders, up to four riders but when I don't take more than four riders, they are going to pile up into my car, they make false report.  So, that's too many reports coming in from riders and Uber must give us reasonable time so we could submit the documents.

CHAIRPERSON BROOKS-POWERS:  Thank you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    138

WAIN CHIN:  Hello, my name is Wain Chin.  I am a New Yorker Uber driver and I support the big stupid company to pay the meter fare rate.  And also ask the city, uh for a bigger extension because my vehicle had to be wheelchair accessible and also, my loan, my current medallion loan is not restricted yet.  My bank, I pay my bank $2,000 a month only on the interest rate and the new accessible vehicles cost another $1,400 a month.  So, it would be better on me until you know my loan restriction with my current bank and we stay waiting for the city MIP for my bank to drain or a new bank to take over a loan.

So, until that time, you know I ask the city and TLC to extend our I mean retirement.  So, I ask the TLC and city to extend our retirement and pay our loan restriction.  So, otherwise I have to keep my medallion in storage and eventually do the bankruptcy.  So, I ask extension for my vehicle operation and take my loan restriction.  Thank you so much.

AKINWUNMI ANTHONY KOMOLAFE:  Good afternoon Madam Chairman.  My name is Akinwunmi.  I started working with Uber in November 2018, almost a year after Uber deactivated my account and I got in touch with the

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   139

support team to find out the reason why my account was deactivated and I was told a passenger reported out he or she felt unsafe in the car.  And I asked the guy, I said, I'm going to ask you three questions okay and I need you to answer me.  If you're in a car and you feel unsafe with the driver, would you wait to you get to your destination or would you tell the driver to stop you want to get out or you call the police, or the last option, you report to Lyft and Uber immediately.  But you waited till you got to your destination and then make a false allegation.  The gal was like well, I'm sorry, your account has been deactivated.  There's nothing I can do blah, blah, blah, so that was it.  This was in 2019.  Now, the thing here now is this Intro. 276 is the only option of the drivers in New York, to have peace of mind and rest of mind.  If not, we'll continue to go through this unlawful, illegal and unfair deactivation by Uber and Lyft.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you to the panel.  Next, we're going to call us Allison Langley, Mohamed Barry, Barry Mohamed, Tenzin Dorjee, Tsering Jupa, Pradhumma Rayamaijhi, and I apologize if I am not doing justice to your names, as someone

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    140

with a difficult first name myself.  So, please just say your name as you open up and forgive me.

ALLISON LANGLEY:  Thank you.  Good afternoon.  My name is Alli Langley.  I'm a Staff Attorney at the New York Taxi Workers Alliance.  You've heard today and will hear more from my colleagues and the members of the New York Taxi Workers Alliance about the importance of passing Intro. 276.  So, I would like to focus my testimony on two other bills before the Committee today.  Intro. 323 and Intro. 939.  Intro. 323 requires the TLC to implement lease caps for for-hire vehicles.  Lease caps should be an uncontroversial regulatory tool.  They've been an essential part of regulating the Yellow Cab sector and protecting driver pay for years.

Unfortunately, the TLC has failed to take any action and you heard that directly from them today.  Even though they themselves have identified that these leasing arrangements are predatory and have a significant negative impact on driver pay.  They alleged to be doing other things to support leasing – drivers who are leasing but nothing that they said held up today.  They said they released the license, the EV, FHV licenses in part to support those

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    141

drivers.  They did nothing in that process to make sure that it was targeted at drivers who were renting so just flooded the market and actually harmed all drivers and increased all drivers income, which we're seeing in the lockouts.

Intro. 323 fixes this by mandating the TLC to set lease caps and it should be passed immediately.  In addition, NYTWA opposes the passage of Intro. 939 which would give street hail rates to commuter vans. This would harm other for-hire vehicles in this sector including yellow and green cab drivers.  The Yellow Cab trips simply have not recovered after the pandemic and taking more street hails away from them would really only serve to push drivers further into poverty.  In addition, you heard from drivers about how their operational costs will be almost doubling because of a recent court order requiring that all new Yellow Cabs be wheelchair accessible vehicles. This is going to have a significant negative impact on drivers –

CHAIRPERSON BROOKS-POWERS:  Thank you.  I just ask that you submit the rest in writing but I appreciate your testimony.

ALLISON LANGLEY:  Thank you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   142

TENZIN DORJEE:  Thank you so much.  Good morning. My name is Tenzin Dorjee.  I work as a lecturer in political science at Columbia University.  I'm here to support the bill to add Losar, the Tibetan New Year to the alternate site parking suspension calendar.  Losar is celebrated by up to 100,000 people in the city if we include not just Tibetan's Mongolians, Nepalese, [INAUDIBLE 03:05:16], Sherpas etc.., but also thousands of others across the city who follow Tibetan Buddhism or the teachings of his holiness all against the Dalai Lama.

Now if you've ever been to a Losar celebration, you know it's like New Year's Eve, the Superbowl, Thanksgiving, all enrolled into one.  It's a time for families to come together, honor our traditions, and start the year with hope and blessings but right now, when the clock hits 11:30 on Losar, instead of focusing on prayers and celebrations, we have to worry about where to move our cars.  There's nothing like a parking ticket to ruin your New Year celebrations.

Many members of our community are essential workers. They are nurses, taxi drivers, social workers, small business owners who have kept this

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   143

city going through the toughest times.  They have risked their lives for all New Yorkers.  They have fought the pandemic on so many levels.  The least we can do is give them the peace of mind to celebrate Losar without interrupting their prayers, without having to rush out of a family gathering just to move the car to the other side of the street.  Without having to spend a half an hour looking for a parking spot.

The bill, this bill is a small gesture respect and inclusion recognizing the rich, cultural tapestry that makes New York City the greatest city in the world.  By declaring Losar a street cleaning holiday, we are acknowledging the contributions off a diverse community that has given so much to this city and we're saying your celebrations matter too.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.

PRADHUMNA RAYAMAJHI:  Hi, good afternoon.  My name is Pradhumna, I live in Queens.  I'm driving in New York City since 2015.  First I started I drive in Yellow Cab, after that I switched to Uber and Uber and Lyft.  And when I started in 2017 Uber, after a few months in the work, you know they deactivated my

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   144

account because you know I had a confrontation with a customer.  He came with a dog and he claimed his dog is a service dog but I refused because his dog was big and heavy.  And that was not a service dog, there is no tag.  A service dog has a tag and there's differently build right and then after Uber the next day, they deactivated my account.  And I have a question, do all dogs, animals, are service animal we must take or just service animal?  That's why they deactivated my account.  Since 2017 to now, still my account is deactivated.  That's my problem, thank you.

TENZIN DORJEE:  Good afternoon Chair.  My name is Tenzin Dorjee and I'm a father of two daughters and I'm a full-time stay at home dad and a part time Uber and Lyft driver.  And since they started doing the lockout, it's been impossible for me to help my family and that is one of the reasons I am here and to also support the Intro. 276, which is going to help us drivers in the future.  And also, support Tibetan, support the Intro. 100 for the Losar alternate.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you to this panel.  Next panel we will call Josh Gold, we will

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    145

call Sameena Syed(SP?), Hylande Pierre-Louis(SP?), Pasang Sherpa, Tenzin Phentok Lama, and Yanming Gong.

Ali Akbar, Ganesh Harry, Choudary Adnan.  I'm sorry sir, you can't record from there.  Tenzin Dorjee, Chhewang Lama.  If we could get started Josh, just take it off of mute and say your name before you start.  Two minutes please.

JOSH GOLD:  My name is Josh Gold from Uber.  I will focus on Intro. 276.  First, let me clear, we do not deactivate a user because we want to, we do it because we need to and it's always a last resort.  We do it to help ensure everyone who uses Uber can have a safe and reliable experience.  This means that any user, not only drivers but also consumers and business partners can lose access if they violate our terms or community guidelines.  Except for extreme situations like sexual assault, we typically provide education and notifications when incidents are detected and before we have to deactivate.  We also let drivers know when their account is at risk of deactivation so they can take actions to improve and avoid it.  At the same time, we know that some riders make false allegations and we put in place systems to identify fraudulent behavior and make sure false

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   146

allegations are not considered when we deactivate a driver.  Drivers can always dispute a deactivation and provide additional information and context through an in app deactivation review center.  When drivers lose access to their accounts, it's usually temporary due to expired documents, the TLC active list or other TLC regulations like maximum hours.  Once the required document is approved or TLC compliance –

CHAIRPERSON BROOKS-POWERS:  Please talk closer to the mic.

JOSH GOLD:  Once the required document is approved or TLC compliance issues are resolved, account access is typically restored immediately.  So far this year around one percent of drivers have faced a permanent deactivation.  These deactivations were largely due to fraudulent activity and safety incidents.  Drivers who are deactivated can utilize our in app review center where they can dispute the decision and submit any additional information and have a human review it.  95 percent of these cases are resolved within 72 hours of submission.

In New York City, drivers are also able to appeal through a process set up with the IDG and overseen by

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   147

AAA.  While we believe existing processes are fair and thorough, we welcome a continued dialogue on legislation.  I will submit detailed written testimony but wanted to share high level concerns with the bill as drafted.  I was pleased to see that the DCWP testified that the legislation should apply to all FHB bases and medallion fleet owners.  All TLC licensed drivers, not just high volume for our service licensed drivers should have the same standards and protections.  The bill should focus on drivers who face permanent deactivation and would have otherwise been able to drive if not for the deactivation.

CHAIRPERSON BROOKS-POWERS:  I'm sorry Josh, sorry, I just ask that you submit the rest in writing but I do have questions for you so that will give you another opportunity.  The next person can please come off mute.

PASANG N. SHERPA:  Good afternoon Council Members.  My name is Pasang N. Sherpa.  I have been driving Yellow Cab since 2005.  I medallion owner/ driver.  So, my loan is $430,000 and every week I am paying $500.  My loan is owned by the OSK Bank.  This bank is not participating with the city plan.  So, I

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   148

request you Council Member and TLC, to request that OSK Bank to participate with the city plan so we get relief from this struggling and restart the remaining loan for the medallions.  So, it remains medallions not restricted of their loans.

Owners of 2000 medallion owners, they have restricted their loans, their engines, their lives, to be left behind.  So, we request the result of these problems.  Thank you.  On behalf of this Committee, I'm talking so we are celebrating every year loss of these lenders and the loss of these.  So, we request you to pass the bills to suspend outdated site, parking sites so we can celebrate our losses smoothly.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Can you just repeat your name please for the record.

PASANG N. SHERPA:  Pasang N. Serpa.  I'm a United Serpa member.

CHAIRPERSON BROOKS-POWERS:  Thank you.

PASANG N. SHERPA:  Sherpa Committee.

CHAIRPERSON BROOKS-POWERS:  Thank you.

PASANG N. SHERPA:  Thank you.

HYLANDE PIERRE-LOUIS:  Good morning, I mean good afternoon.  My name is Hylande Pierre-Louis.  I'm an

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    149 MTA bus operator, TWU Local 100.  I've been driving for 21 years in Jamaica Queens and I'm here to talk about the dollar van drivers.

Okay, the vans are not held to the same safety standard of us MTA operators.  They practice, they drive practice on faith making them a hazard to bus operators and the pedestrians.  The dollar vans often pull over, suddenly stop, pick up passengers and create a danger and a safety to us operators that's coming into a bus stop.  When they pulled in in front of us and just stop and pick up.  The presents of them in Jamica Center contribute to the congestion, the frequent stop blocking traffic, the bus lane while we're picking up wheelchair or dropping off wheelchair or dropping people off with walkers and canes.  It's a problem for us when they are standing in our bus stops.  The bus lane also and that may come – like messed up with our schedules.  So, uhm, the vans are now where – there not uhm what do you call it?  They're not worrying about the traffic. They take red lights.  They do everything they have to do.  They drive there unsafe.  They pick up in any unsafe location.  We're forced to brake fast. Sometimes people in our buses, sometimes they fall

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   150

down and we are the one that's facing the consequences and when we're out there in the nighttime, we do pick up outwards of like five to ten minutes ahead.  So, we do pick up – sorry.

CHAIRPERSON BROOKS-POWERS:  Thank you.  No, thank you.  I just ask that you submit the rest in writing.

