# EXHIBIT 7



**Testimony of Andrew Greenblatt, Policy Director**
**Independent Drivers Guild (IDG)**
**Committee on Transportation and Infrastructure**
**September 27, 2024**

My name is Andrew Greenblatt, and I am the Policy Director of the Independent Drivers Guild, otherwise known as IDG. I thank the committee for this opportunity to testify about Int 276, 323 and 100 today.

*The IDG is a nonprofit affiliate of the International Association of Machinists and Aerospace Workers (IAMAW). Our organization represents over 140,000 for-hire vehicle drivers in New York State and 300,000 in Connecticut, Massachusetts, New Jersey, Florida, and Illinois. The IAMAW is the only union to successfully organize black car workers in New York City and has been doing so for over a quarter of a century.*

**Int 276** would replace a hard-fought grievance procedure negotiated by the International Association of Machinists and Aerospace Workers (IAMAW) with a weaker process run by the city. This is an unprecedented assault on organized labor and we urge every Councilmember to loudly oppose it.

The Machinists originally negotiated the current system, which is now run by their affiliate, the Independent Drivers Guild (IDG). Organized labor routinely negotiates fair grievance procedures for their workers. We are unaware of any time in New York City history when the city stepped in and replaced an existing grievance procedure that was hard-won by the workers. The city should not start now. Workers in an industry know what works for them better than any agency required to regulate all kinds of work ever could.

**The Current System is Better Than the One Proposed In A Number of Ways**

Any rideshare driver in New York who Uber or Lyft has deactivated has a right to be represented by trained advocates in our organization. In cases where there is a disagreement, the driver can appeal all the way up to a worker panel run by a third-party arbitrator from the American Arbitration Association. Since 2016, we won 100% of the cases we've brought before the panel. The only drivers who don't go back to work, about 20% of those who begin the process with us, either find other work before reaching the appeals panel, or have acted in a way that should disqualify them from working in this industry. The current procedure is fair, effective and costs taxpayers nothing.

Furthermore, nearly half of the drivers who are deactivated are deactivated because their rating has dropped below 4.75 out of 5.0. In those cases, IDG refers those drivers to one of our weekly professional development classes. Under our agreement with the companies, those drivers are back to work, as of right, as soon as they present their certificate of completion through our online platform. Int 276 has no provision for professional development.

Deactivating a driver can have devastating consequences for a driver and their family. Drivers often go into debt to buy a vehicle, get the needed permits and insurance, etc.

Currently, when drivers are deactivated, they are represented for free by trained worker advocates from the moment they contact us until final disposition before an arbitrator. Under the bill, drivers who are deactivated would be left on their own to navigate a complex two-tiered system administered by a city agency they are unfamiliar with, the Department of Consumer and Worker Protection. Almost all workers would be left to defend themselves in an arbitration process. Those who had somehow opted out of arbitration beforehand when clicking "accept" to the terms and conditions of the app enter a different but equally complicated system run by department "fact-finders." This system will not work for drivers, 91% of whom are immigrants, and 100% have never faced this process.

Int 276 has one provision dealing with lockouts that looks appealing but ultimately would lead to a single company monopoly in New York City. It would give the company with the larger market share an ever-increasing advantage. Under the existing TLC minimum wage regulations each company must maintain a certain utilization rate, about 58% of the drivers' time must be spent on trips. Smaller companies can only provide timely service to their customers by "sharing" drivers with the market leader. Under the current regulations, and if Int 276 passes, smaller companies would have to keep cutting back on their drivers, thus increasing wait times for passengers until the company is no longer viable. No new company could ever get enough drivers to hit the utilization rate.

A better solution is the same one discussed in more detail below concerning lease rates, limiting the number of drivers allowed to work for any and all HV-FHV companies. The TLC could allow new drivers to enter the market whenever the utilization rate rose too high and passenger wait times were too long. This would end lockouts once and for all without driving any company out of business and allowing new companies to draw on the entire pool of drivers on day 1.

Replacing a successful, worker-friendly, union-won grievance procedure with a city agency that leaves workers to fend for themselves at a time of great distress is bad for workers, bad for organized labor, and bad for the city's taxpayers. The City Council should not destroy important worker protections won by a labor union. Instead, we look forward to working with Councilmembers who truly care about these workers to enact solutions that work.

**Int 323** would require the Taxi & Limousine Commission to set limits on how much companies could charge For Hire Vehicle Drivers to lease or rent vehicles with TLC plates. These rates are currently too high, starting at more than $400 per week for the most basic car and going up sharply from there. Drivers who rent these cars end up earning less than the minimum wage after paying these exorbitant fees, but for many, it is their only chance to get on the road and earn some money. Capping these fees would undoubtedly help, and IDG supports this bill.

But while this bill would go part way toward dealing with this problem, there is a much better solution. Companies can charge these fees because the TLC limits how many plates are available. This creates a monopoly that keeps new drivers from getting their own cars, which is a much better deal for them. Instead, the TLC should eliminate this cap. When they recently did this for electric and wheelchair-accessible vehicles, over 8,000 drivers applied for plates in a matter of days. Drivers stuck renting FHV or yellow medallion vehicles spoke loud and clear, "Let us own our cars!" The TLC was forced to end the new permits when they were sued by the New York Taxi Workers Alliance, a group that represents medallion owners who had much to lose if those who rent their vehicles could instead own their own.

Flooding the streets with thousands of new vehicles and drivers would, however, push down driver pay. More drivers sharing the same number of trips means fewer trips per hour for each driver. Therefore, the best solution is for the City Council to require the TLC to cap the number of drivers who can work with high-volume FHV

app companies to a level that supports the minimum wage regulations while providing quality service for passengers. In short, limiting plates takes money out of drivers' pockets and puts it into the pockets of medallion owners and leasing companies. Limiting the number of drivers leaves the money in drivers' pockets where it belongs.

**Int 100** would suspend alternate-side of the street parking regulations during Losar. IDG represents many drivers from the region that celebrates this holiday (Tibet, Bhutan, Nepal, India), and we ask you to support this bill. It would not only honor this important part of the New York City demographic mosaic, but would also allow people to celebrate the holiday more easily with their families and community.

For more information:

Andrew Greenblatt
andrew@idgbenefits.org