# EXHIBIT 8

# New York Taxi Workers Alliance

*AFL-CIO, Intl. Transport Workers' Federation*

31-10 37th Avenue, Suite 300, LIC, NY 11101

**Phone: 718-706-9892** E-mail: Media@nytwa.org / www.nytwa.org

September 30, 2024

Honorable Transportation Committee Chair Selvena N. Brooks-Powers
250 Broadway, Suite 1865
New York, NY 10007

Dear Council Transportation Committee Chair Brooks-Powers and Members of the Committee:

Greetings. On behalf of the 28,000-plus members of the New York Taxi Workers Alliance, I submit this comment:

- In support of Int. 276-2024, regarding the wrongful deactivation of For-Hire Vehicle drivers, and Int. 323-2024, which establishes maximum rates for the leasing, rental, lease-to-own and conditional purchase of for-hire vehicles.
- In opposition to Int. 939-2024, which would allow commuter vans to accept hails from prospective passengers in the street, at a time when yellow cab trips remain at almost half of what they were before the pandemic.
- Requesting that the City Council refrain from taking further action on Int. 277-2024, relating to taxicab driver pay for electronically dispatched taxicab trips, until more data can be collected.

**NYTWA Supports Int. 276, regarding the wrongful deactivation of For-Hire Vehicle drivers.**

For years, app-based drivers in New York have been routinely deactivated – suspended or fired, blocked from the app and unable to receive jobs – without a fair reason, without notice, and without the right to an independent appeal process that is not controlled by the companies themselves. Overnight, drivers are pushed into financial ruin, left without income, and with high vehicle-related expenses still on their backs.

From the get-go, the process is stacked against drivers. Unlike traditional workers, app-based drivers have no access to a manager or supervisor; once drivers are deactivated, they struggle to have any meaningful contact with the companies. Lyft no longer even has an in-person office for drivers in NYC. In many cases arising from customer complaints, drivers don't know why they've been fired, making it impossible for them to challenge their firings, even if a fair process for such challenges existed. Companies often refuse to give drivers any details about a complaint that would allow them to even know what trip or trips formed the basis for their discipline.

What's more, the companies often rely solely on customer complaints to deactivate drivers, regardless of whatever evidence a driver may have to the contrary, like footage from a dashboard camera. Drivers report being deactivated when they:

- Were assaulted by passengers, yet passengers complained to the companies about driver conduct.

- Were accused of drunk driving, even where such drivers were observant Muslims who never drink and no complaints were made to law enforcement.
- Refused to perform illegal turns or drop-offs at the passenger's request.

Such patterns are consistent with company practices elsewhere in the U.S.[1]

Legislation protecting drivers from being fired without a fair reason is essential to ensure a just and equitable termination process that protects drivers against having their jobs arbitrarily taken away from them and subjecting them to overnight loss of income and saddled in debt.

In line with City law for fast food workers, Int. 276 makes it unlawful for High-Volume For-Hire Vehicle ("HVFHV") companies such as Uber and Lyft to fire drivers without a good reason and, in most cases, without advance notice. Int. 276:

- Requires companies to provide written statements explaining the reasons for deactivation and informing drivers of the right to challenge their deactivation.
- Allows drivers to challenge their deactivations in fair hearings.
- Provides a 14-day upfront period for informal resolution.
- Prohibits HVFHV companies from deactivating drivers without a bona fide economic reason, in line with City law for fast food workers.
  - Such a standard is essential to giving the law meaningful protection. Without this standard, any firing could pretextually be called an economic layoff.
- Provides for remedies where a driver has been deactivated without good cause, including reinstatement, backpay, and civil penalties.
- Allows for review of previous deactivations within the past 6 years, in line with state statutes of limitation for labor law and contract violations.

These protections are particularly important for For-Hire Vehicle drivers, as the effect of unfair firings has more dire consequences for FHV drivers than other workers. Drivers are not only left without income, but, because they must cover their driving expenses themselves, are often saddled with continuing debt from long-term vehicle and insurance payments that often continue even after they are unable to work.

What's more, although studies indicate[2] that passenger bias often factors into customer complaints and driver deactivations, drivers lack any independent remedies when they are deactivated unfairly; driver contracts don't require any proof for driver deactivations. Due process for allegations of misconduct, however, is par for the course in the Taxi/FHV industry. The Taxi and Limousine Commission ("TLC") has always had to prove violations for TLC license suspensions and revocations at an OATH administrative hearing; as HVFHV companies command the vast majority of market share[3], deactivation from a private company is as significant as losing one's TLC license entirely, and similar due process should be established.

