**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UBER TECHNOLOGIES, INC., and UBER USA, LLC,

                    Plaintiffs,

     v.

CITY OF NEW YORK,

                    Defendant.

No. 26-cv-4893

**ORAL ARGUMENT**
**REQUESTED**

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Karen L. Dunn (N.Y. Bar No. 4498028, *SDNY admission pending*)
Martha Goodman (N.Y. Bar No. 5034210)
Kyle N. Smith (N.Y. Bar No. 5075940, *SDNY admission pending*)
Meryl C. Governski (*pro hac vice forthcoming*)
Leah R. Hibbler (*pro hac vice forthcoming*)
Linda E. Halfacre (*pro hac vice forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Suite 800
Washington, DC 20004
Tel: (202) 240-2900
kdunn@dirllp.com
mgoodman@dirllp.com
ksmith@dirllp.com
mgovernski@dirllp.com
lhibbler@dirllp.com
ehalfacre@dirllp.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS............................................................................................4

    A.    Drivers Benefit From Contractual Relationship With Uber That Balances Multiple Competing Priorities.............................................................................4

    B.    Uber Provides A Fair Deactivation Process, Including Avenues Of Appeal. ...5

    C.    The City Passed The Challenged Law To "Fix" A Nonexistent Problem At The Expense Of Uber's Rights And Public Safety. ..........................................7

    D.    The Challenged Law Would Rewrite Uber's Contracts And Compel Uber To Convey Information It Would Not Otherwise Convey And Associate With Drivers With Whom It Has Chosen Not To Associate. ..........................8

LEGAL STANDARD ................................................................................................10

ARGUMENT.............................................................................................................10

    I.  UBER IS LIKELY TO SUCCEED ON THE MERITS...........................................10

    A.    Uber Is Likely To Succeed On Its Contracts Clause Claims. .........................10

        1.  Uber is likely to demonstrate that the Challenged Law would substantially impair Uber's contracts with drivers. .................................11

        2.  The Challenged Law does not advance a "legitimate public purpose" or use reasonable and appropriate means...................................................13

    B.    Uber Is Likely To Succeed On Its Due Process Claim. ..................................15

    C.    Uber Is Likely To Succeed On Its Compelled Speech Claim. ........................16

        1.  Uber is likely to succeed in arguing that the Compelled Speech Provisions are subject to, and fail, strict scrutiny. .................................16

        2.  Even if the regulated speech is commercial, Uber is likely to demonstrate that the Challenged Speech Provisions would not survive intermediate scrutiny...................................................................................19

        3.  The Compelled Speech Provision would not survive *Zauderer* Scrutiny. 20

    D.    Uber Is Likely To Succeed On Its Compelled Association Claims. ...............21

    II.  UBER WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION...............................................................................................22

    A.    Deprivation Of Constitutional Rights Is Irreparable Harm. ...........................22

    B.    The Challenged Law Threatens To Impose Numerous Additional Irreparable Harms..........................................................................................23

    III.  THE PUBLIC INTEREST AND BALANCE OF EQUITIES SUPPORT AN INJUNCTION....................................................................................26

CONCLUSION ........................................................................................................27

i

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023).................................................................................................16, 22

*725 Eatery Corp. v. City of New York*,
  408 F. Supp. 3d 424 (S.D.N.Y. 2019).................................................................10, 27

*A.H. v. French*,
  985 F.3d 165 (2d Cir. 2021).........................................................................................27

*Airbnb, Inc. v. City of New York*,
  373 F. Supp. 3d 467 (S.D.N.Y. 2019).................................................................22, 24

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978)..................................................................................... 10, 12, 13

*Am. Meat Inst. v. U.S. Dept. of Agriculture*,
  760 F.3d 18 (D.C. Cir. 2014).......................................................................................20

*Association of Equipment Manufacturers v. Burgum* ("*AEM*"),
  932 F.3d 727 (8th Cir. 2019) .......................................................................................14

*Bery v. City of New York*,
  97 F.3d 689 (2d Cir. 1996)...........................................................................................23

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000)................................................................................................21, 22

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)......................................................................................................19

*Buffalo Teachers Fed. v. Tobe*,
  464 F.3d 362 (2d Cir. 2006)........................................................................................13

*Burns v. Martuscello*,
  890 F.3d 77 (2d Cir. 2018)...........................................................................................16

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980)........................................................................................17, 19, 20

*Conn. State Police Union v. Rovella*,
  494 F. Supp. 3d 210 (D. Conn. 2020), *aff'd*, 36 F.4th 54 (2d Cir. 2022) ...........................23

*Coronel v. Decker*,
    449 F. Supp. 3d 274 (S.D.N.Y. 2020)...................................................................................24

*Doctor's Associates, Inc. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997)...........................................................................................27

*Donohue v. Paterson*,
    715 F. Supp. 2d 306 (N.D.N.Y. 2010)...............................................................................23

*DoorDash v. City of New York*,
    692 F. Supp. 3d 268 (S.D.N.Y. 2023)...............................................................11, 13, 14, 15

*DoorDash v. City of New York*,
    789 F. Supp. 3d 337 (S.D.N.Y. 2025)...............................................................17, 19, 20, 21

*Edenfield v. Fane*,
    507 U.S. 761 (1993)........................................................................................................20

*Elrod v. Burns*,
    427 U.S. 347 (1976)........................................................................................................23

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983)........................................................................................................10

*Gov't Emps. Ins. Co. v. Patel,*
    2024 WL 84139 (E.D.N.Y. Jan. 8, 2024), *aff'd*, 166 F.4th 280 (2d Cir. 2026)...................26

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) .....................................................................................25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)........................................................................................................17

*In re Workers' Comp. Refund*,
    46 F.3d 46 F.3d 813 (8th Cir. 1995) ................................................................................11

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)...............................................................................................23

*Landsgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)........................................................................................................15

*Melendez v. City of New York*,
    16 F.4th 992 (2d Cir. 2021) .......................................................................................passim

*Mercer Health & Benefits LLC v. DiGregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y. 2018)......................................................................24

*Miami Herald Publishing Co. v. Tornillo*,
    418 U.S. 241 (1974)........................................................................................17

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010).................................................................................22

*Nat'l Inst. of Fam. & Life Advocs. v. James*,
    160 F.4th 360 (2d Cir. 2025) ...........................................................................17, 18

*National Institute of Family and Life Advocates v. Becerra*,
    585 U.S. 755 (2018)................................................................................16, 17, 21

*New Hope Family Services, Inc. v. Poole*,
    966 F.3d 145 (2d Cir. 2020)...............................................................................22

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)...........................................................................24, 26, 27

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015).......................................................................................18

*Regina Metro. Co. v. New York State Div. of House. and Community Renewal*,
    154 N.E.3d 972 (N.Y. 2020)...............................................................................15

*Register.com, Inc. v. Verio Inc.*,
    356 F.3d 393 (2d Cir. 2004)...............................................................................24

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781, (1988)......................................................................................17

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984).......................................................................................22

