26 Civ. 4893 (GHW) 26 Civ. 4931 (GHW)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UBER TECHNOLOGIES, INC., and UBER USA, LLC,

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

LYFT, INC.,

Plaintiff,

-against-

CITY OF NEW YORK,

Defendant.

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION

*STEVEN BANKS*
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, NY 10007*

*Of Counsel:* Scali Riggs
Jessica Katzen
*Tel: (212) 356-1646*
*Matter No. 2026-044852*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

    A.    The Wrongful Deactivation of Drivers and
         the Enactment of LL52 ........................................................... 5

    B.    Local Law 52 of 2026 ................................................... 12

    C.    The Instant Action ................................................................. 14

STANDARD OF REVIEW ............................................................................................ 14

ARGUMENT ................................................................................................................. 15

    POINT I

    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON
    THE MERITS OF THEIR CLAIMS. ......................................................... 15

    A.    LL52 Does Not Violate the Contract Clause ................................ 15

         i.    LL52 Does Not Substantially Impair
             Plaintiffs' Contracts. ................................................. 16

         ii.    LL52 Serves a Significant and
             Legitimate Public Purpose. ................................... 22

         iii.    LL52 is an Appropriate and
             Reasonable Means of Achieving its
             Purpose. ................................................................... 24

    B.    LL52 Does Not Violate Due Process. ........................................ 28

    C.    LL52 Does Not Impermissibly Compel
         Plaintiffs' Speech. .......................................................... 34

         i.    The Notice and Data Sharing
             Provisions Regulate Conduct, Not
             Speech. ..................................................................... 35

         ii.    LL52 Implicates At Most
             Commercial Speech. ............................................... 38

**Page**

    a...LL52 is Subject to, and Satisfies, Rational Basis Review under *Zauderer*...................................................... 39

    b. The Challenged Provisions Satisfy Intermediate Scrutiny. ................................................................................. 43

    iii.    Strict Scrutiny Does Not Apply. ........................................47

D.    LL52 Does Not Impermissibly Compel Expressive Association. ................................................................ 47

    i.    The First Amendment is Not Implicated Because Uber Does Not Engage in Expressive Association. ...................................48

    ii.    LL52 Does Not Impair Uber's Ability to Advocate its Viewpoints...................................50

    iii.    The 14-Day Notice Requirement and 7-Year Lookback Period Satisfy Rational Basis Review. ......................................................52

POINT II

    PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM. ........................................................ 53

POINT III

    THE BALANCE OF THE EQUITIES TIPS STRONGLY IN THE CITY'S FAVOR.................................................. 55

CONCLUSION.................................................................................................. 56

WORD COUNT CERTIFICATION ........................................................... 57

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Pages**

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978)............................................................................................20, 22

*Amerisourcebergen Drug Corp. v. New York State Dep't of Health*,
    227 A.D.3d 1286 (3d Dep't 2024) .....................................................................33

*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986)............................................................................................37

*Bd. of Trs. v. Fox*,
    492 U.S. 469 (1989)............................................................................................38

*Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987)............................................................................................48

*Boy Scouts of America v. Dale*,
    530 U.S. 640 (2000)...........................................................................48, 49, 51, 52

*Buffalo Teachers Fed'n v. Tobe*,
    464 F.3d 362 (2d Cir. 2006)...........................................................22, 24, 25, 26

*Carver v. Nassau Cty. Interim Fin. Auth.*,
    11-CV-1614, 2018 U.S. Dist. LEXIS 70491
    (E.D.N.Y. Apr. 26, 2018),
    *aff'd sub nom.*, *Sullivan v. Nassau Cty. Interim Fin. Auth.*,
    959 F.3d 54 (2d Cir. 2020)...............................................................................18, 21

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
    447 U.S. 557 (1980).........................................................................38, 39, 43, 47

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
    598 F.3d 30 (2d Cir. 2010)................................................................................15

*Citizens Union v. Att'y Gen.*,
    269 F. Supp. 3d 124 (S.D.N.Y. 2017)..............................................................23

*Compasscare v. Hochul*,
    125 F.4th 49 (2d Cir. 2025) ...............................................37, 38, 40, 42, 48, 49, 51

*Cornelio v. Rosado*,
    24-cv-01335, 2025 U.S. Dist. LEXIS 191250 (N.D.N.Y. Sept. 29, 2025)...........................36

*Council for Responsible Nutrition v. James*,
    159 F.4th 155 (2d Cir. 2025) ............................................................................35

**Cases**                                                                                                                          **Pages**

*De Veau v. Braisted*,
    363 U.S. 144 (1960)...................................................................................................30

*Doordash, Inc. v. City of New York*,
    25-cv-10268, 2026 U.S. Dist. LEXIS 12619 (S.D.N.Y. Jan. 22, 2026) ...........................39, 44

*Doordash, Inc. v. City of New York*,
    789 F.Supp. 3d 337 (S.D.N.Y. 2024)...................................................................................41

*Doordash, Inc. v. New York City. Dep't of Consumer & Worker Protect.*,
    Index. No. 155947/2023, 2023 N.Y. Misc. LEXIS 6071
    (Sup. Ct. N.Y. Cnty Sept. 27, 2023) ...................................................................................56

*E. Enters v. Apfel*,
    524 U.S. 498 (1998).........................................................................................28, 29, 32

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983)...................................................................................................15

*Fabri v. United Techs. Int'l, Inc.*,
    387 F.3d 109 (2d Cir. 2004)........................................................................................18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)........................................................................................53

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005)........................................................................................54

*Gen. Media Commc'ns, Inc. v. Cohen*,
    131 F.3d 273 (2d Cir. 1997)........................................................................................23

*Gen. Motors Corp. v. Romein*,
    503 U.S. 181 (1992)...................................................................................................34

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)...................................................................................................35

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)...................................................................................................15

*HomeAway.com v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2018) .......................................................................................36

*Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*,
    85 F.3d 839 (2d Cir. 1996)..........................................................................................48

| **Cases** | **Pages** |
|---|---|

*Jacoby & Meyers, LLP v. Presiding Justices*,
852 F.3d 178 (2d Cir. 2017)................................................................................52

*Karham v. Lippman*,
478 F.3d 502 (2d Cir. 2007)................................................................................52

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987)................................................................................24

*Landsgraf v. Usi Film Prods.*,
511 U.S. 244 (1994)................................................................................31

*Lewis v. Thompson*,
252 F.3d 567 (2d Cir. 2001)................................................................................42

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)................................................................................14

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021) ................................................2, 16, 20, 21, 22, 24, 26, 27, 28, 44

*N.Y. State Rest. Ass'n v. New York City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009)................................................................................38, 47

*Nat'l Advert. Co. v Niagara*,
942 F2d 145 (2d Cir 1991)................................................................................34

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001)................................................................................42

*Nat'l Retail Fed. v. James*,
25-cv-5500, 2025 U.S. Dist. LEXIS 199836 (S.D.N.Y. Oct. 8, 2025)................................40, 41

*New York v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)................................................................................53

*New York v. U.S. Dep't of Homeland Sec.*,
969 F. 3d 42 (2d Cir. 2020)................................................................................53

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................14

*Nnebe v. Daus*,
931 F.3d 66 (2d Cir. 2019)................................................................................20, 50

**Cases**                                                                                                                          **Pages**

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978)........................................................................................................38

*OTR Media Group, Inc. v. City of New York*,
    83 A.D.3d 451 (1st Dep't 2011) ....................................................................................44

*Real Est. Bd. of N.Y., Inc. v. City of New York*,
    786 F. Supp. 3d 788 (S.D.N.Y. 2025)...........................................................................23

*Regina Metro. Co. v. New York State Div. of Hous. & Cmty. Renewal*,
    35 N.Y.3d 332 (2020) ............................................................................................29, 31

*Restaurant Law Ctr. v. City of New York*,
    585 F. Supp. 3d 366 (S.D.N.Y. 2022)..............................................................................4

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)............................................................................................47, 51

*Roman Catholic Diocese v. Cuomo*,
    592 U.S. 14 (2020)..........................................................................................................14

*Rumsfeld v. FAIR.*,
    547 U.S. 47 (2006)..........................................................................................................36

*Safelite Grp. v. Jepsen*,
    764 F.3d 258 (2014)........................................................................................................41

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).............................................................................................55

*Sanitation & Recycling Indus., Inc. v. City of New York*,
    107 F.3d 985 (2d Cir. 1997)......................................................................................21, 22

*SEC v. AT&T, Inc.*,
    626 F. Supp. 3d 703 (S.D.N.Y. 2022)...........................................................................40

*Singas Famous Pizza Brands Corp. v. New York Advert. LLC*,
    10-Civ.-8976, 2011 U.S. Dist. LEXIS 14524 (S.D.N.Y. Feb. 10, 2011) ...............................53

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023) ...........................................................................37, 48, 49

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)......................................................................................................35, 36

**Cases**                                                                       **Pages**

*Sveen v. Melin*,
    584 U.S. 811 (2018)......................................................................................16, 19

*Tabbaa v. Chertoff*,
    509 F.3d 89 (2d Cir. 2007)....................................................................................52

*Tucker Anthony Realty Corp. v. Schlesinger*,
    888 F.2d 969 (2d Cir. 1989)..................................................................................54

*U.S. Trust Co. v. New Jersey*,
    431 U.S. 1 (1977)..................................................................................................15

*Uber Techs., Inc. v. City of Seattle*,
    168 F.4th 1202 (9th Cir. Mar. 4, 2026)...................................................37, 39, 41

*United States v. O'Brien*,
    391 U.S. 367 (1968)..............................................................................................36

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)...................................................................................28, 29, 31

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)......................................................................................39, 42

*Vugo, Inc. v. City of New York*,
    931 F.3d 42 (2d Cir. 2019)...................................................................................47

*Wheely USA, Inc. v. City of New York*,
    26-cv-091957, 2026 U.S. Dist. LEXIS 79548 (S.D.N.Y. Apr. 10, 2026) ...................36, 39, 41

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...........................................................................................14, 55

*Yang v. Kosinski*,
    960 F.3d 119 (2d Cir. 2020).................................................................................55

*Zauderer v. Off. of Disciplinary Couns.*,
    471 U.S. 626 (1985)..........................................................................39, 40, 41, 42, 43

| **Statutes** | **Pages** |
|---|---|
| 35 RCNY § 68-15(a)(1) | 50 |
| Admin. Code § 1-105 | 34 |
| Admin. Code § 20-1282 | *passim* |
| Admin. Code § 20-1283 | *passim* |
| Admin. Code § 20-1284 | 12 |
| Admin. Code § 20-1285 | *passim* |
| Admin. Code § 20-1286 | *passim* |
| Admin. Code § 20-1271 | 4, 21 |
| Admin. Code § 20-1281 | 12, 16 |
| Admin. Code Title 20 Chapter 12 | 1, 12 |
| Admin. Code Title 20, Chapters 8, 10, 12, and 15 | 4 |
| City Charter § 2303(a) | 1 |
| CPLR Article 78 | 31 |
| CPLR § 213 | 26, 30 |
| Local Civil Rule 7.1 | 57 |
| U.S. Const. Art. I, § 10 cl. 1 | 15 |

**PRELIMINARY STATEMENT**

In January 2026, the New York City Council ("Council") adopted Local Law 52 of 2026 ("LL52") to create new protections for high-volume for-hire vehicle ("FHV") drivers ("Drivers")—the drivers who transport passengers on trips dispatched through the app-based platforms of high-volume FHV services ("Services")—against being wrongfully deactivated from the platforms. Studies and anecdotal accounts show that for years, Drivers have lost their livelihoods because of deactivations with no prior notice, insufficient evidence, and sometimes, based on discriminatory or false reviews from riders. To ameliorate these harms, LL52 extends worker protections in Chapter 12 of Title 20 of the New York City Administrative Code ("Admin. Code") to Drivers. Under LL52, a Service may no longer remove Drivers from its platform on an arbitrary basis. Instead, a Service must show just cause, or must show that the deactivation was for a bona fide economic reason or was required under a federal, state, or local law or rule. LL52 makes appropriate carveouts to protect public safety, permitting Services to immediately deactivate Drivers, without advance notice or progressive discipline, in certain circumstances, including for egregious misconduct. The law will go into effect on July 28, 2026.

LL52 will have a positive impact on thousands of Drivers by requiring Services to adhere to practices, many of which they claim to already be following. The New York City Taxi and Limousine Commission ("TLC") is responsible for the regulation and licensing of FHVs.[1] With the introduction of mobile app-based FHVs in New York City (the "City"), the number of licensed FHVs increased drastically. Local Law 149 of 2018 created a new license category, high-volume FHV services, for TLC-licensed FHV bases that dispatch more than 10,000 trips per day.[2]

---

[1] City Charter § 2303(a).

[2] TLC, Businesses, *High-Volume For-Hire Services*, available at https://www.nyc.gov/site/tlc/businesses/high-volume-for-hire-services.page (last accessed June 24, 2026).

