# *Uber v. City of New York*

No. 26-cv-04893

July 16, 2026 Preliminary Injunction Hearing

# Uber Is Likely To Succeed On Its Contracts Clause Claim

## Uber's Deactivation Rights Are "Central" To Its Contracts

16. Uber has to balance competing interests, including maintaining driver access to its platform, fairness, and safe and high-quality experiences for riders, and its own financial interests—for example, against liability or fraud. **The contracted-for ability to deactivate drivers without notice based on Uber's determination of whether the driver has committed a violation of its standards or policies is critical** to Uber's ability to maintain the balance competing priorities and standards that benefit all users of the platform, including drivers, and to live by its values, including to Stand for Safety. As a result, the PAA Deactivation and Termination Provisions (and, before that, the TSA Customer Relationship and Termination Terms), are **central to the Agreement and Uber's willingness to enter into it**.

Declaration of Rachel Perl (Senior Manager, Northeast Rides Operations), Dkt. 11

## Uber's Contract: <u>Discretion</u> to Deactivate Without Notice if Uber Determines Violation

### PAA Deactivation Provision

**5.3. Deactivation.** You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a 'Material Breach or Violation'). You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred.

Dkt. 11-1 § 5.3

# Uber Contracts To Deactivate For Violations Of Its Community Guidelines

## Respect isn't always about what you say—it's also about how you act

We believe that everyone should feel supported and welcomed when interacting with others in the Uber community. That's why we've created standards and policies on threatening and rude behavior, post-trip contact, physical contact, discrimination, sexual assault and misconduct, and property damage.

The actions you take while using the Uber Marketplace Platform can have a big impact on the safety and comfort of others. Courtesy matters. For example, always try to be on time for your ride or to pick up your delivery. It's also common courtesy not to shout, swear, or slam doors. And by tidying up after yourself—whether it's taking your trash home or cleaning up a spilled drink—you'll help ensure that everyone has a pleasant ride.

## Threatening and rude behavior

Aggressive, confrontational, and harassing behavior is not allowed. Don't use language or make gestures that could be disrespectful, discriminatory, threatening, or inappropriate.

If you are the recipient of or witness to any threatening or rude behavior, you can report the situation to Uber. We'll address any report in accordance with our policies.

## Sexual assault and misconduct

We all value our personal space and privacy. It's OK to chat with other people while remaining respectful. But please don't comment on someone's appearance or ask whether they are single. Sexual assault and sexual misconduct of any kind is prohibited. Sexual assault and misconduct refers to sexual contact or behavior without explicit consent of the other person.

Personal space and privacy should be respected. Uber has a no-sex rule regardless of whether you know the person or they give you their consent.

Find out how all of us can help prevent sexual assault

Dkt. 11-2
https://www.uber.com/us/en/safety/uber-community-guidelines/respect/

# LL52 Unconstitutionally Impairs Uber's Contracts

"To determine whether a law violates the Contracts Clause, we ask
  (1) whether the **contractual impairment is substantial**,
  (2) whether the law serves a **legitimate public purpose** such as remedying a general social or economic problem, and
  (3) whether the means chosen to accomplish that purpose are **reasonable and necessary**."

*DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 289 (S.D.N.Y. 2023) (quoting *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 63 (2d Cir. 2022)).

# LL52 Rewrites Uber's Contracts

**5.3. Deactivation.** You consent to and we may temporarily deactivate your account without notice to investigate, but only for under 72 hours, whether you have engaged in egregious misconduct, failed to satisfactorily perform your job duties, or engaged in any other misconduct that is demonstrably and materially harmful to Uber's legitimate business interests ("Just Cause"), or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a 'Material Breach or Violation'). You also consent to and we may terminate this Agreement or permanently deactivate your account after 14 days of advance notice (containing all the precise and detailed reasons for the deactivation, all rider feedback, and driver performance data) without notice if we can prove to a fact-finder by a preponderance of the evidence determine in our discretion that Just Cause exists a Material Breach or Violation has occurred and is not contradicted by any other factor deemed relevant.

