USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  7/21/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
UBER TECHNOLOGIES, INC., *et al.*,                                 :
                                                                   :
                                        Plaintiffs,                :          1:26-cv-4893-GHW
                                                                   :
                  -v-                                              :          1:26-cv-4931-GHW
                                                                   :
CITY OF NEW YORK,                                                  :          MEMORANDUM
                                                                   :          OPINION & ORDER
                                        Defendant.                 :
                                                                   :
------------------------------------------------------------------ X
------------------------------------------------------------------ X
                                                                   :
LYFT, INC.,                                                        :
                                                                   :
                                        Plaintiff,                 :
                                                                   :
                  -v-                                              :
                                                                   :
CITY OF NEW YORK,                                                  :
                                                                   :
                                        Defendant.                 :
                                                                   :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

Approximately 87,000 Uber and Lyft drivers completed more than 22 million trips in New York City in March 2026.  Each company's agreements with drivers confer broad authority over platform access, including the right to deactivate a driver without advance notice.  Uber and Lyft use that authority to police the safety of their platforms and their passengers.  A statute recently passed by the New York City Council—Law 52 of 2026—deprives Uber and Lyft of those contractual rights.  Under the Law, Uber and Lyft may deactivate drivers only for specified reasons, and they cannot do so unless they follow procedures prescribed by the City.

The City Council enacted the Law to protect drivers from wrongful deactivations.  But the record does not establish that wrongful deactivation is a problem that affects more than a narrow

group. Uber, for example, deactivates approximately one percent of its New York drivers each year, and permanent deactivations number in the hundreds among a workforce of tens of thousands. The record documents hardships that wrongful deactivation imposes on drivers but does not estimate how many deactivations were wrongful. The record does not establish that the group likely to require its protections is large in the context of the public served by the City Council.

And the record shows that the City Council did not consider the Law's effects on the broader citizenry of New York City, such as passengers and pedestrians—groups whose safety depends in part on swift deactivation of drivers accused of assault, fraud, or dangerous conduct. Nor did the City consider whether the cost of compliance with the Law would result in increased costs for the millions of monthly users of Uber and Lyft's services.

Uber and Lyft contend that Local Law 52 violates the Contracts Clause and other provisions of the Constitution, and each seeks a preliminary injunction preventing enforcement of the Law before it takes effect. On this record, because Uber and Lyft are likely to succeed in showing that the Law protects a narrow class of drivers and does not advance the broader social or economic interest which the Constitution requires to permit the severe impairment of their contracts, Plaintiffs' motions for a preliminary injunction are granted.

I.      BACKGROUND

A. Plaintiffs

Plaintiffs Uber Technologies, Inc. and Uber USA, LLC (together, "Uber") and Plaintiff Lyft, Inc. ("Lyft," and together with Uber, "Plaintiffs") operate technology platforms that connect drivers who provide for-hire transportation to riders who request it. Uber Dkt. No. 11 ("Perl Decl.") ¶¶ 5–6; Lyft Dkt. No. 9 ("Castleman Decl.") ¶ 2. As of March 2026, there were approximately 111,800 taxi and for-hire vehicle drivers in New York City, 87,207 of which were high-volume for-hire

2

vehicle service drivers.[1]  Uber Dkt. No. 28 ("Opp.") at 44.  In March 2026, Uber and Lyft drivers completed more than 22 million of the 28 million trips taken in New York City by taxi and for-hire vehicle drivers.  *Id.*

Uber launched its platform in New York City in 2011, and Lyft began operating there in 2014.  Perl Decl. ¶ 5; Castleman Decl. ¶ 2.  More than 100,000 trips are made available to New York City drivers through Uber each day.  Perl Decl. ¶ 6.  Drivers on both platforms are independent contractors.  Perl Decl., Ex. 1 ("PAA") § 1.1(a); TSA § 13.1; Castleman Decl., Ex. E ("TOS") § 20. They decide when, where, and whether to offer rides; which trip requests to accept; and whether to work simultaneously for other platforms or maintain outside employment.  Perl Decl. ¶ 19; PAA § 1.1(b).  Drivers in New York City must hold an active Taxi and Limousine Commission ("TLC") for-hire driver's license to access either platform.  Castleman Decl. ¶ 4.  Deactivation from either platform does not affect a driver's TLC license; a deactivated driver remains free to work for other rideshare platforms, traditional car services, or elsewhere.  Perl Decl. ¶ 19.  Each platform requires every driver to agree to the platform's terms as a precondition of access, and drivers may terminate their agreements at any time upon advance written notice.  PAA § 5.2; TOS § 16(a).

### B.  Uber's Existing Deactivation Framework

Since January 1, 2022, Uber and each driver have entered into the Platform Access Agreement ("PAA").  Perl Decl. ¶ 8.  From December 10, 2015 through January 5, 2020, Uber's agreements with drivers were governed by the Technology Services Agreement, and from January 6, 2020 through January 1, 2022, they were governed by an earlier version of the Platform Access Agreement.  Perl Decl. ¶¶ 13–15, Ex. 3 ("TSA").  Those prior agreements afforded Uber

---

[1] A "high-volume for-hire service" means an entity operating under a common brand "utilizing software that allows a passenger or prospective passenger to arrange for transportation using a passenger-facing booking tool, including a smartphone or other electronic device, and that dispatches, or facilitates the dispatching of, 10,000 or more trips in the city in one day."  *See* Admin. Code § 19-502 (gg).  At oral argument, the City represented that Uber and Lyft are the only high-volume for-hire vehicle services in New York City.  July 16, 2026 Hearing Tr. at 67:7–13.

substantially the same deactivation rights as the current PAA.  Perl Decl. ¶¶ 14–15; TSA §§ 2.4, 12.2.

The PAA, together with the Uber Community Guidelines and other incorporated policies and standards, constitutes the parties' "Agreement."  PAA at 1.  The PAA incorporates Uber's Community Guidelines and other applicable standards and policies, including safety and accessibility policies, into the parties' agreement.  *Id.*  The Community Guidelines prohibit conduct involving physical contact, threatening or rude behavior, discrimination, fraud, unsafe driving, account sharing, and other misuse of the platform.  Perl Decl., Ex. 2 at 2–4, 6, 10.  By accepting the Agreement, each driver consents to Uber's deactivation rights.  PAA § 5.3.

The PAA specifies each party's right to end the relationship.  A driver may terminate "without cause at any time upon seven (7) days' prior written notice to Uber" or "immediately, without notice for Uber's violation or alleged violation of a material provision of this Agreement." PAA § 5.2.  Uber's deactivation right is set forth in Section 5.3 of the PAA:

> You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a 'Material Breach or Violation'). You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred.

PAA § 5.3.

Uber's agreements contained comparable provisions throughout the period reached by Local Law 52's retrospective provisions.  Perl Decl. ¶¶ 13–15.  From December 10, 2015 through January 5, 2020, Uber's Technology Services Agreement provided that Uber could "deactivate or otherwise restrict" a driver's access for an actual or alleged violation of the agreement, conduct that harmed Uber's brand, reputation, or business as determined in Uber's sole discretion, or a driver's failure to satisfy applicable law or Uber's standards and policies.  TSA §§ 2.4, 12.2.  An earlier version of the PAA, in effect from January 6, 2020 through January 1, 2022, contained the same termination and

deactivation provisions as the current PAA.  Perl Decl. ¶ 15.  Uber characterizes the PAA's deactivation and termination provisions as "central to the Agreement and Uber's willingness to enter into it" because Uber has to "balance competing interests, including maintaining driver access to its platform, fairness, and safe and high-quality experiences for riders, and its own financial interests— for example, against liability or fraud."  *Id.* ¶ 16.

Uber deactivates approximately one percent of New York driver accounts each year.  *Id.* ¶ 17.  At a September 27, 2024 hearing before the City Council's Committee on Transportation and Infrastructure concerning the proposed deactivation legislation, Uber's representative testified that permanent deactivations numbered "in the hundreds, not in the thousands."  Riggs Decl., Ex. F ("Sept. 2024 Hearing Tr.") at 172:7–10.  Uber also states that more than 12,000 drivers have been deactivated since 2019.  Perl Decl. ¶ 31.  The record does not provide a combined annual deactivation count for Uber and Lyft or a separate annual count for Lyft.

Uber reports that safety issues accounted for more than half of its New York City driver deactivations in 2025, and that safety and fraud—including identity and document fraud—together accounted for more than ninety-two percent.  *Id.* ¶ 18.  Safety-related deactivations include dangerous driving and serious incidents such as physical or sexual assault and intoxicated driving.  Freivogel Decl. ¶¶ 18, 22.  For safety-related reports, Uber does not deactivate a driver without human review, and no deactivation through Uber's Safety team is based solely on an automated system.  *Id.* ¶ 15.  In most situations, Uber notifies the driver of the date of the relevant trip and the general nature of the allegation, but does not disclose the reporting rider's name, personally identifiable information, or the verbatim text of the complaint.  *Id.* ¶¶ 28, 30–31.  For serious incidents, including alleged sexual assault, Uber provides more limited information to reduce the risk that drivers could identify and potentially retaliate against reporting riders.  *Id.* ¶¶ 31–32.  Uber similarly provides only limited information to drivers deactivated for identity or economic fraud

because revealing how Uber detected the fraud could help fraudsters evade detection in the future. Uber Dkt. No. 9 ("De Coning Decl.") ¶¶ 20–21; Uber Dkt. No. 10 ("Jarzabek Decl.") ¶¶ 11–13.

When Uber receives a serious safety allegation, such as a report of sexual assault, it temporarily restricts the driver's account pending investigation. Freivogel Decl. ¶ 18. For serious incidents, Uber may deactivate the driver based on a single rider report even absent a definitive factual conclusion, because being identified as having committed a serious safety incident violates Uber's standards. *Id.* ¶ 21. Once Uber decides to permanently deactivate a driver, it acts immediately, and the driver loses platform access at the moment of deactivation. *Id.* ¶ 37. Uber explains that permitting a driver to remain on the platform after a deactivation decision—with knowledge that deactivation is imminent—creates a risk that the driver will harm additional riders or commit further fraud. *Id.* ¶¶ 38–39; Jarzabek Decl. ¶¶ 16–17.

Uber maintains an internal "Review Center" through which most deactivated drivers may seek review by a specialized team; more than eighty percent of New York City drivers deactivated in 2025 chose to appeal, and reactivations occur. Perl Decl. ¶ 22. Since 2016, drivers in the City have also had access to an independent appeals process through the Independent Drivers Guild ("IDG"),[2] under which drivers are represented by trained advocates and cases are ultimately decided by worker panels administered by a third-party arbitrator. *Id.* ¶ 26.

### C. Lyft's Existing Deactivation Framework

Lyft and its drivers are governed by the Lyft Terms of Service ("TOS"), last updated February 9, 2026, together with incorporated guidelines, policies, and addenda (collectively, the "Lyft Agreement"). Castleman Decl. ¶ 7; TOS. The deactivation terms embedded in the Lyft Agreement—codified in Section 16 of the TOS, incorporating Sections 9 and 10—have remained

---

[2] The Independent Drivers Guild ("IDG") describes itself as a nonprofit affiliate of the International Association of Machinists and Aerospace Workers that represents for-hire vehicle drivers. Sept. 2024 Written Test. at 46–47.

substantively similar since 2019.  Castleman Decl. ¶ 8, Ex. F ("Aug. 26, 2019 TOS").  Like Uber,

Lyft requires drivers and riders to comply with Community Guidelines that direct all users to "put

safety first" and make clear that violations may result in permanent removal from the platform.

Castleman Decl. ¶ 6, Ex. D.

Section 9 of the TOS enumerates "restricted activities" with which drivers agree not to

engage.  They include prohibitions on stalking, harassment, threats, and carrying weapons, violation

of applicable law, fraudulent or harassing conduct on the platform, impersonation and identity

manipulation, discrimination and sexual harassment, and conduct undermining the operability of

Lyft's platform.  TOS § 9.  Section 10 requires drivers to represent that they are properly licensed,

competent, and insured, and provides, among other things, that drivers will not "attempt to defraud

Lyft or Riders on the Lyft Platform."  TOS § 10(f).