GANESH HARRY:  My name is Ganesh Harry and uhm good afternoon.  Earlier panel says that the bus takes an hour and half from Rockaway to Jamaica Center.  I've been driving for 18 years.  The same route, the same line.  I does that in 55 minutes.  That's the local one.  If we do the limited, it's 45 minutes, so I don't know where he gets his facts from but they are so dangerous out there these dollar vans.  To be honest with you, I wish your kids never travel on them vans but they are really, really ridiculous out there and I don't know if they're licensed or they're not licensed but there's a whole slew.  Someone mentioned 35 buses or 35 licensed.  There's more than even that on wheel line alone, so I don't know where – there's something missing somewhere and they are not trained properly, maybe they should get some kind of training.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    151

CHAIRPERSON BROOKS-POWERS:  That's it?  You got 55 seconds left.  Okay, uhm, if you could come off of mute and please state your name before starting.

TENZIN PHENTOK:  Good morning.  Sorry, actually good afternoon members of the Transportation Committee.  I'd like to start by first thanking Chairwoman Brooks-Powers for cosponsoring Intro. 100.  Thank you for being an advocate for my community.

My name is Tenzin Phentok.  I'm a Tibetan New Yorker originally from Nepal and I'm here today to testify in support of Intro. 100 from Council Member Julie Won to make Losar or Tibetan New Year a holiday for Alternate Side Parking, also known as ASP.

Like many in the city, my family and I immigrated here when I was nine and my sister seven and we were raised in Astoria in LIC.  From spring of 2003, my younger sister and I attended PS 166 in Astoria for elementary school.  I then went to IS 227 in Corona for middle school.  Being New York City public school kids, we were exposed to many different holidays through both school breaks and suspension of ASP once my dad was able to buy a car.  Even though our families didn't celebrate Hanukkah, Easter, Thanksgiving or Christmas, we understood even at that

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    152

age that those days were important to others around me.  People we cared about.

I'm now an adult living in Woodside with my Uncle and their three kids.  Simsung who is 10, Sala who is 7, and Mela 5, all born in Queens.  They attended Charter school in the neighborhood and spend their weekends playing in the park and reading books at the library.  Imagining their friends at their school and in their local park knowing when and what Losar is and its significance in our culture is a beautiful image.  They're feeling seen, heard and understood by their community, by their city as something they deserve.

The city is home to roughly 20,000 Tibetans out of the larger 61,000 Himalayans.  So, lots more families and kids like my little cousins who live in all five boroughs, not just Queens and who celebrate Losar each year.  By suspending ASP on Losar, New York City would be sending a powerful message of welcoming and inclusion to all Himalayan New Yorkers that our city recognizes us.

CHAIRPERSON BROOKS-POWERS:  Thank you.

TENZIN PHENTOK:  Thank you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   153

CHHEWANG LAMA:  Good afternoon everyone.  This is Chhewang Lama.  I am from Nepal.  I represent the Himalayan communities and I am the [INAUDIBLE 03:20:35] 8037 and Community Board 2 member.  I am so glad to read my masses like for all celebrate the Losar.

All Himalayan communities in the diaspora like you know, they stay around the block in the Queens.  We have a thousands of Himalayan communities that read the Losar.  We expect in this year to celebrate the Losar.  We can sleep like we can't even do it properly on the street.  So, that's why I thank you for bringing this bill to uh Council Member Julie Won and the other Councilman who supported this bill that I would like to thank you all.

Then next topic is as a driver, I'm driving in the city since 14 years, I would like to recognize you guys, drivers around the city.  Driver bring the city, that's why I hope that Council Member has to listen this time.  Please, do not listen to the Uber and Lyft, listen to the driver once.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  So, I do have some questions for this panel.  I'm going to start with Josh.  I'm just wanting to get some

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    154

clarity.  So, in terms of Uber, does Uber monitor or review at all the complaints that come into IDG and like what is that like I guess mechanism?

JOSH GOLD:  So, we have a process that we stood up with IDG.

CHAIRPERSON BROOKS-POWERS:  I'm sorry, can you pull that back?  I'm not sure, you sound so low to me.  Okay.

JOSH GOLD:  Sorry, is this better?

CHAIRPERSON BROOKS-POWERS:  That's better.

JOSH GOLD:  Okay, we have a process we stood up with IDG I believe in 2016 where there are drivers who were deactivated who come to them and they bring those cases to us.  We review those.  They make cases for those drivers.  The next step in that process is a AAA overseen hearing where a panel of driver's reviews our – the information that we provide as well as the information the driver provides through the IDG and that panel of drivers decides whether the driver who comes to the panel is reactivated or not.

CHAIRPERSON BROOKS-POWERS:  So, the AAA panel that includes drivers is who makes the decisions?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   155

JOSH GOLD:  The AAA panel makes the decision. The AAA oversees the panel.  The panel is just with drivers.

CHAIRPERSON BROOKS-POWERS:  Only the drivers?

JOSH GOLD:  Yes.

CHAIRPERSON BROOKS-POWERS:  Okay.  Who selects those drivers?

JOSH GOLD:  The IDG selects those drivers.

CHAIRPERSON BROOKS-POWERS:  So, those are like the delegates-

JOSH GOLD:  Well, to be fair, I think they recommend drivers to us and we have an opportunity to disagree with the drivers that they recommend.

CHAIRPERSON BROOKS-POWERS:  What would be a case that you would disagree with?

JOSH GOLD:  I'm not sure we have.

CHAIRPERSON BROOKS-POWERS:  Okay, so generally, you've taken whoever they've given to be on this panel, which have been of drivers?

JOSH GOLD:  Correct.

CHAIRPERSON BROOKS-POWERS:  Okay, uhm, could you describe what it's like in terms of the process when a driver is deactivated from your app?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    156

JOSH GOLD:  Sure, so there are multiple different types of deactivations.  The one that impacts 99 percent of deactivations is a compliance deactivation.  The TLC keeps a what's called a 24 hour list, an active list.  Those are driver's that are allowed to accept dispatches from bases or for-hire services or use a medallion owned taxicab in New York.  And so, we do a sweep of that list every day.  If you are not on that list, you are not allowed to receive a dispatch.  You could fail to be on that list because you failed the city required drug test, you don't have the proper insurance documents.  There are multiple reasons why the TLC may put you on that list.  That is the number one reason that drivers are deactivated because they have either failed to be on the TLC's active list, their license or insurance requirements are no longer valid, or they've hit the – TLC has a maximum hours you are allowed to drive threshold, so if you've hit the maximum hour threshold, then you are deactivated.  Those are in a bucket that I call temporary deactivations because if you are able to upload the proper insurance documents, if you are back on the TLC active list, if you no longer are stuck by the maximum hours

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    157 requirement, then you're automatically reactivated once you submit that proper documentation.  Then there are the more serious deactivations and the much more rare deactivations.  So far this year, one percent of drivers have been permanently deactivated. There are some situations, I think service animals came up earlier in the conversation, which I think is a good one.  There are TLC rules and regulations about when you can or cannot deny a service animal. There's also a federal decree that Uber is under from a federal judge about when we can – what we have to do with drivers who knowingly say no to an animal that's claimed to be a service animal.  Use the word knowingly and claimed very specifically there and in those situations, there is not much that we can do. There are other situations that are grey where there is a deactivation review center that we have internally and then there is the IDG process.

CHAIRPERSON BROOKS-POWERS:  No, and I appreciate that and as you know the Intro. Number 276 is sponsored by Council Member Krishnan and I know he'll have questions to go into that but I know where my concern mostly lies or has lied is with the uhm, the lockouts and the reasons behind the lockouts,

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    158 especially in light of the fair wage that the TLC has tried to put in place and then now seeing and hearing from drivers about these lockouts and how it's impacting them.  So, can we talk a little bit about the lockouts?  What causes, because I know deactivation lockout has two different reasons but just wanting to understand more the scope of the lockout dynamic with Uber.

JOSH GOLD:  Yeah and I appreciate it because I share those concerns.  Since 2018, we have repeatedly warned that the intended consequence of utilization rule was to control access for drivers of the platform.  The study that the rule was based on is specific that drivers made the subject to limited access to the platform.  We have seen five different TLC commissioners since 2018.  The TLC has repeatedly tried to tweak the rule to try to limit the lockouts. If you don't know, the rule has been paused more than it's been effect.  For three and a half years, the rule was not enforced.  The TLC stopped enforcing the rules and in January of 2020, not post-pandemic but before the pandemic in January of 2020 and didn't start enforcing it again until last year.  The rule is fundamentally flawed.  There needs to be a minimum

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    159

payroll.  There are dozens of jurisdictions that have implemented minimum pay rules that don't lean heavily on utilization.  That doesn't mean utilization shouldn't be measured.  That doesn't mean there can't be another rule that works with utilization but the rule, what a former TLC Commissioner told me is that lockouts are a feature, not a bug of the rule.  And lockouts are horrible.  Lockouts are horrible.  The rule is a bad rule.  The TLC needs to revisit it and the TLC doesn't revisit it.  They implemented it because the Council gave them the authority to do so in 2018.  The Council gave them authority to do so after a report that was published by James Parrott and Michael Reich and the rule that was proposed in that rule looks very, very different than the rule that exists today.  For example, that rule is based on company specific utilization.  The rule that's active today is industry-wide utilization.

So, when one companies utilization rate drops below 45 percent and the other companies utilization rate is above 53 or 54 percent, the company with the higher rate still has to lock drivers out in order to make sure that the industry-wide utilization is above 53 percent.  That was not the rule envisioned in 2018

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   160

when the Council passed the law allowing the TLC to create the utilization role.  It's a totally different rule.  The TLC has stepped way out of where the rule was in 2018 when this Council granted them the right to create that rule.

CHAIRPERSON BROOKS-POWERS:  Offline, I'd like to understand a little bit more granularly on that piece.  And when I hear that many drivers are finding success getting reactivated, I have to wonder why they were deactivated in the first place.  Going back to deactivation, sorry, I'm going back and forth with you.  Is there a problem with like do you think that sometimes maybe Uber may be too quick to deactivate drivers?  And should there be like a grace period in a sense for like the easily fixable problems that drivers can address before getting deactivated?

So, for example, like you said, it may be a matter of the insurance or the drug test.  Like something that they can upload to your point to remedy.  Is there an opportunity to establish like a grace period for those more easily fixable offenses versus – because there are some drivers as you heard earlier that spoken to they've been like deactivated

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    161

for a long period of time to be able to address those challenges?

JOSH GOLD:  I do think that's a good idea and there are some steps where our processes weren't great early on.  One is there are drivers who you know after multiple accusations of drug use were deactivated but we instituted and this was due to the IDG process actually.  This was brought to our attention there.  We instituted a program where a driver can go take a drug test at Uber's expense and be reactivated to counter you know multiple accusations.

CHAIRPERSON BROOKS-POWERS:  I believe they're able to do it at the IDG office right?

JOSH GOLD:  I think it's Lab Corp but it's one of the national –

CHAIRPERSON BROOKS-POWERS: Well, I know they have some services because I visited their office before.

JOSH GOLD:  But that was a positive step, so that if you're falsely accused and then we can go back to those riders who made those false accusations and deactivate them from the platform.  And so, you know I do think that for some you know deactivations that are more egregious in nature, uhm there may not be an

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    162

opportunity for a grace period but I do think for others there should be.

CHAIRPERSON BROOKS-POWERS:  It would be great like to work collaboratively with the industry to see how we can address the easily fixable ones especially because what we don't want is drivers not being able to provide for their families, especially to your point, as you're saying right now, there are some that are now easily visible so wanted to understand, which ones would be in that category and how quickly can this you know be remedied?  Is it a matter of a 12 hour turnaround or a 24 hour turnaround versus 6 months and more?  Which I think creates a challenge for folks because a lot of these drivers have to pay for their cars, their insurance, and then the bills don't stop just because they're on pause with Uber.

So, that is important as well but I do appreciate the openness about that, and in terms of the TWU Members, thank you for coming out.  I'm glad you come from Southeast Queens, so now we can have a conversation apples to apples.  So, from your advantage point, I know we had a whole conversation, like I said earlier in terms of the Queens bus redesign in particular, which I have been advocating

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    163

for increased bus service.  I have more buses because I know there's some routes that have a lot of crowding for example.  There are other areas that need access to bus stops and then we want to kind of breakdown having to transfer so many times on the buses.  But do you agree that there are still some parts of the community that through the bus redesign will still likely not be covered by a bus route in itself?  Just turn on the mic, I'm sorry.

HYLANDE PIERRE-LOUIS:  So, the area where I'm at, I'm at [INAUDIBLE 03:33:51] Boulevard, so we work with the 113, 114, 111.

CHAIRPERSON BROOKS-POWERS:  Oh you're on my route, okay.

HYLANDE PIERRE-LOUIS:  Okay, so yes, a lot of the people, a lot of you know a lot of these buses will help the community.  So, we do one like I said, we're one with the 114, 111, the one with 114 and the 113 so most the people would run to go and get – to the 113 and 114 because it's limited.  So, I know that with the redesign, it would help out because there will be more buses going to Rosedale.  Because Rosedale, a lot of people are coming out of Rosedale

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   164

and that's where the dollar vans come out also.  So, there will be more buses going to Rosedale.