---

[1] "Fired by an App," Asian Law Caucus and Rideshare Drivers United, February 2023, available at https://www.advancingjustice-alc.org/media/Fired-by-an-App-February-2023.pdf.
[2] "Fired by an App," Asian Law Caucus and Rideshare Drivers United, February 2023, available at https://www.advancingjustice-alc.org/media/Fired-by-an-App-February-2023.pdf.
[3] Uber has a 74.7% market share of ride hailing apps in New York City, while Lyft has the remaining 25.3%; meanwhile, Uber and Lyft combined have a 86% market share of the entire taxi and for-hire vehicle industry in New

Through recent legislation[4] on unwarranted firings of fast food workers, the City Council has shown that just cause protections for workers are just, necessary, and pass legal muster.[5] You may hear directly from the Independent Drivers Guild ("IDG"), a company-funded union of sorts[6], that Int. 276 is not only unnecessary but harmful to an existing so-called "grievance procedure." These claims are simply untrue: Int. 276 has no impact on any existing appeal or grievance process; drivers who wish to use any existing deactivation appeal process would remain free to do so. However, it is notable that IDG is protesting because they provided what Uber describes as input on an Uber-controlled driver-appeals process–a process restricted to only those cases that Uber allows it to hear[7]. This process is individualized, private, and not even available for all cases. For example, drivers cannot even begin this process if they have been accused of allegations related to safety, a concept that the companies define so broadly as to cover many allegations related to driving or customer interactions. Among other possible exclusions, it does not cover:

- Drivers who have been assaulted by their passengers cannot access the appeals process if they face the mere allegation of assault.
- Drivers who have been falsely accused of driving while intoxicated, perhaps because, as Uber acknowledges, "[s]mells of alcohol or drugs—even if left by riders—can be interpreted as impairment and also lead to such reports."[8]

Whatever agreement created this Uber-IDG process is not public; it does not appear that drivers have any right to notice or back pay, and it is not clear what standard they must prove to get their job back, assuming they can even get in the door. Notably, despite holding a rally before the public hearing held on Friday, September 27th, no driver testified at the hearing in support of Uber's existing process, nor were IDG staff available to answer questions or provide explanations regarding how the process works. Instead, a number of drivers testified about how the IDG process had failed to work for them. Although IDG staff chose not to participate in the hearing, prior testimony from IDG staff before City government corroborated drivers' testimonies that the current IDG-Uber process is insufficient.[9]

Real workers' rights are enforceable, hold the company to account, and can't be taken away at the company's whim. In line with the Council's protections for fast food workers, these rights

York City. *See Taxi and Ridehailing Usage in New York City* (date accessed: September 30, 2024), available at https://toddwschneider.com/dashboards/nyc-taxi-ridehailing-uber-lyft-data

[4] Local Law 1 of 2021, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3860321&GUID=76C5427B-7B33-4E55-AA73-37345B8ABEEF&Options=ID|Text|&Search=1396.

[5] *See Rest. L. Ctr. v. City of New York*, 90 F.4th 101 (2d Cir. 2024) (upholding New York City's Wrongful Discharge Law for fast food workers).

[6] https://www.nytimes.com/2017/05/12/business/economy/uber-drivers-union.html

[7] https://www.uber.com/blog/new-york-appeals/ (stating that "certain deactivation decisions, especially those related to zero tolerance violations, are not eligible for appeal" and that "[u]ltimate determination of eligibility will be determined by Uber on a case-by-case basis.")

[8] https://www.uber.com/us/en/drive/safety/deactivations/

[9] *See* Transcript of Minutes of the Taxi and Limousine Commission Hearing (Oct. 3, 2018) colloquy between then-TLC Chair Meera Joshi and IDG staff Aziz Bah, at pp. 262-64 (reflecting Mr. Bah's testimony, in response to the question of "what is IDG's agreement with Uber regarding deactivation?" that "There is a proper deactivation process going on but the system is not fair…. [Uber is] not giving everyone a fair hearing, and that's our issue… We just want it to be fair across the board, and we want every single driver, actually, to have access to that hearing. We're not saying everyone is going to get reactivated, but hear everyone's story. You can't just deactivate the driver without them even knowing why they're getting deactivated.")

and a fair and impartial process must be codified to truly protect workers. Drivers deserve job security that is rooted in law.