*Safelite Group, Inc. v. Jepsen*,
    764 F.3d 258 (2d Cir. 2014)...............................................................................21

*San Diego Cty Lodging Assoc. v. City of San Diego*,
    2021 WL 5176477 (S.D. Cal. July 8, 2021) ..............................................................11

*Seventh Regiment Armory Conservancy, Inc. v. Knight*,
    811 F. Supp. 3d 467 (S.D.N.Y. 2025)......................................................................23

*Slattery v. Hochul,*
   61 F.4th 278 (2d Cir. 2023) ...................................................................................21, 22

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011)...................................................................................................16

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.,*
   120 F.4th 59 (2d Cir. 2024) ......................................................................................25

*Statharos v. N.Y.C. Taxi and Limousine Comm'n,*
   198 F.3d 317 (2d Cir. 1999).......................................................................................23

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994)...................................................................................................26

*U.S. v. Playboy Entertainment Grp.,*
   529 U.S. 803 (2000)...................................................................................................18

*Volokh v. James,*
   148 F.4th 71 (2d Cir. 2025) .......................................................................................20

*Winter v. Nat. Resources Def. Council, Inc.,*
   555 U.S. 7 (2008).......................................................................................................10

## PRELIMINARY STATEMENT

This lawsuit is a quintessential Contracts Clause, First Amendment, and Due Process challenge to an unprecedented New York City law.  Local Law 52 of 2026 ("***Challenged Law***") would override well-settled contractual provisions designed to protect Uber,[1] riders, and the public at large who rely on Uber to keep its platform and users safe, and then force Uber to speak in further degradation of safety and its interests.  Simply put, this draconian new law attempts to force Uber to allow drivers to continue to provide rideshare trips even if Uber has made a good-faith determination that the drivers have engaged in dangerous, threatening, and/or inappropriate behavior.  It simultaneously would force Uber to alter the content of its speech by compelling it to disclose to drivers a level of detail about their deactivations and specific complaints from riders even though Uber does not want to provide that information, including because doing so threatens rider safety and privacy.  Such a law is unconstitutional and not in the interest of New Yorkers.

**The Challenged Law's Constitutional violations are worsened by its 7-year retroactive application.**  The City goes beyond a forward-looking infringement on core constitutional rights by imposing unconstitutional requirements retroactively for a seven-year period.  If Uber fails to comply with even a technical requirement of the new law, it could mean Uber has to reinstate drivers who were deactivated as early as 2019 *even if* the driver undoubtedly committed a serious act of misconduct, like sexual assault or driving while intoxicated.  Retroactive legislation violates multiple constitutional rights, including substantive Due Process, and requires Uber to act in a way that offends its core values, including standing for safety.

**Uber and its drivers have long-settled contractual rights and obligations.**  Uber connects City drivers with riders by granting both parties access to Uber's platform.  As a

---

[1] "Uber" refers to Plaintiffs Uber Technologies, Inc., and Uber USA, LLC.

precondition of providing rides on the platform, each driver agrees to a Platform Access Agreement, which incorporates numerous Uber standards and policies.    That contractual agreement defines the relationship between Uber and drivers.    It grants Uber the right to temporarily remove access to its platform "without notice" to investigate issues and to deactivate a driver's account "without notice if we determine in our discretion" that the driver has engaged in "activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates" the agreement.    By incorporating Uber's public-facing Community Guidelines, it also specifies the types of driver conduct that, if found by Uber, may result in a loss of access.    These contractual provisions protect not only Uber but also riders and the public at large, and benefit the vast majority of drivers who operate safely.

**The Challenged Law stands to upend this long-settled contractual regime and violate Free Speech, Free Association, and Due Process rights, including by:**

(i) Overriding Uber's contractual right to deactivate a driver for conduct that it determines in its discretion materially violated the driver's agreement (§§ 20-1282(a)-(c));[2]

(ii) Replacing Uber's contractual right to deactivate drivers immediately in some instances with a requirement that Uber provide 14 days' notice, notwithstanding that doing so is inherently unsafe and poses an avoidable risk (§ 20-1282(d));

(iii) Compelling Uber to speak specific content—such as "all the precise and detailed reasons for" a deactivation and "all customer comments, ratings, and complaints" and "information and data"—even though doing so could endanger riders and interfere with privacy expectations and reveal fraud detection methods (§§ 20-1282(d)-(e), 20-1283(c), 20-1286);

---

[2] Unless otherwise specified, all citations to Ex. 1-3 refer to Exhibits to the Perl Declaration, all citations to Ex. A-E refer to Exhibits to the Goodman Declaration, and all citations to "Section" or § refer to Local Law 52 (Ex. A).  All citations to the names of declarants refer to their respective declarations.

2

(iv) Compelling Uber to provide other information to drivers that it does not want to disclose, including a report about all other driver deactivations the preceding year which can reveal success in eliminating fraud (§ 20-1286); and

(v) Subjecting Uber to retroactive liability by creating a seven-year retroactive lookback period that requires Uber to reactivate a driver to the platform unless it can prove deactivation decisions back to 2019 met the new standards and new "factors" for deactivations that did not apply previously (§ 20-1283(a)-(b)).

The Constitution does not require a party with rights and obligations under a contract, or who wishes to engage in free speech and association, to justify why it agreed to particular terms or why it wishes to speak (or not speak) or associate (or not associate) in a particular way. But even if the law required justification, Uber has legitimate, carefully considered reasons for deactivating and communicating the way it does, rooted in a careful balance of competing priorities essential to Uber's business, riders, and drivers. The Challenged Law would override that careful balancing entirely, imposing an inflexible wrongdoers-over-safety regime that flies in the face of Uber's contractual rights and the interests of all users of Uber's platform except the tiny portion of deactivated drivers. The result could mean that Uber must let the driver pick up and transport a rider in an enclosed vehicle— including, for example, a single female rider at night to the home where she lives alone—even if Uber has reason to conclude that a driver engaged in misconduct and poses a danger.

**Preliminary injunctive relief is necessary to avoid irreparable harm and to balance the equities.** The Challenged Law will cause *per se* irreparable harm by depriving Uber of constitutional rights the minute it goes into effect on July 28, 2026. Numerous additional irreparable and noncompensable harms would result if the law takes effect. The balance of equities

3

and public interest favor enjoining the Challenged Law because no one benefits from constitutional violations and it poses an avoidable and significant risk to Uber, riders, and the general public, for the benefit of a tiny minority of drivers.  With an injunction in place, deactivated drivers are protected by existing internal appeals and a process led by the Independent Drivers Guild.  Uber respectfully requests the Court enter injunctive relief enjoining the City from enforcing the unconstitutional law against Uber and staying its effective date until after this lawsuit is adjudicated.