As of March 2026, there were approximately 111,800 taxi and FHV drivers, 87,207 of which were drivers for high-volume FHV services.[3]

Plaintiffs, Uber Technologies, Inc. and Uber USA, LLC ("Uber") and Lyft, Inc. ("Lyft"),[4] commenced these actions and simultaneously filed applications for preliminary injunctions seeking to enjoin enforcement and stay the effective date of LL52, despite only challenging select provisions of LL52.[5] Plaintiffs claim that LL52 violates their rights under the Contract Clause and Due Process Clause, and Uber argues that the law violates the First Amendment.[6] Plaintiffs' allegations have no sound basis in law or fact, and Plaintiffs cannot satisfy the requirements for injunctive relief.

First, Plaintiffs are not likely to succeed on the merits of their claims. LL52 does not violate the Contract Clause because it does not substantially impair Plaintiffs' existing contracts. Even if it did, LL52 is a reasonable and appropriate means to protect thousands of Drivers from arbitrary and wrongful deactivation and the corresponding sudden loss of income. The legislature made a reasonable determination about the means chosen to achieve this legitimate public purpose, easily satisfying the five-factor analysis set forth in *Melendez v. City of New York,* 16 F.4th 992 (2d Cir. 2021).

---

[3] TLC, Factbook, *Driver Data* available at
https://app.powerbigov.us/view?r=eyJrIjoiYTYwODgwNDMtYWQzNC00OGQxLTg2ZGYtMTcwZmE2OWU1N
TJhIiwidCI6IjMyZjU2ZmM3LTVmODEtNGUyMi1hOTViLTE1ZGE2NjUxM2JlZiJ9 (last accessed June 24, 2026).
[4] *See* Uber's Memorandum of Law in Support of a Preliminary Injunction (ECF 6) ("Uber Mem."); Lyft's Memorandum of Law in Support of Motion for a Preliminary Injunction (ECF 7) ("Lyft Mem.").
[5] Plaintiffs appear to challenge Admin. Code §§ 20-1282(a)-(e); 20-1283(a)-(b); 20-1285, 20-1211(c), 20-1208(c), and 20-1286 as violative of the Contract Clause and Admin. Code §§ 1283(a)-(b) as violative of the Due Process Clause, and Uber challenges Admin. Code §§ 20-1282(d)-(e); 20-1283(a)-(b); 20-1285 and 20-1286 as violative of freedom of speech under the First Amendment; and Admin. Code §§ 20-1282(a)-(d) and 20-1283(a)-(b) as violative of freedom of association under the First Amendment.
[6] Plaintiffs also assert Equal Protection claims in their Complaints, but they have elected not to move on these claims in their preliminary injunction motions. *See generally* Uber Mem.; Lyft Mem.

Plaintiffs' Due Process claims are equally meritless.  The opportunity for Drivers to contest the factual basis of a prior deactivation and seek reinstatement to a Service within the year following the effective date of LL52 does not impose "retroactive" liability.  Instead, it serves to give the law comprehensive effect by ensuring that no Driver is subject to wrongful deactivation without just cause—due to a false customer report or a glitch in the app, for example— or without an opportunity to seek reinstatement.

Uber's First Amendment claims fare no better. The requirement to provide Drivers with notice of deactivations, an opportunity to be heard, and data supporting such deactivations, regulates conduct, not speech, and therefore does not implicate the First Amendment.  And even if the First Amendment were implicated, at most, these provisions require the disclosure of factual, non-controversial commercial speech that is subject to a lesser level of scrutiny and is reasonably related to the goal of preventing abrupt and wrongful deactivations.  Uber's right of association is also not implicated, as it will continue to have the ability to advocate its viewpoints, while maintaining its own structure and identity.

Finally, Plaintiffs cannot satisfy the remaining requirements to warrant injunctive relief.  Plaintiffs cannot show that they will be irreparably harmed by LL52's commonsense measures, developed *with* input from the Services, to address issues that the Services acknowledge exist.  The balance of the hardships and the public interest favor the City and the thousands of Drivers who will benefit from LL52.  Plaintiffs' motions for a preliminary injunction must be denied.

**STATEMENT OF FACTS**

For years, Council has focused on instituting workplace protections for the City's most vulnerable workers.[7]   Notably, in 2021, Council enacted protections against wrongful termination for workers in the fast-food industry. *See, e.g.,* Admin. Code § 20-1271, *et seq.*; *Restaurant Law Ctr. v. City of New York*, 585 F. Supp. 3d 366 (S.D.N.Y. 2022) (upholding protections for fast food workers).  Now, Council has extended similar protections to Drivers.

Council introduced Int. 1078 of 2023, and its successor, Int. 276 of 2024, to limit the wrongful deactivation of Drivers.[8]  To that end, Int. 276 prohibited Services from deactivating Drivers without just cause or a bona fide economic reason.  The bill created an informal resolution process for deactivated drivers to contest their deactivation.[9] It also set forth notice and progressive discipline requirements that Services had to satisfy prior to deactivation, and provided appropriate exceptions to those requirements in the interest of protecting public safety.[10] On December 18, 2025, after engagement with Drivers, Services, and other stakeholders, Council introduced an amended version of the bill, Int. 276-A, and passed the bill that same day.[11]  On January 29, 2026, Int. 276-A became Local Law 52 of 2026 after Council overrode Mayor Eric Adams' veto.[12]

LL52 protects Drivers from being wrongfully deactivated from Services' platforms without just cause, a legal reason, or a bona fide economic reason.  Drivers who are deactivated without warning face the financial harm that comes with sudden and immediate loss of income. At the same time, Council recognized the need for Services to utilize immediate deactivations in

---

[7] *See, e.g.*, Admin. Code Title 20, Chapters 8, 10, 12, and 15 (establishing earned safe and sick time, protections for freelance workers, fair work practices for fast-food and retail employees, and protections for contracted delivery workers).

[8] *See* Declaration of Scali Riggs, dated June 25, 2026 ("Riggs Decl."), Exs. B, C. All exhibits referenced herein are annexed to the Riggs Decl.

[9] Ex. C.

[10] *Id.*

[11] Ex. H.

[12] Ex. P.

certain circumstances.    To that end, LL52 has appropriate carveouts to ensure that Services maintain the ability to immediately deactivate Drivers to protect public safety, combat fraud, and comply with legal requirements.    Prior to enacting LL52, Council carefully considered ample evidence, including oral and written testimony from Services.

### A.    The Wrongful Deactivation of Drivers and the Enactment of LL52

In 2023, increasing reports were circulating in the media of passengers submitting false complaints to Services about Drivers.[13]  Passengers submitted false reports to take advantage of Services' refund policies.    Even worse, some passengers were lodging complaints against Drivers based on discriminatory animus.[14]  Drivers expressed numerous concerns to Council about being wrongfully and arbitrarily deactivated from platforms because of these false complaints.[15]

On September 27, 2024, December 18, 2025, and January 28, 2026, Council's Committee on Transportation and Infrastructure ("Committee") issued reports regarding Int. 276 and Int. 276-A.[16] The Committee Reports detailed the Committee's consideration of several important studies.

First, the Committee considered a February 2023 survey of Drivers in California conducted by the Asian Law Caucus.[17]  That survey reported that two out of every three Drivers experienced discrimination, sexual harassment, or other forms of misconduct or customer bias while driving for Services.[18]  Half of the Drivers who faced racial discrimination from a customer

---

[13] *See* Ex. J, pp. 7-9; Ex. O, pp. 6-9.
[14] *Id*.
[15]  *Id*.
[16] *See* Exs. E, J, O.
[17] Ex. J, pp. 8-9; Ex. O, p. 7.
[18] *Id.*

5

were also reported *by* that customer.[19]  Almost all deactivated Drivers experienced hardship as a direct result of deactivation, including 18% losing their vehicles and 12% losing their homes.[20]

The Committee also reviewed a TLC survey conducted in 2024, which reported that 91% of surveyed Drivers were born outside of the United States and 86% were non-white.[21] The survey revealed that 88% of Drivers relied on driving as their sole source of income, and another 11% of the Drivers reported that driving accounted for more than half of their income.[22] The survey also noted that 66% of Drivers were still paying off vehicles, and 79% of Drivers who rented their vehicles did so primarily to drive for the Services.[23]  Drivers reported median car payments ranging from $735 to $950 a month with median insurance costs ranging from $379 a month to $396 a month, costs that accrue even when a Driver is deactivated.[24]

The Committee also considered data collected by the New York Taxi Workers Alliance ("NYTWA") in 2025 and analyzed by the Asian American Legal Defense and Education Fund ("AALDEF").  Consistent with TLC's findings, the AALDEF analysis revealed that "95% of drivers relied on their driving income as the main source of income for their family, 69% of drivers were still paying off their vehicle, 88% bought their vehicle for the purpose of working for the FHV services, and that median vehicle expenses were $1,200 a month."[25]  The report found that Drivers' income is "both low and unstable income."[26]  Additionally, the analysis determined that Drivers are "required to invest significant resources up front in order to begin operations, while continuing to accrue monthly expenses even if they are temporarily or permanently

---

[19] *Id.*
[20] *Id.*
[21] Ex. J, pp. 5-6; Ex. O, pp. 4-5.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Ex. J, pp. 6-7; Ex. O, p. 5.
[26] *Id.*

6

prohibited from working for the Services."[27]

The AALDEF analysis found that most of the deactivated Drivers were "long-time, high-performing Drivers with high ratings and no record of misconduct, and were deactivated without prior notice based on vague allegations of 'customer complaints.'" [28] Over 70% of Drivers reported not receiving any notice prior to deactivation.[29]   Drivers also reported that when deactivations were due to multiple complaints, they were not informed of the earlier complaints prior to deactivation.[30]   Drivers reported an inability to pay rent or afford groceries as common consequences of deactivation.[31]

In addition to the Committee Reports, on September 27, 2024, the Committee held a public hearing on Int. 276 at which time it received oral and written testimony.[32] This included testimony in support of Int. 276 from Drivers, NYTWA (which has 21,000 members), the National Employment Law Project ("NELP"), Dollaride, a Brooklyn-based mobility company, Legal Services NYC, and the Legal Aid Society.[33]

NELP's testimony highlighted the imbalance in protections when driving for Services compared to operating medallion taxicabs:

> Uber and Lyft together control nearly the entire rideshare market, with the result that deactivated drivers have limited options for seeking new employment in the same field. . . . Frequently drivers are deactivated based on unverified customer complaints – and the companies don't give drivers a meaningful opportunity to challenge them. While the app corporations operate an internal appeals process that in theory allows drivers to try to contest certain deactivations, it's a discretionary, non-transparent company-run process that doesn't provide strong protections.

---

[27] *Id*.
[28] Ex. J, p. 9; Ex. O, p. 8.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Exs. F, G.
[33] Ex. G.

> This all stands in stark contrast with the process that has long existed for New York's taxi drivers. When [TLC] seeks to revoke or suspend a driver's license – typically after receiving a complaint – the Commission bears the burden of proving that a violation has occurred and drivers are afforded an administrative hearing through the city's OATH process – a process that, while not perfect, provide much more meaningful safeguards and processes.

Ex. G, pp. 13–16.

Legal Services NYC highlighted the broader impact of deactivations and noted the difficulties Drivers have seeking relief through existing processes:

> During the pandemic, our office and [NYTWA] brought litigation which resulted in approximately 68,000 Uber and Lyft drivers receiving State Unemployment Insurance at the full rate of payment for employees. Many of the drivers we represent have been unfairly deactivated from their companies' platforms without notice and without any effective means to challenge the deactivation.
>
> ***
>
> Our driver clients assume that there must be something they can do to challenge unfair deactivations. Unfortunately, they have few rights to challenge a termination no matter how unfair it is. They are devastated when I inform them that there is really nothing we can do since the company has the power to deactivate them for almost any reason. Yes, there is an arbitration process that was developed by Uber and a drivers' union which was, and may still be, funded by Uber . . . . However, Uber ultimately controls who is eligible to go to arbitration on a case-by-case basis. This Uber-controlled process resembles the grievance process provided by many other companies where the corporation ultimately makes the decision not a third-party.

*Id.*, pp. 51–52.

Several stakeholders testified at the September 27, 2024 hearing.  NYTWA testified that over 2,000 Drivers annually reach out for assistance with deactivations.[34] Bhairavi Desai, Executive Director of NYTWA testified to the unique problems Drivers face when deactivated,

---

[34] Ex. F, pp. 56:15-24.

8

including the high upfront expenditures Drivers make to do this work, and the significant costs they are still responsible for if they are deactivated from the Services.[35]

Council also heard testimony from Drivers who detailed their personal experiences with wrongful deactivation. That testimony described deactivations after complaints from passengers who were upset that Drivers would not make additional unplanned stops, would not violate traffic laws by making illegal U-Turns, and passengers who lodged false accusations that the Driver was under the influence.[36] One Driver testified that she received a complaint from a passenger after being verbally and physically assaulted by that passenger.[37] Several Drivers testified that, to this day, they still do not know the reason for their deactivation.[38] Council considered the phenomenon of riders lodging false complaints to try to receive refunds on their rides, a problem that Uber itself acknowledged.[39]

Services, including Plaintiffs, testified in opposition to the bill at the September 27, 2024 hearing and through written testimony submitted to the Committee.[40] Lyft testified that the notice requirement for all deactivations would create safety hazards and be difficult to comply with, and argued that the bill failed to take into account existing post-deactivation processes already set in place, including through Lyft's partnership with the Independent Drivers Guild ("IDG").[41] Uber asked that the definition of "egregious misconduct" in the bill be revised, and also testified about the success of their Driver Review Center and partnership with IDG.[42] Of note,

---

[35] *Id.*, pp. 52:17-55:8.
[36] *See generally id.*.
[37] *Id.*
[38] *Id.*
[39] *Id.*, pp. 172:24-173:14.
[40] *See id.* (testimony of Josh Gold); Ex. G, pp. 54-55, 69-70.
[41] *Id.*
[42] Ex. G, pp. 69-70.