# LL52 Substitutes Discretion Of "Fact-Finder" For Uber's Contracted-For Discretion

**What LL52 Requires:**

**In determining whether a high-volume for-hire vehicle service has deactivated a high volume for-hire vehicle driver for just cause, a fact-finder shall consider, in addition to any other relevant factors, whether:**

1. Driver "knew or should have known" of Uber's "policy, rule, or practice that forms a basis" for deactivation and of consequences for violation;

2. Such policy, rule, or practice "is reasonably related to safe and efficient" operations;

3. Uber "provided relevant and adequate training";

4. Such policy, rule, or practice "was reasonable and applied consistently";

5. Uber "undertook a fair and objective investigation" into "driver's job performance as well as their misconduct or failure to satisfactorily perform job duties";

6. Deactivation "is a reasonable response" and "accounts for any mitigating circumstances, including but not limited to" the "driver's past work history";

7. Driver "violated the policy, rule or practice or engaged in any misconduct or failure to satisfactorily perform job duties that forms a basis for progressive discipline or such deactivation."

§ 20-1282(b)

8

## Scenario:
### *Report of Sexual Assault*

**Currently:**

"21. . . . given the severity of certain types of misconduct including sexual assault, a single report may lead to deactivation, even if Uber is not able to definitively confirm a rider's report."

Declaration of Cory Freivogel (Head of Safety, US & Canada), Dkt. 8.

**What LL52 Requires:**

- Uber **must reinstate if Uber cannot prove "just cause" to a fact-finder by a preponderance** of the evidence §§ 20-1208(c)(1), 20-1211(c), 20-1282(a)-(c), 20-1285;

- Uber **must give details that could endanger the rider** §§ 20-1282(d), 20-1286;

- Even if Uber can prove just cause, Uber **still must reinstate the driver if this notice was "defective"** §§ 20-1208(c)(1), 20-1211(c)

9

## Scenario:
### *Driver Commits Fraud (But Not A "Pattern" Of Fraud)*

**Currently:**

"16. . . . Currently, **if Uber determines that a driver account was used in certain forms of fraud even one time, Uber will deactivate the account as soon as possible** and within fewer than 14 days."

Declaration of Mateusz Jarzabek (Head of United States and Canada Risk Operations), Dkt. 10.

**What LL52 Requires:**

"While **LL52 may require Uber to keep the account of a Driver (who has not engaged in** egregious misconduct, account sharing, or **a pattern of fraudulent behavior) active for 14 days longer than Uber wishes to** . . ."

Opp., Dkt. 28, at 60-61.

# LL52 Would Leave Uber With Only Bad Choices

**In deciding whether to deactivate, Uber would have to choose between three bad options:**

**1**   deactivate the driver's account and turn over detailed information

**2**   deactivate the driver's account without making those disclosures, and consequently be barred from presenting any of that evidence to a fact-finder (**risking mandatory reinstatement**)

**3**   maintain the driver's access to the platform

Declaration of Cory Freivogel (Head of Safety, US & Canada), Dkt. 8 ¶ 44
Declaration of Phil De Coning (Senior Safety Operations Manager, Identity), Dkt. 9 ¶ 25.

# LL52's Lead Sponsor and Lobbyist Said It Was Not Foreseeable

**Shekar Krishnan, Main Sponsor of LL52:**

"==Today, we are setting an important national precedent for drivers==, giving labor more power and holding megacorporations accountable."

December 2025 Hearing, Dkt. 1-9 6:13-15.

**Bhairavi Desi, Executive Director of NYTWA:**

"that's why we so strongly support Intro. 276 because ==it is the first time that drivers will have rights codified in law where the companies must have good cause== to even take this very drastic measure against you ==and then they must give you notice so it doesn't go into effect immediately== and there must be an appeals process that they cannot control."

September 2024 Hearing, Dkt. 12-4 52:5-12.