Section 16 of the TOS governs termination and deactivation and provides in relevant part:

> This Agreement may be terminated:  (a) by User, without cause, upon seven (7) days'
> prior written notice to Lyft; or (b) by either party immediately, without notice, upon
> the other party's material breach of this Agreement, including but not limited to any
> breach of Section 9 or breach of Section 10(a)-(i) of this Agreement.  In addition, Lyft
> may terminate this Agreement or deactivate your User account or cease offering or
> deny access to Lyft services or any portion thereof immediately in the event:  (1) you
> are no longer eligible to qualify as a User; (2) you no longer qualify to provide
> Rideshare Services or to operate the approved vehicle under applicable law, rule,
> permit, ordinance or regulation; (3) you fall below Lyft's star rating threshold; or
> (4) Lyft has the good faith belief that such action is necessary to protect the safety of
> the Lyft community or third parties, provided that in the event of a deactivation
> pursuant to (1)-(4) above, you will be given notice of the potential or actual
> deactivation and an opportunity to attempt to cure the issue to Lyft's reasonable
> satisfaction prior to Lyft permanently terminating the Agreement.  For all other
> breaches of this Agreement, you will be provided notice and an opportunity to cure
> the breach.  If the breach is cured in a timely manner and to Lyft's satisfaction, this
> Agreement will not be permanently terminated.

TOS § 16.  The Deactivation Terms draw a material distinction between two categories of violation.

For breaches of Sections 9 and 10(a)–(i)—including stalking, sexual assault, discrimination, fraud,

and conduct undermining the platform—either party may terminate the Lyft Agreement

immediately and without notice. *Id.* § 16(b). For four additional circumstances in Section 16—ineligibility as a user, failure to qualify under applicable law, falling below Lyft's rating threshold, or a good faith belief that deactivation is necessary for community safety—Lyft may act immediately but must provide notice and an opportunity to cure before any deactivation becomes permanent. *Id.* § 16(1)–(4). For all other breaches of the Lyft Agreement, notice and an opportunity to cure are required, and if the driver cures the deficiency, the Lyft Agreement is not permanently terminated. *Id.* § 16; Castleman Decl. ¶ 9.

For potential violations related to safety incidents, Lyft first places the driver's account on a temporary hold while it investigates. Castleman Decl. ¶ 13. Lyft notifies the driver of the hold and requests relevant information; both the rider and driver may submit evidence, including audio and video recordings, photos, and police reports and either may speak by phone with Lyft's investigating agents. *Id.* ¶ 14. Once the investigation is complete, Lyft notifies the driver of the final decision: either that the allegations were unsubstantiated, that a warning was warranted, or that the driver's account would be permanently deactivated. *Id.* More than seventy percent of driver account holds are resolved within 24 hours. *Id.* ¶ 17.

Permanently deactivated drivers may appeal to Lyft safety agents who were not involved in the underlying investigation and deactivation, submitting additional or newly available information such as dash-cam footage, photos, videos, and police reports. *Id.* ¶ 15, Ex. G. Drivers may also pursue claims through binding arbitration under Section 17 of the TOS. Castleman Decl. ¶ 16; TOS § 17. Lyft drivers who are IDG members may also use a separate appeal process established by Lyft and the IDG, which provides IDG support, an opportunity for informal resolution before a hearing, and an appeal to a neutral third-party arbitrator at Lyft's expense. Lyft Dkt. No. 8 ("Drylewski Decl."), Ex. 4 at 3.

Lyft describes its deactivation terms as "embody[ing] Lyft's careful balancing of public,

driver, and rider safety with driver access to the platform," enabling Lyft to "intervene swiftly to deactivate drivers who pose a risk to public and rider safety" while affording drivers "notice, an opportunity to submit information, and a process to appeal deactivations that they believe are not fair or justified." Castleman Decl. ¶ 18; Lyft Brief at 5.

### D.  The Enactment of Local Law 52

In June 2023, the City Council introduced Int. No. 1078 of 2023, prompted in part by news reporting about passengers submitting false complaints to obtain ride refunds and by driver complaints about arbitrary deactivations. Uber Dkt. No. 26 ("Riggs Decl."), Ex. B, Ex. J ("Dec. 2025 Comm. Rep.") at 10–11. Int. No. 1078 did not advance, but its successor, Int. No. 276 of 2024, was introduced on February 28, 2024 by Council Member Shekar Krishnan. Opp. at 4; Riggs Decl., Ex. C. Int. No. 276 would have prohibited high-volume for-hire vehicle services ("vehicle services") from deactivating drivers except for just cause or a bona fide economic reason, required an informal resolution process, and imposed advance notice and progressive discipline requirements, with exceptions for immediate deactivation in cases of imminent safety concern. Riggs Decl., Ex. C; Opp. at 4; Dec. 2025 Comm. Rep. at 10–11.

In connection with committee hearings and the preparation of committee reports, the Council considered several surveys and studies regarding the experiences of vehicle service drivers in New York City and elsewhere. A February 2023 survey of for-hire vehicle drivers in California by the Asian Law Caucus reported that two out of three drivers surveyed had experienced discrimination, sexual harassment, or other forms of misconduct or customer bias while driving for vehicle services; that half of those who faced racial discrimination from a customer were also reported to the platform by that same customer; and that nearly all deactivated drivers in the survey suffered material hardship, with eighteen percent losing their vehicles and twelve percent losing their homes. Dec. 2025 Comm. Rep. at 8–9.

A 2024 TLC survey of New York City drivers found that ninety-one percent were born outside the United States, eighty-six percent were non-white, eighty percent relied on driving as their sole source of income, and sixty-six percent were still paying off their vehicles.  Dec. 2025 Comm. Rep. at 5–6.  Median car payments for vehicle-owning drivers ranged from $735 to $950 per month, with median insurance costs of $379 to $396 per month—expenses that continue to accrue during any period of deactivation.  *Id.*

An October 2025 report by the Asian American Legal Defense and Education Fund ("AALDEF"), analyzing 2025 data collected by the New York Taxi Workers Alliance ("NYTWA"),[3] found that most of the deactivated drivers surveyed were "long-time, high-performing drivers with high ratings and no record of misconduct, and were deactivated without prior notice based on vague allegations of 'customer complaints.'"  Dec. 2025 Comm. Rep. at 10.  The report further found that seventy percent of Uber drivers and seventy-six percent of Lyft drivers surveyed received no notice before deactivation; that sixty-four percent of Uber drivers and seventy-five percent of Lyft drivers deactivated based on multiple complaints were not informed of earlier complaints before being deactivated; and that the most commonly reported consequences of deactivation were an inability to pay rent or afford groceries.  *Id.*

On September 27, 2024, the City Council's Committee on Transportation and Infrastructure held a public hearing on Int. No. 276, receiving oral and written testimony from drivers, advocacy organizations, and the FHV services.  Sept. 2024 Hearing Tr.; Ex. G ("Sept. 2024 Written Test.").  NYTWA, which represents approximately 28,000 driver members, testified that more than 2,000 drivers annually seek its assistance with deactivations.  Sept. 2024 Hearing Tr. at 56:20–57:4.  The National Employment Law Project ("NELP") submitted written testimony highlighting the contrast

---

[3] NYTWA is a union of more than 28,000 New York City taxicab drivers, "representing yellow cab drivers, green car, and black car drivers, including drivers for Uber and Lyft."  Drylewski Decl., Ex. 9 at 4.

between drivers' situation and the protections available to licensed taxicab drivers, who can contest TLC license revocation proceedings through an OATH administrative hearing at which TLC bears the burden of proof.  Sept. 2024 Written Test. at 13–16.  Legal Services NYC characterized Uber's existing appeals process as an "Uber-controlled process" that "resembles the grievance process provided by many other companies where the corporation ultimately makes the decision not a third-party."  *Id.* at 51–52.  Individual drivers testified about specific deactivations they regarded as unjust, including deactivations following a rider's demand for an unscheduled stop, a rider's demand that the driver make an illegal U-turn, or a false accusation of driving under the influence; one driver testified that she was deactivated after being physically and verbally assaulted by a passenger.  Opp. at 9.  Several drivers testified that they still do not know the reason for their deactivation.  *Id.*

Uber and Lyft each testified in opposition.  Lyft's representative stated that the then-proposed fifteen-day notice requirement for all deactivations would "create serious safety hazards for users of the Lyft platform and the public as a whole" and "would make it impossible for Lyft to comply with conflicting regulations that call for drivers to be deactivated immediately."  Dec. 2025 Comm. Rep. at 11.  Lyft's representative also expressed concern that disclosure requirements would force victims of serious misconduct to relive traumatic experiences.  *Id.*  Uber's representative, Josh Gold, stated that Uber agreed with the general principle of providing notices, warnings, and opportunities for improvement "for 99 percent of deactivations," but opposed any requirement in "egregious situations" that could "put a future rider in jeopardy."  Sept. 2024 Hearing Tr. at 168:24–169:7.  Gold also acknowledged that Uber had "worked in other jurisdictions to figure out better deactivation policies" and that deactivation processes in 2018 and 2019 "were not great."  *Id.* at 178:19–179:7, 181.  Uber's principal requests were that the bill narrow the notice period from fifteen to three days for most deactivations and that the definition of "egregious misconduct" be broadened.  Dec. 2025 Comm. Rep. at 11–12.

With respect to appealable deactivations, IDG reported that it had represented approximately 20,000 drivers in the City during the preceding five years, including 4,800 cases in 2024, and had obtained reinstatement for ninety percent of the drivers it represented.  Dec. 2025 Comm. Rep. at 7–8.  However, nearly half of the drivers were deactivated "because their rating dropped below 4.75 out of 5.0" and "those drivers are back to work, as of right, as soon as they present their certificate of completion through our online platform."  Sept. 2024 Written Test. at 47. The report noted that certain deactivations, including those involving criminal activity and physical or sexual altercations, were not eligible for Uber's IDG appeal process.  *Id.* at 7.  The Committee stated that the reinstatement rate suggested that "a significant number of deactivations either do not stand up to closer scrutiny or could be quickly resolved upon opening a line of communication between the FHV drivers and the FHV services."  *Id.* at 8.  The report did not distinguish between those two explanations, and the legislative record does not otherwise quantify the number of deactivations determined to have been wrongful.

Between September 27, 2024 and December 10, 2025, Committee staff engaged further with the vehicle services and organizations representing vulnerable passenger populations, principally to address concerns about the absence of a statutory definition of "egregious misconduct."  *Id.* at 12. The result was Int. No. 276-A, introduced on December 18, 2025.  Riggs Decl., Ex. H.

The amended bill incorporated a number of changes responsive to the vehicle services' concerns as expressed during the legislative process.  "Egregious misconduct" was defined to mean "conduct that poses an imminent danger to other persons, including but not limited to violence, threats to engage in violence, sexual harassment, or sexual assault" or "discrimination in violation of federal, state, or local law."  Dec. 2025 Comm. Rep. at 13.  The Council declined to adopt Uber's broader proposed definition on the ground that it would be "over-inclusive and could include behavior such as the failure to properly signal a turn."  *Id.*  Account sharing and "a pattern of

repeated fraudulent behavior" were added to the list of circumstances in which advance notice is not required. *Id.* Deactivations required by law or rule were excluded from the general prohibition. *Id.* The bill removed a proposed New York City Department of Consumer and Worker Protection ("DCWP")-run arbitration process and replaced it with an informal resolution process administered through each service's own electronic communications system, with drivers permitted to be represented throughout. *Id.* The data that services must produce to deactivated drivers was narrowed, and redaction of passengers' personally identifiable information was made mandatory. *Id.* at 13–14. The definition of "deactivation" was amended to allow up to 168 hours of temporary access restriction per year without triggering the law's full requirements, and language requiring consideration of exculpatory evidence was added. *Id.* at 14. Several requests from the vehicle services were not accommodated: Uber's request for TLC rather than DCWP oversight; Uber's request to limit the bill to deactivations lasting 30 days or more; and both services' requests for a standard of justification more deferential than preponderance of the evidence. *Id.* at 14–15.