CHAIRPERSON BROOKS-POWERS:  What about in Far Rockaway?

HYLANDE PIERRE-LOUIS:  In Far Rockaway also because I know that with the redesign, they're going to take out some and put more buses, so with that, it's going to be more accessible to buses than you know because they do have the A-train and we do come out of Far Rockaway like 45 minutes in the morning.  Because we are limited coming out of Far Rockaway and going into Far Rockaway.

CHAIRPERSON BROOKS-POWERS:  Can you talk to me about a little bit more about the limitations coming out of Rockaway?  Why you feel that uhm, to your point, that it takes so long to come out of Rockaway?  Is it because it's a matter of there's just that many people getting on the bus?  Is it the congestion because of our roads in Rockaway?

HYLANDE PIERRE-LOUIS:  Exactly.

CHAIRPERSON BROOKS-POWERS:  Is another conversation for DOT but uhm –

HYLANDE PIERRE-LOUIS:  True it is.  Yes, it's the congestion.  We got a lot; we got a lot of

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    165

constructions going on and we do drive – like we all take buses so it takes us a minute to turn in and out of these roads.  Especially when they're have been like road blocks and people parking in our bus stop, people parking in our bus lane.  So, it took us more time you know to come in and come out of our bus stop and to service everything, all of the people that we need to service but we do come and we want like 5 to 10 minutes.  You know we have 5 to 10 minutes headway.  By the time we leave, there's another bus behind us.

CHAIRPERSON BROOKS-POWERS:  And I agree in terms of folks in the bus lanes, which is a pet peeve but it's my hope that the new automated cameras will take care of that behavior in terms of the parking in the bus stops.  Do you think that – so earlier first of all, I know that it was said by Mr. Morrison when he was testifying that there is a difference in terms of the commuter vans, right?  There are some that are – there's only about like 39, 40 that are actually like with their credentials and everything like that but then there's another asset that they are not licensed and registered with the TLC.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    166

And so, I understand anything in bus route is a problem. I actually agree with that because we don't – we're trying to find ways for you to speed up service, however, there are areas that the buses do not touch and the trains do not touch as well. So, not thinking about the unregistered vans, because I think that's going to come with enforcement and I'm looking forward to working with TLC as an onboard more TLC offices and working with NYPD in terms of enforcement in that space. Because as I said, I have issues in Rosedale with some of the ones that are not licensed and registered. But for those that are licensed, registered and following the rules, do you feel that there is a potential for them to be uhm helpful in terms of and not only looking through the lens as a driver but as a member of the community? Do you feel that there is a need in those areas where there's no buses and no trains that access those areas?

HYLANDE PIERRE-LOUIS: I would say yes, because I do have some of my coworkers that walks around Jamaica, Belmont going to Belmont and we do have a lot of people that take the buses that goes down to Belmont, which is the Q110 and we do have a lot of

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   167

people that do take those dollar vans because there's places that they want to stop.  There's no bus stop there, so instead of getting on the bus, they would jump on the dollar van but if they are licensed and they are following the rules that we followed, you know they could do their job and we do ours, but it's the fact that they are taking into our job and making our work hard and making it unsafe for us and for the pedestrians that's on the road.

CHAIRPERSON BROOKS-POWERS:  No, I totally agree with that and I look forward to having additional conversations with TWU, ATU, the commuter industry, NYTWA, and the Administration to continue to have these conversations.  Obviously these bills, when we hear them are just an opportunity for us to talk about it, to hear all sides of a conversation but then there's another phase of this process where there's negotiations and there's give and take.  So, I'm looking forward to working with all stakeholders in this because you know there is a need for it in communities like the ones that I represent and you know, you agree with also but then at the same time, we want to ensure all drivers in all industries are

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   168

safe as well as the ones, the public that's utilizing these services.

So, I thank you and I'm going to pass it to Council Member Krishnan.

COUNCIL MEMBER KRISHNAN:  Thank you so much Majority Brooks-Powers.  I just have some questions Josh for you as well from Uber.  You know and I think just taking a step back for a second.  I want to be very clear about you know there's a lot of dialogue and you know testimony and opposing viewpoints but I think we all can agree that we all want to have a process that is fair, that allows for drivers to have a voice in that process to be able to make their case and one that gives them notice and an opportunity to be heard.  I know that's the place that we all want to come from and we all, I think, agree on these fundamental principles.  So, I just have a few questions about the current process and also the bill that we're hearing today.

So, firstly, you would agree right that it's important for drivers to have notice before they're deactivated on the fact of impending deactivation?

JOSH GOLD:  I think for 99 percent of deactivations, I think there needs to notice but

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    169

there are some egregious and it's egregious because it's in the bill.  There's some egregious situations that could put a future rider in jeopardy.  Where there might not be an opportunity for notice but that aside, notifications, warnings, opportunities for education, yes agree.

COUNCIL MEMBER KRISHNAN:  Sure and I'm putting aside those egregious cases you mentioned that are in the bill and focusing on the 99 percent of them.

So, if we can agree that you know for those 99 percent of cases, notice in advance is crucial, uhm, what, can you point to anything in the IDG process, Uber process right now that provides, that requires notice to drivers before they're deactivated.  Is there anything currently that requires such notice?

JOSH GOLD:  The IDG process is after the deactivation takes place but we do have repeated notifications and so the IDG process is separate. It's after deactivation takes place.  We have repeated notifications and so the IDG process is separate.  It's after deactivation takes place.  We have repeated notifications and warnings prior to a deactivation.  In some instances, I imagine we can improve those and would want to work with your office

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    170

and others to improve on those but we do and we have improved them over the years to add more education opportunities, more warnings and more notifications of accounts that are in jeopardy of deactivation.

COUNCIL MEMBER KRISHNAN:  Got it.  So, I think if you know and I would talk about this before as well but if the process in place starts after the fact, I think what we're trying to adjust to legislation is to create process before the fact.  Uhm and the importance of notice being part of that process and I know you all maybe providing notice in your own way too but having a statutory process that starts before and has notice as part of it, I think is really an important piece of this legislation and just a part of due process generally.  Uhm, so I appreciate hearing your feedback on that.  My next question is about, wouldn't you agree that if Uber or Lyft?  But if a for-hire vehicle company makes a decision to deactivate a driver, why would the burden – could you explain a bit about why the burden would then fall on the driver to reverse that decision?  In other words if a company like Uber has made a decision, wouldn't it make sense to have Uber explain its rational and

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    171

justify its decision rather than having a driver have to reverse that after the fact?

JOSH GOLD:  So, just to comment on the first piece because I was unable to get to it in my testimony.  The one of the key changes that I did want to you know discuss or suggest or work with you on is, while we agree with notice requirements and creating a process ahead of time, we would love to discuss you know defining egregious and what types of advance notice or when are advance notices not necessary or when do advance notices possibly create, jeopardize rider or drivers EMT, both on the rider and the driver side.  So, I just want to be clear that we agree with the intent that notices and warnings and opportunities for improvement and education are needed but want to make sure that I'm specific that there are some cases where that just may not be warranted or may not be in the best interest of rider and driver safety.

And then on the other question around I guess the burden of proof, there is a separate TLC oath process for your license.  We are not taking away anybody's license to drive and that is a very thorough process.  We're choosing who we believe with good reason who to

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    172
engage in business with and we are trying to create
as many opportunities for drivers to point out or
defend allegations that were made either by riders or
others.  We have added video and audio recording.  We
have added a deactivation review center so that
information can be provided.  But there are some
instances again, those permanent deactivations, it's
less than one percent of the driver population.  It's
in the hundreds, not in the thousands and you know
when we make a mistake, uh it's not a statistic.
It's going to be that persons livelihood and it's
really important that we do whatever we can not to
make those mistakes but we're getting a bunch of
information.  We're having investigations.  These are
human led processes and then we are now providing
opportunities for drivers to present as much
information as they can to review any of those
allegations.  But what I talked about with Chair
Powers, Brooks-Powers is the opportunity for a driver
to take a drug test when there's allegations of drug
tests that we're happy to pay for but that is an
example of one where you know there are multiple
allegations.  There is you know driver's came to me
and we discussed this when marijuana became legal

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   173

over the past few years in New York and so, if someone came into the car, a rider came into the car, they may have smoked beforehand.  They left the car; the next passenger comes in and smells that from the previous passenger and then reports that.  That is not a good deactivation, and so, we wanted to create an opportunity for a driver to have a test at that and there's 3 or 4 or 5 but the burden is still on the driver to go have the task, we're paying for that but that's an instance where you know there were things that were happening that weren't with a just cause or just wanted there and that's an avenue we took to try to fix that.

COUNCIL MEMBER KRISHNAN:  I guess my question more is uhm obviously you've heard testimony today and that's where I, you know I know the statistics that Uber cites but obviously there are so many drivers here testifying to how they've been deactivated can get back on the app and you've heard it.  So, there seems to be a disconnect there.  Uhm, but you know if we have – my question is essentially, if we have one process, you would agree obviously that uh you know everyone is in our legal system

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    174

innocent until proven guilty right?  And right, do you agree with that?

JOSH GOLD:  Yeah.

COUNCIL MEMBER KRISHNAN:  Right and so –

JOSH GOLD:  And I don't want to say anything that would you know another side of the hall-

COUNCIL MEMBER KRISHNAN:  Right, we're not touching that one but I think besides that, and its coming up in that context too but innocent until proven guilty right?  You're familiar with that and you go through a whole process legally where if you're charged with something right, the process is to prove with the right burden of proof and evidence, make out why an individual is guilty of those charges.  We don't say to the individual, you're presumed guilty, show us as the court why you were actually innocent.  What happens right is the basic principle of proceed with due process is the prosecutor's office, the agency, government, whatever it is, has to make out the case to say you're innocent until we can show beyond a reasonable doubt or whatever it may be that you're guilty right?  Can you see how in this – why wouldn't that same framework be applied here for a process that of

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    175

course impacts a driver's livelihood?  Can deprive them of income and support for their family.  Why wouldn't we have the same standard here where we have a process and we require the decision maker, Uber in this case for right now, why would we not require them to make out their case as opposed to saying to the driver prove to us why you should not be deactivated?

JOSH GOLD:  Well, I do think there's a couple differences.  One is it's not a criminal case.  There's – uh we're contracting with an individual and we're making a business to contract with that individual.

COUNCIL MEMBER KRISHNAN:  But the stakes are high, sorry to interrupt but the stakes are high though right?  So, like in this case where the stakes are high for the induvial that's effected by the outcome, why wouldn't the process be, we give you notice, we have to make out our case before the ultimate decision that a very high stake is affected.  Because another context where the stakes are so high, that's what we do.  Why wouldn't the same principle apply here?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   176

JOSH GOLD:  So, I think what we're trying to get to is a place where there's a similar principle that applies but uhm you know we have sexual assault cases for example, where we have spent a lot of time working with advocates.

COUNCIL MEMBER KRISHNAN:  Let's put aside those because those are the egregious cases that are – those are exception to the bill right?  I'm talking about the other 99 percent we were saying where those are not the egregious cases that raise serious issues, sexual assault, whatever or any other of those issues or the egregious circumstances.  I'm talking about the majority of deactivations that are non-egregious.

JOSH GOLD:  Well, the vast majority of deactivations are TLC rule driven.  That's 99 percent of deactivations.  When you're in the bucket of the one percent that aren't TLC driven situations, you're talking about the vast majority being egregious or accusations of egregious.  Not the vast majority but the majority.  And so, now you're narrowing it down to uh you know a much smaller group.  So, if you are moving serious safety incidences into personal conflicts, if you're removing you know we just had a

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    177

major fraud operation here in New York City where the Southern District of New York uncovered a group of about 800 drivers who were committing fraud, not only against Uber but against the other 80,000 drivers by cutting them in line at the airports, by taking away surge trips that were due to those drivers.  By driving down the utilization rate so that companies like Uber and Lyft had to institute the lockouts.  And so, those are the types of serious allegations that are in the deactivation piece.  That broad case could take years to play out and so, you know in a court of law.  And so, there are some instances where we want to provide drivers with as much opportunity as possible to refute any allegations and they should be given as much opportunity as possible to refute allegations and as much warning as possible to not have to be deactivated in the first place.

But there are cases where we don't believe we should wait for a court case to play out and have that criminal burden of proof.