**NYTWA Supports Int. 323, which establishes maximum rates for the leasing, rental, lease-to-own and conditional purchase of for-hire vehicles.**
NYTWA supports the passage of Int. 323. In recent years, a market for the financing and leasing of For-Hire Vehicles has grown to a scale not previously seen. Despite repeated calls to regulate the FHV leasing market, TLC has yet to do so. There is currently no regulation of the financial terms for the TLC-FHV leasing market, meaning there are no limits to how much FHV dealers may charge drivers for the sale or lease of a FHV. Where regulation of expenses has, in the taxi sector, always been a crucial part of the formula that ensures decent pay rates are not entirely consumed by a driver's expenses, no such rules exist in the FHV sector.

The TLC must regulate TLC vehicle owners to protect drivers from subprime auto lenders, opaque billing practices, and exorbitant lease rates. The TLC currently requires taxi lessors to limit the costs they may charge per week and limit the total sales costs for taxicab vehicles. These costs are limited to $42,900 for sale of a vehicle (at a maximum of $275 per week), and rates for leases that amount to a $48/day cost for daily or weekly lease of the taxicab (not counting medallion lease costs). *See* 35 RCNY § 58-21(c); *Metro. Taxicab Bd. of Trade v. N.Y.C. Taxi & Limousine Comm'n*, 2009 NY Slip Op 29474, ¶ 11 (Sup. Ct.) (noting that the "portion representing the rental of the vehicle itself" was set at $24 per 12-hour shift). In contrast, the TLC has let the leasing costs of TLC-licensed FHVs remain entirely unregulated. The result is predictable, exorbitant fees for vehicles that have been in place for years. Drivers have been made to pay over $68,000 for Toyota Camrys.  Current lease rates for Toyota Camrys "start at $390."  *See* https://www.fasttrackleasingllc.com/vehicles-pricing/. There is simply no reason why the TLC would limit payment for a yellow Toyota Camry to $275 a week while placing no limit on the costs for a black Toyota Camry– this hole in TLC's regulatory scheme needs to be plugged immediately. Int. 323 would require the TLC to do exactly that.

**NYTWA opposes Int. 939, which allows commuter vans to accept hails from prospective passengers in the street, at a time when yellow cab trips remain at almost half of what they were before the pandemic.**
NYTWA opposes the passage of Int. 939, which would allow commuter vans to accept street hails anywhere in the city – a right historically reserved exclusively for yellow cabs. In the past decade, the yellow cab sector has been roiled by one devastation after another, from the unlimited entry of Uber and Lyft to the medallion debt crisis to the Covid-19 pandemic. These interrelated crises have left many yellow cab drivers locked into poverty, with no clear way to exit, as many drivers are stuck with ballooning debt while making less and less money. Such economic consequences cannot be taken lightly: just five years ago, a string of drivers died by suicide because of the poverty and debt caused by the collapse of the yellow cab sector. This cannot be allowed to happen again.

The consequences of allowing commuter vans to compete with yellow cabs for the same, limited number of trips is clear: yellow cab drivers, who are already struggling to survive post-pandemic, will be pushed further into poverty. While other sectors in the for-hire vehicle industry have experienced a more robust recovery post-pandemic, yellow cabs have been left behind, and are doing just a fraction of the trips they once did.

The numbers are stark. Before the pandemic, in February 2020, yellow cabs did 217,216 trips a day; in July 2024, the most recent month for which there is data, yellow cabs performed just

97,930 trips a day. *See Taxi and Ridehailing Usage in New York City* (date accessed: September 26, 2024), available at https://toddwschneider.com/dashboards/nyc-taxi-ridehailing-uber-lyft-data/. This is just 45% of the trips they performed before the pandemic, and 19.7% of the trips they performed before the entry of Uber and Lyft (compare 497,661trips performed in March 2014 to 97,930 trips performed in July 2024).

Meanwhile, drivers have returned at a much faster rate than trips: the number of active vehicles per day is now at 75% of pre-pandemic levels (compare 7,779 active vehicles per day to 10,349 active vehicles per day in February 2020). As a result, individual drivers have seen their income plummet: where once a yellow cab driver could expect, on average, 21 trips a day, now the average is 12.6. This 40% reduction in trips, of course, comes with an equivalent reduction in income.