STATEMENT OF FACTS

**A.    Drivers Benefit From Contractual Relationship With Uber That Balances Multiple Competing Priorities.**

Uber's technology platform connects New York City ("*City*") drivers, who want to earn money, with riders who need rides.  Perl ¶ 7.  Uber's platform provides drivers with access to more than one hundred thousand trips every day in the City.  *Id.* ¶ 6.  Uber agrees to grant drivers access to its platform only if they agree to the Platform Access Agreement, which incorporates "the Community Guidelines" and "other applicable Uber standards and policies," such as "safety standards" and "accessibility policies."  Ex. 1 at 1 ("*PAA*") (PAA plus incorporated policies, "*Agreement*").[3]  The Agreement affords drivers the right to "decide when, where, and whether" they want to offer rides on Uber's platform, which rides to accept, and whether they want to simultaneously offer services on other platforms or maintain jobs elsewhere.  Perl ¶ 6.  Drivers have the freedom to terminate the Agreement at any point for any reason.  PAA § 5.2.  The PAA establishes Uber's right to deactivate drivers:

> "**5.3. Deactivation.**  You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe,

---

[3] The agreements that Uber and drivers entered into prior to January 1, 2022 provided for substantially the same rights as the PAA regarding deactivation and notice.  Perl ¶¶ 13-15.

4

> illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a 'Material Breach or Violation'). You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred."

PAA § 5.3 ("*PAA Deactivation Provision*").  The PAA imposes obligations on each party in exchange for benefits received: Drivers must not violate the Agreement, and Uber deactivates them only if it has determined that a violation occurred.

Uber structured its contract with drivers to balance multiple, and sometimes competing, priorities: keeping open driver access and earning opportunities; promoting safe, comfortable, and high-quality rides; and protecting Uber's brand and economic interests.  Perl ¶ 16; *see also* Freivogel ¶ 7.  Uber's Community Guidelines reiterate that Uber prioritizes making "every experience feel safe, respectful, and positive." Ex. 2 at 1.  Given that Uber's technology provides person-to-person interactions inside a private vehicle, the Agreement is designed to protect against avoidable risks by reserving for Uber the discretion to prevent drivers from interfacing directly with riders if they have engaged in prohibited behavior, which directly implicates the core tenets on which Uber operates.  Perl ¶ 16; Freivogel ¶ 9.  One of Uber's core values is "Stand for Safety," and it makes clear that Uber "stand[s] for safety.  Safety is not just a feature–it's a foundation." Freivogel ¶¶ 5-6.  Drivers benefit from this: safety attracts more riders, thereby increasing earning opportunities for drivers. *Id*. ¶ 7.

**B.      Uber Provides A Fair Deactivation Process, Including Avenues Of Appeal.**

Deactivations are a last resort and affect only 1% of drivers in New York.  Perl ¶ 17.  More than half of deactivations of drivers in the City in 2025 were attributable to safety, including: interpersonal issues, such as altercations or alleged sexual misconduct; dangerous driving, such as a crash or poor, unsafe, or distracted driving; serious traffic violations, such as high speeding

5

(captured by phone sensor data while using the Uber platform); or having drugs and/or open containers of alcohol in the car or smells of alcohol or drugs.[4]  Freivogel ¶ 14.  Uber at times must make deactivation decisions based on imperfect information, such as in the case of a reported sexual assault.  *Id*. ¶ 21.  Uber typically prioritizes safety by exercising its discretion to deactivate drivers identified in reports about very serious, alarming situations.  *Id*.  Other prevalent reasons for deactivations in the City in 2025 were identity or document fraud, and economic fraud.  Perl ¶ 18; De Coning ¶¶ 16-17; Jarzabek ¶ 9.  Together, safety and fraud (including identity verification and document fraud) reflected 92 percent of deactivations in the City in 2025.  Perl ¶ 18.

When Uber receives reports of conduct that may result in deactivation, Uber generally notifies drivers they have been the subject to a report that could lead to deactivation and may be deactivated if additional reports are received (even though the PAA does not require any notification).  Freivogel ¶ 28.  Uber calibrates the specific details it discloses to balance keeping riders safe with providing the driver meaningful notice.  *Id*. ¶¶ 30-33.  Notices generally inform drivers that they have received a report, the date of the trip, and the general nature of the report (such as "Post-trip contact" or "Unsafe driving").  *Id*. ¶ 30.  Uber does not provide to the driver the personally identifiable information like the rider's name, details like pick-up or drop-off address or the time of the trip, or the verbatim text of the rider's report, unless such information is required during a legal process, because such information increases the likelihood that the driver could identify the reporting rider, while not necessarily helping the driver respond.  *Id*. ¶ 31.  For the more serious issues, Uber limits the type of information it provides due to the heightened risk of retaliation.  *Id*. ¶ 32.  Similarly, Uber does not provide drivers with details where Uber has

---

[4] *Deactivations*, Uber, available at www.uber.com/us/en/drive/driver-app/deactivation-review/?city=washington-dc#overview (last accessed June 4, 2026).

6

detected fraud because such information provides fraudsters with a roadmap to avoid detection in the future.  De Coning ¶¶ 20-21; Jarzabek ¶¶ 11-13.

When Uber has determined to deactivate a driver account, it deactivates immediately. Because allowing drivers to remain on the platform after Uber has decided to deactivate could pose safety risks to riders and the public, or financial risks to riders and Uber from additional fraud, it does not give advance notice.  Freivogel ¶¶ 37-39; Jarzabek ¶¶ 16-17.  The risk of repeat or similar conduct would be even worse if the driver is aware of the impending deactivation and has no incentive to follow the Agreement.  Freivogel ¶ 39; Jarzabek ¶¶ 16-17.

Uber maintains an appeal process under which Drivers can seek review of Uber's decision to deactivate their accounts.  Most deactivation decisions, including those based on serious safety incidents, are eligible for review in the Review Center.  Perl ¶¶ 22-25.  When Uber notifies a driver that Uber deactivated the driver's account, Uber discloses the appeals process, if available, and generally provides the ability to submit evidence and immediately request review.  Perl ¶ 22. Drivers in the City have had access to an additional independent, union-negotiated appeals process through the Independent Drivers Guild ("*IDG*") since 2016.  Perl ¶ 26.

C.     **The City Passed The Challenged Law To "Fix" A Nonexistent Problem At The Expense Of Uber's Rights And Public Safety.**

The City Council ("*Council*") passed the Challenged Law to address what it labeled "wrongful deactivation of high-volume for-hire vehicle drivers."  Ex. A at 1.  The powerful taxi driver's lobby (the New York Taxi Workers Alliance ("*NYTWA*")) spent more than two years demanding the Council address "unfair deactivations" and reportedly helped write the bill that would become the Challenged Law.  Ex. C at 3.  The Council did not define what it means for a deactivation to be "wrongful" or "unfair" and concluded, without analysis, that they posed a problem in the City.  *E.g.*, Ex. D at 21:11-19; Ex. E at 10.  The Council does not appear to have

7

commissioned any studies or research into the purported problem, relying on representations by the NYTWA and anecdotes of deactivated drivers. *E.g.*, Ex. D at 49:15-52:12; Ex. E at 6, 8-9. NYTWA and a similar advocacy organization in California conducted the two "surveys" on which the Council relied, which convey similar one-sided anecdotes by a few hundred deactivated drivers in the City. Ex. E at 6, 8-9. The discussion of the bill focused on addressing drivers' "fear" of deactivation. Ex. D at 51:24-52:12; Ex. F at 3.