Uber's representative, Josh Gold, acknowledged that some parts of Int. 276 might be necessary. For example:

> I think for 99 percent of deactivations, I think there needs to [be] notice but there are . . . some egregious situations that could put a future rider in jeopardy. Where there might not be an opportunity for notice but that aside, notifications, warnings, opportunities for education, yes agree.

> \*\*\*

> So, I just want to be clear that we agree with the intent that notices and warnings and opportunities for improvement and education are needed but want to make sure that I'm specific that there are some cases where that just may not be warranted or may not be in the best interest of rider and driver safety.

> \*\*\*

> JOSH GOLD: I will say I did hear some testimony from individuals in 2018, 2019 and I do think the processes were not great and we've worked hard to improve those processes including the drug test issue that I brought up, including a lot of education around service animal denial. So, if there are old cases if someone feels comfortable talking to me, they may not. They may feel more comfortable going to your office or the Chairs office. I would love to you know look into those cases and figure out what was the reason behind it and if that case deserves to have another hearing.

Ex. F, pp. 168:6–169:7; 171:14-20; 178:19-179:7.

Uber further acknowledged that it had "worked in other jurisdictions to figure out better deactivation policies."[43] Uber's most prevalent objection to Int. 276 was concerning the definition of "egregious misconduct."[44]

On December 18, 2025, after careful consideration of all the feedback it received, Council introduced an amended bill, Int. 276-A. Int. No. 276-A defines "egregious misconduct" as any "conduct that poses an imminent danger to other persons, including but not limited to

---

[43] *Id.*, p. 181.
[44] *See generally* Ex. G; Ex. J, pp. 11-13; Ex. O, pp. 10-12.

10

violence, threats to engage in violence, sexual harassment, or sexual assault" or "discrimination in violation of federal, state, or local law."[45]  In addition, account sharing and a pattern of repeated fraudulent behavior were added to the list of conduct that excuses Services from providing 14-days' notice prior to deactivation.[46]  "[C]onduct that poses an imminent danger to other persons" was chosen over a broader definition suggested by Uber, which Council felt would be "over-inclusive and could include behavior such as the failure to properly signal a turn that, although it arguably endangers others, does not rise to the level of wrongdoing contemplated by the term 'egregious misconduct.'"[47]  To address the Services' concerns about legal and regulatory compliance, deactivations required by law or rule were added to the list of reasons why a Service may deactivate a driver.[48]

To address Services' testimony about their existing appeals process and their relationship with IDG, Council removed a portion of the bill that provided for an arbitration process run by the New York City Department of Consumer and Worker Protection ("DCWP") and instead provided for an "informal resolution process" initiated with the Services through an "email address, website, or other form of electronic communication maintained by [the Service]."[49]

Council noted that IDG reported a 90% success rate for reinstatement of the Drivers that it represented.[50] However, Council also discerned that IDG's consistent success demonstrated that a significant number of deactivations either do not survive closer scrutiny or could be quickly

---

[45] Ex H.
[46] *Id*.
[47] Ex. J, p. 13; Ex. O, p. 12.
[48] *Id*.
[49] *Id*.
[50] Ex. J, pp. 7-8; Ex. O, pp. 6-7.

resolved with improved communication between the Drivers and the Services. The Services have deemed deactivations on certain grounds non-appealable through the IDG process.[51]

Following consultation with the Services, other amendments, including narrowing the data required to be produced to the driver upon deactivation and requiring redactions of personally identifiable information ("PII") of riders, were made.[52]  Additionally, the definition of "deactivation" was amended to provide flexibility for temporary restrictions of access, and language concerning the consideration of exculpatory evidence was added at the request of the Services.[53]

**B.      Local Law 52 of 2026**

LL52 amends existing provisions of Chapter 12 of Title 20 of the Admin. Code to fold Drivers into established retaliation protections, complaint procedures, remedies, penalties, and enforcement tools, and adds a new Subchapter 8 of Chapter 12 (Admin. Code §§ 20-1281 – 20-1290).  Under LL52, a Service may deactivate a driver for just cause, a bona fide economic reason (§ 20-1284), or where law requires. *Id.* § 20-1282(a).  "Just cause," means that the Driver: (1) engaged in egregious misconduct, (2) failed to satisfactorily perform their job duties, or (3) engaged in any other misconduct that is demonstrably and materially harmful to the Service's legitimate business interests. *Id.* § 20-1281.  For a deactivation on the second or third grounds, the Service must have engaged in progressive discipline pursuant to a written progressive-discipline policy that was provided to the Driver. *Id.* § 20-1282(c).

Except for deactivations for egregious misconduct, account sharing, or a pattern of repeated fraudulent behavior, Services must provide Drivers 14-days' notice of an impending

---

[51] *Id.*
[52] Ex. J, pp. 13-14; Ex. O, pp. 12-13.
[53] *Id.*

12

deactivation (or 120-days' notice for a deactivation for a bona fide economic reason, *Id.* §§ 20-1282 d(i), 20-1284), stating the precise and detailed reasons for the impending deactivation, the effective date, and informing the Driver of their challenge rights. *See id.* 20-1282(d)(i)-(iv).

In determining whether a deactivation satisfies "just cause," a fact-finder considers whether the Driver knew or should have known of the rule (or policy or practice) the Driver violated, and the potential consequences of violating it, and whether the Driver actually committed the violation. Admin. Code § 20-1282 (b)(1), (7).  A fact-finder also considers whether the rule relates to safe and efficient operations; whether adequate training was given; whether the rule was reasonable and consistently applied; whether the service undertook a fair and objective investigation; and whether deactivation was a reasonable response accounting for mitigating circumstances. *Id.* § 20-1282 (b)(2)-(6).  These are non-exclusive; a factfinder may consider other relevant factors as well. *Id.*

Under Admin. Code § 20-1285, the Service bears the burden of proving just cause or a bona fide economic reason by a preponderance of the evidence. *Id.* § 20-1285(a).  A fact-finder may not consider reasons that were not stated in the deactivation notice or written explanation for a prior deactivation. *Id.* § 20-1285(b).  Where a Driver is deactivated for egregious misconduct, a Service does not have to provide notice prior to the deactivation or use progressive discipline.  In addition, a deactivation for account sharing or in response to a pattern of fraudulent behavior does not require notice prior to deactivation.  In those circumstances, the Service must provide written notice within five days after deactivation.

LL52 has a 7-year lookback period for previously deactivated Drivers.  Within one year after the effective date of LL52, these Drivers may petition the Service for reinstatement. *Id.* § 20-1283(a).  A Service must reinstate the Driver within 30 days after receipt of such petition,

13

unless the prior deactivation was for just cause, a bona fide economic reason, was required by law or rule, or occurred during the Driver's probation period.  If the Service does not reinstate the Driver, the Service must provide the Driver with written notice detailing the precise reasons for the prior deactivation and informing the Driver of their challenge rights. *Id.* § 20-1283(c).

Upon issuing a deactivation notice, a Service must also provide the Driver relevant information and data, including driving-performance data, customer comments, ratings, and complaints, and anonymized and aggregated reports on discipline imposed on other drivers for similar conduct over the prior 12 months. *Id.* § 20-1286(a).  Passengers' PII must be redacted. *Id.* § 20-1286(b).  In the case of a petition to reinstate pursuant to Admin. Code § 20-1283, such information and data must be provided only to the extent such information is available to the Service. *Id.* § 20-1286(c).

## C.     The Instant Action

On June 11, 2026, almost five months after the enactment of LL52, Plaintiffs commenced these actions and simultaneously filed applications for preliminary injunctions seeking to enjoin enforcement and stay the effective date of  LL52.

## STANDARD OF REVIEW

Emergency injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation modified).  Plaintiffs must demonstrate that they are likely to succeed on the merits of their claims, are likely to suffer irreparable harm without preliminary injunctive relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *See Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 16 (2020) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Regarding the first factor, "a mere possibility" that relief will be granted is insufficient; rather, Plaintiffs must make a

14

showing strong enough to establish a likelihood of success on the merits. *Nken v. Holder*, 556 U.S. 418, 420 (2009). At minimum, Plaintiffs must demonstrate "that there are 'serious questions' going to the merits, [and] additionally establish that 'the balance of hardships tips decidedly' in [their] favor." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35–36 (2d Cir. 2010).

## ARGUMENT

### POINT I

### PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A.    LL52 Does Not Violate the Contract Clause.

Plaintiffs are not likely to succeed on their Contract Clause claims. The Contract Clause provides that "[n]o State shall pass any . . . Law . . . impairing the Obligation of Contracts." U.S. Const. Art. I, § 10 cl. 1. Yet, the prohibition on contractual impairment is "not an absolute one and is not to be read with literal exactness like a mathematical formula." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977) (citation modified). Legislatures retain "broad power" to adopt generally applicable laws "without being concerned that private contracts will be impaired, or even destroyed, as a result." *Id.* at 22. This is especially true where, as here, the government is acting to "safeguard the vital interests of its people." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934).

Analysis of a claim under the Contract Clause proceeds in three parts. First, the law must substantially impair an existing contract. *See Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983). Second, if there is a substantial impairment, courts consider whether the challenged law serves a legitimate public purpose. *Id.* Third, if the law serves a legitimate public purpose, courts then consider whether the law is appropriate and reasonable to

achieve that purpose. *Id.* at 412.

>            i.        **LL52 Does Not Substantially Impair Plaintiffs' Contracts.**

The threshold inquiry in a Contract Clause analysis is whether the law "has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 411. The substantial impairment inquiry asks "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Melendez,* 16 F.4th at 1033 (*quoting Sveen v. Melin*, 584 U.S. 811, 819 (2018)).

Plaintiffs argue that LL52 substantially impairs the deactivation terms in their contractual agreements. Lyft alleges that LL52 "will prevent Lyft from deactivating drivers who have materially violated their contracts" even where the driver's conduct was "extremely serious." Lyft Mem. at 10. Further, Lyft alleges that the notice requirements under LL52 force Lyft to keep drivers on the platform for 14 days even where their misconduct implicates safety. *Id.* at 11. Uber alleges that the Law impairs its contract because Uber "specifically contracts for the right to deactivate drivers without notice if it determines that they have engaged in activity that is deceptive, fraudulent, unsafe, illegal," or harmful to Uber's brand or reputation. Uber Mem. at 11.

Plaintiffs misconstrue the requirements of the law. LL52 does not prevent Plaintiffs from deactivating Drivers who materially violated their contracts. The definition of "just cause" includes a failure to satisfactorily perform job duties or engaging in "any other misconduct that is demonstrably and materially harmful" to the Service. *See* Admin. Code § 20-1281. If a Driver challenges a deactivation, LL52 simply specifies that a fact-finder must consider various factors, including whether the Driver knew or should have known about the policy or rule that formed the basis for the deactivation. Admin Code § 20-1282(b)(1). Though LL52 requires 14-days' notice in advance of some deactivations, this notice is *not* required in every instance, such as when

egregious conduct is involved.  Importantly, Plaintiffs highlight throughout their Complaints that they *already* provide notice and opportunities to cure in most circumstances. *See generally* Compls.

Lyft's Terms of Service provide for deactivation without notice for "material breach," but carve out other instances where Lyft may deactivate Drivers *after* providing notice and opportunity to cure. Lyft Compl. Ex. 2.  To that end, Lyft provides notice and opportunity to cure if (1) a driver ceases to qualify as a user, (2) a driver ceases to qualify to provide rideshare services or to operate the approved vehicle under applicable law, (3) a driver falls below Lyft's star rating threshold, or (4) Lyft has the good-faith belief that such action "is necessary to protect the safety of the Lyft community." Lyft Compl. ¶ 20.

Uber's Platform Access Agreement universally provides for deactivation without notice for "Material Breach." Uber Compl. Ex. 2.  However, Uber specifies that "Deactivating a driver is a last resort for Uber," and that "[p]ermanent deactivations are rare, and largely relate to safety or fraud." Uber Compl. ¶ 13.  Uber further states that "*drivers typically receive warnings and notices beforehand*, and avenues of appeal afterwards." Uber Compl. ¶ 12 (emphasis added). Far from impairing Plaintiffs' contractual rights, LL52 simply specifies a timeframe for Plaintiffs to provide notices that they already purport to be providing.  *See* Admin. Code § 20-1282(d) (requiring Services to provide notice of an impendent deactivation 14 days in advance, except where a deactivation is for a bona fide economic reason, egregious misconduct, account sharing, or if there is a pattern of repeated fraudulent behavior).