**Joint Press Release of Shekar Krishnan and NYTWA:**

"Intro 276 is the largest and most comprehensive reform of unfair firings for app-based drivers in the country, setting ==a nationwide precedent for driver protections==."

Joint Press Release of Shekar Krishnan and NYTWA, Dkt. 12-6, at 3.

12

# Fast Food Regulations Did Not Make LL52 Foreseeable

**The City says:** "Notably, in 2021, Council enacted **protections against wrongful termination for workers in the fast-food industry. . . .** Now, Council has **extended similar protections to Drivers.**" (Opp., Dkt. 28, at 13.)

**The City is wrong:**

- The fast food law is different:
  - No retroactivity;
  - No advance notice;
  - No compelled reports; and
  - No requirement to provide "<u>all</u>" reasons.
- The fast food industry is not even analogous, particularly as to safety risks.
- The City cites no case where regulation of a different industry affected expectations.
- The City has never previously regulated driver deactivation. *See Melendez v. City of New York*, 16 F.4th 992, 1034 (2d Cir. 2021).

13

# Substantial Impairment Is Exacerbated By Section 20-1283

**§ 20-1283 Prior deactivations.** a. Within 1 year after the effective date of the local law that added this section, a high-volume for-hire vehicle **driver who was subject to a prior deactivation** by a high-volume for-hire vehicle service **may petition such high-volume for-hire vehicle service for reinstatement** or restoration of access to such high-volume for-hire vehicle service's driver platform. Within 30 days after receipt of such petition, such high-volume for-hire vehicle service shall reinstate or restore such high-volume for-hire vehicle driver's access to such driver platform, unless such prior deactivation occurred during the probation period or was for just cause, for a bona fide economic reason, as described in section 20-1284, or required by federal, state, or local law or rule.

§ 20-1283

## LL52 Impairs Uber's Rights And Imposes New Duties And Liability For Prior Deactivations

**Retroactive effect:** "*i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

*LL52 is retroactive because it:*

- requires Uber to justify prior deactivations under new standards with evidence it did not know it had to keep;

- forces reinstatement; and

- authorizes compensatory damages and attorneys' fees.

15

# The City Is Wrong On Retroactivity

"The opportunity for Drivers to contest the factual basis of a prior deactivation and seek reinstatement to a Service within the year following the effective date of LL52 ==does not impose "retroactive" liability. Instead, it serves to give the law comprehensive effect by ensuring that no Driver is subject to wrongful deactivation== without just cause—due to a false customer report or a glitch in the app, for example— or without an opportunity to seek reinstatement."

was

Opp., Dkt. 28, at 12

16

## LL52 Lacks A "Significant And Legitimate Public Purpose" And Lacks "Reasonable And Appropriate Means"

"As recognized in *Allied Structural Steel*, the Clause continues to afford individuals the right to use contracts to order their affairs and to rely thereon except as warranted by a significant and legitimate public purpose pursued through reasonable and appropriate means."

*Melendez v. City of New York*, 16 F.4th 992, 1032 (2d Cir. 2021).

# LL52 Targets A Very Narrow Class at the Expense of Everyone Else



**872 deactivated drivers per year, by the City's numbers (0.01%)**

**8.8 million** residents of New York City

Opp., Dkt. 28, at 53, 60

"A legislature acts in the public interest when it passes a law in the service of a broad societal goal, not the pursuit of the interests of a narrow class."

*DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 291 (S.D.N.Y. 2023) (cleaned up); *see also Assoc. of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019) (Contract Clause demands more than incidental public benefits).

# No "Record Basis To Link Purpose And Means"

The City claims: "==the record is replete with data and information detailing the problems that Drivers face when deactivated without warning==, and it also includes testimony about the broader implications of those problems."

Opp., Dkt. 28, at 32.