The Committee voted in favor of Int. No. 276-A on December 18, 2025. Riggs Decl., Ex. K ("Dec. 2025 Hearing Tr."). At that hearing, Council Member Krishnan—the bill's primary sponsor, who had introduced the prior bill with substantially more stringent limitations—stated that "[t]he current system allows Uber and Lyft to upend drivers' lives in exchange for their own profits," described the legislation as "starting a nationwide movement to end unfair firings of app-based drivers," and characterized it as "setting an important national precedent" in "giving labor more power and holding megacorporations accountable." *Id.* at 5–6. The full Council voted to pass Int. No. 276-A later that day. Riggs Decl., Ex. L ("Dec. 2025 Stated Meeting Tr."). At that meeting, Council Member Krishnan stated that "[n]o longer are Uber and Lyft the judge, jury, and prosecutor in these cases." *Id.* at 61:13–15.

On December 31, 2025, Mayor Eric Adams vetoed Int. No. 276-A, citing concerns that it

13

would "second-guess business decisions regarding independent contractors," "create regulatory confusion," and come "with a high cost." Riggs Decl., Ex. M. The Mayor's Office of Management and Budget had estimated that the bill would require a new compliance division of approximately 170 staff at an annual cost of approximately $23 million to process an assumed volume of approximately 2,000 cases per year, and one committee member cited that fiscal impact in explaining her vote against the bill. *Id.*; Dec. 2025 Hearing Tr. at 9.

On January 28, 2026, the Committee on Transportation and Infrastructure convened to consider an override. Riggs Decl., Ex. N ("Jan. 2026 Hearing Tr."). Committee Chair Shaun Abreu described the legislation as addressing situations in which drivers "can find themselves deactivated with little warning and limited explanation, effectively losing their income overnight," while recognizing that "platforms and the City have a responsibility to protect passengers and the public and to take swift action when there are credible allegations of violence, harassment, fraud, or other serious misconduct." *Id.* at 4. Council Member Krishnan described the occasion as "a historic day for drivers across this city and workers across the country," stating that before the Council's December passage, Uber and Lyft drivers had been "fired by billion-dollar companies, with no notice, no process, and no ability even to contact the companies that hired them after they were fired, to understand why they were fired, and to challenge it when it was wrongful." *Id.* at 7. On January 29, 2026, the Council voted to override the Mayor's veto, and Local Law 52 was enacted. Riggs Decl., Ex. A ("Local Law 52") at 28.

### E. Local Law 52

Local Law 52 amends Title 20, Chapter 12 of the Administrative Code to extend existing workplace protection enforcement tools to high-volume for-hire vehicle service drivers and adds a new Subchapter 8 (Admin. Code §§ 20-1281–20-1290) establishing substantive protections and procedures. Local Law 52 § 9; Opp. at 12. The Law will take effect 180 days after it became law—

14

July 28, 2026.  Local Law 52 § 10.

Section 1 extends Chapter 12's existing anti-retaliation protection to high-volume for-hire vehicle drivers.  It provides that "[n]o person shall take any adverse action" against a driver that "penalizes" the driver for, or "is reasonably likely to deter" the driver from, "exercising or attempting to exercise any right protected under this chapter."  Admin. Code § 20-1204(a).  An adverse action includes "threatening, intimidating, disciplining, discharging, demoting, suspending or harassing" a driver, reducing the driver's hours or pay, informing another vehicle service that the driver engaged in protected activity, and discriminating against the driver, including based on perceived immigration status or work authorization.  *Id.*  A driver "need not explicitly refer to this chapter or the rights enumerated herein to be protected from retaliation."  *Id.*

Under the law, a "deactivation" is "(i) an indefinite or permanent discharge, termination, or layoff of a high-volume for-hire vehicle driver; or (ii) a revocation or restriction of a high-volume for-hire vehicle driver's authorization to accept trips on a driver platform that is either continuously in effect for at least 72 hours or consists of multiple periods of revocation or restriction that total at least 168 hours within a 1-year period."  Admin. Code § 20-1281.

Section 20-1282(a) states the core provision:  a vehicle service "shall not deactivate a high-volume for-hire vehicle driver after such high-volume for-hire vehicle driver's probation period with such service except for just cause, for a bona fide economic reason, as described in section 20-1284, or where federal, state, or local law or rule requires such high-volume for-hire vehicle service to deactivate such high-volume for-hire vehicle driver."  *Id.* § 20-1282(a).  The Law does not apply to deactivations during the driver's initial 30-day probation period.  *Id.* §§ 20-1281, 20-1290(1).

"Just cause" means the driver "engaged in egregious misconduct, failed to satisfactorily perform their job duties, or engaged in any other misconduct that is demonstrably and materially harmful to the high-volume for-hire vehicle service's legitimate business interests."  *Id.* § 20-1281.

15

"Egregious misconduct" means "(i) conduct that poses an imminent danger to other persons, including but not limited to violence, threats to engage in violence, sexual harassment, or sexual assault or (ii) discrimination in violation of federal, state, or local law." *Id.*

Section 20-1282(b) directs a factfinder deciding whether a deactivation was for "just cause" to consider seven factors, "in addition to any other relevant factors":  (1) whether the driver knew or should have known of the policy, rule, or practice that forms a basis for deactivation and knew or should have known of the potential consequences for the violation; (2) whether the policy, rule, or practice that forms a basis for deactivation is "reasonably related to safe and efficient" vehicle service operations; (3) whether the vehicle service "provided relevant and adequate training" to the driver; (4) whether the policy, rule or practice that forms a basis for the deactivation, including the utilization of progressive discipline, was "reasonable and applied consistently"; (5) whether the vehicle service "undertook a fair and objective investigation" into the driver's job performance, as well as their misconduct or failure; (6) whether deactivation is a "reasonable response" to the driver's job performance as well as their misconduct or failure to satisfactorily perform job duties and "accounts for any mitigating circumstances, including but not limited to [the driver's] past work history"; and (7) whether the driver "violated the policy, rule or practice or engaged in any misconduct or failure to satisfactorily perform job duties" that forms a basis for progressive discipline or such deactivation." *Id.* § 20-1282(b).

Local Law 52 does not designate a single factfinder; instead, the factfinder for a driver's challenge depends on the forum in which Uber and Lyft are called upon to justify any deactivation. A driver may file an administrative complaint with the Department of Consumer and Worker Protection ("DCWP"), which investigates the complaint "if resources permit" and, upon finding a violation, orders the prescribed administrative relief. *Id.* §§ 20-1207(b), 20-1208(c).  Alternatively, a driver may bring a private action in "any court of competent jurisdiction" without first filing a

16

complaint with DCWP. *Id.* § 20-1211(a), (e)(2). The City acknowledged during oral argument that drivers would be required to arbitrate such claims if required by the arbitration provisions in Uber and Lyft's agreements. July 16, 2026 Hearing Tr. at 61:2–7.

Under the statute, except where deactivation is for alleged egregious misconduct, a deactivation cannot be found to have been based on just cause unless the vehicle service demonstrates both that it utilized progressive discipline within the year preceding the deactivation and that it maintained a written progressive discipline policy that had been provided to the driver. *Id.* § 20-1282(c). "Progressive discipline" means "a disciplinary system that provides for a graduated range of reasonable disciplinary measures, including but not limited to warnings and further training requirements, in response to a high-volume for-hire vehicle driver's misconduct or failure to satisfactorily perform job duties for a high-volume for-hire vehicle service, with the type of disciplinary measure varying based on the frequency and degree of such misconduct or failure." *Id.* § 20-1281.

Except in specified circumstances, a service must provide a driver with advance notice of an impending deactivation fourteen days before it takes effect. The notice must state "all the precise and detailed reasons" for the deactivation and the effective date, and must inform the driver of the right to challenge the deactivation, how to initiate the informal resolution process, the opportunity to submit evidence, the right to file a DCWP complaint or bring a private action, and the availability of unemployment insurance. *Id.* § 20-1282(d). Advance notice is not required where deactivation is for egregious misconduct, account sharing, or "a pattern of repeated fraudulent behavior." *Id.* In those cases, the service must instead provide written notice within five days of deactivation containing the same informational elements. *Id.* § 20-1282(e). Where a deactivation is for a bona fide economic reason, 120 days' advance notice is required. *Id.* §§ 20-1282(d)(i), 20-1284(a). Section 20-1282(f) provides that the requirements of Section 20-1282 "shall not apply to any deactivation

17

that occurred prior to the effective date of the local law that added this section." *Id.* § 20-1282(f).

Section 20-1283 governs "prior deactivations," which are deactivations "that occurred during the 7 years prior to the effective date of the local law," meaning on or after July 28, 2019. *Id.* § 20-1281. Within one year after Local Law 52 takes effect, a driver who was subject to a prior deactivation may petition the service for reinstatement or restoration of platform access. *Id.* § 20-1283(a). Within 30 days after receiving the petition, the vehicle service must reinstate or restore the driver's platform access unless the prior deactivation was for just cause, was for a bona fide economic reason, was required by law or rule, or occurred during the driver's probation period. *Id.* If the vehicle service declines to reinstate the driver, it must provide a written explanation of "all the precise and detailed reasons for such prior deactivation" and must inform the driver of available challenge rights and remedies. *Id.* § 20-1283(c).

The just cause factors applicable to prior deactivation petitions are stated in Section 20-1283(b). They overlap substantially with the prospective factors in Section 20-1282(b) but omit the prospective factors concerning adequate training and a fair and objective investigation, and add whether the service "considered any exculpatory evidence or other facts" indicating that the driver did not commit the charged conduct. *Id.* § 20-1283(b)(1)–(6).

In any proceeding alleging a violation of Sections 20-1282 or 20-1283, the service "shall bear the burden of proving just cause and bona fide economic reason . . . by a preponderance of the evidence." *Id.* § 20-1285(a). In determining whether the vehicle service had just cause for a deactivation, a factfinder "may not consider any reasons proffered by the [vehicle service]" that were not included in the five-day notice required by Section 20-1282(e) or the written explanation of a prior deactivation required by Section 20-1283(c). *Id.* § 20-1285(b). When determining damages, the factfinder may consider evidence that the driver submitted during the statutory notice, reinstatement, or informal resolution process but that the service did not timely or duly consider. *Id.*

§ 20-1285(c).  A driver may also submit evidence in a proceeding that was not previously provided to the service, and "no negative inference or consequence" may result from the driver's earlier decision not to submit that evidence.  *Id.*

Section 20-1288(b) requires a vehicle service to retain for three years records documenting its compliance with Subchapter 8, maintain those records in their original format, and provide them to DCWP in their original format or a machine-readable electronic format.  *Id.* § 20-1288(b)(1). DCWP may adopt rules governing those records and may issue orders or subpoenas for data, documents, testimony, or other information relevant to implementing or enforcing Chapter 12, including information about data collected concerning drivers or passengers and discipline imposed on drivers.  *Id.* § 20-1288(b)(1), (3).  A vehicle service's failure to maintain, retain, or produce requested material relevant to a material fact alleged by DCWP in a notice of violation creates a rebuttable presumption that the fact is true.  *Id.* § 20-1288(b)(2).

If DCWP finds a violation of Section 20-1282 or Section 20-1283, DCWP must order reinstatement or restoration of the driver's platform access, unless the driver waives that remedy.  *Id.* § 20-1208(c)(1).  For violations of Section 20-1282, DCWP must additionally order back pay equal to what the driver "would have normally earned or received" during the period of wrongful deactivation, determined based on average daily earnings over a reasonably comparable prior period and subject to specified rules concerning other earnings, mitigation, and unsubstantiated allegations of egregious misconduct.  *Id.* § 20-1208(c)(2).  DCWP may also award compensatory damages and other equitable and statutory relief.  *Id.* § 20-1208(d).