COUNCIL MEMBER KRISHNAN:  And I think if you can just send the data.  I know you know I think what we're talking about you mentioned these cases outside of the egregious instances let's say are the

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    178

exceptions in the bill too, that the vast majority are TLC driven document cases. What's not clicking with me is because I've heard a lot of testimony today, we all did, from drivers who didn't have just document issues. That they had – some of them didn't even know the reasons why they were deactivated and they continue to be deactivated. So, the testimony we are hearing doesn't match with data, so would you all be able to provide data showing that the vast majority of these cases are actually routine document TLC initiated issues?

JOSH GOLD: Yeah, I'm happy to provide that data and also if there are other, if there are folks who testified who want to go through your office, right rather than direct to me or to the IDG or to anybody else, I'm happy to work with you, your office, somebody in your office on those individual cases to walk through someone that's deactivated. I will say I did hear some testimony from individuals in 2018, 2019 and I do think the processes were not great and we've worked hard to improve those processes including the drug test issue that I brought up, including a lot of education around service animal denial. So, if there are old cases if someone feels

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   179

comfortable talking to me, they may not.  They may feel more comfortable going to your office or the Chairs office.  I would love to you know look into those cases and figure out what was the reason behind it and if that cases deserves to have another hearing.

COUNCIL MEMBER KRISHNAN:  And my final question is just given the process the way that it's set up, a driver is deactivated from Uber but ultimately it has to go through an Uber informed process with IDG.  It sounds like from the questions that Majority Whip Brooks-Powers had asked to that the AAA panel that comes later, Uber has the final say on the drivers on that panel.  They can object to them, veto them or they can be okay with them.  What safeguards does Uber have in place where Uber is essentially acting as the decision maker upfront, the judge and jury?  What safeguards does Uber have in such as process to make sure that it's a neutral process as compared to a third party agency for example?

JOSH GOLD:  Sorry, the process?

COUNCIL MEMBER KRISHNAN:  The process is, Uber makes the initial decision of the deactivation right?

JOSH GOLD:  Yeah.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   180

COUNCIL MEMBER KRISHNAN:  And it's an Uber informed process with IDG after the fact to contest that deactivation.

JOSH GOLD:  Yeah.

COUNCIL MEMBER KRISHNAN:  Including going over to the driver panel, the AAA panel in the end where Uber also gets to have the final say or have the final say on the drivers that are part of that panel that IDG submits.  It seems a process where you know for characterizing that Uber is the decision maker upfront, the judge the jury throughout the proceeding.  So, given that set up, what safeguards are in place?  What safeguards does Uber put in place to make sure it's a neutral and fair process as compared to having an outside third party from a process like that.

JOSH GOLD:  Yeah, so first let me just expand on the process.  The process, there's a deactivation that's human reviewed.  There is an internal deactivation review process that's human reviewed.  Then there is the IDG process and the panel of drivers that the process is run by AAA, which is a neutral third party, the panel of drivers makes that

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   181

final decision.  We don't review the final decision of the panel of drivers.

COUNCIL MEMBER KRISHNAN:  But I guess that whole process, I'm wondering what's the - what are the safeguards that Uber puts in place to ensure it's a neutral and fair process?

JOSH GOLD:  We have a panel of third party drivers that are reviewing those pieces but look, I think we've worked in other jurisdictions to figure out better deactivation policies and I know we've been in touch with your office.  This hearing was scheduled.  This bill was put on the schedule at the last minute, so my colleague who had talked to your office recently is in Minnesota and dealing with a similar issue but we're happy to continue to work on legislation.  We're not opposed to legislation outright.  I think there are some issues we'd like to address, but I will say that we are the contracting entity with individuals and we are making a choice the same way a taxi medallion owner is renting a taxi medallion to someone the same way a black car or livery base is choosing to work with someone.  We are making a choice to work with someone and we sometimes choose not work with individuals.  You know we now

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    182

play into the unemployment insurance fund when that happens through no fault of their own.  Unlike you know taxi medallion owners, unlike Lyft, unlike black car basis, livery car basis.  That unemployment insurance is available to drivers where they lose work through no fault of their own but you know if there are other steps to take to improve the warning process, to improve the notification process, to improve the education process and then on the back end, improve the process to make sure that the deactivations were reviewed properly against our policies and our community guidelines.  That's something we'd like to work with your office on.

CHAIRPERSON BROOKS-POWERS:  Thank you.

JOSH GOLD:  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you to the panel.  Next, we will call up Chhewang Lama, Richard Chow, Kunchok Dolma, Kunga Rota, Urgen Sherpa, Diallo Tizo.  We ask that you just say your name prior to starting your testimony and please adhere to the two minute rule.

RICHARD CHOW:  Okay, I'm going to start.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   183

CHAIRPERSON BROOKS-POWERS:  One moment.  Raja Sohail(SP?), Raja Sohail, okay, Malang Gassama(SP?).  Okay, you could get started sir.

RICHARD CHOW:  Okay.  Hello, good afternoon Committee Madam Chair.  My name is Richard Chow.  I've been driving taxi for 18 years.  I'm a New York Taxi Worker Alliance Union Member.  All e-hail companies charge a lot of money to the rider, pay too cheap to the driver.  E-hail up from pricing from equal to the meter fare plus all the airports are charged.  E-hail company, how much they charge the passenger, how much they pay to the driver, must transparency show on the receipt.

About a month ago, I accepted Uber fare, $31 minus $4 congestion fee.  I got $27.  I pick the lower east side to upper east side, upper west side 63rd and Central point west.  Four passenger, passenger request two stop, east side 73rd Street and 1st Avenue.  Uber charged each stop $6 to the rider and the total they charged $76 to the rider.  And my tablet show only one stop.  One passenger sit in front of the seat, I told him first stop pay the $31, I can't stop pay by the regular meter.  Passenger said no because already I paid $76 to the Uber and

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    184

then he took a screenshot at the fares of $31.  He sent it to the Uber.  The fares fee pending in the night, the whole night and the next day I got a fare amount $53 because the passenger complained to the Uber, pay too low to me.

City Council should rule and regulate pay fairly amount to the driver we are waiting, the debtor to see the awful transaction.  And thank you for listening.  God Bless you everyone.  Thank you.

DIALLO TIZO:  Thank you.  My name is Diallo Tizo and I'm going to talk about the 276 bill for ending Uber and Lyft deactivation.  This time, I'm not going to talk about my deactivation but I'm going to tell you some situation where they deactivate us unfairly.  Example, sometimes its happened to us people like the night and when you take the customer, he going to go home.  When he was driving and one moment he going to tell you he's going to like he want to go to the restaurant like Wendy's or McDonald's.  He is going to ask you; can you please go there?  I'm going to just get quickly my food.  And you know this is not what we have on the deal because I'm going to take you from destination from the pick up to destination.  I don't have to go to the restaurant.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    185

For this kind of situation, if you ask the driver, you say, I cannot do that because I cannot go wait there. And when you drop that customer, if they report you, they can say anything. Whatever they say, Uber, Lyft, they won't check exactly what is happening and they will deactivate you. Its happened. I see a lot of time its happening. Not all the time but I saw it. And the second time, so many people say that know Uber and Lyft give them refund sometime if they make complaint. They don't get excited. I saw it. I'm not going on your time because I don't have enough time and the way its happened when they ask you to make U-turns somewhere where you shouldn't. You know, you should not make U-turn in this area and they don't care. If you don't do it, they get mad. You drop them before knowing anything they can send Uber or Lyft a notification. This driver was like under – that's it. Those guys in that situation have been multiple times. I'm not the only one because I have been deactivated and I know what is happening. And I saw so many people have the same situation. That's why we plead you what this bill we needed for protections. Thank you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   186

CHAIRPERSON BROOKS-POWERS:  Thank you.

URGEN SHERPA:  Hi.  Good afternoon Chairwoman Selvena Brooks-Powers and members of the Transportation Committee.  My name is Urgen Sherpa.  I'm an Organizer at Chhaya Community Development Corporation.  Today, I urge City Council to pass Intro. 100 introduced by Council Member Julie Won.  This bill would designate Losar festival as an alternate side parking hub parking holiday.  This bill is crucial for our committee.  Before moving through our country, I would like to signal my support for Intro. 276, the bill to end unfair deactivations and cap the FH bill.  Please, please listen to the drivers.  Drivers are the one who drive, who pay the insurance, who maintain the car, and who pays the high gasoline.  It is not Uber and Lyft.

And now, back to the Losar. Recognizing Losar would allow us to celebrate without the stress of parking regulations.  By making Losar an alternate site parking holiday, you would ease logical concerns and confirm that our traditions and values are respected in our great city.  This recommendation

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    187

would foster understanding and encourage broader participation in our festivities.

Your Committee has previously organized similar cultural holidays, establishing a precedent for inclusivity.  I commend you for your ongoing efforts to champion equity within our transportation system.  Passing Intro. 100 would demonstrate respect for the traditions of over 60,000 Himalayan people living in New York City and reflect the will of the 78 percent of New Yorkers who believe cultural celebrations should be recognized in public policy.

Losar is our –

CHAIRPERSON BROOKS-POWERS:  Thank you.

URGEN SHERPA:  Christmas, Thanksgiving, New Year –

CHAIRPERSON BROOKS-POWERS:  Sorry sir, I just ask you to submit the rest in writing please.

URGEN SHERPA:  Thank you so much.

CHAIRPERSON BROOKS-POWERS:  Thank you.

KUNCHOK DOLMA:  My name is Kunchok Dolma.  I am a Tibetan New Yorker and I'm here to testify in support of Intro. 100 to make Losar a holiday for alternate side parking.  As Urgen just said and someone testified earlier, Losar is a New York, Thanksgiving,

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   188

Christmas, Superbowl, all bundled into one.  As minorities, we are often used to our holidays being sidelined.  So, it makes our community very happy to be finally seen and heard in the city we call home.

To the 25 Council Members who signed on to this bill, specially to Council Member Julie Won and her office, my Council Member Shekar Krishnan and to you Chairwoman Brooks-Powers, we are forever grateful.

In New York City alone, Losar is celebrated by over 60,000 New Yorkers of Tibetan and Humala heritage.  This number, however, does not account for the many more tens of thousands of Tibetan Buddhist who celebrate this holiday alongside us.

I ask and hope that each of you vote in favor of Intro. 100 for three important reasons.  First, this would be the first and only ACB holiday that is specific to Buddhist and people from across the Himalayan region, one of the fastest growing communities in the city.

Second, like other communities, a community should also have the opportunity to celebrate a main religious holiday with the families without having to worry about getting a parking ticket or leaving our celebrations to move our cars.  And lastly, it allows

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   189

us as one of the fastest growing New Yorkers to see ourselves represented in a civic fabric and laws of our city.

So, thank you.  I hope you quickly vote Intro. 100 out of Committee and come to celebrate Losar with us at one of our many community halls and temples across the city.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Can I get your name again just for the record?

KUNCHOK DOLMA:  Kunchok Dolma.

CHAIRPERSON BROOKS-POWERS:  Thank you.

KUNGA ROTA:  Thank you.  Thank you Madam Chair. My name is Kunga Rota and I'm a Tibetan.  I'm Himalayan.  I'm a member of the Himalayan community. Approximately there are around 61,000 Himalayan people living in the five boroughs.  They're spanning from all walks of life and on this particular Losar day, we all gather together.  We all marry, we all have festive times, the adults.  We all put on traditional clothes.  The kids put on a – they have new clothes on and we visit their parents.  We visit relatives, friends and once we go out, we're in a very festive mood and you don't want to be worrying about whether you got to take a parking ticket and it

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   190

will be such as bummer if you're in a festive mood, right?

And I want to just briefly say about how the Himalayan community is structured. Under the Himalayan community, there are many several smaller communities like Wallan Community, the one I come from. This Wallan community is in Nepal. It's in the right at the border of Nepal and Tibet and back in '94 I came to states for further studies and since then I've been a New Yorker for the past 25 years. And we all have our own stories; you know unique journeys but we all come in one shared ambition shared notion that we wanted to really make this bill. This is a very meaningful bill for us. Once this bill is passed, it's something the city would – we feel like it's meaningful and a good reason for our community. Thank you.

CHAIRPERSON BROOKS-POWERS: Thank you.

MALANG GASSAMA: Hello, my name is Malang Gassama. I'm a member of NYTWA. I'm here in support of the Uber and Lyft deactivation bill. I think Madam Chairman can probably remember me. I just want to start by saying that as of right now, I feel like I am a slave in my own car because Uber and Lyft are

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   191

the prosecutor, the judge and the jury in any case that is brought to them by any customer. So, I'm scared of anybody that come in my car because any customer can turn out to be my life killer. So, I think as I was saying, Madam Chairman I was physically and verbally assaulted in my car. People sprayed and I had all the evidence that I provided to Uber. Uber still – even Uber send me $20 to go clean myself up and after that a customer called him, I mean send him an email and lie about me and Uber went ahead and deactivated me for eight months. Thanks to your help and the help of the WNYC radio, Uber deactivated me after eight months. After I got in serious trouble, they deactivated me and after they realized I was very active with the NYC NYTWA, three months after that, they deactivated me again claiming that somebody had forwarded my account in 2021 and this was in 2024.