Meanwhile, as trips and income are down, drivers are facing rising costs. While many drivers benefited from the City's Medallion Relief Program, which sought to address the medallion debt crisis, hundreds of drivers have yet to receive debt relief because their lenders do not want to participate directly in the program. As a result, drivers are left with loans as high as $700,000 for an asset that is being sold for, at most, a fraction of that.

Further, a recent court order in a federal lawsuit means that all yellow cabs must be wheelchair accessible vehicles. *See The Taxis for All Campaign, et al v. TLC, et al*, 11-cv-0237-GBD (S.D.N.Y.), Dkt. No. 343, Memorandum Decision and Order (Aug. 29, 2024). Despite not being a party in the lawsuit, medallion owners are the parties solely responsible for vehicle costs – and operating a wheelchair accessible vehicle doubles the initial cost of purchasing a vehicle from approximately $40,000 to $80,000 per vehicle, while also increasing maintenance and operational costs. Many drivers report that they simply cannot afford these costs, and will be forced to give up their medallion or go into bankruptcy. While the Taxi and Limousine Commission must comply with the court order, they're also inexplicably attempting to worsen this crisis by proposing rules that remove an existing hardship exemption that gives drivers additional time to save up to afford the purchase of a new wheelchair accessible vehicle. See *Proposed Rule for Public Hearing – 100% Wheelchair Accessible Vehicles (Taxis) – October 10, 2024 at 10:00 am*, available at https://www.nyc.gov/site/tlc/about/proposed-rules-pilot-programs.page.

Just three years after going on hunger strike to demand the City address the humanitarian disaster created by medallion debt, yellow cab drivers are, once again, facing a crisis of poverty. If the Council passes Int. 939, and reduces the limited trips currently available for yellow cab drivers, they will be worsening this crisis at a time when yellow cab drivers simply cannot afford another reduction in income. NYTWA urges the City Council not to take such a damaging step; NYTWA oppose Int. 939.

**<u>NYTWA requests that the City Council refrain from passing Int. 277, relating to taxicab driver pay for electronically dispatched taxicab trips, until more data can be collected.</u>**
NYTWA requests that the Council refrain from passing Int. 277 until more data about e-hail trips can be collected about how e-hail trips impact driver income. On August 14, 2024, the TLC adopted a package of rules that require e-hail providers to disclose comprehensive information about e-hail trips to drivers, including how much the passenger pays. NYTWA respectfully requests that the City Council wait for this rule change to be implemented so that drivers and their advocates can use the information gathered from trip receipts to develop a more complete understanding of the current dynamics of e-hail trips prior to passing any legislation.

As described more completely in the New York Taxi Workers Alliance's October 2023 testimony before this Committee, the information currently available about e-hail trips is summarized in the TLC's reports on the Flex Fare Pilot Program, which have significant methodological flaws and thus reach faulty conclusions. In short, the TLC's report fails to come out and say that, on average, most e-hail taxi trips pay less per-mile than conventionally hailed trips even though that is what the data from the report shows. *See* Taxi and Limousine Commission's September 2023 Flex Fare Report at 3, Table 1; Table 2 (showing the average driver revenue per mile for Curb, the e-hail provider who dispatched the large majority of e-hail trips, was $4.14, which is less than the average driver revenue per mile on metered trips of $4.28). Among the report's other failings: it includes data both from before and after the fare raise that occurred in December 2022, and does not distinguish between the two time periods when performing its analysis, or discuss the impact the fare raise would have on the general averages. September 2023 Report at 3. In addition, the 2023 report also inexplicably fails to compare the revenue earned via metered and e-hail trips by time, instead considering only distance. *Id.*

The TLC's newly passed transparency rules, on the other hand, give drivers and their advocates an opportunity to develop an independent analysis of the data regarding e-hail trips and driver pay, and tailor any legislative interventions accordingly. In light of the recent TLC rule change, passing Int. 277 now would be premature.

**Conclusion**

NYTWA appreciates the Committee's time and attention on these matters. NYTWA supports Int. 276 and 333, opposes Int. 939, and asks the Council to refrain from voting on Int. 277.

Respectfully Submitted,

Bhairavi Desai, Executive Director
New York Taxi Workers Alliance