Although the Challenged Law ultimately would require Uber to justify its deactivations by a preponderance of the evidence, Council Member Shekar Krishnan, the Challenged Law's primary sponsor, publicly explained initially that companies like Uber should "bear the burden of proving that their actions were justified" "beyond a reasonable doubt," as if Uber was placing drivers in prison. Ex. D at 173:21-174:3; 174:8-175:9. Mr. Krishnan's apparent philosophy was that a driver accused of a serious crime (like kidnapping or rape) must be permitted to continue to pick up passengers and transport them in an enclosed vehicle unless Uber can meet the criminal beyond a reasonable doubt standard. The Council never meaningfully discussed how its presumption in favor of drivers and against Uber could negatively impact rider or public safety. The Council largely dismissed the concerns raised by Uber and other companies and community groups about how restricting the "ability to deactivate bad and unsafe drivers accused of serious misconduct" could create profound safety issues. Ex. B at 2; Ex. E at 12-15.

**D.    The Challenged Law Would Rewrite Uber's Contracts And Compel Uber To Convey Information It Would Not Otherwise Convey And Associate With Drivers With Whom It Has Chosen Not To Associate.**

The Challenged Law, which will take effect on July 28, 2026 if not enjoined, would impose substantive and procedural requirements that, separately and in combination, unconstitutionally interfere with Uber's contractual agreements and violate Uber's rights guaranteed by the United States Constitution:

8

- Section 20-1282(a)-(c) (the "***Deactivation Prohibitions***") substitutes Uber's contractually agreed-upon right to deactivate a driver based on Uber's discretionary determination of a contractual violation with the City's notion of only three vaguely defined reasons: "just cause;" a "bona fide economic reason"; or "where federal, state, or local law or rule requires" deactivation.  The "just-cause" standard is limited to behavior that "poses an imminent danger to other persons" or is discriminatory ("egregious conduct"), a failure to "perform their job duties;" or "misconduct that is demonstrably and materially harmful" to Uber.  The Deactivation Prohibitions articulate seven subjective factors that a "fact-finder shall consider" when determining if Uber had "just cause" for the deactivation, and allows for any other factor to be considered.

- Section 20-1282(d) ("***14-Day Notice Provision***") requires giving certain deactivated drivers 14 days' notice prior to deactivation, eviscerating Uber's existing contractual right to deactivate drivers without notice, and forcing Uber to continue to make its platform available to drivers who Uber has decided have violated their contractual commitments.

- Section 20-1283(a)-(b) ("***Retroactive Provision***") applies the Deactivation Prohibitions back to 2019, meaning that Uber must prove that its decision to deactivate a driver at any time in the past seven years would have met the new standards and factors, which did not exist at the time.

- Sections 20-1282(d) ("***14-Day Required Message***"), 20-1282(e) ("***Five-Day Required Message***"), and 20-1283(a)-(b) ("***Retroactive Required Message***") (collectively, "***Required Messages***"), plus § 20-1285 ("***Compelled Reports Provision***") alter the content of Uber's speech by requiring it to deliver specific information that it does not wish to convey, including because the disclosure could endanger riders and help fraudsters.

- Section 20-1285 ("***Burden of Proof Provision***") constructs kangaroo court proceedings before a fact-finder either in a private action court, or arbitration, or in front of the Department of Consumer and Worker Protection ("***Department***") that presume all deactivations are unjust, shifts the burden of proof to Uber in any proceeding involving a deactivated driver, and restricts Uber's ability to defend itself.

The Challenged Law threatens Uber with robust civil penalties.  § 20-1208.  In either of the two venues the Challenged Law provides (the Department or a court of competent jurisdiction), the Challenged Law mandates driver reinstatement if any of the fact-finders determine Uber has violated any part of the Deactivation Prohibitions, 14-Day Notice Provision, Retroactive Provision, or Required Messages, no matter how technical.  §§ 20-1208(c)(1), 20-1210(c).

9

## LEGAL STANDARD

A preliminary injunction is warranted upon a showing that a plaintiff is "likely to succeed on the merits" and "suffer irreparable harm in the absence of preliminary relief," that the "balance of equities tips" in its favor, and that "an injunction is in the public interest." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The "balance of hardships" and "public interest" factors "merge" into one factor when the government is the defendant. *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 469 (S.D.N.Y. 2019).

## ARGUMENT

### I.   UBER IS LIKELY TO SUCCEED ON THE MERITS.

Uber is likely to succeed on all its claims, and in particular on its constitutional claims pursuant to the Constitution's Contracts Clause, First Amendment, and the Due Process Clause.[5] Uber need only show the likelihood of success of any one of its claims.

####   A.    Uber Is Likely To Succeed On Its Contracts Clause Claims.

Uber meets both of the two steps that courts consider before finding that a law violates the Contracts Clause: the Challenged Law (1) would substantially impair Uber's longstanding contracts with drivers; and (2) is not an "appropriate" or "reasonable" way to advance any "significant and legitimate public purpose." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–412 (1983); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978) (Constitution places a "high value" on the right of companies to rely on private contracts "to order their personal and business affairs according to their particular needs and interests" and,

---

[5] The Challenged Law's impermissible vagueness, violation of the Equal Protection Clause, and unfair procedure under the Due Process Clause (Counts V–VII) also are likely to succeed and bolster the likelihood of success for each of the causes of action subject to Uber's request for injunctive relief.

once "arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them").

        1.    <u>Uber is likely to demonstrate that the Challenged Law would substantially impair Uber's contracts with drivers.</u>

The Challenged Law would substantially impair the PAA Deactivation Provision by rewriting it, "undermin[ing] the contractual bargain," and interfering with Uber's "reasonable expectations." *Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021); *DoorDash v. City of New York*, 692 F. Supp. 3d 268, 289–90 (S.D.N.Y. 2023); *accord In re Workers' Comp. Refund*, 46 F.3d 46 F.3d 813, 819–20 (8th Cir. 1995); *San Diego Cty Lodging Assoc. v. City of San Diego*, 2021 WL 5176477, at *6–7 (S.D. Cal. July 8, 2021). Uber specifically contracts for the right to deactivate drivers without notice if it determines that they have engaged in "activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation," or that otherwise violates the Agreement. Uber had every reason to expect its settled arrangement with drivers would remain settled such that it can maintain the necessary balance of priorities to keep its platform safe and successful. The Challenged Provisions would frustrate Uber's reasonable expectations by rewriting the PAA Deactivation Provision:

- The Deactivation Prohibitions would impair Uber's contractual right by requiring Uber to maintain drivers' access to the platform if any number of fact-finders determine the violation did not meet any of the three "valid" bases for deactivation (one of which requires the application of seven subjective "factors"), even if the drivers have materially violated the terms to which they agreed in the Agreement.