Both Plaintiffs state that under the current terms of their contracts they may immediately deactivate Drivers over concerns of rider or public safety, concerns about the operability of their respective platforms, or for activity that is fraudulent, illegal, or otherwise

harmful to their businesses. Lyft Mem. at 10; Uber Mem. at 11.  These immediate deactivation rights remain intact.    LL52 provides for immediate deactivation in the case of egregious misconduct, which includes *but is not limited to*, violence, threats to engage in violence, sexual harassment, sexual assault or discrimination in violation of federal, state, or local law, as well as for account sharing, or other patterns of fraudulent behavior. Admin. Code § 20-1282(d).  Thus, LL52 undeniably preserves Plaintiffs' right to immediately deactivate a Driver out of concerns for safety.

Separately, Uber argues that the "retroactive requirements" (§ 20-1283), "compelled data" (§ 20-1286), and "remedial provisions" (§§ 20-1283, 20-1285), substantially impair its contracts.[54]  Uber alleges that the "retroactive requirements" would "rewrite the deactivation provisions pursuant to which Uber has deactivated drivers in the past seven years[.]" Uber Mem. at 11.  Yet, an essential component of any Contract Clause claim is that the law substantially impairs "existing contracts." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 124 (2d Cir. 2004).  Plaintiffs cannot establish a claim as to now terminated contracts because the Contract Clause only applies to contracts that existed at the time the law was enacted. *Carver v. Nassau Cty. Interim Fin. Auth.*, 11-CV-1614, 2018 U.S. Dist. LEXIS 70491, at *15 (E.D.N.Y. Apr. 26, 2018), *aff'd sub nom.*, *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54 (2d Cir. 2020); *Fabri*, 387 F. 3d at 124 ("The Contract Clause prohibits the impairment by the state of <u>existing</u> contracts.").  This is particularly relevant as to the provisions that Plaintiffs incorrectly characterize as "retroactive requirements."  The individuals covered by those provisions are drivers who were deactivated by a Service and had their previous contracts terminated. *See, e.g.,* Uber Compl. Ex. 5 at ¶¶ 12–12.3 (termination provisions).  LL52 does not retroactively annul a prior

---

[54] Lyft "adopts and incorporates by reference" Uber's arguments, but does not substantively address these arguments in its motion. Lyft Mem. at n. 2.

deactivation or require backpay.  It gives Drivers a limited opportunity to petition for prospective reinstatement, thus entering into new contractual relationships with Plaintiffs.  LL52 specifically contemplates Drivers meeting current requirements prior to being allowed access to any platform. Admin. Code § 20-1283(d).  When LL52 passed, these individuals were no longer parties to an existing contract with a Service, let alone one that is substantially impaired.

Contrary to Plaintiffs' narrative, LL52 does not mandate reinstatement of a previously terminated agreement, nor does it impose liability on a Service for a deactivation decision made before the Law's effective date.  Rather, a Driver deactivated between July 28, 2019 and July 27, 2026 may petition, within 1 year after the effective date of LL52, a Service to reinstate or restore their access to the platform and the Service is required to respond within 30 days as to whether they will do so or will bar that individual from the platform because the prior deactivation was for just cause, for a bona fide economic reason, or was required by federal, state, or local law or rule. Admin. Code § 20-1283.

With respect to LL52's requirement that Services provide Drivers with information relevant to their deactivation (Admin. Code § 20-1286), Plaintiffs appear to be arguing that because their contracts are silent as to how deactivation decisions are communicated, LL52's notice requirements impair their contracts. *See* Uber Mem. at 12.  Not all laws affecting pre-existing contracts violate the Contract Clause. *See Sveen*, 584 U.S. 819.  The impact on Plaintiffs' contracts, if any, is minimal because LL52 does not impair the core function of Plaintiffs' contracts with the drivers—facilitating FHV transportation.  Even a "significant change" to existing contractual relationships does not necessarily cause a substantial impairment. *Sveen*, 584 U.S. at 819.

As already noted, Uber has confirmed that it voluntarily provides Drivers with

19

certain information about their deactivations, and the Law's primary purpose of ensuring deactivations are not rooted in false claims or mistake could not be realized without giving a Driver information about the factual basis for a deactivation.  Importantly, Council's discussions with the Services resulted in amendments narrowing the data required to be produced to the driver upon deactivation and requiring redactions of PII.[55]  Far from causing significant change, LL52 simply creates a framework for a fair and balanced enforcement of existing terms and conditions that is aligned with what Plaintiffs claim they are already doing.

As to the "remedial provisions," Plaintiffs allege that, under LL52, if a fact-finder determines a Driver was deactivated for committing sexual assault, but the Service's notice was deficient, the fact-finder would have "no choice" but to reinstate that Driver.  Uber Mem. at 12.  This claim is false.  First, Plaintiffs' hypothetical contemplates egregious misconduct, for which advance notice is not required under LL52. Second, there is nothing in LL52 that prevents a Service from amending a defective notice.  Finally, Plaintiffs' hypothetical disregards TLC's role. As the licensing agency, TLC is authorized to immediately suspend a Driver's TLC license when they have engaged in unsafe behavior.  *See Nnebe v. Daus*, 931 F.3d 66, 70–71 (2d Cir. 2019); 35 RCNY § 68-15(a)(1).  Drivers whose licenses have been suspended are not authorized to operate on Plaintiffs' platforms, and thus, would not be reinstated.

LL52 does not render Plaintiffs' contracts "permanently and completely unenforceable." *Melendez*, 16 F.4th at 1034, and, to the extent any impairment does exist, it is a minimal alteration that bears so little weight that the inquiry should end here. *Melendez*, 16 F.4th at 1034 (*quoting Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)).

---

[55] Ex. J, pp. 13-14; Ex. O, pp. 12-13.

LL52 does not interfere with Plaintiffs' reasonable expectations because it was foreseeable.    For years, governments have passed laws providing Drivers and other "gig workers"—who Plaintiffs treat as independent contractors—with the same worker protections as employees.[56]  It was thus foreseeable that the City would extend existing worker protections to cover Drivers, particularly given that Plaintiffs operate in a heavily regulated industry and LL52 is not the first of its kind in the City. *See, e.g.*, Admin. Code § 20-1271, *et seq.*; *Sullivan*, 959 F.3d at 64  (foreseeability is "affected by whether the relevant party operates in a heavily regulated industry.").   Furthermore, LL52's original bill was introduced on February 28, 2024 and its predecessor bill was introduced on June 8, 2023, more than three years ago.  As set forth above, Plaintiffs were actively lobbying for changes to the legislation, while presumably continuing to enter into contracts with Drivers.  Lyft's terms of service have even been updated *after* the passage of LL52. *See* Lyft Compl. Ex. 2.  Uber acknowledged in its public testimony regarding Int. 276 that it had "worked in other jurisdictions to figure out better deactivation policies."[57]  Accordingly, the law was not "wholly unexpected" and thus constitutes no impairment of Plaintiffs' contracts. *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).

Finally, relying on *Melendez*, Plaintiffs argue that "because [LL52] is permanent" it prevents Plaintiffs from safeguarding or reinstating their rights. Lyft Mem. at 12.  This claim misses the mark.  Plaintiffs can still deactivate Drivers for the same reasons provided for in their current contracts.  Moreover, the analysis of "permanence" in *Melendez* was more nuanced.  In *Melendez*, the Court was concerned because, although the law at issue in *Melendez* only applied to defaults that occurred during government mandated Covid-19 closures, the prohibition on

---

[56] *See, e.g.*, California Assembly Bill 5 of 2019, available at
https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB5 (last accessed June 25, 2026).
[57] Ex. F, p. 181.

enforcing personal guaranties had no such temporal limitation. The Court reasoned that, "although the Guaranty Law pertains only to rent arrears arising between March 7, 2020, and June 30, 2021, it does not simply defer guaranty obligations until the conclusion of that period. Rather, it permanently and entirely extinguishes them. Thus, far from affording temporary relief that leaves the 'integrity' of commercial lease guaranties unimpaired, the City destroys the guaranties by rendering them forever unenforceable[.]" *Id*. at 1039. No such permanence exists here. Drivers may only seek reinstatement to Services' platforms for prior deactivations for one year post enactment of LL52, and Plaintiffs can still enforce their existing terms, policies, and guidelines through notice and progressive discipline, followed by deactivation, or through immediate deactivation in appropriate circumstances. The integrity of Plaintiffs' contracts remains intact.

### ii.    LL52 Serves a Significant and Legitimate Public Purpose.

Since Plaintiffs cannot establish substantial impairment, this Court's inquiry should end without the need to address the remaining prongs of the Contract Clause analysis. *See Allied Structural Steel*, 438 U.S. at 245. However, should this Court find that LL52 substantially impairs Plaintiffs' existing contracts, the Law nevertheless serves a significant and legitimate public purpose. "A legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'" *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (*quoting Sanitation,* 107 F.3d at 993).

LL52 easily meets the public-purpose test. The Law was designed to limit wrongful deactivations of Drivers by providing a framework through which Drivers can access information about their deactivations and challenge the claims lodged against them before losing what for many is their sole source of income. Plaintiffs' claims that the legislators relied only on "anecdotes from

22

a handful of drivers" and displayed "certain hostility" towards Plaintiffs are belied by the record. Lyft Mem. at 13-14; Uber Mem. at 13-14.

As detailed *supra*, the record is replete with data and information detailing the problems that Drivers face when deactivated without warning, and it also includes testimony about the broader implications of those problems. General harms to the public from sudden Driver deactivations include increased reliance on unemployment, debt from lost vehicle investments, and an inability to pay rent, or other expenses. Far from affecting a "narrow class" of people as Plaintiffs allege, the legislative record confirms that there are thousands of Drivers operating in the City, and Drivers make up a significant portion of the FHVs available in the City.[58]

As to Plaintiffs' claims of "hostility," Lyft Mem. at 13-14; Uber Mem. at 13-14, Council engaged with Plaintiffs, not only during the public hearing, but during the drafting process. The legislative record confirms that many of Plaintiffs' concerns were addressed in the amended version of the bill.[59] The legislative record also identifies Council's reasoning in instances where Plaintiffs' suggestions were not accepted. *Id*. To the extent that Plaintiffs link their reference to purported "hostility" to one Councilmember's comments, when "determining statutory purpose, 'the motivations of individual legislators, to the extent [the Court] may be able to discern them, are not dispositive.'" *Real Est. Bd. of N.Y., Inc. v. City of New York*, 786 F. Supp. 3d 788, 807 n.7 (S.D.N.Y. 2025) (*quoting Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 283 n.13 (2d Cir. 1997)). Instead, a court should look to the "bill text, legislative record and other public materials[.]" *Citizens Union v. Att'y Gen.*, 269 F. Supp. 3d 124, 140 (S.D.N.Y. 2017) (collecting cases). LL52 easily meets the public-purpose test.

---

[58] *See* note 3, *supra*. (TLC Factbook).
[59] Ex. J, p. 13; Ex. O, p. 12.

###### iii.    LL52 is an Appropriate and Reasonable Means of Achieving its Purpose.

Lastly, LL52 is a reasonable and appropriate means of achieving Council's goals. Where "a law impairs a private contract, substantial deference is accorded to the legislature's judgment as to the necessity and reasonableness of a particular measure." *Buffalo Teachers*, 464 F.3d at 369; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (the Supreme Court has "repeatedly held that unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure") (citation modified).

*Melendez* identified "five features" of the law at issue there that led to the conclusion that the Contract Clause claim could not be dismissed "as a matter of law." 16 F.4th at 1038.  The "five features" are (1) whether the law impairs contracts permanently and entirely extinguishes contractual rights; (2) whether there is some record basis to link the legislature's purpose and its chosen means; (3) whether, if the burden of contractual impairment comes at the expense of a discrete group, it is tailored to the party causing the public harm that the state sought to mitigate; (4) whether the relief provided by the law is conditioned on need and, if not, whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is better positioned financially than the relieved party to bear that burden; and (5) whether the law provides compensation for damages or losses sustained as a result of the impairment. *Id.* at 1038–46.  It is the "totality" of the five features that precluded dismissal in that case. *Id*. at 1038.  The totality of these five features applied here confirms that LL52 is a reasonable and appropriate means of achieving the Council's goals.

First, as set forth above, LL52 does not permanently and entirely extinguish Plaintiffs' contract rights.

24

Next, there is a clear record basis to link the Council's purpose and its chosen means. The purpose of LL52 was to create protections for Drivers against wrongful deactivation, and to address Drivers' repeated concerns that they often are left not knowing why they were deactivated. LL52 introduces protections to address these exact concerns. Specifically, LL52 requires Services to provide 14-days' notice to Drivers in some circumstances and to engage in progressive discipline in advance of deactivations unrelated to egregious misconduct, bona fide economic harm, or legal compliance. Admin. Code §§ 20-1282 (a)-(f). These measures give Drivers an opportunity to respond to any false claims lodged against them, correct any reasons for an impending deactivation that might be administrative in nature, and better understand what the Services require of them to avoid future deactivations. LL52 also affords an opportunity for a previously deactivated Driver to petition for reinstatement.