## The Truth: The Record Is Devoid of Data <u>Supporting The Law</u>:

- Underlying reasons for deactivation
- Any quantification of "wrongful" or "arbitrary" deactivations
- Rider safety concerns
- Efficacy of LL52's processes versus existing processes

- Likely impact of LL52 on public
- Analysis of specific provisions of LL52
- Comparison with alternative methods of protecting drivers' livelihoods

19

# The Record Is Replete with "Hostility" Toward Uber

"As in *Melendez*, the ==legislative history indicates 'a certain hostility'== to Plaintiffs 'and sympathy for small business owners.' The complaint cites to numerous comments by the two principal sponsors of the legislation . . . that suggest that the **not-so-veiled purpose of the legislation** may have been economic protectionism for local 'mom and pop' stores and ==**antagonism toward out-of-state, wealthy third-party platforms**.=="

*DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 292 (S.D.N.Y. 2023) (quoting *Melendez*, 16 F.4th at 1040).

**Shekar Krishnan, Main Sponsor of LL52:**

"the current system allows Uber and Lyft to ==upend drivers' lives in exchange for their own profits==. . . Today, we are setting an important national precedent for drivers, giving labor more power and ==holding megacorporations accountable==."

December 2025 Hearing, Dkt. 1-9 6:2-15.

"Uber and Lyft have been scared knowing that this bill has the ingredients to start a driver's rights movement. They've used their billion-dollar war chest to spread fear and false information to New Yorkers, because ==that is the only thing they know how to do, waste money and make people afraid==."

January 2026 Hearing, Dkt. 26-16, 39:20-25.

"Our New York City Council has taken on ==Uber and Lyft's billion-dollar war chest that has fueled their lies, fear-mongering, and misinformation==. Together, we are standing united with workers and passing my legislation that will start a nationwide movement to give app-based drivers the power they deserve."

Joint Press Release of Shekar Krishnan and NYTWA, Dkt. 12-6, at 4.

20

# The Council's Only "Data" Is From Two Biased Surveys of ~1,000 Deactivated Drivers (~70% from California)

## NYTWA
### 341 drivers

- "In the summer of 2025, the New York Taxi Workers Alliance (NYTWA) conducted a survey of **341** deactivated Uber and Lyft drivers who had experienced platform deactivation and lost their jobs."

- "NYTWA was responsible for the design, administration, and collection of the survey data."

- No random sample; surveyed <u>deactivated</u> drivers who came to NYTWA's office

## Rideshare Drivers United
### 810 California drivers

- "The study includes two components: a survey of **810** app-based drivers from April to July 2022 and in-depth interviews with 15 current and former app-based drivers in September and October 2022."

- RDU's website depicts Uber logo with devil horns



Don't let Uber take away your rights!

Compl., Dkt. 1 ¶¶ 168-72.          www.drivers-united.org          21

# The Council Had No Explanation For LL52's Specific Requirements

"As pleaded, there was no substantial basis for the City Council to adopt commission caps in the amounts ultimately adopted. As a result of the alleged gap in the record supporting the adopting of the commission caps at issue here, 'deference is not warranted' to the City Council's decision."

*DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 294-95 (S.D.N.Y. 2023) (quoting *Melendez*, 16 F.4th at 1041)).

**The City Council had no explanation—let alone a "substantial basis"–for its specific choices:**

- Seven-year lookback period (Retroactive Provision)

- 14-day waiting period (14-Day Notice Provision)

- Five days to give notice after deactivation for egregious misconduct (Five-Day Required Message)

- "All customer comments, ratings, and complaints" required even when deactivation not based on a report (Compelled Reports Provision)

- "Driving performance data" required even when deactivation unrelated to driving performance (Compelled Reports Provision)

- Intentionally unfair burden of proof in proceedings (Burden of Proof Provision)

# Compelled Speech

# Compelled Speech Provisions
# Force Uber to Create and Disseminate Information

**What LL52 Requires:**

- A "high-volume for-hire vehicle service shall provide a written explanation, in a form and manner designated by the department, to such high-volume for-hire vehicle driver of all the precise and detailed reasons for" deactivation. (§ 20-1283(c); *see also* § 20-1282(d)-(e))