A private right of action is also available to enforce provisions of the Law.  *Id.* § 20-1211(a)(9)–(13).  In a private action, the court must order reinstatement or restoration of platform access for each violation of Sections 20-1282 or 20-1283, unless the driver waives that remedy.  *Id.* § 20-1211(c).  The court must also award reasonable attorneys' fees and costs.  *Id.*  For a violation of

Section 20-1282, the court must order back pay and may also award $500, punitive damages, rescission of discipline, an order directing compliance, and other appropriate equitable relief. *Id.*

### F. Procedural History

On June 9, 2026, Uber filed a complaint against the City, asserting that Local Law 52 violates the Contracts Clause, the Due Process Clause, and the First Amendment of the United States Constitution, and simultaneously moved for a preliminary injunction enjoining enforcement of the law pending resolution of the litigation. Uber Dkt. Nos. 1, 5. On June 10, 2026, Lyft filed a complaint asserting substantially similar claims and moved for a preliminary injunction the next day. Lyft Dkt. Nos. 1, 6 ("Lyft Br."). Both complaints also assert Equal Protection claims, which Plaintiffs have elected not to press at this stage. The City filed a consolidated opposition to both preliminary injunction motions on June 25, 2026. Uber Dkt. No. 28; Lyft Dkt. No. 24. Uber and Lyft filed their reply briefs on July 2, 2026. Uber Dkt. No. 37 ("Uber Reply"); Lyft Dkt. No. 32 ("Lyft Reply").

On July 16, 2026, the Court heard oral argument from Plaintiffs and the City on Plaintiffs' motions for a preliminary injunction. After the hearing, the Court ordered the parties to submit supplemental briefing on the severability of Local Law 52's provisions, including whether Section 1 and the recordkeeping provisions could remain in effect if the challenged provisions were enjoined. On July 17, 2026, the parties filed their supplemental briefs. Uber Dkt. Nos. 44–45; Lyft Dkt. No. 40. The parties filed reply briefs on July 19, 2026. Uber Dkt. Nos. 46–47, Lyft Dkt. No. 41.

## II.    LEGAL STANDARD

The legal standards governing preliminary injunctions and temporary restraining orders in the Second Circuit are the same. *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228–29 (2d Cir. 1992); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010). A preliminary injunction "is an extraordinary and drastic remedy, one that

should not be granted unless the movant, by a clear showing, carries the burden of persuasion."
*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation marks omitted).

A plaintiff seeking a preliminary injunction to preserve the status quo "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Plaintiffs need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims.'" *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (quoting *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018)).

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

Plaintiffs have demonstrated a likelihood of success on their Contracts Clause claims.  The Contracts Clause of the Constitution of the United States provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1. "The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 584 U.S. 811, 818 (2018). "Although facially absolute, the Contracts Clause's prohibition 'is not the Draconian provision that its words might seem to imply.'" *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367–68 (2d Cir. 2006) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978)). "Rather, courts must accommodate the Contract Clause with the inherent police power of the state 'to safeguard the vital interests of its people.'" *Id.* (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)). "[T]o determine whether a law violates the Contracts Clause, we ask (1) whether the contractual impairment is substantial, (2) whether the law serves 'a legitimate public

purpose such as remedying a general social or economic problem,' and (3) whether the means chosen to accomplish that purpose are reasonable and necessary." *Conn. State Police Union v. Rovella*, 36 F.4th 54, 63 (2d Cir. 2022) (quoting *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020)).

As a threshold matter, the Contracts Clause reaches the agreements governing prior deactivations.[4]  "States violate the Contract Clause when legislative action interferes with existing contractual relations." *Kinney v. Conn. Jud. Dep't*, 974 F.2d 313, 314 (2d Cir. 1992) (per curiam). Accordingly, "the offending statute necessarily must be enacted after the contract in question has come into effect." *Id.* at 315.  The Contract Clause's protection is not limited, however, to contracts that remain executory when the legislation is enacted:  "the constitution of the United States embraces all contracts, executed or executory." *See Green v. Biddle*, 21 U.S. 1, 92 (1823); *see also Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429 n.8 (1934) ("Contracts, within the meaning of the clause, have been held to embrace those that are executed . . . as well as those that are executory."). Thus, the fact that Plaintiffs exercised their contractual deactivation authority before Local Law 52 was enacted does not remove the agreements governing those decisions from the Contracts Clause's protection.  Those agreements came into effect before the Law, and Section 20-1283 now alters the

---

[4] Although the Court does not reach Plaintiffs' due process claims, it rejects the City's threshold contention that the prior deactivation provisions do not operate retroactively.  A statute operates retroactively when it "attaches new legal consequences to events completed before its enactment," including by "impair[ing] rights a party possessed when [it] acted" or "impos[ing] new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70, 280 (1994).  Local Law 52 expressly reaches deactivations that occurred during the seven years preceding its effective date.  Admin. Code § 20-1281.  It permits drivers subject to those completed deactivations to petition for reinstatement and requires Plaintiffs to reinstate them unless the prior decisions satisfy the Law's newly enacted standards. *Id.* § 20-1283(a)–(b).  Plaintiffs bear the burden of proving just cause or a bona fide economic reason by a preponderance of the evidence. *Id.* § 20-1285(a).  The City responds that the provisions merely afford "prospective reinstatement" into "new contractual relationships" and do not alter the past deactivation or impose back pay or fines based on it.  Opp. at 19, 29.  But the obligation to reinstate depends on a new legal assessment of the completed deactivation under standards and a burden of proof that did not govern when the decision was made.  Although reinstatement occurs prospectively, it is a new legal consequence attached to a past event.  The provisions therefore operate retroactively.  That conclusion does not itself establish a due process violation.  Because Plaintiffs have shown a likelihood of success on their Contracts Clause claims, the Court need not decide whether the provisions' retroactive operation independently violates the Due Process Clause.

22

legal consequences of decisions made under them by requiring Plaintiffs to reopen prior deactivations and restore platform access unless the deactivations satisfy newly imposed statutory standards.

Plaintiffs' agreements retained operative force after deactivation because they expressly preserved liabilities and disputes arising after termination.  Uber's PAA provides that, "[u]pon termination, each party will remain responsible for its respective liabilities or obligations that accrued before or as a result of such termination," and that several provisions—including the arbitration provision—"shall survive any termination or expiration of this Agreement."  PAA § 5.4; *see id.* § 14. Lyft's terms are more explicit:  "This Arbitration Agreement survives after the Agreement terminates or your relationship with Lyft ends."  TOS § 17(a).  That provision governs disputes "whether based on past, present, or future events," including disputes concerning "the threatened or actual suspension, deactivation or termination" of a user account or agreement and "breach of any express or implied contract or covenant."  *Id.*  These provisions confirm that a deactivation—or even termination of the parties' relationship—does not extinguish the agreements' legal effect as to liabilities and disputes arising from the deactivation.

Section 20-1283 operates directly on those contractual rights.  It requires Plaintiffs to revisit their prior exercises of contractually conferred deactivation authority and to restore platform access unless they can justify the deactivations under standards imposed only after the decisions were made.  The provision therefore does not merely regulate any new relationship that may arise between Plaintiffs and previously deactivated drivers.  It requires Plaintiffs to reverse the continuing consequence of decisions made under pre-enactment agreements.  Accordingly, the agreements governing prior deactivations fall within the Contracts Clause's protection.

*Real Estate Board of New York* does not require a different conclusion because its reference to executory agreements identified the contracts that remained subject to prospective relief.  The court

stated that the plaintiffs' claim was "limited to tenant-pays exclusive listing agreements executed before December 13, 2024 . . . and that remained executory beyond June 11, 2025," and that their request for an injunction was limited to agreements "still valid during the pendency of this appeal." 2026 WL 2015138, at *13. Those limitations made sense in that case because the challenged legislation regulated future performance under listing agreements—including the broker's collection of a fee when an apartment was rented—and the plaintiffs sought an injunction against that prospective application. Once an agreement expired or no relevant performance remained, an injunction could no longer protect it. Section 20-1283 operates differently because it expressly makes a completed deactivation the basis for a present obligation to reconsider the decision and restore platform access unless the deactivation satisfies newly enacted standards. *Real Estate Board* therefore did not address whether legislation may impair an executed contract by reopening completed performance and reading it to exclude executed contracts would conflict with the Supreme Court's recognition that the Contracts Clause protects executed and executory contracts alike.

### 1. Substantial Impairment

Plaintiffs have shown a likelihood of success in establishing that Local Law 52 substantially impairs their contracts with drivers. In assessing the substantiality of an impairment, courts "consider 'the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" *Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021) (quoting *Sveen*, 584 U.S. at 819).

### i. Undermines the Contractual Bargain

Plaintiffs are likely to establish that Local Law 52 undermines their contractual bargain with drivers. A law undermines the contractual bargain when it "superimpos[es] . . . obligations . . . conspicuously beyond those that [a party] had voluntarily agreed to undertake" and modifies "a basic

term" of the contract. *See Allied Structural Steel*, 438 U.S. at 244, 246. A law also undermines the contractual bargain when it "effectively prohibit[s]" essential elements of an existing contract, even if others remain intact. *See Real Est. Bd. of N.Y., Inc. v. City of New York*, No. 25-1506, 2026 WL 2015138, at *14 (2d Cir. July 13, 2026). A term is central to the bargain when it was a "primary inducement" to contracting or a "central provision" on which the parties reasonably relied. *See Sullivan*, 959 F.3d at 64 (quoting *Buffalo Tchrs.*, 464 F.3d at 368).

Plaintiffs' agreements grant drivers access to their platforms subject to specified conditions and grant Plaintiffs the authority, within defined bounds, to determine when a driver's violation of those conditions warrants suspension or deactivation. Uber calls its deactivation provisions "central to the Agreement and Uber's willingness to enter into it." Perl Decl. ¶ 16. Lyft describes its deactivation terms as "integral both to the success of the platform for all users and Lyft's commitments to safety." Lyft Br. at 3. The deactivation provisions define a central aspect of the parties' relationship: whether, when, and under what circumstances a driver may use the platform. In that respect, those provisions are "the central provision[s] upon which . . . [Plaintiffs] reasonably rely." *Buffalo Tchrs.*, 464 F.3d at 368.

Uber reserves broad authority over deactivation under its agreement. Uber may suspend an account without notice while investigating suspected conduct that is deceptive, fraudulent, unsafe, illegal, harmful to Uber's business or reputation, or otherwise violates the agreement. PAA § 5.3. It may permanently deactivate the account, also without notice, if it "determine[s] in [its] discretion" that a material breach occurred. *Id.* Uber's agreements during the seven-year period reached by Local Law 52 reserved substantially similar authority. Perl Decl. ¶¶ 11–15.

Local Law 52 undermines that authority. After a driver's probationary period, Uber may deactivate only for grounds permitted by the Law. Admin. Code § 20-1282(a). For unsatisfactory performance and other conduct materially harmful to Uber's legitimate business interests, Uber

25

generally must first use progressive discipline. *Id.* § 20-1282(c). The Law also generally requires fourteen days' advance notice and, if a driver challenges the deactivation, subjects Uber's decision to review by a factfinder applying statutory standards that its agreement does not impose. *See* Admin. Code §§ 20-1282(b), (d). Thus, whether a violation warrants deactivation is no longer committed to Uber's discretion under the standards incorporated into its agreement but is governed instead by the City's criteria and ultimately decided by an outside factfinder if challenged.