So, from 2021, somebody stole my identity. Uber new it and they didn't say anything about it until 2024 when they realized I was very active on the NYTWA platform, they deactivated me again. And I stayed for the second day of doing three months. I did everything until they activated me again. They

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    192

saw me back after the big rally we did.  The very next day I started getting all kinds of emails from Uber saying oh, some such and such say that they didn't like you coming.  So, they're sending me emails that I don't know what customers said, "what about me?"  What time?  And what did they exactly say?  And I told them that I am being targeted because of my implication with NYTWA.  So, please help us out and pass the bill please.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you.  Thank you to the panel.  Next we'll hear from Kara Klita, Max Cheung, Charles Dorvil, YI Feng Chen, Bashiru Kamara, Alpha Barry, Lateef Ajala, Saif Aizah, Saiful Hoque, Paul Sonn, Shahal Udolin(SP?), Anthony Aybozo, Mohammad Ali Awan, Arvan Babar, Modibo Doukaru(SP?), Mohamed Barry, and Barry Mohamed.  Yeah, we have Mohamed Barry and Barry Mohamed.  Okay.

Please state your name before you start your testimony and adhere to the two minute rule.  You may start.  Turn on your mic please.

ALPHA BARRY:  First, I want to thank Council Member for having us here.  My name is Alpha Barry. I'm a member of NYTWA.  I used to drive for Lyft and

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    193

Uber but I now I only drive for Lyft because Uber deactivated my account.

I've been a TLC driver for over 20 years.  What I'm going through right now is a disgrace.  Not only Uber deactivate my account, Lyft also is locking me out.  For awhile now, I was not able to go online to make a living.  I have family to feed and bills to pay for my house bill and car insurance and other expenses.  How am I going to survive like this?

Uber deactivated my account and Lyft is locking me out.  Up to today, I don't know why Uber deactivated my account.  When you call, they say it is a safety reason.  I went to the office.  They told me they cannot do anything about it.  I went to IDG.  One of them looked into my account and uh file an appeal.  They sent me a text saying that my reactivation was denied.

After that IDG was created by Uber and Lyft.  This is like coming from an enemy and go to another enemy, which was created by the same enemy.

CHAIRPERSON BROOKS-POWERS:  Thank you sir.  I'm just going to ask that you submit the rest of your testimony in writing please.

ALPHA BARRY:  Okay.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    194

CHAIRPERSON BROOKS-POWERS:  Sir.

SAIF AIZAH:  My name is Saif Aizah.  Thank you and I really appreciate you giving me the change to stand and testify in support of the bill Intro. 276 with unfair deactivation.  Aside from what you heard from other testimonies, my story is very unique and very tragic.  After COVID, I decided to go and work in Baltimore Maryland.  I signed up for Uber and Uber took 30 days to investigate me and do a background check and they found a speeding ticket.  Finally, they opened an account for me in Baltimore Maryland which I have to use my private car.

Then I uploaded my insurance card, which have my wife middle name the same as my last name.  Then they said I was trying to make fraud.  I went to Uber and I provided from the broker the correct and I corrected everything on my insurance card.  Then after going through so much, Uber finally said, well, you have double accounts.  One in New York and one in Maryland.  After the fact that they investigated me and did a background check for 30 days, then they said, this is their final decision.  They don't make it here; it comes from California.  So, I said give me one account at least so I can survive or try to at

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   195
least work with one account.  They said, after I went to them again, they said no.  Mind you that Lyft follows and Lyft did the same thing and I was out of work.  I have to pay my car payments, my insurance, all my bills, struggling for almost one year.  Then I tried to go back with Lyft and Uber again, Lyft then finally decided to open my account again.  This is what happens and this is the misery I have to go through.  Besides all of this financial stress, I get stress, I get mental stress, I get my health problems, I got high blood pressure just because of what Uber is doing to us drivers.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.

SAIFUL HOGUE:  Yes, good afternoon.  My name is – good afternoon, my name is Saiful Hoque.  I am an Uber Lyft- I was an Uber Lyft driver for the last one and a half year.  They deactivated my account and the reason is that I was substance use.  I used a substance and I have proof from the doctors for my TLC and from my private doctor but they don't trust anything else.  I went to the office a lot of times and sent them emails.  They don't listen to anything else.  That's the problem, you know, when the passenger complain, this happens to come with proof

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   196
and without any reason they stop my account.  I am paying my car $1,000 a month.  I have insurance.  I have five family members.  It has been hard for me to survive right now.

So, I hope the justice we'll be getting and we get justice to activate my account.  I am suffering with my financial trouble.  So, I hope your decision will be right and the passenger that complain, this happens to come with the testimony because what reason are they going to complain.  Just happens to know what is the reason and the driver don't know nothing else.  And I have a question regarding this. They use a lot of excuses.  Sometimes the driver will be on the street, they say oh, you're going to drive fast.  You're not a good driver.  They complain and they stop my account.  This is happening a lot of times.  You know so I hope in the future, bring the passenger, the person that makes the complaint, face to face.  If not, it's a lame excuse and some of the passengers are drunk and they complain, they say, okay you want to stop the account.  And Uber start to justify the reality of it and the right – and they're going to complain against this and they're going to close the account.  It's not right.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   197

We have a right, a human right as the law in the America, they have no right for us.  We work like slaves.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you, next.

ARVAN BABAR:  Good evening ma'am.  My name is Arvan Babar.  So, when I start work with Uber –

CHAIRPERSON BROOKS-POWERS:  Is you mic on?  If so, move it closer to you please.

ARVAN BABAR:  Alright, when I start work with Uber, I was pretty new to this app system.  I was not aware that Uber policy that if customer complained about driver, Uber turn his money.  Unfortunately, within first week, I got two back to back complaints in which one customer said that I hit another car.  I mean, I got in accident.

Then Uber contacted me.  I showed them all around picture of my car and it was false allegation but I do not know Uber policy after reviewing, they still put me on risk and later deactivated my account.  Since then, I'm working with Lyft.  I've done almost 15 plus rides, not a single safety complaint about me.  You can see my app.  I'm done, thank you so much.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    198

MOHAMED BARRY:  Good afternoon.  My name is Mohamed Barry or Barry Mohamed.  So, I was working for Uber for five years.  I have been deactivated three times.  The first time when I went to their office, they told me someone drove my car.  I said, now who drove my car?  Because even my wife never drove my car.

They said, okay, so now we're going to reactivate.  I started again, second time they told me they deactivated me and they told me for my rating is low.  Okay, I go take a class.  They reactivate and third time they deactivated me again; they say my rating is low.  All that they're telling me and also Lyft, I work for them three years.  And I ask them, they're telling me the rating is low so since that time now, I'm working car service.  My life is at risk because some passengers didn't pay, some harassed me and my bills now, I pay very hardly because I have bills to pay.  I have a family, so that's why I need help and I thank you very much.

CHAIRPERSON BROOKS-POWERS:  Thank you.

MOHAMED BARRY:  Hi, my name is Mohamed Barry.  I've been driving Yellow Cab before I become an Uber driver and Lyft for a while, maybe four years and

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    199

then I joined Uber and Lyft and Uber deactivate me while I was in my country in Africa and then I came back, I find out my app is done.

When I went to the office, they say somebody put a picture into my account.  That person tried to reactivate the account again and I went to the office, I explained to them everything but they told me, listen, somebody already did it and they tried to deactivate your account.  If you come over here, we're going to take you to the courts.  I was like, "what did I do, to take me to court?"  They said, no, now you tried to reactivate your account like two or three times.  That's illegal.  And I never have complaints with my customers.  My rate was 4.8 and then also Lyft deactivated me because I got into accident.  I have not – I don't have customer in Jamaica.  I don't hit anybody.  I was by myself and due to the collision, they deactivated me.  I went to the office, they said they cannot do anything.  I have to call.  I called, nobody answer but this is I think is unfair like he said, we driving like sometimes – it's not easy to get the bills.  That's why we are here today to justify it and we hope this is going to end.  We're going to get back our

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    200

account.  We'll be able to do our living because we have a lot of bills.  We have wives and kids.  We do everything possible to feed them properly.  Thank you so much.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you to the panel.  Next panel, Norbu Choezung, Urgen Sherpa, Tashi Choephel, Tsering Diki, Tenzin Tsering, Dolma Yangzom, Raul Rivera.  Again, please say your name before starting your testimony and please adhere to the two minute rule.

NORBU CHOESZUNG:  Hi, good afternoon and thank you Chairwoman Selvena Brooks-Powers and members of the Transportation Committee.  My name is Norbu Choeszung and I am Tibetan who live in New York.  I live in Queens.  I am the two time former President of the Community of [INAUDIBLE 04:26:21] and served the community for three terms as board member.  I am here to testify in support of Introduction 100 from Council Member Julie Won to make Losar, the Tibetan New Year a holiday for alternate side parking.

This bill is important to me for the following reasons:  New York is home to over 6,000 Buddhists from Tibet and Nepal, India, Bhutan, and other countries.  In addition to the practical benefit of

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    201

not requiring asked to move our cars on this important Buddhist holiday, all New Yorkers need to see themselves represented in the civic public and laws of our city.  This would be the first and only alternate side parking holiday that is specific to Buddhists and the people from across the Himalayan regions.  In addition to those 60,000 Himalayan Buddhist Americans, the City of New York also welcome many Buddhist communities from the different states of America and Canada by driving to celebrate the New Year Losar with the families and friends of New York.

Compared with the other immigrants, the immigrant from Himalayan communities from Tibet, India and Nepal are quite new and are growing rapidly every year.  Since the time of the Uber, Lyft services in the city, we have many community members who own and drive cars in their every day lives.

Just like the communities that celebrate Christmas, Hanukkah, and other holidays, my community should have the privilege to celebrate our religious holiday with their families and friends.  By suspending the side parking on the Losar, New York City sends this powerful message to –

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   202

CHAIRPERSON BROOKS-POWERS:  Thank you sir.  We just ask that you submit the rest in writing.

NORBU CHOESZUNG:  Thank you very much.

CHAIRPERSON BROOKS-POWERS:  Next.

Good afternoon and thank you Chairwoman Brooks-Powers and Council Member Shekar and everyone.  My name is Tashi Choephel and I am a Tibetan Refugee and a New Yorker.  I'm here to testify in support of Intro. 100 from Council Member Julie Won to make Losar or Tibetan New Year a holiday for alternate side parking.

As an Uber driver and a community member, this bill is important to me.  New York City has over 61,000 Tibetan Buddhists from Bhutan, India, Nepal, Tibet and other countries.  In my home country Tibet, our religion and culture are under threat of annihilation due to China's ongoing occupation.

In New York City we have had the opportunity to practice and preserve our traditions freely.  By suspending alternate side parking on Losar, New York City sends a powerful message to all Tibetans and Himalayans that our city sees us.  Our city recognizes us and our culture traditions.  New York City is our home too.  In addition to practical

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    203

benefit of not requiring us to move our cars on this important Buddhist holiday, it is important for my community to see them selves represented in the loss of our city.  Just like communities who celebrate Christmas, Diwali and other holidays, my community should have the opportunity to celebrate Losar with our families and not having to worry about getting a parking violation.

I hope you can join us at one of our communities Losar celebrations this year and celebrate the passage of this law with us.  I ask that you please vote in favor of Intro. 100 to make Losar an ASP holiday.  Thank you Council Member Julie Won and Chairman Brooks-Powers for being a champion for our community.  We will always remember you.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you so much.

TSERING DIKI:  Good afternoon Chairwoman Brooks-Powers and members of the Transportation Committee and our very own Council Member Krishnan.  And my name is Tsering Diki.  I am the Tibetan New Yorker. I came from Tibet and I live in Queens New York.  I am a business owner and I'm also the Executive Director of Neo-Tibetan Service Center.  A non-profit

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   204

organization that looks after the social needs of Himalayan communities and New Yorkers.  And I'm here to testify to support the Introduction of 100 from Council Member Julie Won to make the Losar or Tibetan Lunar New Year a holiday for alternate side parking. This bill is important to me because the Losar is the most important festival of the year in the Tibetan diaspora and here in New York City, the Tibetan Himalayan community celebrates the first day of New Year with the family enjoying festive meals, dressing in the best traditional clothing, making offerings, drinking homemade rice wine and playing games at home.  It is considered bad luck for people to have to worry about anything on the first day of our new year.