- The Retroactive Requirements[6] would rewrite the PAA Deactivation Provision pursuant to which Uber has deactivated drivers in the past seven years by requiring that those deactivations meet the new Deactivation Prohibitions.

---

[6] The "Retroactive Requirements" consist of the Retroactive Provision, Retroactive Required Message, and Compelled Reports Provision.

- The 14-Day Notice Provision would replace Uber's contractual right to deactivate any driver who has violated the Agreement "without notice" with a mandatory 14-day advance notice for certain drivers, even in cases where the City agrees the deactivation meets its "just cause" multi-factor standard.[7]

- The Required Messages, Burden of Proof Provision, and Compelled Data Provision would replace Uber's contractual right to communicate deactivation decisions in any way it chooses (and its promise to disclose to riders and drivers exactly how it will use their data) with a mandate to provide deactivated drivers with specific information.

The remedial provisions in the Challenged Law further would eviscerate Uber's contractually bargained for rights by requiring a fact-finder to order Uber to reinstate a driver—no matter the reason for deactivation or risk to safety or to Uber's business—unless Uber can prove by a preponderance of the evidence that it complied with the Challenged Law, including for deactivations taking place during the seven years before the Challenged Law existed. That means, for example, that a fact-finder who found a driver likely committed a reported sexual assault for which he was deactivated, but also found that Uber's deactivation notice was insufficiently "detailed and precise" or came a day late, would have no choice but to order the driver reinstated. In sum, Uber has no way to safeguard or reinstate its contractual rights because the Challenged Law does "not effect simply a temporary alteration of the contractual relationships" between Uber and drivers; it creates "a severe, permanent, and immediate change in those relationships— irrevocably and retroactively." *Spannaus*, 438 U.S. at 250; *Melendez*, 16 F.4th at 1039 ("significant impairment of contract" where a law "permanently and entirely extinguishes" contract rights).

---

[7] The 14-Day Notice Provision exempts only deactivations based on a "bona fide economic reason" or for "egregious misconduct, account sharing, or if there is a pattern of repeated fraudulent behavior."

2.       The Challenged Law does not advance a "legitimate public purpose" or use reasonable and appropriate means.

Because the Challenged Law substantially impairs Uber's contracts with drivers, the City has the burden to "show a significant and legitimate public purpose behind the law," *Buffalo Teachers Fed. v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006), and that the Challenged Law is a "reasonable and appropriate means" to achieve that public purpose, *Melendez*, 16 F.4th at 1046. The City will be unable to meet its burden, which is "more demanding than" rational basis, requiring a "careful examination of the nature and purpose of the challenged state legislation." *Id*. at 1032, 1035.

The Challenged Law has no significant and legitimate public purpose because it does not "deal with a broad, generalized economic or social problem" but rather aims to benefit only "a narrow class" of only a few thousand people. *Spannaus*, 438 U.S. at 248–50; *see also DoorDash*, 692 F. Supp. 3d at 289. The legislative record does not contain any definition of what "problem" the Challenged Law attempts to address. It does not define "wrongful deactivation," and the legislative history suggests an amorphous concept of the "problem," shifting from "unfair" substantive reasons for deactivation to "unfair" process. Rather than probe the existence and contours of the "problem," the Council concluded one exists as part of an outcome-determinative process orchestrated by a powerful lobby. Even if *arguendo* there exists a problem with "wrongful" determinations, the plain text and legislative history of the Challenged Law reflects that the Council's goal was to benefit only a narrow, "favored" group—a small percentage of drivers who can no longer offer services on technology platforms like Uber—at the intentional expense of Uber and to the detriment of other users of the Uber platform. *Spannaus*, 438 U.S. at 248–50; *Melendez*, 16 F.4th at 1037 (vacating denial of preliminary injunction where legislative history reflected "a certain hostility" to one group and "sympathy" to a smaller group, suggesting

13

law might "not protect a basic societal interest" and benefit "only a favored group"); *Association of Equipment Manufacturers v. Burgum*, 932 F.3d 727, 731–33 (8th Cir. 2019) (affirming preliminary injunction because law "nowhere" mentioned public and "primarily" benefited "a particular economic actor," which is "insufficient to justify a substantial impairment of contractual rights"). The Council knew (and intended) for the Challenged Law to prioritize drivers' access to technology platforms even if it would jeopardize safety and business judgment, meaning not only does it not benefit society, the Challenged Law *harms* it.

Even if the City demonstrated a legitimate public purpose, the Challenged Law's means are not a reasonable or appropriate way to advance that purpose when applying the relevant five factors set out by the Second Circuit in *Melendez*. 16 F.4th at 1038–42. *First*, and as discussed above, the Challenged Law will not impose a "temporary" "impairment of contract" but rather will "permanently and entirely extinguish[]" Uber's contractual rights. *Id*. at 1039. *Second*, there is no basis on which to find that the Challenged Law is "an appropriate means" for preventing "wrongful deactivations." *See id*. at 1040 ("deference is not warranted in the absence of some record basis to link purpose and means"); *DoorDash*, 692 F. Supp. 3d at 294 (same). The Council never has explained, for example, why the Challenged Law curbs "unfair deactivations" by retroactively applying requirements back seven years or compelling Uber to speak specific information where it would otherwise remain silent. *Third*, the Challenged Law's "allocation of its economic burden" places the burden of alleviating the purported hardship on drivers entirely on "the few shoulders" of companies like Uber by "upsetting lawfully contracted-for expectations" between Uber and drivers. *See Melendez*, 16 F.4th at 1042. *Fourth*, despite the Challenged Law's purported aim to address "wrongful deactivations," its remedies are "not conditioned" on whether a deactivation was "wrongful." *Id*. at 1041. It mandates reinstatement for any violation, including

14

for technical violations of the notice or required message provisions, regardless of whether there was a good underlying reason to deactivate the driver, and in fact appears designed to create a minefield of technicalities to generate violations. *See DoorDash*, 692 F. Supp. 3d at 295. *Fifth*, the Challenged Law does not provide for Uber "to be compensated for damages or losses sustained as a result of" the contractual impairment. *See Melendez*, 16 F.4th at 1045.

### B.    Uber Is Likely To Succeed On Its Due Process Claim.

The Retroactive Provision, the Retroactive Provision's Required Message, and Compelled Data Provision violate the Constitution's Due Process Clause by applying retroactively without *any* expressed reason or rationale. *See Landsgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994) (requiring "clear expression of the intent" of any "retroactive application" of a statute); *Regina Metro. Co. v. New York State Div. of House. and Community Renewal*, 154 N.E.3d 972, 988 (N.Y. 2020) (must provide "persuasive reason" for "potentially harsh" impacts of retroactivity). Neither the text nor the legislative history of the Challenged Law provides the Council's reasoning for why various provisions of the Challenged Law should apply retroactively at all, or specifically for seven years. The only discernible purpose for attempting to hold Uber to a "just cause" standard and factors that did not exist during the past seven years is punitive in nature and, therefore, illegitimate. *See Regina*, 154 N.E.3d at 1001–02. "Retroactivity concerns are further heightened" where, as here, a law would affect "contractual or property rights, matters in which predictability and stability are of prime importance." *Id*. at 1000 (citing *Landgraf*, 511 U.S. at 271). No other jurisdiction in the country has required Uber to retroactively apply a new law to deactivation decisions that took place over the course of seven years, Perl ¶ 33, and yet the City had not even attempted to justify why it is entitled to hold Uber to a standard that Uber did not and could not know would apply to all of its deactivation decisions from seven years ago.