This also aligns with Plaintiffs' professed goals. *See, e.g.*, Uber Compl. ¶ 59 (Uber is "strongly motivated" to keep platform access open to Drivers because it benefits Uber economically to do so). As set forth in the legislative record, Council received extensive input from Plaintiffs, and crafted the bill in a manner that was appropriately tailored to effectuate its purpose without prejudicing them.[60] *See Buffalo Teachers*, 464 F.3d at 371 (taking into account whether or not the government considered other alternatives or took more drastic measures). In any event, the legislature is accorded significant deference as to the appropriate means to achieve its goals—it is not obligated to enact the precise statute that a challenger might prefer. The Second Circuit has cautioned against "reexamin[ing] all of the factors underlying the legislation," with the benefit of hindsight, and "ma[king] a de novo determination whether another alternative would have constituted a better statutory solution." *Id.* at 370. The fit between the law and the problem

---

[60] Exs. J, O

25

it aims to alleviate merely has to be reasonable; the legislature is not obliged to rule out every possible alternative. *Id.*

Plaintiffs allege that "there is no logical connection between keeping [Drivers] on the platform for 14 days and the goal of preventing wrongful deactivations." Again, Plaintiffs misconstrue the Law. LL52 does not require arbitrary 14-day waiting periods. LL52 requires *notice* to be provided to Drivers detailing, among other things, the reasons that they are facing deactivation so as to advance LL52's purpose of affording Drivers the opportunity to address curable issues or challenge false claims. Numerous Drivers testified that they have been deactivated without ever knowing the reason why.[61] The notice period gives Drivers a meaningful opportunity to respond and does not apply in all circumstances, such as cases of egregious misconduct.

As to the third factor, the burden of contractual impairment is tailored to the party causing the public harm. *Melendez*, 16 F.4th at 1042. There is ample support in the record for the proposition that Services are responsible for the problem that Council sought to solve. Plaintiffs allege that the "retroactive provision" allocates an "enormous cost" burden to Plaintiffs because they may have to "reinvestigate" or "re-adjudicate" years-old deactivations. Lyft Mem. at 13. This claim rings hollow. The lookback period is only one year longer than the existing 6-year statute of limitations that applies to breach of contract claims in New York.[62] And, the lookback period is further limited because petitions to reinstate brought pursuant to LL52 may only be brought for one year after the Law's effective date. Admin. Code § 20-1283. In contrast, at any point, Plaintiffs could find themselves subject to a breach of contract claim filed by a deactivated Driver that would require "reinvestigation" and "re-adjudication."

---

[61] Exs. F, G.
[62] CPLR § 213.

The fourth factor in *Melendez*, which looks to whether the relief provided by the law is conditioned on need, is a poor fit as applied to this case. The concern in *Melendez* was a perceived loophole created by the law at issue there. The concern was that commercial tenants could walk away from their leases with no consequences because the law prohibited enforcement of personal guaranties whether the commercial tenant could afford to pay rent or not and whether the personal guarantor needed relief from the guaranty or not. *Melendez*, 16 F.4th at 1043. Those kinds of concerns are not applicable here. LL52 does *not* absolve Drivers of their responsibility to abide by contract terms and conditions, nor does it prevent drivers from being deactivated should there be just cause to do so. In any event, the vast resources available to Plaintiffs compared to Drivers further speaks to the reasonableness of LL52.

Finally, courts consider whether the law provides compensation for damages or losses sustained as a result of the impairment. *Id.* at 1038–46. To show harm from the alleged contractual impairment, Plaintiffs would have to show that LL52 will result in unfit Drivers being reinstated or remaining on their platforms. Yet, Plaintiffs offer no reason to believe that notice and opportunity to be heard would result in worse deactivation decisions than are happening currently. Under the existing IDG process, IDG reports that 90% of the deactivations that it handles are overturned. Uber specifically acknowledged that only 1% of its Drivers are deactivated each year, *see* Uber Compl. ¶ 98, and further acknowledged in testimony that 99% of deactivations should have notice.[63] LL52 carves out meaningful exceptions to the notice requirements to protect public safety. Plaintiffs cannot show that LL52 will result in any actual harm.

In sum, it is the "totality" of the factors that determines plaintiffs' likelihood of

---

[63] Ex. F, pp. 168:6–169:7.

success. *Melendez*, 16 F.4th at 1038. The legislature made a reasonable determination about the means chosen to achieve the valid end of limiting wrongful deactivations. Drivers typically invest large sums of money purchasing and maintaining a vehicle to be used in the for-hire transportation industry. Those drivers rely on access to Plaintiffs' platforms to earn a living and support their families. It is therefore critical that they be afforded a fair and transparent process to challenge such deactivations should they occur. The City's determination to establish such a statutory framework is entitled to significant deference, *DeBenedictis*, 480 U.S. at 505, and Plaintiffs have little likelihood of success on the claim.

### B.  LL52 Does Not Violate Due Process.

Plaintiffs challenge, as violative of due process, Admin. Code §§ 20-183(a) and (b) (the "Prior Deactivation Provisions"), which permit a Driver who was deactivated over the past seven years to petition the Service within one year of the effective date of LL52 for reinstatement or restoration of access to the platform. Plaintiffs argue that the purported application of these provisions "irrationally and arbitrarily imposes retroactive liability without any rationale." Lyft Compl. at 16. However, Plaintiffs misconstrue the nature of the provisions, as the Prior Deactivation Provisions do not apply retroactively. Instead, they provide prospective relief to Drivers by allowing them to petition the Service to be reinstated under the new "just cause" scheme. The provisions serve the legitimate purpose of giving the law a comprehensive effect by affording Drivers a path to relief from the continuing effects of past unwarranted deactivations. Thus, they satisfy due process.

"[L]egislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *E. Enters v. Apfel.*, 524 U.S. 498, 524 (1998) (*quoting Usery v. Turner Elkhorn Mining Co.*, 428 U.S.

28

1, 15 (1976)).  While "stricter limits may apply to [legislatures'] authority when legislation operates in a retroactive manner," *id.*, the rational basis test is still "extremely deferential." *Regina Metro. Co. v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 386 (2020).

Plaintiffs cannot meet the high burden of establishing that the Prior Deactivation Provisions are arbitrary and irrational.  As an initial matter, despite Plaintiffs' contentions, LL52 does not have retroactive effect.  Rather, the Prior Deactivation Provisions permit previously deactivated Drivers to petition the Services for reinstatement and require the Services to respond to such petitions.  Unlike future deactivations, to establish just cause for a prior deactivation, the fact-finder does not need to consider whether the Service provided adequate training, engaged in investigation, or maintained a policy of progressive discipline.  Further, the Prior Deactivation Provisions do not subject Services to any retroactive liability.  Even if found that a prior deactivation was not made for just cause, the Services are not subject to fines or liable for backpay.  At most, the Service may need to reactivate the account of a previously deactivated Driver, but that has no impact on the decision to deactivate in the past.

The Prior Deactivation Provisions serve the legitimate purpose of limiting unwarranted deactivations and ensuring fundamental fairness to previously deactivated Drivers.  As discussed *supra*, Point I(A)(ii) and *infra*, Point I(C)(ii)(b), there is a substantial government interest in ensuring that Drivers are not subject to deactivations without just cause and have opportunity to meaningfully challenge deactivations, because of the devastating impact that deactivations have on Drivers.  The studies relied on by Council showed that problematic Driver deactivations are not a new phenomenon but span multiple years.[64]  Indeed, Josh Gold, representative for Uber, testified that the processes for deactivation in 2018 and 2019 "were not

---

[64] *See, e.g.*, Ex. J, pp. 8-9; Ex. O, p. 7.

great," especially in regards to drug testing and service animal denial, and shared that he was willing to work with individuals who were subject to prior deactivations.[65]   Gold also acknowledged that some Drivers who were previously deactivated may not feel comfortable speaking directly to Uber.[66]   Thus, Gold acknowledged that there could be Drivers who were deactivated as far back as seven or eight years ago who Uber may consider reinstating.  The Prior Deactivation Provisions formalize a process that Uber itself recognized the need for.  As Drivers who were subject to prior deactivations similarly invested in the high upfront costs of becoming a Driver and suffered severe financial consequences as a result of deactivations, it was rational for Council to conclude that, as a matter of fundamental fairness, these former Drivers, whose experiences formed the basis for LL52, should be able to apply for reinstatement and address the validity of their prior deactivations.

Even if LL52 was found to have a "retroactive effect," (which it does not), it would still survive under prevailing case law. For example, in *De Veau v. Braisted*, 363 U.S. 144, 153–54 (1960), the Court upheld an Act that disqualified any person convicted of a felony from holding office in any waterfront labor organization and resulted in the plaintiff's suspension as an officer of his union.  The Court explained that in scrutinizing an "ex post facto law," "[t]he question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession." *Id.* at 160.  Here, like in *De Veau*, the Prior Deactivation Provisions do not aim to punish the Services for past acts, and the possibility that they will have to reactivate previously deactivated Drivers comes about as a relevant incident to

---

[65] Ex. F, pp.178–79.
[66] *Id.*

30

the regulation's goal of providing a prospective opportunity to previously deactivated Drivers to petition for reinstatement under the new just cause scheme. *See also Landsgraf v. Usi Film Prods.*, 511 U.S. 244, 267–68 (1994) ("Retroactivity provisions often serve entirely benign and legitimate purposes," including "simply to give a comprehensive effect to a new Law [the legislature] considers salutary.").

That Plaintiffs were not aware that their deactivation decisions would be potentially reviewable under a just cause standard does not render the lookback period arbitrary or irrational. Precedent makes "clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Turner Elkhorn*, 428 U.S. at 16. The Supreme Court has explained that "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." *Landgraf.*, 511 U.S. at 267. The Prior Deactivation Provisions do not "sweep away settled expectations suddenly and without individualized consideration." *Id.* at 266. Instead, they require that any time a Driver petitions for reinstatement, there is an individualized assessment and if the Service does not reinstate the Driver, the Driver may seek independent review by a fact-finder in which the Services have the opportunity to produce evidence to justify the prior deactivation.[67]

Unlike in many of the cases Plaintiffs rely on, the Prior Deactivation Provisions do not impose retroactive liability. For example, in *Landgraf*, the Court declined to apply an amendment to Title VII that allowed for compensatory and punitive damages to plaintiff's Title VII claim brought prior to the amendment and pending on appeal, because Congress had not clearly intended a retroactive effect, and retroactive application would "attach an important new legal burden" to conduct. *Id.* at 283. *See also Regina*, 35 N.Y.3d at 420. But here, again, the Prior

---

[67] CPLR Article 78 review provides yet another level of review to ensure a rational application of the law.

Deactivation Provisions do not attach any new legal consequences to past deactivation decisions, but instead provide a mechanism for deactivated Drivers to show that they should be reactivated prospectively because their deactivation was not supported by just cause, for a bona fide economic reason, required by federal, state, or local law or rule, or was during their probation period. Plaintiffs do not allege that reactivating the accounts of previously deactivated drivers who were not deactivated for just cause, i.e., unsafe driving, misconduct, fraud, unsatisfactory performance, etc., would be harmful to their businesses or unfair in any way. In fact, Uber concedes that it has a "desire to keep drivers on its platform" and "considers deactivation to be a last resort." Uber Compl. ¶¶ 60–61.

Plaintiffs' many grievances with the Prior Deactivation Provisions do not rise to the level of a due process violation. For one, Plaintiffs' purported safety concerns are overblown. Prior deactivations for conduct that endangered others would certainly rise to the level of just cause. Further, Drivers who had their license suspended or revoked by TLC for unsafe behavior may not be restored to the Service platforms anyway under LL52. Plaintiffs argue that retroactive legislation is especially serious when laws affect contractual or property rights, *see* Lyft Mem. at 16, but the Supreme Court has explained that the legislature "has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties," including by "impos[ing] retroactive liability to some degree." *E. Enters*, 524 U.S. at 528–29 (citation modified). "[L]egislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Id.* Here, the Prior Deactivation Provisions impose no retroactive liability; the lookback period does not apply to a limited class as Plaintiffs represent the lion's share of the FHV market in New York

32

City;[68] and the costs of complying with the Prior Deactivation Provisions for a limited period of one year after the enactment of LL52 are not substantially disproportionate to the important purposes of the provisions.

Finally, Plaintiffs take issue with the length of the 7-year lookback period. However, there is no "bright-line rule" that dictates the reasonable length of time for a lookback period. *Amerisourcebergen Drug Corp. v. New York State Dep't of Health*, 227 A.D.3d 1286, 1293 (3d Dep't 2024). Instead, Courts look to the "purpose of the legislation" to determine if the period is "excessive." *Id.* Here, the 7-year lookback period (which is comparable to the 6-year statute of limitations for breach of contract claims plus the 180 day period between enactment and the law's effective date) is appropriate, because it is documented that after the enactment of Local Law 150 of 2018, which set minimum pay rates for Drivers based in part on utilization rates, the Services began to use lockouts and deactivations to manage their workforce and reduce the amount they had to pay drivers.[69] As discussed above, Uber's representative testified to Council that the processes for deactivations in 2018 and 2019 were lacking, and implied that Uber may be willing to reinstate or otherwise work with some of the Drivers who faced such prior deactivations.[70] Thus, as Drivers have been subject to the harms that LL52 seeks to remedy since at least 2018 or 2019, it is rational that the lookback period spans this timeframe. And, as discussed above, the Prior Deactivation Provisions only permit Drivers who were previously deactivated to apply for reinstatement during the one-year period after the effective date of LL52, guarding against excessive burden to the Services.[71] In sum, as the Prior Deactivation Provisions are supported by

---

[68] *See* note 3, *supra*.