- "A "high-volume for-hire vehicle service shall provide a deactivated high-volume for-hire vehicle driver with information and data relevant to such high-volume for-hire driver's deactivation. Such information shall include, but need not be limited to: 1. Driving performance data specific to such high-volume for-hire vehicle driver; 2. All customer comments, ratings, and complaints received regarding the high-volume for-hire vehicle driver; and 3. Anonymized and aggregated reports, covering the 12 months prior to such high-volume for-hire vehicle driver's deactivation, regarding discipline, including deactivation, imposed by such high-volume for-hire vehicle service on any other high-volume for-hire vehicle drivers who engaged in the same or similar misconduct or failure to satisfactorily perform job duties forming a basis for the deactivation of the high-volume for-hire vehicle driver subject to such notice." (§ 20-1286)

24

## LL52 Must But Cannot Survive Strict Scrutiny

**Strict scrutiny applies because LL52 compels non-commercial speech.**

"Commercial speech is '==expression related solely to the economic interests of the speaker== and its audience.' The '==core notion of commercial speech' is 'speech which does no more than propose a commercial transaction==," like an advertisement or proposal of employment.

*DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 353–54 (S.D.N.Y. 2025) (citations omitted).

## Strict Scrutiny:
## Compelling Interest + Least Restrictive Means

25

## If LL52 Regulates Commercial Speech, It Must But Cannot Pass *Central Hudson* Scrutiny

*Central Hudson* (rather than *Zauderer*) scrutiny applies because the "the compelled disclosure is made not to the general public" or about terms of service; "rather, it reflects data collected by Plaintiffs in the course of their services."

*DoorDash, Inc. v. City of New York,* 789 F.Supp.3d 337, 354-55 (S.D.N.Y. 2025) (cleaned up).

### *Central Hudson* Scrutiny:
Substantial Interest + Means Directly Advancing Interest

26

# As In *DoorDash (Data), Zauderer* Is Not The Appropriate Standard

| Topic | Customer Data Law In *DoorDash (Data)* | LL52 |
|---|---|---|
| **Challenged Law** | Must provide restaurants using DoorDash services specific customer data once a month. | Must provide deactivated drivers "all detailed and specific" reasons for deactivation, "all" rider feedback, and driver performance data. |
| **Council's Justification** | Law would "help small mom and pop restaurants" at the expense of "app industry." | Law would help narrow class of deactivated drivers at the expense of Uber, riders, and the public. |
| **Incidental to Conduct?** | No, regulates what Plaintiff must say. | No, regulates what Plaintiff must say. |
| **Commercial Speech** | **Commercial** because the customer data is economically valuable to Plaintiffs—something that they "wouldn't give away for free." | **Not commercial** because it does not occur in the context of a commercial transaction–the information itself is not economically valuable, but maintaining the privacy of the information is valuable to Uber. |
| **Level of Scrutiny** | At least *Central Hudson*, not *Zauderer*, scrutiny without deciding if strict scrutiny would be appropriate. | Strict Scrutiny, but if commercial, then *Central Hudson*. |
| **Outcome** | Fails intermediate scrutiny. | Fails all levels of scrutiny. |

*DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337 (S.D.N.Y. 2025).

# Compelled Association

# Uber is Likely to Succeed on its Compelled Association Claim

1. Uber **engages in expressive association because safety is part** of its mission.

2. LL52 **significantly affects** Uber's ability to advocate its viewpoints about safety**.**

3. The City's interest cannot **justify the severe burden imposed.**

*Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655 (2000); *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023) (quoting *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000)) (cleaned up).

## Our commitment to safety

At Uber, we stand for safety. Safety is not just a feature—it's a foundation. That's why we invest in innovative technologies, robust policies, and expert partnerships that prioritize women's safety at every step of their journey. We are steadfast in our commitment to building a platform where women feel comfortable, safe, and in control.

Our commitment to safety, Uber, https://www.uber.com/us/en/safety/our-commitment/

# Irreparable Harm / Balance of Equities

# A Constitutional Violation Is Per Se Irreparable Harm

"In the Second Circuit, irreparable harm is also presumed where the alleged injury 'flows from a violation of constitutional rights.'"

*Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 478 (S.D.N.Y. 2025) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)).

"It is generally held that an alleged deprivation of constitutional rights—including rights violated under the Contracts Clause—raises a presumption of irreparable harm."

*Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020), *aff'd* 36 F.4th 54 (2d Cir. 2022) (cleaned up).

31

# Uncontroverted Evidence Establishes Irreparable Harm

- Mandatory reinstatement and advance notice will endanger riders and the public by forcing Uber to keep dangerous drivers on its platform.  Freivogel ¶¶ 41, 43.

- The 14-Day Notice Provision requires Uber to provide platform access to fraudsters who have not yet committed a "pattern" of fraud, both endangering safety and subjecting Uber and riders to monetary losses.  De Coning ¶¶ 26; Jarzabek ¶¶ 16-17.

- Providing "all the precise and detailed reasons" for deactivation and the Compelled Report will expose Uber's proprietary anti-fraud measures, providing wrongdoers with a roadmap to future fraud. De Coning ¶¶ 20-25; Jarzabek ¶¶ 11-15.

- Requiring Uber to give platform access to dangerous or substandard drivers will damage Uber's reputation and goodwill. Perl ¶¶ 27-29.

- LL52 will subject Uber to enormous compliance costs, particularly in investigating and responding to retroactive petitions and complying with record-keeping and disclosure obligations. Perl ¶¶ 31-33.

# Balance Of Equities Supports A Preliminary Injunction

**Riders Face Safety
And Privacy Risks**

**The Public Faces More
Unsafe Drivers**

**Safe Drivers Lose
Earning Opportunities**

**Uber Loses Money, Reputation,
and Customer Goodwill**

**Constitutional Violations
Harm Everyone**



Speculative Fear and
Unproven Anecdotes

33

# Appendix

# The Council Did Not Analyze
# Uber's Existing Notices Of Conduct That Could Lead To Deactivation

Title: A message from Uber

User Type: driver

Hi ███ ,We hope you are having a great day and on the safe side of the road. We're contacting you following some feedback we received about one of your trips on December 13th 2024. A rider gave feedback that an argument with you made them feel uncomfortable. We wanted to share this feedback with you and emphasize the importance of remaining respectful while using the Driver app, per our Community Guidelines. Multiple reports like this may result in losing access to the Uber apps.If you disagree with this feedback, you're welcome to share your own feedback by replying to this message. If you have a relevant recording, let us know and we can share a link that will let you upload your recording.You can record your trips with the Driver app. In some areas, we'll let your rider know that the trip is being recorded to help encourage respect and prevent false accusations. If you ever report a safety issue, you can choose to include a recording. Our Support team can only review recordings that you attach to a report. Go to this resource to learn more about your recording options and how to set it up.Thank you for your understanding.

Complaint ¶ 111, Dkt. 1.

35

# The Council Did Not Analyze
# That Uber Already Allows Drivers To Respond To Reports






Complaint ¶ 113, Dkt. 1.

# The Council Did Not Analyze Uber's Internal Appeals Via Review Center







Cases typically resolved within 7 days.

More than 80% of deactivated drivers appeal via Review Center

Complaint ¶ 120, Dkt. 1.

37

# The IDG Testified That LL52 "Replaces A Hard-Fought Grievance Procedure" "With A Weaker Process Run By The City"

" ==Int 276 would replace a hard-fought grievance procedure negotiated by the International Association of Machinists and Aerospace Workers (IAMAW) with a weaker process run by the city.== This is an unprecedented assault on organized labor and we urge every Councilmember to loudly oppose it."

"Currently, when drivers are deactivated, they are represented for free by trained worker advocates from the moment they contact us until final disposition before an arbitrator. ==Under the bill, drivers who are deactivated would be left on their own to navigate a complex two-tiered system administered by a city agency they are unfamiliar with==, the Department of Consumer and Worker Protection."

Written Testimony of the Independent Drivers' Guild, Dkt. 26-7 at 47-48.

38