Lyft's agreement provides notice and an opportunity to cure certain eligibility, performance, and safety deficiencies. TOS § 16. But Lyft may deactivate a driver immediately for certain breaches, including conduct involving safety, harassment, fraud, falsified identification, or interference with the platform. *Id.* §§ 9, 10, 16. The agreement therefore distinguishes between violations that warrant an opportunity to cure and violations that permit immediate deactivation. Under Local Law 52, however, advance notice may be withheld only for egregious misconduct, account sharing, or a pattern of repeated fraudulent behavior. Admin. Code § 20-1282(d). The Law also requires progressive discipline for two categories of just cause, even when Lyft's agreement permits immediate deactivation. *Id.* § 20-1282(c). Thus, Lyft may still deactivate drivers, but the Law supersedes the agreement's deactivation standards to the extent that they conflict with the statutory regime, limits when deactivation may be immediate, and subjects challenged decisions to review by a third-party factfinder under statutory criteria.

The Law further undermines Plaintiffs' contractual bargain by stripping them of final authority over deactivation decisions by subjecting those decisions to review by an outside factfinder if challenged. *See id.* § 20-1282(b). If DCWP or a court finds any violation of Section 20-1282 or Section 20-1283—including a notice or procedural violation—it must order reinstatement unless the driver waives that remedy. Admin. Code §§ 20-1208(c)(1), 20-1211(c). By its terms, it applies to every violation of Section 20-1282, including its notice and procedural requirements. *Id.* §§ 20-

26

1208(c)(1), 20-1211(c).  Thus, even when a driver's conduct warranted deactivation under both the agreement and the Law, a finding of a procedural violation would require Plaintiffs to restore the platform access that the agreement authorized them to terminate.  These provisions transfer the ultimate authority to determine whether a driver may remain on the platform from Plaintiffs to an outside factfinder applying standards that the parties' agreement does not contain.

The City argues that the Law does not substantially impair Plaintiffs' agreements because they already employ many of the procedures it requires.  Opp. at 16–17.  Uber, for example, generally notifies drivers of reports that could lead to deactivation, even though its agreement expressly permits deactivation without notice.  Freivogel Decl. ¶ 28; PAA § 5.3.  The Law does substantially more than "specif[y] a timeframe" for notice Uber already gives.  Opp. at 17.  The Law converts a voluntary practice into a mandatory obligation that Uber expressly reserved the right to forgo and imposes reinstatement, back pay, monetary penalties, and other consequences for noncompliance.  *See* Admin. Code §§ 20-1208(c)–(d), 20-1211(c), 20-1282(d)–(e).

### ii.  Interferes with Reasonable Expectations

Plaintiffs are also likely to establish that Local Law 52 interferes with their reasonable expectations.  "The primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted."  *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).  "[T]he reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry."  *Sullivan*, 959 F.3d at 64.  But the fact that an industry is "heavily regulated" does not "shield any regulation of that market from scrutiny under the Contracts Clause."  *Real Est. Bd.*, 2026 WL 2015138, at *15.  The relevant question is whether prior regulation "pertained to" the contractual right at issue so as to alert the party "to the possibility of state action in that regard."  *See Melendez*, 16 F.4th at 1034–35.  A law is

27

not foreseeable "simply because Plaintiffs knew the City may have, at some point in the future, implemented a law like this one." *Real Est. Bd.*, 2026 WL 2015138, at *15. Foreseeability is assessed in light of the regulation existing "at the time the company's contractual obligations were originally undertaken." *See Allied Structural Steel*, 438 U.S. at 250.

Uber's contracts have reserved authority to deactivate drivers since at least 2015, and the relevant provisions have remained unchanged since 2020. Perl Decl. ¶¶ 13–16. Lyft's deactivation provisions have remained substantively similar since 2019. Castleman Decl. ¶¶ 7–10. The City identifies no law in effect when those obligations were undertaken that prescribed the grounds or procedures by which a service could deactivate a driver from its platform. *See* Opp. at 21. Although the City extensively regulates for-hire vehicles, drivers, and services, that regulation did not "pertain[]" to" the contractual rights that Local Law 52 displaces. *Melendez*, 16 F.4th at 1034.

Council Member Krishnan described the bill as "starting a nationwide movement to end unfair firings of app-based drivers" and "setting an important national precedent for drivers." Dec. 2025 Hearing Tr. at 6:7–20. A joint press release from Council Member Krishnan and NYTWA likewise called the bill "the largest and most comprehensive reform of unfair firings for app-based drivers in the country." Goodman Decl., Ex. F at 2. Those statements support Plaintiffs' contention that Local Law 52 "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State." *See Allied Structural Steel*, 438 U.S. at 250.

The City first argues that Local Law 52 was foreseeable because Plaintiffs operate in a heavily regulated industry. Opp. at 21. The City regulates the licensing of for-hire vehicles, drivers, and services, and has adopted rules governing matters such as driver qualifications, vehicle supply, and minimum pay. *See* Dec. 2025 Comm. Rep. at 4–5; Castleman Decl. ¶ 4; Sept. 2024 Hearing Tr. at 69–70. But heavy regulation does not "shield any regulation of that market from scrutiny under

28

the Contracts Clause." *Real Est. Bd.*, 2026 WL 2015138, at *15.  The other regulations did not govern a vehicle service's contractual authority to determine whether a qualified driver may continue using its platform and therefore did not "pertain[] to" the contractual rights that Local Law 52 displaces or alert Plaintiffs "to the possibility of state action in that regard."  *See Melendez*, 16 F.4th at 1034–35.

The City also points to its just-cause protections for fast-food employees, observing that Local Law 52 was not the City's first regulation of that kind.  Opp. at 21 (citing Admin. Code § 20-1271 *et seq.*).  But the fast-food law governed a different industry, with different operational and safety concerns, and a different legal relationship—employment rather than independent contracting.  The City also argues that the Law was foreseeable because "[f]or years, governments have passed laws providing Drivers and other 'gig workers'—who Plaintiffs treat as independent contractors—with the same worker protections as employees."  *Id.*  The only authority the City cites is a California statute, *id.* at 21 & n.56, which was not part of the New York City regulatory regime existing "at the time the company's contractual obligations were originally undertaken" and therefore did not make comparable regulation in New York foreseeable.  *See Allied Structural Steel*, 438 U.S. at 250.

Finally, the City relies on the introduction of proposed legislation beginning in 2023 and that Plaintiffs were "actively lobbying for changes to the legislation, while presumably continuing to enter into contracts with Drivers."  Opp. at 21.  That history shows that Plaintiffs knew the City was considering restrictions on deactivation.  But knowledge that the City might enact such restrictions did not make them foreseeable in the relevant sense.  *See Real Est. Bd.*, 2026 WL 2015138, at *15 ("The Act was also not foreseeable simply because Plaintiffs knew the City may have, at some point in the future, implemented a law like this one . . . .").

29

### iii.    Prevents Parties from Safeguarding or Reinstating Their Rights

Finally, Plaintiffs are likely to establish that Local Law 52 leaves them no means to safeguard or reinstate their contractual deactivation rights.  In assessing substantial impairment, courts consider "the extent to which the law . . . prevents the party from safeguarding or reinstating his rights."  *Sveen*, 584 U.S. at 819.  Statutes that "enable a party with only minimal effort to protect his original contract rights against the law's operation" generally do not prevent a party from safeguarding its rights.  *See id.* at 820 n.3; *see, e.g., id.* at 822 (policyholder could override statutory default by submitting new beneficiary designation form); *Texaco, Inc. v. Short*, 454 U.S. 516, 531 (1982) (mineral interest owner could prevent statutory lapse by filing statement of claim during two-year grace period); *City of El Paso v. Simmons*, 379 U.S. 497, 514–15 (1965) (purchaser could preserve right to reinstate forfeited land purchase by making written request and paying accrued interest within five years).  By contrast, an impairment may be substantial when the law leaves the party unable to "safeguard or ever reinstate[]" the right for which it contracted.  *Melendez*, 16 F.4th at 1033–34.

Uber's agreement authorizes it to deactivate a driver without notice while investigating specified misconduct and to terminate the agreement or permanently deactivate the driver if Uber determines, in its discretion, that a material breach or violation occurred.  PAA § 5.3.  Lyft's agreement likewise permits immediate deactivation without notice for specified serious violations.  TOS §§ 9, 10(a)–(i), 16.  Local Law 52 replaces that contractual discretion with statutory limits on both the grounds for deactivation and the process Plaintiffs must follow.  Admin. Code §§ 20-1281, 20-1282(a)–(e), 20-1285(a)–(c).  The Law provides no filing, election, or other act through which Plaintiffs may preserve the contractual standard or restore it after displacement.

The City responds that the impairment is not permanent because Plaintiffs may still enforce their policies through notice and progressive discipline and may deactivate drivers immediately in

specified circumstances.  Opp. at 21–22.  But retaining some deactivation authority does not preserve the broad authority that the Law eliminates.  Plaintiffs may continue to write deactivation standards in their agreements, but those standards remain subordinate to Local Law 52 whenever the two conflict.  The Law therefore does not temporarily suspend Plaintiffs' rights or leave them a means to restore those rights later.  It prevents Plaintiffs from exercising them for as long as the Law remains in effect.

The Law goes further by requiring reinstatement for each violation of Section 20-1282 or Section 20-1283 unless the driver waives that remedy.  Admin. Code §§ 20-1208(c)(1), 20-1211(c).  Because those sections include procedural and notice requirements, reinstatement may be required even when the agreement authorized the deactivation.  *Id.* §§ 20-1282(d)–(e), 20-1283(c).  Plaintiffs may deactivate the driver again only by satisfying Local Law 52; they cannot restore the legal effect of the original contractual decision.  The relevant question is whether Plaintiffs can safeguard or reinstate the rights for which they contracted.  *See Melendez*, 16 F.4th at 1033–34.  They cannot.  Plaintiffs have therefore shown that the Law prevents them from safeguarding or reinstating their contractual rights.

Taken together, these considerations show a severe impairment.  Local Law 52 undermines provisions central to the parties' bargain, interferes with Plaintiffs' reasonable expectations, and leaves Plaintiffs no means to safeguard or reinstate the rights the Law displaces.  "[T]he severity of the impairment measures the height of the hurdle the state legislation must clear," and "'[s]evere impairment . . . will push the inquiry to a careful examination of the nature and purpose' of the challenged state legislation."  *Melendez*, 16 F.4th at 1029, 1035 (quoting *Allied Structural Steel*, 438 U.S. at 245).  The Court therefore turns to whether Local Law 52 serves a significant and legitimate public purpose and, if so, whether the means chosen are reasonable and necessary to serve that purpose.

### 2.    Legitimate Public Purpose

Plaintiffs are likely to establish that Local Law 52 does not further a significant and legitimate public purpose, as those concepts are defined under the governing law.  "In general, a legitimate public purpose is one that is 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'"  *Conn. State Police Union*, 36 F.4th at 63 (quoting *Buffalo Tchrs.*, 464 F.3d at 368).  A legislature acts in the public interest when it passes a law "in the service of 'a broad societal goal, not the pursuit of the interests of a narrow class.'"  *Id.* (quoting *Sanitation & Recycling Indus.*, 107 F.3d at 994).  A law may satisfy that standard even if it directly benefits a defined group where it "was not passed to further the interest of a subset of individuals but rather represented an effort by the City to advance 'society's larger interest.'"  *See Real Est. Bd.*, 2026 WL 2015138, at *16 (quoting *Melendez*, 16 F.4th at 1037).  Statements by legislators that "might suggest a certain hostility" toward the party burdened by the law and "sympathy" for its beneficiaries may support an argument that the law does not "protect a basic societal interest," but instead benefits only "a favored group."  *Melendez*, 16 F.4th at 1037.  But in "divin[ing] the true purpose of [a] measure," a court will not view "the motivations of individual legislators . . . [as] dispositive."  *Real Est. Bd.*, 2026 WL 2015138, at *16 (quoting *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 283 n.13 (2d Cir. 1997)).