Losar is the happiest day of the year for all of our community members and imagine having to interrupt the precious moments like that with your children and elders to have to sit in your car and wait for the DSNY to clean the streets.

New York is home to over 60,000 Tibetan Buddhisms from Himalayan regions and in addition to the practical benefit of not requiring us to move our cars on this important Buddhist holiday, it is

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   205

important for all New Yorkers to see themselves represented in the civic fabric of the loss of our city.  By suspending the ASP on Losar, New York City sends a powerful message to all Himalayan New Yorkers that our city sees us and we will –

CHAIRPERSON BROOKS-POWERS:  Thank you.

TSERING DIKI:  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you so much.

TENZIN TSERING:  Good afternoon Chairwoman Brooks-Powers and members of the Council.  My name is Tenzin Tsering and I am a Tibetan American, originally from India and living in Elmhurst Queens for over 15 years.  I am also the program director of the New York Tibetan Service Center, a nonprofit organization providing adult social services and a city funded program for afterschool kids.

Today, I am here to testify and reason my support of Intro. 100 for Council Member Julie Won to make Losar Tibetan Lunar New Year a holiday for alternate side parking.  This bill is important to me because it is the only cultural and religious holiday that I personally celebrate that keeps me connected to my roots and gives meaning to my Tibetan heritage, which I am sure many others here and in our community can

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    206

relate to.  Losar is our single most important cultural, religious and tradition that has followed through generations, regardless of the religious sect, country or the part of the world we live in.

As you've been hearing, New York is home to over 60,000 Tibetan Buddhists from different Himalayan countries.  On an important day with our own religious customs, parking should be the last thing we should worry about.  What is important to know is that our family members sometimes have no choice but to neglect or abandon important customs and traditions due to those minute stresses.

Just like other communities who celebrate their holiday, the Himalayan community, my community should have the opportunity to celebrate one of our main holidays with our family with ease as we have the right to and like others have mentioned before, not have to worry about parking spaces, tickets, fines, meter issues, etc..

If this law passes, again it would be the first and only alternate side parking holiday that is specific to Tibetan Buddhists and people from across the Himalayan region.  By suspending alternate side parking on Losar, it tells the Himalayan New Yorkers

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    207

that our city sees us, acknowledges us, and our traditions.  Because in the end, New York City is our city too.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you.

DAWA YANGI SHERPA:  Hello, I am Dawa Yangi Sherpa, good afternoon to everyone here.  Thank you Chairwoman Brooks-Powers and members of the Transportation Committee.  I am a Sherpa Nepali woman and I live in Sunnyside Queens.  I'm the Board Member and the spokesperson for the United Sherpa Association Inc., more commonly known as Sherpa -.  I also serve as an advisor to the network of Sherpa students and professionals NNSP, an organization dedicated to strengthening the Sherpa youth and professional network.

We're also dedicated to Sherpa Cultural Preservation and bolstering intergenerational relationships between Sherpa elders and youth. Today, I am here to testify in support of Introduction 100 from Council Member Julie Won to meet Losar or Tibetan Sherpa and many Himalayan ethnicities New Year holiday for alternate side parking.  Before we dive into the testimony, I would

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    208

like to share that Losar is a Tibetan word that translates to New Year.  Lo, means year and sar means new.  A festival celebrated by Buddhist communities around the world.  This bill is important to me and my Sherpa community because more than 80 percent of the families that I know of own a car in New York City.  As the majority of them work as independent contractors under Uber or Lyft.  So, I will support Intro. 276 to end unfair Uber and Lyft deactivation as well.  I do not own a car but I have had my share of stories on how many Sherpa people and people from my community have had to move their seats during family get togethers or community celebrations to keep up with alternate side parking rules.  By suspending ASP on Losar, New York City sends a powerful message to all Himalayan New Yorkers that New York City sees us all.

Our city recognizes us and our cultural traditions.  That New York City is also our city.  I hope you can join us at one of our community Losar celebrations.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Perfect timing.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    209

RAUL RIVERA:  Good afternoon my name is Raul Rivera.  I'm a TLC driver and a TLC driver advocate.  I'm the founder of NYC Drivers Unite.  I have over 23,000 trips with Uber and Lyft.  We do support the commuter vans.  We want to see them on the road.  I support Leroy Morrison and his efforts to get them on the road.  We want lower insurance.  I just spoke with the Commissioner before he left.  Excuse me, I have trouble with my voice today.  I spoke with the Commissioner today before he left, David Do and there is a solution.  We support the bill.  I think anything that helps the drivers from being deactivated is excellent but there's something bigger.  You heard the expression, go hard or go home.  There is something bigger.  We spoke to the Commissioner and just for the record, my Uber account is not deactivated.  I have over 11,000 trips with Uber and I personally ask the Commissioner to revoke Uber's license, deactivate Uber from New York City.  That's what we ask for.  We want Uber removed.  They're exploiting people of color.  They are exploiting worker rights and many other things that they're doing.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   210

We also ask and we want this message to get to apple.  Apple can do something.  Apple could step in and remove Uber from the app store.  That will work.  Remove Uber from the app store.  And finally, finally, we want this message to get to our new president that's going to come in 40 days, Donald J. Trump.  We ask you Mr. Trump to stop the abuse of Uber.  Remove Uber from New York City.  We know you care about the New York taxi driver.  We are not Uber drivers.  We are not Lyft drivers.  We are New York City Taxi and Limousine Commission drivers and we're being exploited, and we ask you Mr. Trump, remove Uber.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Thank you to the panel.  Next we will call up Tenzin Bhuti, Sonam Sangpo, Tsering Lhamu Serpha, Zubin Soleimany Pasang Sherpa and Muhammad Arshad.  We ask that you give your name before speaking and adhere to the two minute rule.  Marleny Cruz.  You may begin just make sure you turn on the mic.

SONAM SANGPO:  Good afternoon Chairwomen Brooks-Powers and member of the Transportation Committee, and also good afternoon Council Member of Jackson Heights Mr. Shekar.  My name is Sonam Sangpo.  I'm a

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   211

Tibetan New Yorker from Nepal, now residing in New York.  I'm the Management Director of Lo-Nyamship Association USA Inc., which is a nonprofit organization and we recently established in Woodside New York.

I'm here today supporting Introduction 100, introduced by Council Member Julie Won to recognize Losar, Tibetan Lunar New Year as an alternate side parking.  Losar sacred for Tibetan Buddhist involving ritual and the family gathering and this bill would allow us to celebrate without parking concern.

New Yorkers are home to over 60,000 Tibetan Buddhists and this bill would be first ASP holiday specifically for Buddhists and Himalayan communities. It were from that New York City respect and our traditions.  I warmly invite you to join us one of our celebrations next year and celebrate the passage of this important legislation with our community.  I urge you to vote in favor of Intro. 100.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.

TENZIN BHUTI:  Good afternoon Chairwoman Brooks-Powers, Council Member and member of the Transportation Committee.  My name is Tenzin Bhuti and I am a Tibetan New Yorker living in Queens.  I'm

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    212

here to support Intro. 100, proposed by Council Member Julie Won which designates Losar, the Tibetan New Year as a holiday for Alternate Side Parking, ASP regulations.  This bill is crucial for my community allowing us to celebrate this significant cultural and religious event without the stress of parking restrictions.  By lifting ASP regulations on Losar, families like mine can fully participate in this meaningful Buddhist festival, free from the worry of parking tickets.  Just as other communities celebrate Christmas and Hanukkah and Eid.  We deserve the same opportunity to honor our traditions.

Recognizing Losar promotes inclusivity and respect fostering a sense of belonging for many Tibetan and Himalayan region communities.  I urge you to vote in favor of Intro. 100 so we can celebrate our heritage without barriers.  Thank you for your time and we hope you will join us in our Losar celebration to witness the spirit of our community firsthand.  Thank you.

TSERING SERPHA:  Good afternoon and [SPEAKING IN OTHER LANGUAGE 04:43:23].  Before I begin as a daughter of a driver, I want to signal my support for Intro. 276.  My name is Tsering Serpha and I'm a born

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    213

and raised New Yorker and part of over 60,000 Himalayans in New York City who celebrate Losar.  I urge City Council to follow Chairwoman Brooks-Powers and Council Member Julie Won's example and support Intro. 100, which would designate the Losar festival as an alternate side parking holiday, ensuring religious equality alongside Hanukkah, Christmas and Eid.

Growing up, I went to New York City public schools, Anderson Elementary and middle and Stuyvesant High School.  There I learned about various cultural holidays alongside my friends, which enriched us all.  Through it all, my parents worked hard to make sure every Losar was special, earnestly believing that how we celebrated impacted our luck for the year.  They prepared for weeks to give us the finest clothes, foods, and so they could avoid spending money on Losar, as that's inauspicious. Spending money on Losar means a whole year of financial losses, yet they still had to feed the meter because a parking ticket would be inauspicious as well.  It's frustrating that despite their efforts, city regulations force us into a lose-lose situation every year.  This lack of recognition feels

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    214

like a dismissal of my identity and of my community. I believe in the city's potential and your leadership.  This Committee has recognized other cultural holidays, setting a precedence for inclusivity.  I hope you continue that tradition. Please support Intro. 100.  Recognizing Losar would allow us to celebrate freely, affirming that our traditions matter, that we matter.  Thank you for your time and [SPEAKING IN OTHER LANGUAGE 04:45:05].

ZUBIN SOLEIMANY:  Good afternoon.  My name is Zubin Soleimany.  I'm a staff attorney with the New York Taxi Workers Alliance, also testifying in support of Intro. 276, which our members and my colleagues have already testified so eloquently on. I just want to follow up on a couple of points.  I think the question was asked earlier, how is deactivation distinct for for-hire drivers?  Why is this bill so necessary for them?  And the point was raised once about the expenses and the debts that drivers incur and I think that is huge and it's also connected to another point that makes these drivers unique, which is that when you get fired from a high volume for-hire vehicle company, you are being effectively put in the same position as when you're

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   215

losing your license.  I think the gentleman from Uber testified earlier.  Oh, well, they still have their license, you know they can still work.  Currently, you know everybody has seen the monopolization of these companies unfold as they assume dominant market share.  The two for-hire companies make up 80, 85 percent of the entire for-hire and taxi service in the city.  So, when you lose your ability to work for them, you are largely losing your ability to work with the license that you invested in with the car that you invested in.  And in that 85 percent, the two companies, they do notify each other and sometimes drivers will be deactivated from one company solely on the referral of a deactivation from the other company.

Quick point, just also to say that you know nothing in this law preempt any other process, just like the same way that the fast food deactivation bill, which we were so proud to testify in support of, did not effect any other process that folks could work through.

So, I'm sorry that the folks from IDG weren't able to stay and explain their position.  I would have liked to have heard it.  I will note that the

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    216

last time when they did offer testimony to city government, they did testify to the Chair of the TLC at the time –

CHAIRPERSON BROOKS-POWERS:  Thank you.

ZUBIN SOLEIMANY:  The process was not working.

CHAIRPERSON BROOKS-POWERS:  Sir if you could submit the rest of your testimony in writing.  Thank you.  Next.

ZUBIN SOLEIMANY:  Thank you Chair.

UNIDENTIFIED:  Good afternoon Council Members.

CHAIRPERSON BROOKS-POWERS:  Is your mic on? There we go, yeah, got it.

UNIDENTIFIED: Good afternoon Council Members, duly respectful people.  I joined like Uber in 2017. I was not aware about the laws of Uber at the time. Within two months, they deactivated me and after that, I joined Lyft and I have like more than 17,000 rides and five star rating and I'm still waiting for the Uber to activate me but nothing is going on.  I'm just replying them emails and on the phone then I went to the IDG, they did not do anything.  Then I talked to my friends for the New York Taxi Worker Alliance.  They are trying to help me out but they are saying that this bill is for six years.  In other

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   217

cases, more like seven years and I don't know but I have to much bills.  If I work with Lyft, Lyft make us lock out and we can't pay the bills and we are driving rental cars that we're paying $400 a week approximately.

How can we survive?  Please help us.  For that, we can work on two apps like Uber and Lyft.  Thank you very much.

MARLENY CRUZ:  Hi, my name is Marleny Cruz.  I'm a mother of two that I have to support myself.  I work for Uber and Lyft since 2017 and the reason why I'm here for is because of the lockout.  It's not fair for us to go out to work and go around the city for over an hour and the app are off.