15

**C.      Uber Is Likely To Succeed On Its Compelled Speech Claim.**

The Required Messages, Compelled Data, and Burden of Speech Provisions ("***Compelled Speech Provisions***") would strip Uber of "both the right to speak freely and the right to refrain from speaking at all" by altering "the content of" Uber's speech and compelling Uber to speak in a way preferred by the City. *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (internal citation and quotation marks omitted); *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*").  The Compelled Speech Provisions would force Uber to create and disseminate information that it otherwise would not, specifically: "all the precise and detailed reasons" for any deactivation;  all "customer comments, ratings, and complaints received" from riders about the driver (even where irrelevant to the reasons for deactivation); "information and data" and driving "performance data" about the driver; and reports that aggregate all deactivations of "drivers who have engaged including in the same or similar conduct" as the basis for the driver's deactivation. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("creation and dissemination of information are speech within the meaning of the First Amendment").  These compelled speech provisions would be disastrous in cases of sexual assault and fraud.

The Court should apply strict scrutiny and find the Compelled Speech Provisions presumptively unconstitutional as content-based restrictions because they will "alter the content" of Uber's current communications with drivers and compel Uber "to speak a particular message" instead. *Infra* I.C.1.; *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *NIFLA*, 585 U.S. at 766.  But Uber is likely to succeed on its claim that the Compelled Speech Provisions are unconstitutional no matter what level of scrutiny the Court applies. *Infra* I.C.2, I.C.3.

1.      <u>Uber is likely to succeed in arguing that the Compelled Speech Provisions are subject to, and fail, strict scrutiny.</u>

The Compelled Speech Provisions are content-based and compel non-commercial speech.

16

The Compelled Provisions are content based.  Requiring Uber to make disclosures it "would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795, (1988); *DoorDash v. City of New York*, 789 F. Supp. 3d 337, 353 (S.D.N.Y. 2025) (finding that the First Amendment protects DoorDash's discretion over "who (if anyone) will receive customer data"); *see also NIFLA*, 585 U.S. 755, 766 (2018).[8]  A regulation need not compel specific language to be a content-based restriction.  *See Riley*, 487 U.S. at 795; *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256 (1974).  As discussed in the context of the Contracts Clause, Uber has no contractual obligation to tell drivers the reason for deactivation (even though it does so) or to explain the same in detail, or to provide them with riders' "comments, ratings, and complaints received" or driver performance data or aggregate reports of deactivations for the "same or similar conduct."  Uber would "rather avoid" the need to do more than what it already does or what its private contracts require, and for good reasons rooted in safety and protecting its economic interests against fraudsters.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

The content-based speech compelled by the Challenged Law is not "commercial."  Just because Uber is a commercial company does not mean that all of its speech is commercial as a matter of law.  "The core notion of commercial speech is that which does no more than propose a commercial transaction."  *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 374 (2d Cir. 2025) (affirming granting preliminary injunction on likelihood of demonstrating speech is noncommercial because organization receives "no remuneration or financial benefit for engaging in it"); *accord Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980) ("The First Amendment's concern for commercial speech is based on the

---

[8] The Burden of Proof Provision essentially requires Uber's compliance for the Compelled Provisions because if Uber does not comply with them it is foreclosed from offering as evidence any undisclosed basis for deactivation.

informational function of advertising.").[9]  The speech that the Compelled Speech Provisions would regulate—what Uber communicates privately to drivers in the course of deactivating them—does not meet that legal definition; it does not propose a commercial transaction and is not even customer facing.  Nor are Uber's communications with deactivated drivers about the bases for their deactivation, and the information relied on, such as rider reports, reflects speech "solely" motivated by Uber's "economic interest."  *National Institute*, 160 F.4th at 378 (citation omitted).

Because the Challenged Law is content-based and regulates noncommercial speech, strict scrutiny applies, which imposes on the government the "exacting standard" of demonstrating: (1) there is a "real problem" that amounts to a "compelling state interest"; and (2) that the provisions are the "least restrictive means to achieve" those ends.  *Id.* at 373–74; *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *U.S. v. Playboy Entertainment Grp.*, 529 U.S. 803, 827 (2000).  Uber will succeed in showing that the City cannot meet either requirement.

As discussed above, the Compelled Speech Provisions do not attempt to solve any "real problem." *Supra* I.A.2.  Even if there is a "real problem" of "wrongful" deactivations, the record fails to establish that there is a "compelling state interest" in addressing it.  For the same reason the City cannot meet its burden to justify the violation of the Contracts Clause, the City cannot show that the Compelled Speech Provisions address a "problem" that affects any more than a small percentage of an already small group of New Yorkers.  That some drivers may feel aggrieved by the reason Uber deactivated them or how Uber communicated about the decision is insufficient for the City to carry its burden of demonstrating a compelling, real problem.  *Playboy Ent. Grp.*, 529 U.S. at 822 ("the Government must present more than anecdote and supposition").

---

[9] The speech involved in *Central Hudson* related to a ban on advertising, which indisputably was commercial in nature.

18

If the Court finds Uber's communications with drivers to reflect a "real problem," the Compelled Speech Provisions still fail strict scrutiny because they are far from the least restrictive means to address it. The Compelled Speech Provisions are exceptionally broad, with no tailoring to the reasons why a driver may be deactivated. The Required Messages compel Uber to provide *all* "precise and detailed" reasons for a deactivation, *all* rider "comments, ratings, and complaints" about the driver, all "information and data," and an aggregation of *all* drivers who Uber has deactivated for same or similar reasons. It is inconceivable that requiring Uber to disclose such expansive information, which by definition includes information that has no relevance to a driver's deactivation, is the "least restrictive" way to address purportedly "wrongful" deactivations. The nature of the Compelled Speech Provisions raises "serious doubts" about whether the City "is in fact pursuing the interest it invokes," rather than "disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011) (finding law failed strict scrutiny review where it "singled out the purveyors of video games for disfavored treatment").

> 2. <u>Even if the regulated speech is commercial, Uber is likely to demonstrate that the Challenged Speech Provisions would not survive intermediate scrutiny.</u>

If the Court determines that the Compelled Speech Provisions target commercial speech, the Court should apply the intermediate scrutiny level of review articulated by the United States Supreme Court in *Central Hudson* because the speech targeted is neither "misleading" to consumers (or even consumer-facing) nor related to "unlawful activity." *Central Hudson*, 447 U.S. at 566 ("*Central Hudson* Scrutiny"); *DoorDash*, 789 F.Supp.3d at 355–56 (citing *Central Hudson*, 447 U.S. at 566). Where, as here, the information does not fall into those two categories, the City's "power is more circumscribed" and courts apply a balancing test to determine whether a commercial-speech regulation passes intermediate scrutiny. *Central Hudson*, 447 U.S. at 564.