[69] *See* Ex. G, p.2.

[70] *See* Ex. F, pp.178–79.

[71] Plaintiffs argue that if the Services have not maintained records dating back to 2019, they will be forced to reactivate even if there was serious misconduct or other just cause for the previous deactivation. There is no support for such contention. To the extent that a Service lacks documentation to explain a previous deactivation, it will be up to the fact-finder to determine the proper course based on the evidence and testimony at hand. The possibility that a situation

33

"a legitimate legislative purpose furthered by rational means," *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992), they survive rational basis review and do not violate due process.[72]

### C.    LL52 Does Not Impermissibly Compel Plaintiffs' Speech.[73]

Uber alleges that various provisions of LL52 compel it to alter the content of its speech and to speak in a way preferred by the City. *See* Uber Mem. at 16. Specifically, Uber challenges provisions that require the Services to provide notice to Drivers of the reasons for deactivation and inform them of their right to challenge such deactivation, and state that a Service may only rely on those proffered reasons in its defense (Admin. Code §§ 20-1282(d)-(e) and 20-185(b)) (collectively the "Notice Provisions"); and require Services to provide deactivated Drivers with information and data relevant to their deactivation upon issuance of such notice, including but not limited to driving performance, customer comments, ratings, and complaints, and anonymized and aggregated reports covering other Driver deactivations for the same or similar grounds (Ad Code § 20-1286) (the "Data Sharing Provision"). Uber concedes to already providing Drivers with some notice and explanation of deactivation. *See* Uber Mem. at 6–7. Thus, the challenged provisions merely require Uber to provide somewhat more information than it otherwise would so that Drivers can better understand the reasons for deactivation and more effectively respond. Yet, Uber is not likely to succeed on the merits of its compelled speech claim because the challenged provisions do not implicate the First Amendment.

---

like this may arise does not give rise to a pre-enforcement, facial challenge to the entirety of the Prior Deactivation Provisions.

[72] To the extent that this Court takes issue with the Prior Deactivation Provisions, or any specific provisions challenged herein, they would be severable from the rest of LL52. For example, while the Prior Deactivation Provisions serve an important purpose, LL52 can still maintain its prospective effect of ensuring that Drivers are not deactivated from the platforms without notice, justification, and an opportunity to meaningfully challenge the deactivation, even if the opportunity to challenge prior deactivations is severed. *See Nat'l Advert. Co. v Niagara*, 942 F2d 145, 148 (2d Cir 1991) ("As a general rule, a court should refrain from invalidating an entire statute when only portions of it are objectionable.") (citation modified); *see also* Admin. Code § 1-105.

[73] Only Uber asserts First Amendment compelled speech and compelled association claims for the purposes of the preliminary injunction motion.

The Notice and Data Sharing Provisions regulate conduct—specifically, worker discipline—not speech, and any burden on expression is incidental to LL52's broader scheme of regulating the deactivation process.  Even if these provisions did implicate the First Amendment, they satisfy the lesser scrutiny applied to compelled commercial-speech disclosures because the challenged provisions are reasonably related to the governmental interest of preventing abrupt and unwarranted worker deactivations.

### i.    The Notice and Data Sharing Provisions Regulate Conduct, Not Speech.

While requiring the Services to provide notice and other relevant information to Drivers regarding deactivations requires the Services to put words on a page (or a screen), the aforementioned provisions do not abridge freedom of speech "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).  The Notice and Data Sharing Provisions, at most, impose "incidental burdens on speech" to further the goals of the legislation. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  *See also Council for Responsible Nutrition v. James*, 159 F.4th 155, 167 (2d Cir. 2025) (regulation requiring the inclusion of an age verification prompt on company's website does not implicate First Amendment, because "any burden on expression is incidental an otherwise legitimate regulation.").

The Notice and Data Sharing Provisions do not dictate the specific words that must be used, nor do they compel Uber to convey any value-laden message.  They merely regulate the *process* Uber must undertake when it wishes to deactivate a Driver on its platform, which incidentally requires Uber to convey certain information to the Driver so that the Driver can understand the reasons for deactivation and the right to contest it.  Thus, the challenged provisions "affect what [Plaintiffs] must *do*"—provide drivers with appropriate process related to potential

35

deactivations—"not what they may or may not *say*." *Rumsfeld v. FAIR.*, 547 U.S. 47, 60 (2006) (emphases in original).  As such, they fall outside the First Amendment's reach.

Of note, in *Wheely USA, Inc. v. City of New York*, 26-cv-091957, 2026 U.S. Dist. LEXIS 79548 (S.D.N.Y. Apr. 10, 2026), the Court recently found that reporting requirements, which require, *inter alia*, FHV bases to collect and transmit certain trip records on a monthly basis to TLC and file statements pertaining to the collection and maintenance of certain data, do not implicate the First Amendment.  Important to the Court's analysis was that the required reporting did not "reflect a compelled endorsement of any governmental message, and Plaintiffs remain free to express their disagreement with the Rules." *Id.*  Ultimately, the Court found that because such "communications arise from a broader regulatory scheme governing economic activity," even to the extent it required FHV bases to communicate with users regarding data practices, they are "'plainly incidental' to the regulation of conduct." *Id.* at *81–*82 (*quoting Rumsfeld*, 547 U.S. at 62).  Likewise here, the communications required by the Notice and Data Sharing Provisions are incidental to the broader scheme of regulating the deactivation process for workers, do not reflect an endorsement of any government message, and do not prevent Plaintiffs from expressing their disagreement with the statute. *See Cornelio v. Rosado*, 24-cv-01335, 2025 U.S. Dist. LEXIS 191250, at *11 (N.D.N.Y. Sept. 29, 2025).

The *conduct* regulated by the Notice and Data Sharing Provisions also does not fall within the First Amendment's protection as it is not "inherently expressive." *Rumsfeld*, 547 U.S. at 65–66 (*quoting United States v. O'Brien*, 391 U.S. 367, 376 (1968)).  In determining whether a statute regulates conduct with a significant expressive element, "[a] court may consider the 'inevitable effect of a [law] on its face,' as well as the statute's 'stated purpose.'" *HomeAway.com v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2018) (*quoting Sorrell*, 564 U.S. at 565).

36

Here, the challenged provisions codify a new process that will lead to fewer abrupt and unwarranted deactivations of Drivers, many of whom have invested thousands of dollars in acquiring and maintaining vehicles for the purpose of working for the Services and who rely on this income to support themselves and their families. And, incidental to that process, the Notice and Data Sharing Provisions will ensure that Drivers are given warning of their deactivation, with appropriate exceptions, and the precise reasons for the deactivation, so that they can meaningfully challenge their deactivation.

As regulation of the deactivation process does not contain a "significant expressive element," the First Amendment is not implicated. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). Recently, the Ninth Circuit in *Uber Techs., Inc. v. City of Seattle*, 168 F.4th 1202 (9th Cir. Mar. 4, 2026), confirmed as much when it found that a Seattle ordinance that required companies to inform app-based workers in writing of the company's deactivation policy did not implicate the First Amendment. The Court noted that "[t]he fact that the Ordinance, in Plaintiffs' words, necessarily 'compel[s] and dictate[s] the content of a written communication' does not transform a law regulating nonexpressive activity into one that infringes speech," *id.* at 1213, and that, at its core, the notice requirement regulated a business agreement, which "is not conduct with a significant expressive element," *id.* at 1211. Similarly here, that the Notice and Data Sharing Provisions compel and dictate certain communications does not trigger First Amendment scrutiny, since the provisions ultimately regulate the nonexpressive activity of worker discipline. And, in the end, the Second Circuit has found that the hiring and firing of workers (which is what a deactivation decision entails) is nonexpressive in nature. *See Compasscare v. Hochul*, 125 F.4th 49, 68 (2d Cir. 2025); *Slattery v. Hochul*, 61 F.4th 278, 291 (2d Cir. 2023).

37

###### ii.    LL52 Implicates At Most Commercial Speech.

Even if the Notice and Data Sharing Provisions are found to have more than an incidental effect on speech, and therefore implicate the First Amendment, they concern only commercial speech, which "enjoys 'a limited measure of protection.'" *Bd. of Trs. v. Fox*, 492 U.S. 469, 477 (1989) (*quoting Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978) (citation modified)).  The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience," or, alternatively, as speech "proposing a commercial transaction." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 560–61 (1980).  Here, the speech required by the Notice and Data Sharing Provisions relate to worker discipline, i.e., Driver performance and conduct, which is intrinsically related to the commercial relationship between Uber and its Drivers. *See Compasscare*, 125 F.4th at 65 (requirement that employers issue employee handbooks with information regarding employees' rights and remedies implicated commercial speech).

Uber argues that the Notice and Data Sharing Provisions implicate non-commercial speech because the speech "does not propose a commercial transaction and is not even customer facing." PI. Mem. at 18.  However, that is too narrow of a read of the commercial speech doctrine. "The Supreme Court has never defined the precise bounds of the category of expression that may be termed commercial speech," *Compasscare*, 125 F.4th at 64, but has instead found that the commercial speech doctrine rests on the "'commonsense' distinction" between commercial speech and other varieties of speech, *Cent. Hudson*, 447 U.S. at 562 (*quoting Ohralik,* 436 U.S. at 455–56).  For example, in *N.Y. State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009), the Court found that a law that required disclosure of calorie information regulated commercial speech because calorie count was intertwined with the sale of a restaurant meal. Similarly here, the information required to be disclosed under the challenged provisions, such as

38

the basis for the deactivation, is intrinsically linked to the terms of work for Drivers, i.e., the Services' deactivation policies, and therefore is wholly commercial in nature. *See Uber Techs.*, 168 F.4th at 1215 (finding that even if the challenged Ordinance regulated speech, it was commercial speech, because "communication by Uber . . . to temporary app-based workers about the proposed terms of engagement, including the standards for deactivation or termination of those workers' account," "'simply propose[s] a commercial transaction.'") (*quoting Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976)). Following this logic, the *Wheely* Court found that even if the challenged regulations in that case implicated speech, they regulated commercial speech, because "[t]he communications at issue—statements to workers about the terms and conditions of their engagement—were 'directly related to employment' and thus commercial in nature." 2026 U.S. Dist. LEXIS 79548, at *85 (*quoting Uber Techs.*, 168 F.4th at 1215). Hence, it is a matter of "commonsense" that the Notice and Data Sharing Provisions implicate, at most, commercial speech. *See Cent. Hudson*, 447 U.S. at 562.

### a. LL52 is Subject to, and Satisfies, Rational Basis Review under *Zauderer*.

Non-misleading commercial speech is entitled to less protection than other expression under the First Amendment. *Cent. Hudson*, 447 U.S. at 562–63. Generally, restrictions on commercial speech are subject to intermediate scrutiny and analyzed under the four-part test set forth in *Central Hudson*. However, both the Supreme Court and Second Circuit have found that laws that require, rather than restrict, commercial speech, as is the case here, are subject to a form of more deferential rational basis review. *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985).[74] A regulation compelling commercial speech does not violate the First

---

[74] "[T]he Second Circuit has applied *Zauderer* to commercial disclosures . . . beyond the narrow context of deception cases." *Doordash, Inc. v. City of New York*, 25-cv-10268, 2026 U.S. Dist. LEXIS 12619, at *11 (S.D.N.Y. Jan. 22, 2026).

Amendment if it is "reasonably related to the State's interest" and is neither "unjustified or unduly burdensome." *Compasscare*, 125 F.4th at 64, 67.

To the extent that the First Amendment is implicated, this form of review applies because the Notice and Data Sharing Provisions require platforms to provide "purely factual and uncontroversial information"—information that informs a driver of the basis of their job loss and how to challenge it—and do not restrict any speech. *See Zauderer*, 471 U.S. at 637, 651; *Compasscare*, 125 F.4th at 64–65. Of note, Uber does not contest that the information required to be disclosed—notice of impending deactivations; reasons for deactivation; data relevant to the reason for deactivation; and means to challenge deactivation—is purely factual in nature. Moreover, the Notice and Data Sharing Provisions do not require the disclosure of any controversial information, something that Uber seemingly concedes as it already notifies Drivers when they have been subject to a report that could lead to deactivation, when the driver's account is deactivated, and the appeals process, if available. *See* Uber Mem. at 6–7; *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 750 (S.D.N.Y. 2022) (finding disclosure that company has "already chosen to make to a subset of the market" did not warrant heightened scrutiny).

Instead, Uber argues that it is being compelled to share data and communicate information to drivers that it otherwise would not communicate. However, *Zauderer* specifically contemplates mandated disclosures by the government, so arguing that the challenged provisions simply require Uber to say something it does not wish to say does not warrant higher scrutiny. Further, "[t]he Second Circuit has been clear that a commercial disclosure is not rendered 'controversial' merely because the regulated entity does not wish to make that disclosure or because they would prefer to make a different statement on that same topic." *Nat'l Retail Fed. v. James*, 25-cv-5500, 2025 U.S. Dist. LEXIS 199836, at *16 (S.D.N.Y. Oct. 8, 2025). There is

40

nothing "controversial" about informing Drivers of decisions, policies, and data that directly impact them. *See Uber Techs.*, 168 F.4th at 1215 (even if the mandated disclosures implicated speech, *Zauderer* applies because communication of policies that workers are subject to is purely factual in nature and not controversial); *Wheely*, 2026 U.S. Dist. LEXIS at *86 (if speech was implicated, *Zauderer* applies because required disclosures did not require plaintiffs to take sides in a political controversy or express any opinions).