The legislative record documents real hardships associated with deactivation.  Many drivers depend primarily on platform income and remain responsible for significant vehicle and insurance expenses.  Dec. 2025 Comm. Rep. at 5–6.  AALDEF's analysis of survey data from deactivated New York City drivers reported that many received no advance notice, were given limited information about customer complaints, and experienced difficulty paying rent or purchasing groceries after deactivation.  *Id.* at 9.  NYTWA also testified that more than 2,000 drivers contact it annually for assistance with deactivations.  Sept. 2024 Hearing Tr. at 56:20–57:4.  IDG reported that, among the

drivers it represented in appealable deactivation cases, ninety percent obtained reinstatement. Dec. 2025 Comm. Rep. at 7–8. Taken together, that evidence supports the City Council's concern that some drivers experience inadequate notice, difficulty challenging deactivations, and serious financial hardship when they are deactivated.

But a law does not serve a legitimate public purpose merely because it confers a meaningful benefit on an affected group; it must pursue "society's larger interest," rather than only "the interest of a subset of individuals." *See Real Est. Bd.*, 2026 WL 2015138, at *16 (quoting *Melendez*, 16 F.4th at 1037–38). The laws upheld by the Second Circuit often serve interests distinct from the immediate interests of their beneficiaries. The legislation in *Connecticut State Police Union* advanced the widely recognized interests in open government and police accountability. *See* 36 F.4th at 63–65. The wage freeze in *Buffalo Teachers* addressed an undisputed fiscal crisis threatening the city's finances and public services. *See* 464 F.3d at 368–69. The carting regulation in *Sanitation & Recycling Industries* sought to eradicate organized crime, bid-rigging, and predatory pricing from an industry serving the public. *See* 107 F.3d at 994. And the Guaranty Law in *Melendez* was enacted during an economic emergency to preserve "the small businesses necessary for functioning neighborhoods." *See* 16 F.4th at 1036–37.

The record supporting the Fairness in Apartment Rental Expenses ("FARE") Act, which the Second Circuit upheld against a Contracts Clause challenge, likewise identified a broader societal interest. *Real Est. Bd.*, 2026 WL 2015138, at *15–16. The FARE Act prohibited landlords from requiring tenants to pay fees for brokers retained by landlords. *Id.* at *1. The City Council sought to reduce the upfront cost of moving and improve housing and economic mobility amid a citywide housing crisis. *Id.* at *1, *15–16. The record included vacancy and housing affordability data, evidence connecting broker fees to reduced mobility, an expert concession that upfront fees contributed to lower mobility, and an investigation by the City Council's Oversight and

33

Investigations Division into how the fees were presented and paid. *Id.* at *4, *10, *15. The Second Circuit concluded that "the legislative record on this issue is clear: the FARE Act was enacted to further a legitimate public purpose." *Id.* at *16.

The record here identifies no comparable societal interest distinct from the interests of the covered drivers. The Committee Report describes the legislation as a response to complaints of arbitrary deactivation and states that its objectives are to require just cause, provide notice, and create a process through which drivers may challenge deactivation. Dec. 2025 Comm. Rep. at 10. The Law itself is titled as legislation concerning "the wrongful deactivation of high-volume for-hire vehicle drivers," and its central provisions apply only to those drivers. Local Law 52 at 1; Admin. Code §§ 20-1281–20-1283. The record thus frames the problem principally as the loss of income and procedural protections experienced by drivers who are wrongfully or arbitrarily deactivated.

The record does not establish that the problem that the legislation seeks to solve is widespread. To the contrary, the available evidence shows that the group that is benefited by the Law is quite small. Approximately 87,207 drivers work for Uber and Lyft in New York City. Opp. at 44. Uber deactivates about one percent of its New York drivers' accounts each year. Perl Decl. ¶ 17. The record provides no comparable figure for Lyft. NYTWA's written testimony stated that "Uber has a 74.7% market share of ride hailing apps in New York City, while Lyft has the remaining 25.3% . . . ." Sept. 2024 Written Test. at 10–11 n.3. As an estimate of the number of deactivated drivers, applying Uber's 1% rate for deactivations to the 87,207 total drivers, the total number of annual deactivations in New York City would be approximately 872.[5] The City does not contend

---

[5] Uber represents that it deactivates approximately one percent of its New York City drivers' accounts each year, Perl Decl. ¶ 17, and the City does not dispute that figure. The record also indicates that IDG reported handling 4,800 appealable deactivation cases in 2024 and obtaining reinstatement for ninety percent of the drivers it represented. Dec. 2025 Comm. Rep. at 7–8. But that figure does not establish that 4,800 drivers were wrongfully deactivated, and the record indicates that many cases involved low ratings for which drivers were eligible for reinstatement after completing a course. Sept. 2024 Written Test. at 47. Even assuming that 4,800 drivers were affected, they would represent approximately 0.06% of New York City's population and would not alter the conclusion that the Law principally benefits a narrow class.

that all deactivations are wrongful or arbitrary; therefore, the record establishes that the statute is designed to benefit only a small group of individual drivers. As Uber argues, 872 drivers represents approximately 0.01% of the population of the City of New York. *See* Uber Dkt. No. 43-1 at 18 ("Uber Hearing Slides"). On this record, the group that the Law principally benefits is small. Based on the record before the Court, the Law was passed in the "pursuit of the interests of a narrow class." *See Conn. State Police Union*, 36 F.4th at 63 (internal quotation marks omitted).

The record considered by the City Council in support of the law did not establish the percentage of deactivations that were wrongful or arbitrary. The TLC survey presented to it evaluated the demographics of drivers, but not the basis for deactivations. The Asian Law Caucus Survey in 2023 studied drivers in California, not New York City. And the AALDEF study—prepared by an advocacy group—evaluated the reports of 350 deactivated drivers. It did not determine what number of drivers were deactivated annually, nor did it contend that the 350 drivers surveyed were representative of a larger pool.

The City argues that deactivation also may cause "[g]eneral harms to the public," such as drivers defaulting on vehicle debt or rent and relying on unemployment benefits or public assistance. *See* Opp. at 22–23; July 16, 2026 Hearing Tr. at 85:13–25. But the legislative record documents drivers' reliance on platform income and their continuing personal expenses; it does not identify increased public expenditures, disruption of transportation services, or another effect on the City or its residents as the problem the City Council sought to remedy. The City Council was not required to quantify every potential consequence, and the Court may not "second-guess the City's actions based on potential second-order effects." *See Real Est. Bd.*, 2026 WL 2015138, at *15. The City relies on those asserted downstream effects to distinguish the Law's purpose from the private interests of deactivated drivers, but the legislative record does not identify them as harms the Law was enacted to address.

Council Member Krishnan, the bill's primary sponsor, repeatedly framed the Law as a measure directed against Uber and Lyft. He stated that the companies "upend drivers['] lives in exchange for their own profits" and described the bill as "giving power to workers" and "holding megacorporations accountable." Dec. 2025 Hearing Tr. at 5:25–6:15. He later stated that the Council was "standing up today against Uber and Lyft," "taking back the power from Uber and Lyft and returning it . . . to drivers," and ensuring that the companies would no longer be "judge, jury, and prosecutor." Dec. 2025 Stated Meeting Tr. at 60:7–61:23. During the veto override, he characterized the vote as "taking on Uber, Lyft, and corporate corruption." Jan. 2026 Stated Meeting Tr. at 39:2–40:3.

The motivations of individual legislators are not dispositive in divining the true purpose of a measure. *Real Est. Bd.*, 2026 WL 2015138, at *16. But the Law applies only to high-volume for-hire services—a category that includes only Uber and Lyft—and not to other for-hire vehicle services in the City. Dec. 2025 Comm. Rep. at 4–5, 14; July 16, 2026 Hearing Tr. at 67:9–11. The Committee Report states only that "the balance struck by this bill would best fall" on high-volume for-hire vehicle services; it does not explain why or identify comparative evidence showing that wrongful deactivation was more prevalent among their drivers. Dec. 2025 Comm. Rep. at 14; July 16, 2026 Hearing Tr. at 93:23–95:12. The sponsor's repeated hostility toward Uber and Lyft, together with the conclusory justification for singling them out, supports Plaintiffs' contention that the Law benefits a favored group rather than protecting a broader societal interest. *See Melendez*, 16 F.4th at 1037.

The Council's failure to examine the Law's effects beyond the drivers directly protected further weakens the inference that the Law was enacted to advance "society's larger interest." *See Real Est. Bd.*, 2026 WL 2015138, at *16 (quoting *Melendez*, 16 F.4th at 1037). At oral argument, the Court asked whether the legislative record showed that the Council considered the Law's effects on

36

other New Yorkers, including administrative costs, higher service prices, increased traffic or safety risks, and additional burdens on survivors required to revisit deactivation decisions. July 16, 2026 Hearing Tr. 84–86. The City was unable to point to record evidence showing that the City had considered the potential consequences of the statute, apart from the benefits it would afford to the targeted, but undefined, group of drivers that it sought to support.

The City Council did consider the direct cost of administering the Law. As noted above, the Mayor's Office of Management and Budget had estimated that the bill would require a new compliance division of approximately 170 staff at an annual cost of approximately $23 million to process an assumed volume of approximately 2,000 cases per year. The direct cost of the legislation to benefit the pool of affected drivers contributed to one committee member's decision to vote against the bill. Dec. 2025 Hearing Tr. at 9.

But the record does not show that the City Council considered any of the other potential adverse impacts of the Law on the citizens of New York. There were more than 22 million rides by passengers in these services in a single month in 2026. In the course of passing the legislation benefitting a small group of drivers, the City Council did not consider whether the Law would make travel less safe or less pleasant for the passengers in those millions of rides. Nor did the Council consider whether the Law would have an adverse impact on the safety of pedestrians or other drivers. And while the City recognized that the Law would result in approximately 2,000 administrative cases (on top of an undetermined number of additional private litigation proceedings), the City Council did not consider the potential effect of such increased proceedings on the passengers whose complaints may have triggered the proceedings. Uber argued that the Law might have a particularly adverse effect on the survivors of sexual assault, who would reasonably be expected to be called before fact finders in increased numbers. The City Council did not evaluate that possibility or that the prospect of being called before bodies of inquiry pursuant to the Law

37

would discourage survivors from lodging meritorious complaints against drivers.

Nor did the City evaluate how the cost of compliance with the law would impact the pricing of the services in New York City. That the services might pass on the cost of compliance to passengers or drivers could be reasonably anticipated. But the potential impact of the Law on the cost of travel for 22,000,000 rides a month in New York City did not play a role in the City's decision-making. On this record—in which the City Council evaluated the benefit of the legislation to a narrow group of drivers while not considering broader public implications and costs of the law—the plaintiffs are likely to be able to show that the Law was passed in the pursuit of the interests of a narrow class, rather than in service of a broader public interest.

### 3.    Reasonable and Necessary Means

At the third step of the Contracts Clause analysis, the Court evaluates "whether the means chosen to accomplish th[e] purpose are reasonable and necessary." *Sullivan*, 959 F.3d at 64 (alterations adopted). Because the Court has concluded that Plaintiffs are likely to establish that Local Law 52 does not serve a significant and legitimate public purpose, the Court need not decide whether the means chosen to accomplish the City's asserted purpose are reasonable and necessary. Even so, Plaintiffs have raised substantial questions about whether the Law's deactivation regime is a reasonable and necessary means of advancing that purpose.

"Unless the state itself is a party to the contract, courts usually defer to a legislature's determination as to whether a particular law was reasonable and necessary." *Buffalo Tchrs.*, 464 F.3d at 369. "When a law impairs a private contract, substantial deference is accorded to the legislature's 'judgment[s] as to the necessity and reasonableness of a particular measure.'" *Id.* (quoting *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977)). That deference does not require a court "to reexamine all of the factors underlying the legislation at issue and to make a de novo determination

38

whether another alternative would have constituted a better statutory solution to a given problem."

*Id.* at 370.