We have to be moving around to see if it is open at one time, you know?  Sometimes we just have to go home.  Sometimes we make like $80 or $100 and we have to go back home.  How can we pay the bills?  Being an Uber, uh I mean a TLC driver mean a lot of money because we have to pay like $700 insurance for the car, plus the license, plus a lot of things.  So, we need to lock up stuff please.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Council Member Krishnan has a quick follow up question.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   218

COUNCIL MEMBER KRISHNAN:  Quick indeed.  Thank you all for your testimony.  Zubin, I just had a question for you, how do lockouts actually relate to the pay rule and what does the pay rule require?

ZUBIN SOLEIMANY:  Yeah, so yeah, thank you Council Member.  So, the point of the pay rule is like to approximate what any other minimum wage law does.  The point of it is to compensate drivers for all time that they are at work and the rule does not contemplate lockouts.  They were not contemplated when TLC passed the rule.  They were not contemplated when professors Parrott and Reich put their report together.

The language of the rule says that you should be paid for all drivers – that utilization accounts for all time, the drivers make themselves available to receive dispatches.  It doesn't say that they're only paid for time logged on.  So, you take an example of a driver who works in the – they live in the Bronx.  They go to Manhattan; they pick somebody up.  They say come to the eastern Queens and they're locked out when they do the drop off.  They're still available at that point.  They are trying to work but they've been locked out for now, their hour or two or so.  At

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    219
that point, they are still available to receive dispatches.  That time should be counted under the text of the rule but it's not.  So, when Uber fails to provide the data that shows that time in which under the rules of plain language they are available to work, they are subverting the purpose of the rule.

I know the gentleman from Uber had testified earlier that the initial report by Professors Parrott and Reich contemplated that companies could use lockouts and that's just not true.  I was actually speaking to Professor Parrott about this two weeks ago and he said no, it did not contemplate that.  The report discussed the notion that companies more broadly would have to – they would have to limit supply but the idea of that would be to incentivize getting away from the over saturation that had really wrecked the industry.  That would be a question of hiring an attrition, not of randomly locking out drivers in the middle of their shifts and creating chaos for individual drivers and for the whole workforce.

COUNCIL MEMBER KRISHNAN:  Thank you.

ZUBIN SOLEIMANY:  Thank you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    220

CHAIRPERSON BROOKS-POWERS:  Okay, thank you to this panel.  Next, we're going to call up Christopher Leon Johnson, Choudary Adnan, Tsering Jupa, Yanming Gong, Sameena Syed(SP?), Ali Akbar, Ibrahim K. Diallo and we ask that you state your name prior to starting your testimony and to adhere to the two minute rule. You can start whenever you're ready.

CHRISTOPHER LEON JOHNSON:  Alright, good afternoon Chair Brooks-Powers.  My name is Christopher Leon Johnson on the record and I'm here to support both sides of the spectrum IDG and the TWA.  I said this morning before the press conference about congestive pricing, I'm against CP, I'm a no congestion pricing 2024 uhm that these guys, IDG and IEG and TWA need to stop beefing because you guys are all cab drivers.  You guys are all Lyft drivers and Uber drivers and I think all you guys can agree that look, there's a problem with Uber and Lyft that they deactivate you guys and deactivate you guys and uhm, deactivate you guys because of unwarranted reasons because they don't care.  The apps don't give a crap because they know that for how many people banging on the gate, if they have at least four guys, these three men and this one female right here, there's

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    221

thousands of other people banging at the gate, so they don't care if they're deactivated for some BS. So, they need to stop beefing and the thing is that IEG need to be transparent and TWE be transparent about State Senator Jessica Ramos and she's a big issue with this because Ramos is the uhm is the State Senator and her former husband –

CHAIRPERSON BROOKS-POWERS:  Keep it on the legislation please.

CHRISTOPHER LEON JOHNSON:  Yeah, I know I am, I'm stating that legislation that he's the Chair.  He's the lead for IDG so of course there's going to be real disconnect with elected officials and I'm not saying that you Selvena but she's the Chair of the Labor and the State Senate and I know a lot of you guys want to get bills passed in the State Senate so you don't want to shake the apple cart with Jessica Ramos and so, she's going to block IEG's movement. So, that needs to be set clear and these guys, I think that the members, the members need to stick together because you're all in this same crap together and there should be no more suicides outside City Hall.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    222

So, let me make this clear.  I'm done.  I respect you so I'm going to cut it right here at three seconds, so thank you.  Thank you so much.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.

CHRISTOPHER LEON JOHNSON:  Thank you.  I'm leaving, I got to go.  You not taking no hands Shekar?  You're not asking no questions right?  Alright, I'm out of here.  I got to go.

CHAIRPERSON BROOKS-POWERS:  Sir.

CHOUDARY ADNAN:  Good afternoon.  My name is Choudary Adnan and my Uber account is deactivated.  I've worked with the Uber like 10, 14 years.  I have a ride with Uber so my rating is 4.97.  So, I just uh upload my document.  They say that it expired wrongly uploaded two times and they deactivated my account.  So, I go to the office two or three times but they don't do nothing on that so it is my – two days to help me reactivate my please.  So, thank you for your time.  Thank you.

UNIDENTIFIED:  Thank you again.  This is my friend.  He told me what he wanted to say because he believe when he speak you might not understand exactly what he wanted to say.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   223

CHAIRPERSON BROOKS-POWERS:  Well can you give his name though?

UNIDENTIFIED:  Yeah, I'm going to tell- but I just want to make sure it's possible for me to talk on that?

CHAIRPERSON BROOKS-POWERS:  Yes.

UNIDENTIFIED:  Okay.  Okay, uhm my name is Ibrahim K. Diallo.  That's his name.  He say Uber and Lyft deactivated him because like the other guys said, low rating and he said he's not the one who can write himself.  He don't know who customer is going to write him.  He never had problem with the customers.  They just like maybe when they drop him off or drop her off, they're going to just notify Uber and Lyft.  He don't know what they're going to say.  He never had a problem with a passenger but they just say his rating is very low.  They all – Uber and Lyft deactivated him because of very low rating.

So, he's like just telling me, I have like wife and seven kids to feed.  He pay the bills.  There's mom and grandma back home.  All these people waiting for me.  Now, I don't know what to do.  The bills is so high right now.  Like me to drive customers right

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    224

now is very hard.  He just said he's just proud to be here in front of you and you can hear him you might be able to help us to get our account back to be able to work for the city because we are here helping people going around.  Be happy about that, so we just appreciate you.  That's what he wanted me to say. Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.

NIMA SANGE:  My name is Nima Sange.  Just a few days ago I drive at Lyft.  I used to drive Yellow Cab, now I'm driving with Lyft.  Two days ago, the Lyft deactivated my account just because I had a conversation with my – with one of the passengers. I'm a woman, when I get into car, people see I can speak English, they start talking to me.  You know they feel comfortable.  They feel relaxed, especially work at night time so they feel very comfortable.

So, I make them comfortable.  So, I was talking to just general information, information with one of these customers.  She was misunderstood.  Whatever I said and they deactivated my account.  I mean this is ridiculous.  I have five star rating with them.  I have 100 percent acceptance.  I have the best driver I am.  I only work with Lyft.  Just because of

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    225
misunderstanding of a passenger and they have the right to say whatever they want to say and it's accepted but they don't want to listen to us.  We don't have the freedom of speech.  We have a freedom of nothing.  We are slave to these Uber companies.  We are slave to them.  We have clean the shit.  We have to keep everything what they want us to say.  Our documents in time, everything is perfect.  We have to watch what we say.  We have to watch what we do.  Who are we?  Are we human being or are we a machine like a car?  I just bought a car for them because my car is old and I just bought it in January.  I have to make a payment on it.  Uber didn't open my account but the Lyft they deactivated.

CHAIRPERSON BROOKS-POWERS:  Thank you.  I'd like to thank this panel.  Next, we will hear from Tashi Dolma.  We ask that you adhere to the two minute rule.

TASHI DOLMA:  Yes.

SERGEANT AT ARMS:  You may begin.

TASHI DOLMA:  Hi, my name is Tashi Dolma and I am a Tibetan Member of Queens New York.  I live in Wood Haven Jamaica and I'm also a member of the Tibetan

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    226

People's Movement approach in New York and New Jersey representing 60,000 Tibetans living in New York City.

I'm here to testify in support of Introduction 100 from Council Member Julie Won to make Losar or Tibetan Lunar New Year a holiday for alternate side parking.

This bill is important to me because the bill is crucial for our community as it enables us to celebrate this important cultural event without the hassle of parking regulations.  By alleviating these restrictions, we can create the welcoming atmosphere where families and friends come together to support local businesses and immerse themselves in the vibrant traditions of Losar.  Recognizing this holiday not only honors our city's diversity but also strengthens the local economy by encouraging community involvement and connection.  I ask that you please vote in favor for Intro. 100 to make Losar an ASP holiday.  Thank you so much.

COUNCIL MEMBER KRISHNAN:  Thank you for your testimony.  Now we have Dorel Tamam.

SERGEANT AT ARMS:  You may begin.

DOREL TAMAM:  Hello, can you hear me?

COUNCIL MEMBER KRISHNAN:  Yes.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   227

DOREL TAMAM:  Thank you for the opportunity to address Intro. 277.  My name is Dorel Tamam, and I am Head of Mobile Operations at Curb Mobility where I oversee RVAL services.  We do not support Intro. 277 in fail to keep taxis competitive.  If a minimum pay is put upon the taxi industry for e-hail jobs, then that same standard should be put throughout the industry so taxis don't lose competitiveness within the market and existing earnings opportunity.

Between 2017 and 2022, taxis have lost 50 percent of their rides from TNC's and have not recovered.  In 2017, the Flex Fare Pilot was started, which saw immediate impacts for the taxi industry.  New business was able to be attracted to taxis such as the Access A Ride program, corporate travel accounts and non-emergency medical transportation.  Markets that have previously stayed away from taxis due to the inability of competitive prearranged pricing.

Curb has also helped bring consumer rides through our Curb app and partnerships and notable TNC's and other partners through the integration into our network.  From March of this year, about 10 to 15 percent of rides were e-hail, which are rides the industry would have not captured without its

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   228

flexibility in pricing and could have been distributed to other service classes.

The reason why the Council should avoid setting higher pay rates for taxis are routed in fairness, market competition and the impact of drivers.  To reiterate some key points, street hail volume is down 50 percent and e-hail has accounted for 10 to 15 percent of trips, which could have gone to other service classes, providing more earnings opportunities for taxi drivers.  Taxis were able to get e-hail rides from rates being flexible.  Without the flexibility of rates and uncompetitive environment is created, pricing taxis out of their opportunity of e-hail rides through the choice of consumers, programs and rides from partners.

Lastly, drivers have a freedom of choice when deciding –

SERGEANT AT ARMS:  Your time has expired.

CHAIRPERSON BROOKS-POWERS:  Thank you.  We ask that you submit your remaining testimony in writing.  Thank you for your time.

DOREL TAMAM:  Thank you.

CHAIRPERSON BROOKS-POWERS:  Next we will hear from Lhakpa Dhondup.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    229

SERGEANT AT ARMS:  You may begin.

SERGEANT AT ARMS:  I believe they left the Zoom.

CHAIRPERSON BROOKS-POWERS:  Next, we will call up Yohanes Lie.

SERGEANT AT ARMS:  You may begin.

YOHANES LIE:  Yeah, my name is Yohanes Lie in opposition Intro. 277.  I am dedicated Yellow Cab driver and appreciate Curb for keeping me busy with rides day and night.  The street hail business has been slow lately, so I'm glad I can keep working through Curb during the slow times.  I'm excited to see how Curb will innovate and keep with other ride share apps.  Curb is already showing they care about driver by offering good support, engagement and business consistently.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Uhm, next we will hear from Akouete Afandalo.

SERGEANT AT ARMS:  You may begin.

AKOUETE AFANDALO:  My name is Akouete Afandalo in opposition of Intro. 277.  I've been a taxi driver for about 20 years of experience.  I strongly support Curb and it's positive impact on our industry.  The tradition of E-hail office true curb as improved our 1480 by reducing [INAUDIBLE 05:06:12] and the need to

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    230

sit for street hails.  The ability to accept or decline e hail office is valuable giving us the possibility to manage our term effectively.

During challenging times, Curb fare have been a lifeline for drivers like myself, providing adequate income when traditional business was scarce.  Curb is fair and trustworthy.  With all necessary information such as pick up times, ETA's, fares and addresses clearly displayed.  This transparency enhances trust and ensure a smooth experience for both drivers and passengers.  From my experience, I can confidently say that curb is highly beneficial for the taxi industry.  New Yorkers benefit from having Curb as a deliver e-hail option ensuring service and taxi drivers.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Next we'll hear from MD Karim.