19

The City will be unable to meet *Central Hudson* Scrutiny because doing so requires the City establish that the interest served by the Compelled Speech Provisions is substantial, that the Compelled Speech Provisions directly advance the asserted interest, and that the interest could not be served as well by a more limited regulation of speech. *Id.* at 564. Here, the City cannot establish any interest, and certainly not a substantial one, in controlling how Uber communicates with drivers about deactivations. Nor will the City be able to show that the Compelled Speech Provisions would "alleviate" any problems with driver deactivation "to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). The City has not demonstrated why it cannot address the alleged problem with means that do not compel Uber to speak in a way it does not want to— such as, for example, "an incentive-based program or more fine-tuned regulation." *DoorDash*, 789 F.Supp.3d at 359.

        3.        <u>The Compelled Speech Provision would not survive *Zauderer* Scrutiny.</u>

The standard for commercial speech articulated in *Zauderer* ("**Zauderer Scrutiny**") does not apply, and if it did, the City would not meet it.[10] If the Court determines strict scrutiny does not apply, it should apply the same reasoning from *DoorDash* to find intermediate scrutiny (rather than *Zauderer* Scrutiny) applies. *DoorDash*, 789 F.Supp.3d at 355. In that case, the court applied intermediate scrutiny (without deciding if strict scrutiny should apply) to a law compelling companies to disclose consumer data to third parties that it did not want to disclose. *Id*. The court found *Zauderer* inapplicable because "the compelled disclosure" was not "made" to "the general public" and was related to "data collected" by the plaintiffs "in the course of their services," rather

---

[10] *Zauderer* articulates a standard that requires more than rational basis scrutiny but less than intermediate scrutiny. *See Volokh v. James*, 148 F.4th 71, 86 n.6, 87 (2d Cir. 2025) (noting "some aspects of the *Zauderer* analysis are arguably more stringent than traditional rational basis review" and referring to the standard as "*Zauderer* scrutiny"); *Am. Meat Inst. v. U.S. Dept. of Agriculture*, 760 F.3d 18, 33 (D.C. Cir. 2014) ("*Zauderer* fit requirements are far more stringent than mere rational basis review.") (Kavanaugh, J., concurring).

than the services themselves. *Id.* Like in *DoorDash*, the Challenged Law does not compel disclosures "to the general public," and therefore "does not serve the public informational interest that animated *Zauderer*." *DoorDash*, 789 F.Supp.3d at 355. Federal cases applying *Zauderer* to "factual, commercial disclosure" deal with disclosure requirements "about a company's own products or services," which is not the case here. *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258, 263–64 (2d Cir. 2014).

If *Zauderer* Scrutiny applies, the City will be unable to meet any version of the standard because compelled disclosure mandates must "remedy" a harm that is "'not purely hypothetical'" and "'no broader than reasonably necessary.'" *NIFLA*, 585 U.S. at 776 (internal quotations omitted). The legislative record does not evidence such harm, and the Compelled Speech Provisions are far more expansive than necessary to address purported "wrongful" deactivations.

### D. Uber Is Likely To Succeed On Its Compelled Association Claims.

The Challenged Law infringes on Uber's freedom of expressive association by forcing Uber to include "an unwanted person" in the cohort of individuals whom it permits to offer services on its platform. *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000) (recognizing infringement of freedom of association where "the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints"). Strict scrutiny applies here under the three-step compelled association test that the Second Circuit has held governs the analysis: (1) Uber engages in "expressive association;" (2) the Retroactive Provisions, Deactivation Provision, and 14-Day Notice Requirement ("*Compelled Association Provisions*") would significantly affect Uber's "ability to advocate its viewpoint" by forcing Uber to reactivate drivers who it has deactivated for failing to engage in conduct compatible with its values; and (3) there is no justification for the "the burden imposed on the associational expression." *Slattery v. Hochul,* 61 F.4th 278, 287 (2d Cir. 2023).

Uber engages in protected expressive association through its brand values, public statements related to safety, and company policies, including its "Stand for Safety" core value. First Amendment protections apply to this association, even where Uber does not associate for the sole purpose of disseminating a certain message. *See Dale*, 530 U.S. at 655; *303 Creative LLC*, 600 U.S. at 600. The Challenged Law significantly affects Uber's ability to advocate its viewpoint by forcing Uber to reinstate drivers with whom Uber has already chosen to disassociate for safety reasons. This is incompatible with its values. *Slattery*, 61 F.4th at 287-88; *cf. New Hope Family Services, Inc. v. Poole*, 966 F.3d 145, 179 (2d Cir. 2020) ("Compelled hiring, like compelled membership, may be a way in which a government mandate can affect in a significant way a group's ability to advocate public or private viewpoints." (cleaned up)).

The City must but cannot demonstrate that the Challenged Law was adopted to serve a "compelling state interest" and cannot be achieved through less restrictive means. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). The Court need look no further than the Retroactive Provision, which would force Uber to reinstate drivers from whom it *already chose to disassociate* for violating its policies, to conclude that the Challenged Law applies means far more expansive than needed to meet its professed goal.

## II. UBER WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

### A. Deprivation Of Constitutional Rights Is Irreparable Harm.

A preliminary injunction is warranted because compliance with the Challenged Law threatens to cause Uber irreparable harm. *See Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (requires only "a threat of irreparable harm, not that irreparable harm already have occurred"); *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 498 (S.D.N.Y. 2019) (where

ordinance "has not yet gone into effect" it is sufficient to show the threat of "imminent violations of their constitutional rights in the absence of preliminary relief").

There is a threat of irreparable harm based solely on the possible deprivation of Uber's guaranteed constitutional rights, which constitutes *per se* irreparable harm and alone is dispositive. *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation omitted)); *Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 478 (S.D.N.Y. 2025) ("irreparable harm" is "presumed where the alleged injury 'flows from a violation of constitutional rights.'" (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020), *aff'd*, 36 F.4th 54 (2d Cir. 2022) (" alleged deprivation of constitutional rights—including rights violated under the Contracts Clause—raises a presumption of irreparable harm" (internal quotations omitted)); *Donohue v. Paterson*, 715 F. Supp. 2d 306, 316 (N.D.N.Y. 2010). No separate showing of irreparable harm is needed because Uber is likely to succeed on the merits of its constitutional claims. *See, e.g., Statharos v. N.Y.C. Taxi and Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly*, 76 F.3d at 482.