In arguing that *Zauderer* review should not apply, Uber relies primarily on a lower court decision rendered in *Doordash, Inc. v. City of New York*, 789 F. Supp. 3d 337 (S.D.N.Y. 2024), which found that *Zauderer* did not apply to a law that required food delivery services to provide customer data, including name, address, email, phone number, and order contents, to restaurants upon request.[75]  Adopting the plaintiffs' narrative in that case that the restaurants were competitors of the food delivery services, the Court found that such disclosures did not "serve the public informational interest that animated *Zauderer*" and required the disclosure of data that went beyond the food delivery services' own products or service. *Id.* at 355 (*citing Safelite Grp. v. Jepsen*, 764 F.3d 258, 264 (2014)).  To the contrary, here, Drivers are not "competitors" of the Services, and the Services are not being compelled to turn over what they consider their "customer lists."  Instead, Drivers, like riders are, for the purposes of this analysis, consumers of the Services' product, as they contract with the Services to utilize their technology to arrange FHV trips.  As such, the disclosures mandated by the challenged provisions, which inform Drivers why they were removed from a platform and the process for challenging such removal, further the public informational interest central to *Zauderer*.

---

[75] This decision is currently on appeal to the Second Circuit.

The Second Circuit has applied *Zauderer*'s less demanding scrutiny to commercial disclosure requirements, like those at issue here, "because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberties." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). Here, the mandated disclosure of truthful, factual, commercial information that will better inform drivers of the grounds for their deactivations and their ability to challenge them, certainly "furthers, rather than hinder, the First Amendment goal of the discovery of truth" and "the robust and free flow of accurate information." *Id.* Thus, to the extent that the challenged provisions implicate speech, they are subject to rational basis review. *See Va. State Bd. of Pharm.*, 425 U.S. at 770.

The Notice and Data Sharing Provisions easily satisfy this standard. To pass muster under rational basis review, the government does not have to produce evidence or empirical data to sustain rationality; instead, it can rely upon "rational speculation." *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001). Nor for that matter does the government have to establish that the statute eliminates all the evils it was designed to ameliorate. *See Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115–16. Here, because there is a reasonable relationship between the intended purpose of the challenged provisions and the means employed to achieve that purpose, and because the challenged provisions are neither "unjustified [n]or unduly burdensome," *Compasscare*, 125 F.4th at 64, 67, Uber cannot establish that they violate the First Amendment.

The legislative record provides ample support for upholding the challenged provisions. Council considered an AALDEF study that found that over 70% of Drivers subject to deactivation received no notice prior to deactivation, and many Drivers also were not informed in

42

advance of rider complaints that contributed to their deactivation.[76]  Council also considered that discriminatory or false rider complaints often led to Driver deactivations.[77]  While Uber now alleges that LL52 does not solve any "real problem," Uber Mem. at 18, Uber's representative at the Council hearing on this legislation, Josh Gold, indicated otherwise.  Gold recognized that "for 99 percent of deactivations, . . . there needs to [be] notice."[78]  He further represented that Uber "agree[s] with the intent that notices and warnings and opportunities for improvement and education are needed."[79]  Thus, the need for legislation that limits abrupt and unwarranted Driver deactivations, and allows Drivers to challenge deactivations in a meaningful way, is evident, and the challenged provisions are a rational means to accomplish these important goals.

### b.  The Challenged Provisions Satisfy Intermediate Scrutiny.

If *Zauderer* did not apply, the Notice and Data Sharing Provisions would be subject to intermediate scrutiny under *Central Hudson* since they implicate, at most, commercial speech. To survive intermediate scrutiny, the commercial speech must concern lawful activity and not be misleading, the asserted governmental interest must be substantial, and the regulation must directly advance the governmental interest and not be more extensive than necessary to serve that interest. *Cent. Hudson*, 447 U.S. at 566.  The Notice and Data Sharing Provisions involve the disclosure of factual, uncontroversial information and thereby satisfy the first prong. *See* 447 U.S. at 566. Moreover, these provisions directly advance the important government interests of limiting abrupt and unjustified driver deactivations.  Therefore, the challenged provisions satisfy intermediate scrutiny.[80]

---

[76] *See* Ex. J, pp. 6-7; Ex. O, p. 5.

[77] Ex. O, p. 6.

[78] Ex. F, pp. 178–79.

[79] *Id.*

[80] For the same reasons that the challenged provisions survive First Amendment scrutiny, they do not offend Article I, section 8 of the New York State Constitution, as "the New York State Constitution does not afford heightened free

43

While Uber argues that the challenged provisions address a problem that affects a small percentage of New Yorkers, *see* Uber Mem. at 18, this is not the case.  As of March 2026, there were approximately 111,800 taxi and FHV drivers, 87,207 of which were drivers for high-volume FHV services, and of the more than 28 million trips completed in NYC by taxis and FHVs, more than 22 million were completed by Drivers for the Services.[81]  As the Services make up the lion's share of the FHV industry in the City, it follows that Driver livelihood is a substantial government interest. *See Melendez*, 16 F.4th at 1037–38; *Doordash, Inc.*, 2026 U.S. Dist. LEXIS 12619, at *13.

Data shows that unwarranted deactivations have a significant detrimental impact on Drivers.  Being pushed out of the industry without adequate notice, in many cases based on false and discriminatory complaints, is especially harmful given the significant upfront investment necessary to begin operation as a Driver for the Services and the continued monthly expenses for maintaining a vehicle even if the Driver is temporarily or permanently prohibited from working for the Services.[82]  As discussed above, a survey conducted by TLC in 2024, as well as an analysis conducted by AALEF, found that the large majority of Drivers relied on driving as their only source of income; about two-thirds of Drivers were still paying off their vehicle; and a large majority purchased or rented their vehicle for the purpose of working for the Services.[83]  The devastating impacts of deactivations highlight the need for the challenged provisions which ensure appropriate notice and an opportunity to be heard.

---

speech protections to commercial speech." *OTR Media Group, Inc. v. City of New York*, 83 A.D.3d 451 (1st Dep't 2011).

[81] *See* note 3, *supra*.

[82] Ex. F, pp. 52:17–55:8.

[83] Ex. J, pp. 5-7; Ex. O, pp. 4-5.

Studies and anecdotal evidence also highlight the very real possibility that deactivations can be based on false or unreliable complaints, further emphasizing the need for the challenged provisions to ensure that Drivers have access to the information related to their deactivation and have a meaningful opportunity to challenge such deactivations. As mentioned above, a survey conducted by the Asian Law Caucus revealed that two out of every three Drivers experienced discrimination, sexual harassment, or other forms of misconduct or customer bias while driving for the Services.[84] Half of the Drivers who faced racial discrimination from a customer were also reported *by* that customer.[85] An attorney from Brooklyn Legal Services, who regularly represents Drivers in obtaining unemployment benefits, explained that Drivers often do not know exactly why they are deactivated.[86] Other times, they are deactivated due to complaints from customers who are drunk or unruly; those who want the Driver to violate a traffic rule; and even when the Driver refused a sexual advance of a customer.[87] Testimony from the Legal Aid Society, which represents low-wage workers in employment-related matters, described how their clients are often fired without any notice or explanation, even after years of service.[88] This testimony highlights the need for Drivers to obtain more information about their deactivations in order to meaningfully fight unwarranted deactivations.

Finally, the Notice and Data Sharing Provisions are no more burdensome than necessary. As discussed above, Uber concedes that it already provides Drivers with some of the same notice and information required by the challenged provisions, so the added burden of the challenged provisions, if any, is minimal. Uber argues that the Notice and Data Sharing Provisions

---

[84] Ex. J, pp. 8-9; Ex. O, p. 7.
[85] *Id.*
[86] Ex. G, p. 51.
[87] *Id.*
[88] *Id.* at 61.

are "exceptionally broad," *see* Uber Mem. at 19, but it is not burdensome to expect an entity to explain to a worker the reasons why they lost their job. For Uber to argue otherwise is not only offensive, it constitutes compelling direct evidence as to why this legislation is needed. As to the mandates set forth in the Data Sharing Provision, Uber misconstrues what is required. Admin. Code § 20-1286(a) only requires the Service to disclose information or data "relevant" to the Driver's deactivation, and aggregate and anonymized reports regarding discipline of other Drivers with the "same or similar" grounds for deactivation, not *all* data related to the Driver facing deactivation or all other Drivers. Thus, the only data that must be shared is that which is relevant for the driver to fully understand the reasons for deactivation and for a fact-finder to determine whether the deactivation was for just cause or other lawful grounds. As such, the Data Sharing Provision is not overly broad, and not more burdensome than necessary to advance the government's substantial interest.[89]

The legislative record reflects that Council amended the bill to address concerns raised by the Services, including limiting the data required to be produced and requiring rider PII to be redacted, to protect the safety interests of complaining riders.[90] Council also considered, but rejected other suggestions made by Plaintiffs, and explained the reasoning for rejecting those suggestions in the January 28, 2026 Committee Report.[91] For instance, Council considered Lyft's professed concern about passenger privacy, but determined that in the interests of due process, that while riders' PII must be redacted from data produced under Admin. Code § 12-1282(b), a Driver may be provided information about a specific allegation giving rise to their deactivation.[92]

---

[89] Uber argues that Admin. Code § 20-1286(a)(2)'s requirement that it must share customer comments, ratings, and complaints related to the driver deactivation will threaten rider safety and chill rider speech, *see* Uber Compl. ¶ 230, but Uber does not have standing to challenge the law on behalf of alleged injury to riders.
[90] Ex. O, p. 12.
[91] *Id.*
[92] *Id.* at 13.

46

In the end, the City is afforded "considerable leeway in determining the appropriate means to further a legitimate government interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 58 (2d Cir. 2019) (the Second Circuit is "loath to second-guess the government's judgment" (citation modified)).  Here, Council carefully considered both empirical and anecdotal evidence and crafted the Notice and Data Sharing Provisions to directly advance the substantial government interest in limiting deactivations without warning, justification, or a meaningful opportunity to be heard.  For these reasons, even if intermediate scrutiny applies, the challenged provisions survive.

### iii.    Strict Scrutiny Does Not Apply.

Uber argues that strict scrutiny should apply because the challenged provisions are content-based restrictions and compel it to engage in non-commercial speech, namely disclosing its internal processes and rider data in a manner and method that it otherwise would not. *See* Uber Mem. at 16.  However, as discussed above, any speech implicated by the Notice and Data Sharing Provisions is commercial in nature.  *See, e.g., N.Y. State Rest. Ass'n*, 556 F.3d at 131.  Thus, even if the challenged provisions were content-based, they would still be subject to, at most, intermediate scrutiny. *See Vugo*, 931 F.3d at 50  ("Following *Sorrell*, this Court has continued to apply *Central Hudson*'s intermediate scrutiny test to commercial speech restrictions.").  As such, strict scrutiny does not apply.[93]

### D.    LL52 Does Not Impermissibly Compel Expressive Association.

The First Amendment protects the right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) and the right to exclude potential members "in

---

[93] Should the Court find strict scrutiny applies, the Notice and Data Sharing Provisions meet this threshold because the governmental interest is compelling, they achieve the goals Council sought to address, and they are narrowly tailored.

47

order to foster the group's shared interest in particular speech," *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 858 (2d Cir. 1996).  However, in the labor employment context, First Amendment protections of expressive association are more limited.   "[T]he right to expressive association is implicated only when the employment decision 'goes to the structure and identity of the association as an association.'" *Compasscare*, 125 F.4th at 61 (*quoting Slattery*, 61 F.4th at 290).  Uber alleges that the 14-days' notice requirement (Admin. Code § 20-182(d)), and the opportunity for Drivers to contest the factual basis of a prior deactivation should they choose to petition for reinstatement (*Id.* § 20-186), compel expressive association in violation of the First Amendment by "forcing Uber to include an 'unwanted person' in the cohort of individuals whom it permits to offer services on its platform." Uber Mem. at 21 (*quoting Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000)).  However, as these provisions do not infringe on Uber's ability to advocate its viewpoints, let alone go to its structure and identity as an association, Uber is not likely to succeed on the merits of its compelled association claim.

> **i.    The First Amendment is Not Implicated Because Uber Does Not Engage in Expressive Association.**

To violate the Constitution, a law that interferes with associational rights must "affect in [a] significant way the existing members' ability to carry out their various purposes." *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987).  The Second Circuit applies a three-part inquiry for expressive association claims: (1) evaluate whether the group engaged in expressive association; (2) analyze whether the state action "significantly affected the group's ability to advocate its viewpoints"; and (3) weigh the state's interest against the burden imposed on the associational expression. *Slattery*, 61 F.4th at 287 (citation modified).