The Second Circuit has identified at least five factors that are relevant to determining whether the regulation is drawn in an appropriate and reasonable way to advance its purpose:

> (1) whether the law impairs contractual rights on a temporary or limited basis, or whether it permanently and entirely extinguishes them; (2) whether there is some record basis to link the legislature's purpose and its chosen means; (3) whether, if the burden of contractual impairment comes at the expense of a discrete group of private persons, it is tailored to the party causing the public harm that the state sought to mitigate; (4) whether the relief provided by the law is conditioned on need and, if not, whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is better positioned financially than the relieved party to bear that burden; and finally, (5) whether the law provides compensation for damages or losses sustained as a result of the impairment.

*Real Est. Bd.*, 2026 WL 2015138, at *16. "No single factor controls. Instead, it is the 'totality' of the factors that determines the strength of a plaintiff's claim and thus likelihood of success on the merits." *Id.* (quoting *Melendez*, 16 F.4th at 1038).

The first factor favors Plaintiffs. Although Local Law 52 does not extinguish their agreements with drivers, it permanently impairs their existing contractual rights. A "permanent and complete impairment of contract, by contrast to a temporary and limited one, will weigh heavily against a finding of reasonableness." *Melendez*, 16 F.4th at 1039–40 (holding that a law permanently impaired the guaranties at issue because it "permanently and entirely extinguish[ed]" the affected obligations, "rendering them forever unenforceable"). The City argues that the impairment is limited because Plaintiffs may continue contracting with drivers, enforcing conduct standards through the statutory process, and immediately deactivating drivers in specified circumstances. Opp. at 21–22. But Local Law 52 permanently eliminates the broader deactivation authority granted by Plaintiffs' existing agreements whenever that authority conflicts with the Law. The affected rights do not resume after a fixed period, as would be the case, for example, with contractual wage increases delayed by a temporary freeze. *See Melendez*, 16 F.4th at 1040; *Buffalo Tchrs.*, 464 F.3d at

39

367, 372; *Sullivan*, 959 F.3d at 59, 68.  Local Law 52 therefore permanently impairs Plaintiffs' contractual rights.

Second, Plaintiffs are likely to establish that several central provisions of Local Law 52 lack some record basis linking the City Council's purpose to its chosen means.  In making that assessment, the Court does not "reexamine all of the factors underlying the legislation at issue" or make "a de novo determination whether another alternative would have constituted a better statutory solution."  *Buffalo Tchrs.*, 464 F.3d at 370.  But "deference is not warranted in the absence of some record basis to link purpose and means."  *Melendez*, 16 F.4th at 1041.  In applying that requirement, the Second Circuit found the requisite connection lacking where the challenged law afforded relief "even in circumstances where [it] do[es] nothing to serve the public interest" invoked to justify the impairment.  *See id.*

Plaintiffs are likely to establish that several central features of Local Law 52 lack the required connection to the City Council's stated purpose because they determine entitlement to reinstatement on grounds materially broader than whether a deactivation was erroneous, arbitrary, or unsupported. The legislative record describes complaints that drivers were deactivated without adequate notice, based on false or biased passenger reports, or for reasons they believed were arbitrary.  Dec. 2025 Comm. Rep. at 8–10.  That evidence supports requiring notice, an opportunity to respond, and review of whether the driver committed the alleged misconduct.  But it does not justify authorizing a factfinder to reassess Plaintiffs' training, operating policies, and disciplinary judgments, mandating reinstatement for procedural violations notwithstanding just cause, or reopening seven years of completed decisions under standards that did not govern when those decisions were made.

The seven-factor just cause inquiry permits a factfinder to invalidate a deactivation based on the vehicle service's broader operational and disciplinary judgments even when the driver committed the alleged misconduct.  A factfinder must consider, among other matters, whether the service

40

provided "relevant and adequate training," whether its policy and use of progressive discipline were reasonable and consistently applied, and whether deactivation was proportionate in light of mitigating circumstances and the driver's work history. Admin. Code § 20-1282(b). Whether the driver committed the alleged violation is a separate factor, and the factfinder may also consider "any other relevant factors." *Id.* The Law therefore permits a finding that just cause was absent because the service provided inadequate training, adopted an unreasonable policy, or selected a disproportionate sanction, notwithstanding a finding that the driver committed the conduct identified in the notice. The legislative record does not explain why correcting erroneous or arbitrary deactivations required transferring that broader authority over Plaintiffs' operating policies and disciplinary judgments to an outside factfinder.

The progressive discipline requirement can also preclude deactivation for proven misconduct because, except in cases of egregious misconduct, a service cannot establish just cause without showing that it previously imposed progressive discipline under a written policy provided to the driver. *Id.* § 20-1282(c). That requirement applies not only to minor performance failures, but also to misconduct that is "demonstrably and materially harmful" to the service's legitimate business interests. *Id.* § 20-1281. And discipline issued more than one year before the deactivation cannot satisfy the requirement. *Id.* § 20-1282(c)(1). The record may support graduated discipline for minor or remediable violations but not making prior discipline a universal prerequisite for all non-egregious misconduct or disregarding disciplinary history solely because it occurred more than one year earlier.

The mandatory reinstatement remedy reaches substantively justified deactivations because reinstatement is required for any violation of Sections 20-1282 or 20-1283, not only for a finding that just cause was absent. DCWP or a court "shall order" reinstatement or restoration of platform access upon finding such a violation, unless the driver waives that relief. Admin. Code §§ 20-1208(c)(1), 20-1211(c). Those sections impose notice and timing requirements in addition to the

substantive just cause standard. *See id.* §§ 20-1282(d)–(e), 20-1283(c).  A service may therefore establish that the driver committed the misconduct and that the deactivation was supported by just cause yet still be required to restore platform access because its notice was late or insufficiently detailed.  The record supports requiring meaningful notice; it does not explain why a procedural defect requires reinstatement where the deactivation was substantively justified.

The seven-year prior deactivation regime may make reinstatement turn on missing evidence rather than the wrongfulness of the original decision because it requires Plaintiffs to defend completed deactivations under later-created substantive standards.  Any driver deactivated during the preceding seven years may petition for reinstatement, and the service must restore access within thirty days unless the prior deactivation was supported by just cause, a bona fide economic reason, a legal requirement, or occurred during the probation period.  Admin. Code §§ 20-1281, 20-1283(a).  In any resulting proceeding, the service bears the burden of establishing just cause by a preponderance of the evidence.  *Id.* § 20-1285(a).  Plaintiffs had no reason when the earlier decisions were made to create records directed to standards that did not yet exist.  Uber states that its deactivation taxonomy, review practices, and recordkeeping have changed since 2019; that some contemporaneous communications and identity-verification photographs are no longer available; and that the older records were not maintained in anticipation of review under Local Law 52.  Perl Decl. ¶¶ 31–32.  A service's inability to carry its present burden may therefore reflect the passage of time and the absence of evidence responsive to later-enacted criteria, rather than that the original deactivation was erroneous or unsupported.  Yet the consequence may still be reinstatement.

The record thus supports additional notice and review directed at whether the service accurately and fairly determined that a driver committed the alleged misconduct—but not making reinstatement turn on training adequacy, policy choices, disciplinary proportionality, or a service's

present ability to reconstruct years-old decisions under new standards.  Plaintiffs have therefore shown a likelihood of establishing that this factor weighs against the reasonableness of the Law.

"The third prong asks us to consider whether the burden of contractual impairment comes 'at the expense of a discrete group of private persons,' and if so, whether the targeted group is 'causing the public harm that the [City] sought to mitigate.'"  *Real Est. Bd.*, 2026 WL 2015138, at *17 (quoting *Melendez*, 16 F.4th at 1042).  This factor favors the City.  The asserted public harm is the wrongful deactivation of drivers, and Plaintiffs are the parties that make and implement the challenged deactivation decisions.  The Law therefore places the burden of the contractual impairment on the actors whose conduct allegedly causes the harm the City sought to mitigate, rather than on an unrelated group of private persons.

The fourth factor examines "whether the relief provided by the law is conditioned on need and, if not, whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is better positioned financially than the relieved party to bear that burden."  *Real Est. Bd.*, 2026 WL 2015138, at *16.  Local Law 52 does not condition relief on a driver's financial need.  Although the legislative record documents drivers' economic vulnerability, it does not show that the Council considered whether Plaintiffs were financially better positioned to absorb or reallocate the particular burdens imposed by the Law.  Because Local Law 52 reallocates authority over deactivation decisions rather than a defined economic cost between contracting parties, this factor is less probative here.

The fifth factor asks, "whether the law provides compensation for damages or losses sustained as a result of the impairment."  *Real Est. Bd.*, 2026 WL 2015138, at *16.  "[C]ompensation is [not] always necessary to defeat a Contracts Clause challenge."  *See Melendez*, 16 F.4th at 1046.  Local Law 52 provides no compensation for damages or losses caused by the impairment.  The City argues that Plaintiffs cannot show any loss because they have not established that the Law will cause

43

unfit drivers to remain on or return to their platforms.  Opp. at 27–28.  Plaintiffs, however, have submitted evidence that the Law's restrictions on deactivation may create additional safety and fraud risks.  Freivogel Decl. ¶ 38; Jarzabek Decl. ¶ 15; Castleman Decl. ¶ 21.  This factor therefore weighs against the Law's reasonableness.

On balance, the factors weigh against the reasonableness of Local Law 52.  The Law permanently impairs Plaintiffs' contractual deactivation rights, and the legislative record does not connect several central features of the statutory regime—including its expanded just cause inquiry, progressive discipline requirement, mandatory reinstatement remedy, and seven-year lookback—to the identified problem of wrongful deactivations.  The Law also provides no compensation for losses caused by the impairment.  Although the Law places the burden on the parties responsible for deactivation decisions, and the need-based factor weighs only slightly against reasonableness, those considerations do not overcome the breadth and permanence of the impairment.  Even affording substantial deference to the City Council's judgment, Plaintiffs have therefore shown a likelihood of success at this third step.  The Court need not rely on that independent ground, however, because Plaintiffs are already likely to succeed on the merits of the Contracts Clause claim based on the City's failure to establish a significant and legitimate public purpose.  Because Plaintiffs have shown a likelihood of success on their Contracts Clause claims, the Court does not reach the remaining claims raised in support of their preliminary injunction motions, including Plaintiffs' due process claims and Uber's compelled speech and compelled association claims.

### B.  Irreparable Harm

Plaintiffs have shown that they are likely to suffer irreparable harm absent a preliminary injunction.  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted).  To carry that burden, a plaintiff must establish by a clear

showing that the threatened harm is "actual and imminent, not merely possible," *Toney-Dick v. Doar*, 2013 WL 1314954, at *9 (S.D.N.Y. Mar. 18, 2013) (collecting cases), and "one that cannot be remedied if a court waits until the end of trial to resolve the harm," *Faiveley*, 559 F.3d at 118 (quotation omitted).  But a plaintiff need show only "a threat of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis omitted).  "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Con. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (citation omitted).  In addition, injuries to reputation and goodwill may constitute irreparable harm when damages are difficult to establish and measure.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).  Because Plaintiffs have shown a likelihood of success on their Contracts Clause claim, they have established irreparable harm on that basis alone.  The Court nevertheless addresses the additional, independent harms identified in the record.

The record also establishes a threat of irreparable harm to Plaintiffs' reputations and goodwill as platforms that prioritize safety and the integrity of their services.  Uber publicly emphasizes safety and describes safety and quality as core components of its brand.  Perl Decl. ¶ 28; Freivogel Decl. ¶¶ 5–8.  Uber states that rider trust depends on its ability to enforce the standards it has established for access to its platform.  Perl Decl. ¶¶ 16, 28–29.  Lyft describes safety as its "highest priority," provides riders and drivers with safety tools during trips, and maintains continuous access to safety personnel.  Castleman Decl. ¶¶ 3, 5.  If safety concerns cause fewer riders to use the platforms, drivers may receive fewer trip requests and lose earning opportunities.