SERGEANT AT ARMS:  You may begin.

MD KARIM:  Good afternoon.  My name is MD Karim in opposition of Intro. 277.  As a veterans NOAC taxi driver since 2014, I have extreme significant business growth since Curb introduced e-hail.  Curb has been positive for the industry, allowing me to earn over 400 [INAUDIBLE 05:07:59].  Providing with

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   231

the option to e-hail taxi rides.  It has been invaluable, especially in light of competition from Uber and Lyft, Curb fare and provide additional earning opportunities alongside traditional e-hails.

Offering NYC businesses choice between Uber and Lyft and Curb has been beneficial for both drivers and riders alike.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Next we will hear from Ugyen Pema.

SERGEANT AT ARMS:  You may begin.

SERGEANT AT ARMS:  He has left the Zoom.

CHAIRPERSON BROOKS-POWERS:  Next, we'll hear from Setan Deki.

SERGEANT AT ARMS:  You may begin.

SERGEANT AT ARMS:  They left the Zoom as well, oh, actually sorry.

SETAN DEKI:  Good afternoon and thank you Chairwoman Brooks-Powers and members of the Transportation Committee.  My name is Setan Deki and I am a Tibetan New Yorker living in Queens New York City.  I also work at a company capital, a nonprofit city of five that serves many New York City small businesses from the Himalayan region.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   232

Today, I am here to testify in support of Intro. 100 from Council Member Julie Won to make Losar a holiday for alternate side parking.  Losar marks the beginning of the Lunar New Year, a time of renewal reflection and connection with family and community. As a Tibetan, this holiday is not just a day of celebration.  It represents our heritage and the values we hold dear.  Additionally, many of the small businesses I work with are owned by individuals who celebrate Losar.  These entrepreneurs bring unique products, services, and cultural experiences to our neighborhoods.  However, during this festive time, they often face a challenge of managing parking regulations.  By designating Losar as an ASP holiday, we can alleviate some of the stresses associated with parking, allowing families and community members to celebrate without the added concern of moving their vehicles.  I would also like to take a moment to thank Chairwoman Brooks-Powers for co-sponsoring this bill.  Your support demonstrates your commitment to our community and our cultural diversity and we are grateful to have you as a champion for our voices.

In conclusion, I urge you to support this bill and help ensure that Losar is officially recognized

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    233

by our city.  By doing so, you not only honor our traditions but also strengthen the fabric of our diverse community.  Again, thank you for your time.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Next, we will hear from Nicole Salk.

SERGEANT AT ARMS:  You may begin.

NICOLE SALK:  Okay, thank you so much.  I am testifying regarding Intro. Number 276.  I am a staff attorney at Brooklyn Legal Services, which is part of Legal Services NYC.  As part of my work, I regularly represent Uber and Lyft drivers in obtaining unemployment benefits and during the pandemic, our office and the New York Taxi Workers Alliance, many whose members testified today, brought litigation which resulted in approximately 68,000 Uber and Lyft drivers receiving state unemployment insurance at the full rate of payment for employees.  Many of the drivers we represent have been unfairly deactivated from their companies platforms without notice, without any effective means to challenge the deactivation, as has also been testified to by numerous drivers.

Painfully so, really sad to hear these incredibly horrendous stories where drivers are losing their

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    234
livelihoods.  They often do not know exactly why they are deactivated.  They have told me about drunk and unruly passengers who they believe may have made complaints about them to the company.  Sometimes drivers may be deactivated when a customer complains about a driver refusing to violate a traffic rule, such as an illegal U-turn.  I had one female driver who believes she was deactivated after a customer complained to the company when she refused a sexual advance.

Our driver clients assume that there must be something they can do to challenge these unfair deactivations.  Unfortunately, they have few rights to challenge, as you've heard.  They are devastated when I inform that there really is nothing we can do since the company has the deactivate them for almost any reason.  Yes there is an arbitration process. That was a process developed by Uber and a drivers union, which was and may still be funded by Uber.

However, Uber ultimately controls who is eligible to go to arbitration on a case by case basis.  This Uber controlled process resembles the grievance process provided by many other companies where the corporation ultimately –

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    235

SERGEANT AT ARMS:  Your time has expired.

CHAIRPERSON BROOKS-POWERS:  Thank you.  We ask that you submit the rest of your testimony written. Thank you.

NICOLE SALK:  Thank you.

CHAIRPERSON BROOKS-POWERS:  Next, we'll call up Israel Asavato(SP?).

SERGEANT AT ARMS:  You may begin.

ISRAEL ASAVATO:  Good morning, uh good afternoon.

CHAIRPERSON BROOKS-POWERS:  Israel, you went out for a second.  Go ahead, I'll give you your three seconds back.

ISRAEL ASAVATO:  Can you hear me.

CHAIRPERSON BROOKS-POWERS:  Yes.

ISRAEL ASAVATO:  Okay, I've been driving in the For-Hire Center for nine years and four months and even though I have never been deactivated, I support Intro. 276 because it provides a transparent process for drivers such as myself.  In our current state, we are all one ride away from deactivation.  From the wealthiest to the poorest riders rely on drivers all the time to reach certain perks and benefits from the companies.  After six years of being on the Uber platform, in February of this year, my account was

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   236

blocked for 48 hours preventing me from earning because a rider accused me of being under the influence.  I don't drink alcohol or use drugs and thank God I have an interior dash cam to prove that. I encourage all drivers to get a dual dash cam.  We the drivers are the ones that bail all the operational expenses to work in this industry and these companies should not be able to block or deactivate any driver without proof.

Off the topic, I just want to mention these things.  These companies classify us as independent contractors.  If we are truly independent contractors, then why aren't we provided with the pick up and drop off details before accepting the trip.  Why are we penalized through an acceptance rate when we don't accept a trip?  Shouldn't we be able to accept trips we want and refuse trips we don't want?  Why is our acceptance and capsulation rate monitored?  Thank you for having me and have a great day.

CHAIRPERSON BROOKS-POWERS:  Thank you.  Next we will call up Glenn Velafsky(SP?).

SERGEANT AT ARMS:  You may begin.

CHAIRPERSON BROOKS-POWERS:  Glenn Velafsky?

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    237

SERGEANT AT ARMS:  You are unmuted Glenn.  Glenn, we can't hear you.

CHAIRPERSON BROOKS-POWERS:  We'll come back to Glenn.  We have in the room Mohamed Mohamed.

MOHAMED MOHAMED:  Hi, my name is Mohamed Mohamed.  I am an Uber and Lyft driver for ten years and also, I am a member in NYTWE.

Dear Council Member, by passing bill number 276, justice will be achieved for the driver as a result of malicious or false report.  Passing Intro. 276 will achieve psychological and mental safety for the driver.  Making his performance on the road more safer.  It is not fair to the driver to spend money to obtain TLC license and go to school and be a professional driver for many years.  And when he think to have TLC cars for more than 50,000 or 60,000 and make the payment in five years and Uber accept to affiliate it, then Uber deactivated him without notification by a false report from one of those passengers.

I have here many, many sad stories through many drivers at LaGuardia Airport.  They've been deactivated, unfairly deactivated.  Thousands of drivers have been deactivated.  I have also – I came

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    238

today to explain the importance of bill 276 for the driver, even though I am not deactivated.  I want to update my car and I worry about to update my car because of the unfair deactivation or the lockout. We have temporary lockout.  I can say it's not lockout, it's a temporary deactivation.  The lockout now its temporary deactivation.

So, if we open now, like I'm working for Lyft, a driver working for Lyft and you can see he cannot go online because he got a temporary deactivation which is lockout.  So, please, I'm coming here to confirm and support 276.  Thanks so much.

CHAIRPERSON BROOKS-POWERS:  Thank you. We'll try to get Glenn Velofsky again.

SERGEANT AT ARMS:  Glenn, you're unmuted.  Can't hear you Glenn.

CHAIRPERSON BROOKS-POWERS:  Is he on?

SERGEANT AT ARMS:  Yes, he's on.  Glenn, you're unmuted.

CHAIRPERSON BROOKS-POWERS:  Alright, we'll give it a minute, we have another member of the public in person that we'll call up shortly.  We are now calling up Nima Sange Sherpa.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   239

UNIDENTIFIED:  I'm talking on behalf of him.  My name is Nima Sange Sherpa.  His story is that he was driving with Uber a long time ago.  In 2020, he was driving on a highway.  He has a [INAUDIBLE 05:19:15] in his eyes and he has to brake it because traffic was very bad.  So, passenger filed a complaint that driver is sleepy.  So, they deactivated him.  After that, he talked to them, he explained them.  Next day, they opened his app and he started working again.  After a couple of months, he was taking a passenger to JFK Airport.  The girl was sitting behind the seat, she moved to the front and she started playing with the radio and she distracted him and they passed the yellow light and then they filed a complaint and since 2020, they permanently got deactivated.  That's basically the story.  So, he's been waiting the last 40 years to be activated, to reactivate and they're saying it is very unfair.  They should be such an independent, the judge should decide, call both party and they should decide if he's guilty or not guilty and they should not have to deactivate driver like this.  That's it.  Okay, thank you.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   240

CHAIRPERSON BROOKS-POWERS:  Thank you.  Can we see if Glenn Velafsky is available again?

SERGEANT AT ARMS:  Glenn if you're on, you may begin.

SERGEANT AT ARMS:  Glenn, we can't hear you.

CHAIRPERSON BROOKS-POWERS:  If we have inadvertently missed anyone that has registered to testify today and has yet to have been called, please use the Zoom hand function if you are testifying remotely and you will be called in order that your hand has been raised.  If you are testifying in person, please come to the dais.

SERGEANT AT ARMS:  Glenn, you're unmuted. Unfortunately, we can't hear you.

CHAIRPERSON BROOKS-POWERS:  If there's technical difficulties with Glenn, we ask that you submit your testimony in writing for the record.

With that, we thank everyone who took part in today's hearing and we look forward to continue discussions around these very important topics.

SERGEANT AT ARMS:  Oh Chair?

CHAIRPERSON BROOKS-POWERS:  Yes.

SERGEANT AT ARMS:  Someone has their hand up. Uhm, Ugyen Pema.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    241

CHAIRPERSON BROOKS-POWERS:  Can you repeat the name?

SERGEANT AT ARMS:  Ugyen Pema.

CHAIRPERSON BROOKS-POWERS:  Ugyen Pema, okay.

SERGEANT AT ARMS:  Yeah, I'll unmute you now.

UGYEN PEMA:  Hello.

SERGEANT AT ARMS:  Hello, you are unmuted.

UGYEN PEMA:  Okay, hi, good afternoon.  Thank you Chairwoman Brooks-Powers and members of the Transportation.  My name is Ugyen and I'm a Tibetan New Yorker.  I live in New York more than 26 years and I live in Jackson Heights Queens.  I'm a taxi owner driver.  I drive more than 20 years and I'm here to support the Introduction under Council Member Julie Won to make Losar a Tibetan New Year holiday for alternate side suspended.  So, I would like to thank Julie Won.  And then Tibetan New Year is actually very important for Tibetan and Sherpas from Nepal.  And then I'm also part of the India.  We have a lot of people in New York City.  So, we would like to celebrate with the families and especially the first day we build monastery, temple, do the prayers and just like other communities who celebrate Eid, Christmas, or other holidays.  So, we want not to

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE   242

worry about getting a parking ticket or move the car to the other side, so we could have piece of mind. So, I would like to I mean, I would very appreciate that you pass this bill.

And another thing is I'm a taxi driver is though I have the city and TLC, I want to request that in New York City there's disruption with the doorman and the drivers.  Some of the drivers, they made a group app so they could have a connection with a lot of doormen, especially in Manhattan midtown hotels.  So, to get a job, to have a job like LaGuardia, we have to pay $6.00 to doorman.  $10, $12 at JFK and then –

SERGEANT AT ARMS:  Your time has expired.  Thank you.

CHAIRPERSON BROOKS-POWERS:  Thank you. We ask if you would like, you can submit written testimony for the remainder of your statement.  Again, if we have inadvertently missed anyone that has been registered to testify today and has yet to have been called, please use the Zoom hand function if you are testifying remotely and you will be called in the order that your hand has been raised.

If you are testifying in person, please come to the dais.

COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE    243

Hearing none, we will now adjourn this hearing. We will close out this hearing.  Thank you and have a great day.  [GAVEL]

C E R T I F I C A T E

World Wide Dictation certifies that the foregoing transcript is a true and accurate record of the proceedings. We further certify that there is no relation to any of the parties to this action by blood or marriage, and that there is interest in the outcome of this matter.



Date     October 20, 2024