## B.    The Challenged Law Threatens To Impose Numerous Additional Irreparable Harms.

Even if the threatened deprivation of constitutional rights alone were not a sufficient basis to find irreparable harm (which it is), the Challenged Law threatens a range of other irreparable harms:

**Reinstatement threatening harm to the public.** Given the Challenged Law's prioritization of driver access above safety, there is a real threat that the Challenged Law would require Uber to reinstate a driver who may have already committed a serious crime or otherwise endangered riders or the public—even for an issue as small as Uber missing a deadline or detail. *Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) ("irreparable harm" where "imminent risk" to "health, safety, and lives"). Besides the human toll, such an outcome directly contravenes of Uber's own commitments and values. *See* Freivogel ¶¶ 41, 43.

**Chilling effect on riders by forcing disclosure of private information.** The Required Disclosures threaten to force Uber to disclose to drivers information that riders provided to Uber with an expectation it would remain private (except for limited, disclosed reasons, such as legal process). *See Airbnb, Inc.*, 373 F. Supp. 3d at 499. Requiring Uber to share every comment, rating, or complaint, and all data and information relevant to a deactivation, is likely to have a chilling effect on riders submitting reports and speaking to Uber's investigators on recorded phone calls about negative experiences with drivers, including of serious conduct that even the Challenged Law would recognize as just cause for deactivations. *See* Freivogel ¶ 33; *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020).

**Harm to Uber's reputation and goodwill.** Requiring Uber to allow access to drivers who have violated its contractual agreement creates a real threat that would-be riders will view Uber in lower esteem—including based on a perception that Uber has lowered its safety, quality, and privacy standards—or even to stop using the platform. *See* Perl ¶¶ 27-29; *see also Register.com, Inc. v. Verio Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ( irreparable harm through "loss of reputation, good will, and business opportunities"); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018).

24

**Requiring access to those who have engaged in fraudulent behavior.**  The Challenged Law risks forcing Uber to give access to the platform to drivers who have engaged in fraudulent behavior, including stealing money or pretending to be someone who they are not.  *See* De Coning ¶ 26; Jarzabek ¶ 16; *see also State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80–81 (2d Cir. 2024) (irreparable harm where defendant's action "obscures" what plaintiff "contends is an elaborate and complex fraudulent scheme" and would "help to insulate the alleged fraud from detection").  The 14-Day Notice Provision expressly contemplates forcing Uber to provide access to fraudsters by only exempting "*repeated* fraudulent behavior;" thus, the Challenged Law forces Uber to tolerate and absorb whatever fraud a driver has committed solely because there is not a pattern, yet, with no recourse.  *See* Jarzabek ¶ 17.

**Forced revelation of sensitive internal anti-fraud measures.**  The Required Disclosures threaten to force Uber to reveal its internal fraud detection and prevention methods and provide would-be wrongdoers with a roadmap for avoiding future detection, all of which makes Uber suffer monetary losses it cannot recoup from the City.  *See* De Coning ¶¶ 20-25; Jarzabek ¶¶ 11-15; *see also Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000) ("disclosure of confidential information" is "the quintessential type of irreparable harm that cannot be compensated").  If the Challenged Law goes into effect, Uber would face an untenable choice between irreparable harms: (1) deactivate the driver's account and turn over information revealing its proprietary and confidential techniques for detecting fraud, thereby providing a roadmap for future fraudsters to evade detection; (2) deactivate the driver's account without making those disclosures and consequently be barred from presenting any of that evidence in a subsequent proceeding before an outside fact-finder; or (3) maintain the driver's access to the platform despite the fraud (which the

25

Challenged Law recognizes as a basis to deactivate), and risk additional fraud and unrecoverable losses. *See* De Coning ¶ 25.

**Nonrecoverable compliance costs.** The compliance costs threatened by both the Retroactive Provisions and the Burden of Proof Provision are irreparable, go well beyond what is ordinary or compensable, and irreparably harm Uber. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring) ("complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs"); *New York*, 969 F.3d at 86. The Retroactive Provision immediately would inundate Uber with petitions from drivers deactivated as far back as July 28, 2019 and provide the company with only 30 days to research and respond, which stands to impose a fundamental restructuring of operations, creation of new infrastructure for investigating and responding to complaints, and compelled departure from core business practices. Perl ¶¶ 31-33. The Burden of Proof Provision also forces Uber to engage in extensive record keeping and comprehensive disclosure in its initial notice of deactivation.

**Exposure to inconsistent judgments.** The multi-factor "fact-finding" process established by the Challenged Law is likely to expose Uber, and its drivers, to inconsistent judgments depending upon who the "fact-finder" may be, how those fact finders each interpreted the mandatory factors, and whatever additional factors they considered (or do not consider), from which Uber could not recover. *Cf Gov't Emps. Ins. Co. v. Patel,* 2024 WL 84139, at *7 (E.D.N.Y. Jan. 8, 2024), *aff'd*, 166 F.4th 280 (2d Cir. 2026) ("risk of inconsistent judgments in No-Fault arbitrations, state collection actions, and RICO- and fraud-based litigation in federal court, irreparable harm may be shown"); *see* Freivogel ¶ 42.

III.    **THE PUBLIC INTEREST AND BALANCE OF EQUITIES SUPPORT AN INJUNCTION.**

The "balance of equities and the public interest" favor Uber because it has established that

it will suffer violations of constitutional rights absent a preliminary injunction. *New York*, 969 F.3d at 86–87. The City "does not have an interest in the enforcement of an unconstitutional law" and would not face any additional burdens if the Court grants a preliminary injunction. *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019). The public interest also is "well served by the correction" of the constitutional harms that the Challenged Law imposes. *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021). While that interest alone is sufficient, the public interest also favors an injunction because of the significant risk of harm to riders and the general public if the Challenged Law takes effect.

## CONCLUSION

This Court should enter an injunction prohibiting enforcement of the Challenged Law against Plaintiffs and staying the effective date of the Challenged Law pending resolution of its unconstitutionality.[11]

Dated: Washington, DC

June 9, 2026

Respectfully submitted,

DUNN ISAACSON RHEE LLP

By: */s/Martha Goodman*
Martha Goodman

Karen L. Dunn (N.Y. Bar No. 4498028, *SDNY admission pending*)
Martha Goodman (N.Y. Bar No. 5034210)
Kyle N. Smith (N.Y. Bar No. 5075940, *SDNY admission pending*)
Meryl C. Governski (*pro hac vice forthcoming*)
Leah R. Hibbler (*pro hac vice forthcoming*)
Linda E. Halfacre (*pro hac vice forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Suite 800

---

[11] Uber should not be required to post a bond because the City will not suffer any loss or damage through a wrongful injunction. Fed. R. Civ. P. 65(c); *see Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 236 (2d Cir. 1997).

27

Washington, DC 20004
Tel: (202) 240-2900
kdunn@dirllp.com
mgoodman@dirllp.com
ksmith@dirllp.com
mgovernski@dirllp.com
lhibbler@dirllp.com
ehalfacre@dirllp.com

*Attorneys for Plaintiffs*

28

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT AND LOCAL RULE 7.1**

Undersigned counsel certifies that this Memorandum of Law complies with the Individual Practices' and Local Rules' limit of 8,750 words as it contains 8,744 words of text according to the undersigned's Microsoft Word word count function.

*/s/ Kyle N. Smith*