As to the first step, while a voluntary association "must merely engage in expressive activity that could be impaired in order to be entitled protection," *Dale*, 530 U.S. at 655, the

48

standard is higher in a workplace because of the significant differences between organization types, and the "long and complex history of regulation of employment relationships." *Compasscare*, 125 F.4th at 59–61.  The Court in *Compasscare* explained that

> Employment relationships are contractual, with work exchanged for pay, and the employment contract provides mutual guarantees to the parties.  Employees rely on their jobs for their livelihoods, and termination or refusal to hire an employee can have significantly greater impact than exclusion from a voluntary association.  Furthermore, significant power imbalances often exist between employers and employees which may not be present in voluntary associations. . . *Id.*

While Drivers are classified by Uber as independent contractors and not employees, the unique factors of the employment relationship, such as the contractual relationship, history of regulation, power dynamics, and reliance on work for livelihood discussed, are present in the relationship between the Services and Drivers.  Therefore, the expressive association standard for employers applies here.  Thus, to sustain its challenge, Uber must "adequately allege (and eventually prove) that the [challenged provisions] threaten[] 'the very mission of its organization.' It is not enough for [Uber] to claim that it holds particular views or interests, or even that it expresses such views through its work." *Id.* at 61 (*quoting Slattery*, 61 F.4th at 288).  Uber's right to expressive association is only implicated if the challenged provisions "'go[] to the structure and identity of the association as an association.'" *Id.* (*quoting Slattery*, 61 F.4th at 290).

Uber alleges that it engages in expressive association through its brand values, public statements related to safety, and company policies. *See* Uber Mem. at 22.  However, Uber's motion provides no evidentiary support for this conclusory argument, nor has Uber detailed how the Drivers engage in, or impact, such expressive association.  Stating the obvious, Uber is not the Boy Scouts of America.  Uber does not allege that it contracts with Drivers only because of their

shared values, nor that Drivers help shape Uber's brand values, contribute to the development of Uber's policies, or participate in public advocacy on behalf of the company. As such, Uber cannot establish it is a protected expressive association, let alone that the challenged provisions threaten its alleged mission or identity.

Finally, to the extent that Uber contends that LL52 threatens its purported reputation for safety, reputation is not expression, and in any event, the contention is false. *See* Uber Mem. at 24. First, LL52 explicitly contemplates and allows immediate deactivations without advance notice by the Services for egregious misconduct, account sharing, or a pattern of repeated fraudulent behavior. Admin. Code § 20-1282(d). Second, it does not require reinstatement for Drivers deactivated for just cause, i.e., unsafe behavior. Third, existing TLC regulations and Second Circuit case law, which must be considered alongside LL52 (and which Plaintiffs conveniently omit from their papers), authorize TLC to immediately suspend a driver's TLC license when they have been arrested for certain offenses or have engaged in unsafe behavior, including but not limited to driving under the influence of drugs or alcohol, any acts of fraud, harassment, or abuse, and possession of a weapon in a FHV. *See Nnebe v. Daus*, 931 F.3d 70–71; 35 RCNY § 68-15(a)(1). Accordingly, Plaintiffs' protestations that they will be forced to allow dangerous individuals to remain on their platforms are nothing but a red herring.

### ii.    LL52 Does Not Impair Uber's Ability to Advocate its Viewpoints.

Even if Uber were a protected expressive association, Uber cannot establish that LL52 prevents it from making public statements on any topic it chooses, including safety, or from promoting its brand values. Uber must establish that LL52 "threatens its very mission not only in a vague and generalized sense, but in the context of a specific employment decision" and Uber "must plausibly allege that [LL52's] impact on the specific employment decision 'will impede the organization's ability to engage in . . . protected activities or to disseminate its preferred views."

50

*Compasscare*, 125 F.4th at 61 (*quoting Jaycees*, 468 U.S. at 627).  However, Uber's preliminary injunction motion is devoid of any specific allegations as to "the responsibilities of the [Driver] . . . and whether it involves expressly or implicitly speaking for the organization" or how "the particular conduct or attribute of the [Driver] . . . renders the employment of that person in that position, a threat to the employer's mission." *Id.*

To the extent that Uber alleges that the restrictions on Uber's ability to immediately deactivate a Driver's account will threaten its core value of "stand[ing] for safety," Uber Mem. at 5, for the reasons discussed above, Uber's argument is unavailing as LL52 makes appropriate carveouts for safety.  Further, as Uber has conceded that deactivations "affect only 1% of drivers in New York," Uber Mem. at 5, it is difficult to imagine that changes to the deactivation procedure threaten the core of Uber's mission and identity.  In addition, Uber can continue to take the many safety precautions it mentions in its Complaint—including running annual criminal background checks—to ensure rider safety.[94] *See* Uber Compl. ¶¶ 40–42.

Finally, even applying the standard for voluntary associations, Uber's claim would fail.  In *Dale*, the Court explained that "the forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association *if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints*." 530 U.S. at 647 (emphasis added).  Uber does not articulate in any detail how the activation of the accounts of certain Drivers who it wishes to exclude threatens its mission or prevents Uber as a company from advocating its viewpoints.  While LL52 may require Uber to keep the account of a Driver (who has not engaged in egregious misconduct, account sharing, or a pattern of fraudulent behavior)

---

[94] As drivers operating in New York City must have a TLC-issued license, it bears noting again that TLC regulations allow for immediate suspensions of drivers under certain circumstances, including arrests on various charges and dangerous behavior, and further, TLC fingerprints and conducts extensive background checks on applicants seeking a for-hire driver license.

51

active for 14 days longer than Uber wishes to, or reactivate the account of a Driver whose prior deactivation lacked just cause, a legal reason, or a bona fide economic reason, this would not burden Uber's ability to express its message in any way. In short, LL52 does not limit Uber's self-described core expressive activity. *Id.* at 648. Thus, as "[m]ere incidental burdens on the right to associate do not violate the First Amendment," *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007), the analysis can end here.

### iii.   The 14-Day Notice Requirement and 7-Year Lookback Period Satisfy Rational Basis Review.

Even if the 14-day notice requirement and 7-year lookback period could be interpreted as burdening Uber's expressive activity, Uber is incorrect that strict scrutiny should apply. *See* Uber Mem. at 21. "Strict scrutiny applies only when a challenged regulation imposes 'severe burdens' on associational rights," *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 191 (2d Cir. 2017), and any burden these provisions may have on Uber's expressive association fall far short of "severe." If the burden is less than severe, LL52 need only be rationally related to a legitimate government interest. *See Karham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007). Here, as LL52 does not burden Uber's ability to express its chosen message, the challenged provisions must pass, at most, rational basis review.

For the reasons discussed in Point I(C)(ii)(a), *supra*, the requirement, with appropriate exceptions, that the Services provide Drivers with 14-days' notice of an impending deactivation is rationally related to the important government goal of preventing unwarranted deactivations with no warning. And for reasons discussed in Point I(B), *supra*, the opportunity for Drivers to contest the validity of prior deactivations, should they petition for reinstatement, is rationally related to the important purpose of ensuring that unwarranted deactivations do not prevent a person from earning a living going forward. Because the challenged provisions satisfy

rational basis review, Uber is not likely to succeed on the merits of its freedom of association claim.

## POINT II

### PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM.

Plaintiffs cannot show that they will suffer irreparable harm without injunctive relief. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("irreparable harm is the single most important prerequisite . . .") (citation modified). "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.*, 969 F. 3d 42, 86 (2d Cir. 2020) (citation modified). For one, Plaintiffs cannot allege *per se* irreparable harm as a result of a violation of their constitutional rights because, as discussed *supra*, Point I, LL52 does not violate the Contract Clause, Due Process Clause, or First Amendment. Plaintiffs' other allegations of harm fail because it is well-settled that irreparable harm "is neither remote nor speculative, but actual and imminent." *New York v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015).

Plaintiffs contend that: (1) they will suffer irreparable damage to reputation and goodwill; (2) they will suffer nonrecoverable compliance costs; (3) LL52 will harm the public and have a chilling effect on riders; and (4) they will be harmed by the forced distribution of sensitive data and requiring platform access to those who have engaged in fraudulent behavior. None of these claims have merit.

Plaintiffs' claim that they will suffer damage to their reputations and goodwill with riders is conclusory and does not establish irreparable harm. *See Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 10-Civ.-8976, 2011 U.S. Dist. LEXIS 14524, at *17 (S.D.N.Y. Feb. 10, 2011). Moreover, any damage to Plaintiffs' reputation based on fears that passenger

53

safety may be threatened is more likely to come from Plaintiffs' public response to LL52 than the actual mandates in LL52. Plaintiffs repeatedly misconstrue LL52 as not permitting immediate deactivation of Drivers for safety concerns. *See, e.g.*, Lyft Mem. at 6 (alleging that Council did not address Lyft's safety concerns "or even mention safety as a consideration in developing and enacting the Bill"). The plain language of LL52 negates these claims. Admin. Code § 20-1282(d) (providing that Driver who engaged in egregious misconduct, account sharing, or a pattern of repeated fraudulent behavior need not be notified in advance of the reasons for an impending deactivation); Ex. J at 11–13 (explaining how Council amended the Bill to expand the definition of "egregious misconduct" and require redaction of rider PII in response to the Services' testimony).[95] Notably, Plaintiffs have not identified a single Driver who they would be required to reinstate who would threaten public safety, rendering all allegations on this basis speculative.

As to Plaintiffs' claim that they will suffer irreparable harm from the cost of compliance, "[a] monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Plaintiffs have failed to submit such evidence or explain why a monetary award would not compensate them for their future "compliance" costs. And, as Uber admits, deactivations are rare (1% of drivers in NYC). *See* Uber Mem. at 5. Nonetheless, "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).

Finally, Uber alleges irreparable harm from the "forced revelation of sensitive internal anti-fraud measures," from "requiring [platform] access to those who have engaged in fraudulent behavior," and from "exposure to inconsistent judgments." Uber Mem. at 25–26. These

---

[95] Further, as discussed above, TLC regulations allow for the immediate suspension of a TLC driver who threatens public safety.

claims, yet again, misconstrue the mandates of LL52.  While the Services must provide a Driver deactivated for fraudulent behavior notice explaining the reasons for the deactivation, nowhere in LL52 Law does it require that the Services explain *how* the Service detected the fraud.

For all of these reasons, Plaintiffs cannot establish that they will suffer irreparable harm if LL52 goes into effect.

**POINT III**

**THE BALANCE OF THE EQUITIES TIPS STRONGLY IN THE CITY'S FAVOR.**

Plaintiffs cannot show that the balance of equities weighs in their favor, and that a preliminary injunction is in the public interest. *See Winter,* 555 U.S. at 20.  "[A] court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (*citing Winter*, 555 U.S. at 20).  It further must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[.]" *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020).

The record demonstrates that unwarranted Driver deactivations negatively impact Drivers and the public at large.  Drivers are harmed directly through the immediate loss of income, and the general public is harmed indirectly through the Driver's sudden inability to pay bills and increased reliance on public assistance.  The currently available remedies for wrongfully deactivated Drivers (which Council testimony revealed are internal and secretive) are largely only available *after* deactivation, when the harm has already taken place.  Plaintiffs pride themselves on their "desire to keep drivers on [their] platform[s]" and "consider[] deactivation to be a last resort." Uber Compl. ¶¶ 60–61.  Even so, Plaintiffs admit that "notice could be better."[96]  Yet,

---

[96] Ex. F at 178–79

when common sense measures are developed *with* input from Services to address these issues, Plaintiffs balk.  Enjoining LL52 will allow the inequities faced by Drivers to persist. Therefore, the motions should be denied. *See Doordash, Inc. v. New York City. Dep't of Consumer & Worker Protect.*, Index. No. 155947/2023, 2023 N.Y. Misc. LEXIS 6071 (Sup. Ct. N.Y. Cnty Sept. 27, 2023) (declining to enjoin minimum pay rate for food delivery workers because, in part, petitioners could not show that the balance of the equities favored them over the vulnerable class of workers that the laws were created to protect); *Doordash, Inc.*, 2026 U.S. Dist. LEXIS 12619, at *17–*18.

## CONCLUSION

The City respectfully requests that this Court deny the motions for a preliminary injunction in their entirety, together with such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            June 25, 2026

Steven Banks
Corporation Counsel of the City of New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007
(212) 356-2197

By:        /s/
            Scali Riggs
            Jessica Katzen
            *Assistant Corporation Counsels*

## WORD COUNT CERTIFICATION

According to Microsoft Word, the portions of this memorandum of law that must be included in a word count, pursuant to Local Civil Rule 7.1 and the Part's Individual Practices in Civil Cases, contain **17,426 words** (including footnotes), exclusive of cover page, table of contents, table of authorities, signature block, and this certification.[97]

Dated:  New York, New York
June 25, 2026

STEVEN BANKS
Corporation Counsel of the
City of New York
*Attorney for Defendant City of New York*
100 Church Street
New York, New York 10007
(212) 356-2197

By:    ___/s/_____
Scali Riggs
Jessica Katzen
Assistant Corporation Counsels

---

[97] By order of the Court, dated June 22, 2026, Defendants were granted leave to file a consolidated brief responding to both Uber and Lyft's motions for a preliminary injunction with 17,500 words. *See* ECF 21 (Uber docket); ECF 25 (Lyft docket).

57