The City correctly observes that advance notice is not required for "egregious misconduct,"

account sharing, or a "pattern of repeated fraudulent behavior." Opp. at 54. But those exceptions do not eliminate the threatened harm. "Egregious misconduct" requires conduct posing an "imminent danger," which may not encompass every serious safety concern that Plaintiffs reasonably conclude disqualifies a driver. Admin. Code § 20-1281. For safety-related conduct outside that definition, the Law may therefore require Plaintiffs to leave a driver on the platform for fourteen days after determining that the driver should be removed. Freivogel Decl. ¶¶ 37–39. And because the fraud exception requires a "pattern," it does not permit immediate deactivation after a single substantial fraud. Admin. Code § 20-1282(d). TLC's separate suspension authority likewise does not eliminate Plaintiffs' interest in acting on information that may not yet have prompted regulatory action.

Nor does the exception for egregious misconduct eliminate the risk of compelled reinstatement. Although a driver accused of sexual assault may be deactivated immediately, the Law still requires Plaintiffs to provide within five days a written notice containing "all the precise and detailed reasons" for the deactivation. *Id.* § 20-1282(e). If the driver files a complaint with DCWP or brings a private action and the factfinder finds that the notice violated Section 20-1282(e), the Law requires restoration of platform access unless the driver waives that remedy. *Id.* §§ 20-1208(c)(1), 20-1211(c); Freivogel Decl. ¶¶ 40–42. The Law thus creates a concrete risk that a driver whom Plaintiffs reasonably regard as dangerous could later be returned to the platform because of a procedural defect unrelated to the merits of the deactivation.

The retroactive provisions present a related risk. Uber states that more than 12,000 drivers have been deactivated since 2019, during which its recordkeeping and investigative practices changed and some historical materials became unavailable. Perl Decl. ¶¶ 31–32. Yet the Law gives Uber thirty days to investigate each reinstatement petition, and a missed deadline may require reinstatement regardless of the original basis for deactivation. *Id.* ¶¶ 31–34; Admin. Code § 20-

1283(a).  Even a timely response must defend the historical decision under newly enacted standards and factors Uber had no reason to document at the time.  Perl Decl. ¶¶ 35–36.  These requirements create a concrete risk that Plaintiffs will be compelled to restore access to drivers whom their safety or integrity standards would exclude.

The most serious consequence of the Law's notice and reinstatement requirements would fall on a passenger exposed to an avoidable safety risk.  If a driver whom a platform had determined should be removed remains on, or is restored to, the platform and then assaults or otherwise harms a passenger, the passenger's injury cannot be undone.  The same incident could expose Plaintiffs to claims that they should have removed the driver sooner.  Uber states that it already faces such claims in litigation involving alleged sexual assaults and that the Law may expose it to additional claims of that kind.  Freivogel Decl. ¶ 40.  The Court does not rely on any potential monetary exposure from such litigation as an independent harm.  Rather, an incident involving a driver whom a platform had sought to remove would undermine the safety commitments central to Plaintiffs' brands and damage rider trust, reputation, goodwill, and business opportunities in ways that are difficult to establish and measure.  Perl Decl. ¶¶ 28–29; Freivogel Decl. ¶¶ 40–42; *see Register.com*, 356 F.3d at 404.  The resulting loss of rider trust could also reduce demand for rides.  If riders take fewer trips because they lose confidence in the platforms' safety, drivers who comply with Plaintiffs' standards would receive fewer trip requests and lose earning opportunities.  Perl Decl. ¶ 29.

The Court does not rely on compliance costs as an independent basis for irreparable harm. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).  But the need to reconstruct years of historical decisions and create new review systems reinforces the breadth and immediacy of the constitutional and operational harms described above.  Perl Decl. ¶¶ 31–36.  Accordingly, Plaintiffs have established that they are likely to suffer irreparable harm in the absence of preliminary relief.

### C. Balance of Equities and Public Interest

Plaintiffs must also demonstrate that "the balance of equities tips in [their] favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In assessing them, courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted).

The balance of the equities and the public interest tip in Plaintiffs' favor. The City has identified a genuine public interest. A driver who is wrongfully deactivated may immediately lose an important source of income while continuing to bear substantial vehicle, insurance, and household expenses. Opp. at 5–11, 55–56. The legislative record contains accounts from drivers who believed that they were deactivated based on false or discriminatory complaints and were not given a sufficient explanation or a meaningful opportunity to respond. The Court does not minimize either those experiences or the City's interest in providing drivers with fair procedures. But the Court must compare the consequences of temporarily preserving the status quo while this litigation proceeds with the consequences of immediately implementing Local Law 52 notwithstanding Plaintiffs' likelihood of success on their constitutional claims.

On Plaintiffs' side of the balance are the constitutional injuries already described; a substantial modification of the contractual relationships through which Plaintiffs govern access to their platforms; the reopening of as many as seven years of settled deactivation decisions; the possibility of mandatory reinstatement based on missed deadlines or newly imposed standards; and concrete risks to safety reporting, fraud prevention, rider trust, and Plaintiffs' goodwill. Those effects extend beyond the corporate Plaintiffs. Approximately 87,207 drivers work for high-volume for-hire vehicle services, and those services account for more than 22 million taxi and for-hire-

48

vehicle trips per month.  Opp. at 4, 43.  Drivers who follow the platforms' rules benefit from rider confidence in the safety and integrity of those services.  Riders benefit from Plaintiffs' ability to investigate reports and respond promptly to safety and fraud concerns.  Reducing rider confidence may reduce demand, which would in turn reduce earning opportunities for the much larger population of drivers who remain active on the platforms.

By contrast, a preliminary injunction would preserve the status quo.  Drivers would continue to have access to Plaintiffs' existing review procedures while this litigation proceeds and drivers would not be left without a mechanism to challenge a deactivation while the Court determines whether the City's new regime is constitutional.  The City's asserted hardship, meanwhile, is principally the temporary postponement of a new regulatory regime and the potential wrongful deactivation of a very small but undetermined number of drivers.  The City remains able to enforce its existing laws and regulations, and the TLC remains able to exercise its licensing and public-safety authority.  In addition, the City "does not have an interest in the enforcement of an unconstitutional law."  *725 Eatery Corp.*, 408 F. Supp. 3d at 470.  And "the public interest is well served by the correction" of constitutional harm.  *A.H. ex rel. Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021).  Because Plaintiffs have demonstrated a likelihood of success on their Contracts Clause claims, delaying enforcement protects, rather than disserves, the public's interest in constitutional government.

Finally, the public has a substantial interest in safe transportation and in preserving candid reporting of dangerous conduct.  Among other things, the public has an interest in ensuring that drivers do not engage in unsafe driving or sexual assault.  Maintaining the existing standards avoids introducing additional risks to public safety while this litigation proceeds.  The City has not considered in passing this statute whether its changes to protect some drivers will harm the millions of other users.  The broader public has an interest in maintaining the status quo.  The record

49

establishes a risk that the Law will impede Plaintiffs' ability to identify and respond to safety and fraud concerns. Accordingly, Plaintiffs have established that the balance of the equities and the public interest support the issuance of a preliminary injunction.

### D. Scope of the Preliminary Injunction

Although a district court has "a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," its equitable authority extends only to "relief no broader than necessary to cure the effects of the harm caused by the violation." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quotation omitted). Injunctive relief must be "narrowly tailored to fit specific legal violations," and an injunction is overbroad when it restrains legal conduct or conduct that was not fairly the subject of the litigation. *Id.* at 144–45. Rule 65(d) further requires an injunction to "state its terms specifically" and "describe in reasonable detail" the conduct restrained. Fed. R. Civ. P. 65(d)(1)(B)–(C).

"Severance of a local law is a question of state law." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 243 (2d Cir. 2014). Under New York law, "a court should refrain from invalidating an entire statute when only portions of it are objectionable." *Id.* (quoting *Gary D. Peake Excavating, Inc. v. Town Board of Hancock*, 93 F.3d 68, 23 (2d Cir. 1996)). "The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether." *Gary D. Peake Excavating*, 93 F.3d at 73 (quoting *People ex rel. Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 60 (1920)). "Although the presence of a severability clause is not dispositive, '[t]he preference for severance is particularly strong when the law contains a severability clause.'" *Id.* at 72 (quoting *Nat'l Advert. Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir. 1991)).

"The principle of division is not a principle of form. It is a principle of function." *Nat'l Advert.*, 942 F.2d at 148 (quoting *Knapp*, 230 N.Y. at 60). The inquiry must be resolved

"pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots." *Id.* Severance is inappropriate when the valid and invalid portions "are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended." *Id.*

By contrast, severance is appropriate where the surviving provision regulates "a discrete regulatory topic and regime" and has an "independent legislative purpose." *People v. On Sight Mobile Opticians*, 24 N.Y.3d 1107, 1109–10 (2014). The Second Circuit similarly preserved provisions that served an independent purpose and "function[ed] independent of" the provisions likely to be unconstitutional. *Evergreen*, 740 F.3d at 243. A court also may not preserve a law by adopting a limitation incompatible with its enacted language: "the doctrine of separation of governmental powers prevents a court from rewriting a legislative enactment through the creative use of a severability clause when the result is incompatible with the language of the statute." *See People v. Marquan M.*, 24 N.Y.3d 1, 10 (2014). Severability may not be used to "significantly modify the applications" of a law where the resulting scope would bear "little resemblance to the actual language of the law." *See id.* at 11–12.

As explained above, Plaintiffs are likely to establish that Local Law 52 violates the Contracts Clause both as applied to existing contractual deactivation rights and through its prior deactivation provisions. Yet, apart from the seven-year lookback, the Law creates one deactivation regime for all high-volume for-hire vehicle drivers. It does not distinguish between agreements made before and after enactment, and its standards, procedures, and remedies apply uniformly to the entire covered class.

The constitutional defect is not confined to a particular provision that can be severed from the rest of the Law. There is no separate provision governing pre-enactment contractual rights that can be enjoined while a distinct provision governing later-formed rights remains in force. Limiting

51

the Law to future contractual relationships would require the Court to add a temporal qualification the Council did not enact to decide which agreements and rights fall within it.

The Code's severability clause does not supply that missing distinction. Administrative Code § 1-105 provides that a judgment invalidating a "clause, sentence, paragraph, section or part" of the Code "shall not affect, impair or invalidate the remainder thereof." That language favors preserving the remainder of a law when the invalid portion can be separated from it. Here, however, the same provisions govern both existing and later-formed contractual rights.

This case therefore differs from *Evergreen*, which reviewed a preliminary injunction against a local law in its entirety. There, the law contained distinct disclosure requirements and a separate confidentiality provision. After rejecting the plaintiffs' vagueness challenge, the Second Circuit could enjoin the disclosure requirements likely to violate the First Amendment while leaving in force a confidentiality provision that "function[ed] independent of the disclosure requirements." 740 F.3d at 242–43. Here, no comparable textual division separates the Law's application to existing contractual rights from its application to later-formed rights. Narrowing the injunction along that line would require the Court to add a limitation to the Law, not simply leave an independent provision in force.

Because the constitutional defect in the prospective regime cannot be isolated in particular statutory text, limiting the Law to future contractual relationships would require the Court to add a distinction the Council did not enact. Nothing in the Law indicates that the Council would have chosen that limited regime had it anticipated the constitutional defect. The Court therefore concludes that Local Law 52 should be enjoined in full at this preliminary stage.[6]

---

[6] Following oral argument, the Court ordered supplemental briefing on whether Section 1 and the recordkeeping provisions should go into effect if the substantive deactivation provisions were enjoined. The City conceded that "if Section 1 and the Recordkeeping provisions went into effect, but the law's substantive protections did not, Section 1 and much of the Recordkeeping provisions would likely serve little practical purpose." Uber Dkt. No. 44 at 2.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs' motions for a preliminary injunction are granted.

The City is preliminarily enjoined from enforcing Local Law 52 pending further order of the Court.

The Clerk of Court is directed to terminate the motions pending at Uber Dkt. No. 5 and

Lyft Dkt. No. 6.

SO ORDERED.

Dated: July 21, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge